Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

Cause No. CV-15-115-BLG-SPW

DEPOSITION OF ROXANNA JACKSON
June 22, 2016

ROXANNA JACKSON,

Plaintiff,

vs.

ST. VINCENT HEALTHCARE,

Defendant.

        PURSUANT TO NOTICE, the deposition of
ROXANNA JACKSON, called for examination by the
Defendant herein, was taken at Husch Blackwell LLP,
1700 Lincoln Street, Suite 4700, Denver, Colorado
80203, commencing at 9:29 a.m., on Wednesday, June 22,
2016, before Aimee S. Reisinger, a Registered
Professional Reporter and Notary Public in and for the
State of Colorado.

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

Exhibit A
1

Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

5

PROCEEDINGS

ROXANNA JACKSON, having been sworn by the Reporter, testified as follows:

EXAMINATION

BY MS. SAVORY:

Q. Hi, Roxanna.

A. Hi.

Q. My name is Emma. We met before. But I represent St. Vincent's in this case.

Can you please state and spell your name for the record.

A. Roxanna Jackson. R-o-x-a-n-n-a, J-a-c-k-s-o-n.

Q. What is your address?

A. 501 East 102nd Avenue, Apartment A-104, Thornton, Colorado. I think it's --

Q. Have you -- I'm sorry, go ahead.

A. I think it's 104.

Q. And is that Denver, Colorado?

A. Thornton, Colorado.

Q. Okay. And what's the ZIP code?

A. I don't remember.

Q. Okay. Have you ever lived anywhere else?

A. Yes. Billings, Montana.

6

Q. And what was your address in Billings?

A. 707 1st Street West, Apartment 5, Billings, Montana 59103.

Q. And what's your phone number?

A. 720-503-9275.

Q. And do you have a cell phone?

A. That's my cell phone number.

Q. Do you have another telephone number?

A. No.

Q. Do you have an email address?

A. No. I don't remember it.

Q. You have one, but you don't remember it?

A. Yeah. I think my brother put one up for me, but...

Q. Okay.

A. I don't have a computer, so...

Q. Do you use social media such as Facebook or Twitter?

A. No.

Q. How old you are?

A. 61.

Q. Have you ever been involved in a lawsuit before?

A. No.

Q. Have you ever filed any other claims of

7

discrimination before?

A. No.

Q. Have you ever testified in court as a witness?

A. No.

Q. Have you ever been deposed before?

A. I don't understand.

Q. Okay. So this -- we're at a deposition today. Have you ever been to a deposition before?

A. No.

Q. Have you ever gone by any other names other than Roxanna Jackson?

A. No.

Q. Okay. So since this is your first deposition, I'm going to go over some rules, ground rules.

Do you understand that the testimony that you're giving is under oath?

A. Yes.

Q. I will ask you questions and ask that you give me your best answer. Do you understand that?

A. Yes.

Q. If you don't understand one of my questions, will you please let me know that you don't understand?

8

A. Yes.

Q. If you answer the question and don't tell me that you don't understand, I will assume that you understand the question. Is that okay?

A. Yes.

Q. We can take a break throughout the deposition if you need one, so just let me know. But first, before we take a break, you must ask -- answer any question that I have asked. Is that okay?

A. Yes.

Q. Okay. Because there is a court reporter present, you must provide audible answers, meaning you have to say your answer rather than say "uh-huh" or "huh-uh" or shake your head yes or no. Do you understand that?

A. Yes.

Q. Okay. The court reporter is taking down every question that I ask and then every answer that you say, so we need to be sure that only one person talks at a time and that we don't interrupt each other or talk over each other. Do you understand that?

A. Yes.

Q. Okay. Are there any reasons that you're unable to answer my questions today?

A. Not -- no.

Exhibit A
2

Deposition of: Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

**17**

Q. Do you receive health insurance?

A. I'm on Medicaid disability.

Q. Okay. And when did you start Medicaid disability?

A. When did I start? Oh, when I was -- a few months after I moved here. So I was 60.

Q. When did you move to Colorado?

A. It was in December of 2015.

Q. And why did you move to Colorado?

A. Well, I lost the job and no family live in Montana anymore, my family was here, so -- and my brother was helping me for about three or four months. I was still in Montana, so it was just easier for him money-wise.

Q. Did you want to move to Colorado?

A. I think eventually I would have, but it was just sooner than I expected.

Q. And when you said your brother was helping you, how was he helping you?

A. He was helping me paying bills.

Q. Okay. Was he helping you search for another job?

A. At that point, no, because we was just concentrating on the process of, you know, getting me help, seeing where I should go. Yes, I was trying to

**18**

apply for jobs there, but...

Q. When you said your brother was helping you find help, what do you mean by that?

A. Well, like here, he was trying to help me find organizations where they would help me to get back on my feet.

Q. Okay.

A. If I needed -- you know, he couldn't really help me find a job because he didn't live in Billings at that time, so he didn't know what --

Q. Okay.

A. So he was trying to, you know, find people to help me to find a job.

Q. Okay. Do you live with your brother now?

A. Right now, no.

Q. Did you live with him when you moved here?

A. Yes.

Q. And how long did you live with him?

A. A little bit more than a year.

Q. Okay. And when did you decide to move -- into your own apartment, I assume?

A. Yes. To give them more room, because getting kind of crowded. And I would like to have my more independence.

Q. Okay. Who else did you live with when you

**19**

lived with your brother?

A. His wife, his youngest daughter, and her two little girls.

Q. Okay. And now you live by yourself?

A. Yes.

Q. Okay. When did you start work at St. Vincent's? Do you remember the year?

A. 1976, '77.

Q. What position did you start in when you started working at St. Vincent's?

A. It was a central processing aide.

Q. Okay. And what were your duties as a central processing aide?

A. Pretty much what I did before I left. I worked in what they called issue mostly. That was just delivering the stuff throughout the hospital, whatever they needed.

Q. And when you say "delivering the stuff," what type of stuff?

A. You know, their trays, if they have to use sterile trays, linen, machines.

Q. Okay. So you delivered those all around the hospital?

A. Yes.

Q. Were there any other job duties that you

**20**

did as a central processing aide?

A. Then I was working in the sterile area -- or the SO area, which is called sterilizer operator. And that's wrapping the stuff; putting them in the sterilizers and getting them sterilized.

Q. Okay. Anywhere else? Any other duties?

A. And then decontam. That's the dirty area. And wash the instruments and send them through the washers and stuff.

Q. Okay.

A. And then I used to work the night shift every now and then, the graveyard shift.

Q. Okay.

A. And that was putting on -- filling these carts up and exchange them throughout the hospital.

Q. Okay.

A. Because they would take that -- their stuff out of that first before they call us if they need more stuff.

Q. And by "stuff," do you mean instruments? Surgical tools?

A. Well, not necessarily instruments. Bandages. Mostly it was bandages. For maternity ward was their packs for them -- for the mothers to take home for the newborns.

Exhibit A

3

Deposition of:  Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

21

Q.  Okay.  Were there any other job duties as a central processing aide?

A.  At the beginning they didn't have techs.

Q.  Okay.

A.  So everybody did what we did before.  They didn't really put me in instruments.  It took -- you know, they had to step me along for six years pretty much doing the issue part, delivering, and then the exchange carts.

Q.  And that was the first six years of your employment, right when you started?

A.  Yep.  Yes.

Q.  And then when you were -- but you said that central processing aides, the job duties were very similar to the instrument tech?

A.  Yes.

Q.  So when did your title change to instrument tech?

A.  When the pay thing, the pay raise, you know, the ladder, as each management was, you know, changing, they changed the rules.  So eventually the aides weren't going to be around anymore, but there was me and a few others was grandfathered in to be an aide all the time, but the raise wasn't going to be that good.  So I asked if I could transfer over to being a

22

tech to get the raise.

Q.  Okay.  And do you remember when you asked, about when that was?

A.  Maybe in the 1990's maybe.

Q.  Okay.  And --

A.  But they understood about my disability, so they didn't really put me in instruments that much.

Q.  What do you mean they understood your disability?  Who --

A.  The management.

Q.  Okay.  And who was the management at that time?

A.  Sister Rita hired me.  And then there was a Kathy Jones -- no, sorry.  Kathy Tony.  She came down from surgery to be a manager central processing.  There was a Pam somebody.  I can't remember her last name.

Q.  Okay.

A.  And then there was a Barbara Jones.

Q.  And these were your managers in the 1990s, about?

A.  Yeah.  And then -- the last one is Heather.

Q.  So you said they understood your disability.  How do you know that they understood your disability?

23

A.  Okay.  When I first started, like I said, Sister Rita didn't really want to hire me.  A cousin of mine stepped -- she knew a nun there.  She talked to this nun and this nun talked to Sister Rita --

Q.  Okay.

A.  -- you know, to try to convince her to hire me, to give me a chance.

Q.  Okay.

A.  So they knew back then I was, you know, disabled.  So that's why -- so Sister Rita didn't put me anywhere except for the issue part and exchange carts.

Q.  And how do you know that they knew you were disabled?

A.  Because everybody before me and after me who got hired, they was doing everything else.  They was getting trained, you know, everywhere, but they left me on -- between issue and exchange carts.

Q.  Okay.  And when you were doing issuing and exchange carts, were you doing any specific type of carts or were you doing all of the issuing and all of the carts?

A.  Back at that time I only did the exchange carts.  And then I used to -- I used -- before I got a car, she kept me on day shift.

24

Q.  Okay.

A.  Because of the city bus.  I was able to catch the city bus.  On the evening shift they don't have the city bus like they do here on the evening -- in the evening.

Q.  Okay.

A.  So they -- she left me alone on the day shift.  But as soon as they realized that I got -- or as soon as Sister Rita got me -- sorry, I'm going too fast for my mind.

Q.  That's okay.  Take your time.

A.  As soon as I got a car, Sister Rita put me on the evening shift all the time.

Q.  Okay.  And what hours was the evening shift, do you remember?

A.  It was 3:00 p.m. to 11:30 p.m.

Q.  And do you remember about when that was, about when you got the car?

A.  '80s maybe.

Q.  Okay.

A.  '90s.

Q.  So in the '90s when you asked to be changed into the instrument techs because you understood that they were making more money and had a higher raise potential, did you have to fill out any

Exhibit A
4

Deposition of:  Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

37

A.  The instrument tech has to do everything -- had to do everything.  The aides didn't -- at one point they didn't have to do everything.

Q.  Okay.  And were there any aides that worked in that area when Heather was the supervisor?

A.  No.

Q.  When, if you can remember, did the aides go away?

A.  1990s.

Q.  Okay.  So there haven't been any aides for a while.  So for a while everyone was instrument techs and they had to do all of the different stations --

A.  Right.

Q.  -- is that correct?  Do you know why everyone had to do all of the different stations?

A.  Because the weekends there is no supervisor, and there is only -- now there is only one on mornings and one on evening.

Q.  Okay.

A.  So, yes, you had to know everything because you would have to know in the decontam how to wash the instruments and then instruments you had to put them up.

Q.  Okay.

38

A.  And sterilize them.

Q.  So it was important for all of the instrument techs to know all of the different areas of your job in case you were working the weekends and were working by yourself?

A.  Right.

Q.  Okay.  I'm going to show you.

(Deposition Exhibit 1 was marked for identification.)

Q.  Okay.  So take a minute to read what's been marked as Exhibit 1.

(The deponent perused the exhibit.)

Q.  And you really only need to read over the first page.  Let me know once you've read the first page, once you're ready.

Are you ready?

A.  Uh-huh.  Yes.

Q.  Have you seen this before, this document marked Exhibit 1?

A.  It looks familiar, but...

Q.  Okay.  Is this a job description for the instrument tech position?

A.  You know, I think so.  It could have changed, you know, throughout the years, so it's --

Q.  Sure.  Okay.  So in the middle of Exhibit

39

1 on the first page where there's the bullet points under where it says "Essential duties and responsibilities."  Do you see that?

A.  Yes.

Q.  Do those bullet points describe the job functions that we just talked about?

A.  Yes.

Q.  And those are the job functions that every instrument tech was responsible for, correct?

A.  Yes.

Q.  Okay.  When you were -- okay.  So we're done with that, so you can put it away for now.

When you were working as an instrument tech, how many other people were on the same shift as you?  How many other instrument techs?

A.  There was one -- four to five.  Sometimes there are five, and that fifth person was the floater type.

Q.  Okay.  And what would the floater do?

A.  They do the case cart area, you know, taking care of that.  On the evening shift we were responsibility (sic) of sealing up the cases for the next day.

Q.  Okay.

A.  Then once they're done with that, then

40

they're supposed to float around to see whether they're needed somewhere else.

Q.  Okay.  And then on the weekends, how many people were working?

A.  One in the morning, one in the evening.

Q.  Okay.

A.  And there's a call person on the graveyard shift.

Q.  Okay.  Generally did you like working at St. Vincent's?

A.  Yes.

Q.  You liked your job?

A.  Yes.

Q.  Did you feel like you were treated fairly when you were working there?

A.  The only part that I didn't feel like I was treated properly, the last -- with Heather.  The rest of the time, yes, but...

Q.  And why did you feel like you weren't treated fairly during the last part?

A.  I just felt -- I felt that she didn't respect me.  She didn't understand that I had this disability.  She didn't understand that I could have -- the pressure was just a little too much.  I tried and tried, but...

Deposition of:  Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

---

53

Q. So with your disability -- you said you had a learning disability?

A. Yes.

Q. What does that mean?

A. It takes me longer to learn anything new.

Q. Okay. So it takes you longer to learn new things, so to help with that you had this tell me/show me and then you would do it process?

A. Yes.

Q. Okay. Who is your medical doctor?

A. I can't really pronounce his name, Dr. Rieher, or something like that.

Q. Is that your doctor here in Colorado?

A. Yes.

Q. And how often do you see him?

A. Once in three months or so. Right now I'm getting my skin tags off, so about once a month.

Q. Okay. And who was your medical doctor when you were living in Montana?

A. I can't think of his name right now. Huh. I don't remember.

Q. Okay.

A. I don't remember names too well.

Q. Okay.

(Deposition Exhibit 2 was marked for

---

54

identification.)

A. Okay. Dr. Phillips.

Q. Was Dr. Phillips your doctor in Montana?

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. What is this document?

A. He's just letting the job know that, yes, I am disabled. I have diabetes and heart condition. With all the, you know, stress and --

Q. Did you bring this note in to someone at St. Vincent?

A. Yes.

Q. Who did you bring this note in to?

A. I gave it to Heather.

Q. Okay. And do you remember when you brought it in?

A. No. It was one of my deals that I was hoping would help for her to understand it.

Q. And when you say it was one of your deals, what do you mean by that?

A. You know, with all the stuff that I was going through, I was hoping that she would understand that I was disabled or special need that -- consider that, you know, give me a bit more time to...

---

55

Q. So you said -- was this -- did you bring this in after you received a corrective action?

A. Yes.

Q. And in the note it says in Exhibit 2, "May require additional time to learn and perform certain tasks."

What certain tasks were you learning at that time?

A. It was, you know, the instruments.

Q. Okay. And doing the instrument trays; is that what you're referring to?

A. Yes.

Q. Had you ever asked for additional time before you brought this note in to Heather?

A. I don't remember if I actually asked her, but...

Q. So this is the first time you remember asking for additional time to perform certain tasks and to learn?

A. Yes.

Q. Okay.

A. Like I said, I don't really remember too well.

Q. So you said that you were learning the instrument trays. Why were you learning those tasks

---

56

now, or around the date of this note in October 2013?

A. That's when I was starting to relearn the instruments.

Q. Okay.

A. I did the instruments but was slower. I was more cautious. I was actually finding more mistakes with, you know, with the instruments, a lot that wasn't working, they were chipped. Even the new supervisor was surprised that she didn't see it before me.

Q. Okay.

A. She said, Whoa. I says, Well, yeah, it...

Q. So you were finding some mistakes with the instruments themselves?

A. Yes.

Q. Were there any new instrument trays around that time that you were learning or was it just relearning all of the trays that had been processed by the department then?

A. It was pretty much all of the instruments.

Q. Okay. And so here you brought this in to ask Heather for additional time and to perform certain tasks. Were those -- excuse me, additional time to learn and to perform certain tasks. Were those the only requests that you needed help with to perform your

---

Exhibit A

6

Deposition of: Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

57

job?

A. I don't understand.

Q. So in here you -- so you said that you brought this letter in to ask Heather for additional time to learn and perform certain tasks, right?

A. Yes.

Q. Were those -- was that the only thing you asked for help?

A. Mainly was the instruments was the main problem.

Q. Okay. So you brought this note in because you had received some discipline regarding the instruments, and you asked Heather -- you brought this note in to ask Heather for additional time to learn and perform certain tasks because of your learning disability; is that correct?

A. Yes.

Q. Were there any other accommodations that you asked for because of your learning disability?

A. Not in any other area.

Q. Okay. And what did Heather tell you when you brought this note in?

A. Nothing. She just put it in my record.

Q. Okay.

A. I don't remember if she said anything with

58

it.

Q. Did you talk with Heather at all about the speed of your performance, the speed it took you to do the instrument tasks?

A. I don't think so. I don't remember. She was just trying to get me faster. I don't know how fast they expected for anybody to go.

Q. And how do you know that she was trying to get you faster?

A. Well, with all the write-ups, then the retraining.

Q. And during those they told you --

A. That I need to go faster.

Q. Were you ever -- did you ever receive a write-up for going too slow?

A. That's when it was first started. But I -- you know, if they used those exact words, I don't...

Q. Okay. What happened after you brought this note in? Did anything change?

A. No.

Q. Do you remember meeting with a doctor named Dr. Gumm?

A. Yes.

Q. Do you remember why you met with him?

59

A. Annette Hoffman thought that maybe it would help everybody to understand where I am with my disability, if I was disability, and so...

Q. Did you have any objection with going to meet Dr. Gumm?

A. No. Like I said, I'm not ashamed of my disability. And I was just trying to save my job, so I was trying to do everything that they asked me to do.

Q. Sure.

(Deposition Exhibit 3 was marked for identification.)

Q. Have you seen this document before?

A. It doesn't really look like one that I have, but...

Q. Okay. So I'll direct you to page four, the last page, of Exhibit 3. And if you can read on page 4 where it says recommendations. Read 1, 2, 3 and 4 to yourself.

(The deponent perused the exhibit.)

Q. Okay. Are you done?

A. Yes.

Q. Okay. So on Number 1 on Exhibit 3, page 4, it says, "The patient reports she has recently been having some difficulties at work."

Do you know what difficulties the doctor

60

is referring to here?

A. Was just the stress in instruments.

Q. And what in instruments was causing you stress?

A. Well, to try and go faster. Trying to understand.

Q. Trying to understand what?

A. The process. Like I said, I was trying, but -- I don't know.

Q. It says, "She feels that the difficulties are in part related to a new manager who is not patient with her."

Do you know who the doctor is referring to there?

A. Heather.

Q. Heather. Okay.

And then in Number 2 it says, "She might learn best by having things demonstrated to her rather than explained orally." Do you see that?

A. Yes.

Q. Do you know what he was referring to -- what you might need to learn? It says "She might learn best." Was there a new part of your job that you needed to learn?

A. I really don't understand. Like I said in

Exhibit A

7

Deposition of: Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

**61**

instruments, this is just --

Q. Okay. So he's referring to the instruments there?

A. Uh-huh.

Q. And earlier you talked about the three-step process and when you were learning new tasks. So did St. Vincent demonstrate things to you when you were learning new -- new instruments or new parts of your job?

A. I usually didn't really go to the management. There were some coworkers who understood that, you know, I had this problem, and they -- when the instrument came, they showed me how to put it together better. You know, because I actually -- like in decontam, if there was a certain way to clean it, they helped me to show me to clean.

Q. Okay.

A. And then the instrument area, they helped me to put it together.

Q. Okay. And then number 4 it says, "She might have a third party act as a mediator to make sure that communication is as effective as possible."

Do you see that?

A. Yes, uh-huh.

Q. Do you know who St. Vincent appointed as

**62**

your mediator?

A. Well, you know, like I said, Annette Hoffman was at the meetings for me.

Q. Okay. So she was the person that was selected as your mediator. Did you ask for anyone else?

A. No.

Q. No. Okay.

So when you look at these four recommendations that are here on Exhibit Number 3 on the last page, did you feel that St. Vincent did these four recommendations?

A. I think they tried maybe, but they -- I guess they truly didn't understand. I don't know if Heather really worked with a special need before, so she really didn't know -- I don't think she was really qualified to under- -- I don't -- you know, I don't know.

Q. Did you say you don't think Heather was qualified to work with a special needs person?

A. Right. Yeah. I don't think she really was -- you know, she never really worked with a special need.

Q. Okay.

(Deposition Exhibit 4 was marked for

**63**

identification.)

(The deponent perused the exhibit.)

Q. Are you done?

A. Yes.

Q. Have you seen Exhibit Number 4 before?

A. Yes.

Q. What is Exhibit Number 4?

A. My doctor back then in Billings was really trying to help me to get -- help them to understand that I need more help than...

Q. And what type of additional help did you need?

A. Well, with the instruments. You know, to understand more that I need more time than a normal, regular person.

Q. Okay. And did you bring this note to someone at St. Vincent's?

A. Yes, to Heather.

Q. To Heather. Why did you bring in this note?

A. I was hoping that she would understand that -- that I need more help, that I need more time.

Q. Okay. In this note do you see where it says, "She feels she is being mistreated and harassed"?

A. Yes.

**64**

Q. Who -- who was mistreating and harassing you?

A. Heather and David Dobson.

Q. And what were they doing?

A. Well, they just kept on telling me I need to go faster, that --

Q. Had you told them before that you felt like they were mistreating you?

A. Yes. Well, I didn't really come -- you know, say those words, but --

Q. What did you say?

A. That -- that I felt that I -- I just told them that I was confused, that I was trying, and I really didn't know what they expect from me.

Q. And what do you mean you when you say you didn't know what they expected from you?

A. Well, you know, they put the bar a bit too high for me to do. Maybe it took a regular person five minutes to do a tray where it might take me 10, 15 minutes to do a tray. You know, they didn't understand that I may -- I might have needed just a bit more time.

Q. Okay. And did you ask them for more time?

A. Well, not -- I didn't -- I never really came out with it, but...

Q. Okay.

Exhibit A
8

Deposition of: Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

**65**

A. Because I was really trying to.

Q. Okay. And in here it says, "She does her best with her physical limitations." What physical limitations is the doctor referring to in Exhibit 4?

A. Is not lifting. And I don't... I don't -- you know, with a special need, I don't know what.

Q. Okay. So you think he's referring to special needs there?

A. We never -- I never really had a problem with lifting, but...

Q. Okay.

A. There was no --

Q. So physically you didn't have any limitations at work?

A. Right. I didn't really let it to interfere with my -- because, you know, 50 pounds is quite heavy, so it's --

Q. But when you were performing the job duties as an instrument tech, did you ever have any physical things that you could not do as part -- that were your job duties?

A. No.

Q. Okay.

A. We was -- I do believe it was 50 pounds

**66**

that we were supposed to lift.

Q. Okay. And then in Exhibit 4 the doctor also says, "She is not getting the support that she needs." What additional support did you need?

A. They didn't really -- I think where he was coming from that he -- we felt that they didn't really support me. You know, saying that -- they never said "good job." They always said, "Well, you're doing lousy."

Q. Okay.

A. I -- you know, I felt they didn't really expect me, so it's...

Q. They didn't expect you...

A. Respect.

Q. Oh, respect. Okay.

(Deposition Exhibit 5 was marked for identification.)

(The deponent perused the exhibit.)

Q. (By Ms. Savory) What is Exhibit 5?

A. The write-up for not improving.

Q. Okay. And do you remember if this was the first corrective action form that you've ever received when you were working at St. Vincent?

A. You know, maybe. I don't know. I don't remember for sure.

**67**

Q. Okay. Why did you receive this corrective action?

A. Because they felt that I was going too slow in instruments, and that they -- and then they felt that I didn't improve.

Q. So in the box under number 1 it says that "On July 24th, 2013, Roxanna Jackson met with the Materials Management Director and the Central Processing Manager to have a conversation from a high, medium, low perspective of the productivity in the Central Processing Department to establish expectations."

Do you remember having that meeting with David Dobson and Heather Franzel?

A. Yes.

Q. And then it says, "Based on our conversation, we requested that you continue to address and look for opportunities to improve productivity within the department."

Does it say anywhere in that box that they had a conversation with you about the speed of your performance?

A. No, but they said that I didn't improve.

Q. Okay.

A. Improve.

**68**

Q. Okay. And then in box number 2 on Exhibit 5, about halfway through the box it says, "The request to improve your technical skills to be able to maintain the instrumentation area has not been met." And then it says, "Based on our previous discussion we asked that if you need assistance to make us aware and we would provide the training and means of measure to improve on." Do you see that?

A. Yes.

Q. Did you ever ask for any assistance?

A. Probably not. I was so confused at that time that --

Q. Did you ever let Heather or David Dobson know that you were confused?

A. I might have. I don't remember for sure.

Q. Okay. And during that meeting as it says in Exhibit 5, box 1, you talked about the productivity in the department. What did they mean by that?

A. They want, you know, certain stuff done more --

Q. Accurately?

A. Yeah. Yes.

Q. Was it after this corrective action form that you brought in the note from your doctor that we looked at in Exhibit 2?

Mile High Court Reporting and Video, Inc.   303-202-0210
contact@milehighreporting.com

Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

73

A. Yes.

Q. And so you signed this acknowledging the corrective action, correct?

A. Yes.

Q. Okay.

A. That's one thing, I will admit -- if I feel that I was wrong -- in the wrong, I will admit it.

Q. Okay. So you've talked a little bit about this retraining program that you had to go. Do you remember when this retraining program took place?

A. The dates, no.

Q. And do you remember why you had to go through the program?

A. Try to go faster in instruments.

Q. And what -- can you tell me a little bit about the program? What did you do in the program?

A. Mainly to relearn how to do the instruments and go faster. That's really the main thing, to go faster.

Q. And why did -- do you think the main thing of the retraining program was to go faster?

A. The pro- -- however you want to pronounce it, to make the department go faster, to get the stuff done faster.

Q. Did anyone during the retraining program

74

tell you to go faster?

A. At the beginning, yes. They told me that -- to help me go faster.

Q. Okay.

A. To see if I could, you know, speed up. This -- to show me how to do cuts -- shortcuts.

Q. Okay. Who performed the retraining program?

A. Amanda, the new supervisor.

Q. Okay. And did you like Amanda?

A. Yes. I didn't really know her that well, but...

Q. Did you feel like Amanda was honest with you?

A. Yes.

Q. And could you trust Amanda?

A. I think so.

Q. Was Amanda available to ask questions if you had questions on the instrument trays?

A. She tried to be, you know. She -- you know, as the time went on, she went to do her other work that she needed to get done, but I knew I could go to her if I --

Q. Okay. When they told you that you were going to go through a retraining program, how did you

75

feel?

A. Okay. Like I said, I tried to do everything that they asked me to.

Q. Did you feel like St. Vincent was trying to help you?

A. Maybe. Like I said, I don't think Heather herself knew how to work with me.

Q. Okay.

A. She really didn't understand that she was pushing it too hard. I might have always needed that little bit of extra time.

Q. Okay.

A. But I don't know if anybody would really feel that comfortable in you're going to be under a microscope all the time.

Q. What do you mean, "under a microscope"?

A. They was watching me, like, you know, every step that I made.

Q. And who are you referring to?

A. Heather. The management.

Q. When Heather -- what shift was Heather on when you were working?

A. When I was getting retrained?

Q. Uh-huh.

A. She was working mornings and I was working

76

at noon to 8:30.

Q. Okay. And you did the training primarily with Amanda?

A. Yes.

Q. Did you feel like Amanda understood you?

A. I think so. But then she was new, so she really didn't know me too well. Like I really didn't know her.

Q. Okay. So you were both getting to know each other around the same time?

A. Yeah.

Q. Did you have any objection to going through the retraining program?

A. No.

Q. And what areas did you -- did you go through in the retraining program? Can you tell me just a little bit about what you did in the retraining program?

A. I only did instruments.

Q. Okay.

A. Because every other area, I was fine.

Q. Okay. And when the retraining program started, do you remember what you and Amanda did as part of the retraining program? What was your day like?

Exhibit A
10

Deposition of:  Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

**77**

A. Just doing instruments. Like a new employee, learning the new -- the instrument area. So the first week I didn't empty washers or I didn't empty the window, or anything like that, I just ignored that, and I just did instruments. Whatever Amanda, you know, gave me.

Q. Okay. So you would just work on the instrument trays?

A. Yes.

Q. How did you feel like the retraining program went?

A. Okay.

Q. Was it helpful?

A. I think so. I don't -- I really didn't know for sure if it was going to really speed me up because -- and I don't really think it really -- maybe it speed me up to a point, but not as fast as anybody else.

Q. When you were doing instrument trays, did you ever make mistakes with instrument trays?

A. Oh, yes. Yes.

Q. Okay. And so what would you do to try to prevent making those mistakes?

A. I -- there's -- you know, there's books to read to look at if you're not sure of an item, they --

**78**

they're trying to put pictures in with the new items because, you know, that would help you to see, you know, if you have the right item or not.

Q. Okay.

A. So I tried to use those. Mainly I used those for the most part is the spellings. I'm the worst speller there is.

Q. Some of the tool names are pretty hard to spell, aren't they?

So when you were putting together the instrument trays, you would -- there were books you could look at, there were recipe cards you could look at to tell you what needed to go on each tray and how to do it?

A. Yes.

Q. During the retraining program did you go through different trays to learn what needed to go on each of the trays?

A. Yeah. I only relearned every -- all the trays.

Q. Okay.

A. Amanda had a better way of putting instruments in that they fit better.

Q. Okay.

A. And it kind of helped them to understand

**79**

that maybe some of the trays were a little too small for the -- all the stuff.

Q. Okay.

A. So -- which was a good thing, because they understood what we were going through.

Q. Yeah.

A. So they was made to put it into more trays than one. So that helped.

Q. Okay. So you were going through all the trays. And during the retraining program did you feel pretty comfortable with all of the trays, that you knew how to do the trays?

A. I think so.

Q. Okay. During the retraining program, could you ask Amanda questions if you had questions throughout?

A. Yes.

Q. Was Heather present at all during the retraining program?

A. Very little. She tried to stay out of that.

Q. Okay.

A. Because if there was a concern, then she would just pull Amanda, you know, away and talk to her.

Q. Okay. So you were working primarily with

**80**

Amanda during the retraining program?

A. Yes.

Q. Okay.

(Deposition Exhibit 7 was marked for identification.)

(The deponent perused the exhibit.)

Q. And you don't have to read everything in the document, just to get a general understanding of what it is.

A. Yes, okay.

Q. Have you seen Exhibit 7 before?

A. Yes.

Q. And what is Exhibit 7?

A. This is the sheets that we sign saying that I did this, you know, at each -- like week one I say what tape it was, you know, the color code and some of the trays that...

Q. Okay. So is this a list of what you went through during the retraining program?

A. Yes.

Q. Okay. And then you -- when -- is this your signature or your initials here on Exhibit 1 (sic) on the first page under Roxanna Jackson?

A. Yes.

Q. And would you sign Exhibit 7 in those

Exhibit A
11

Deposition of: Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

---

**81**

boxes with your initials when you completed the tasks?

A. Yes.

Q. And then it looks like Amanda put her initials in there?

A. Uh-huh. Yes.

Q. And then Heather as well.

So once you went through the six-week retraining program, did you feel pretty comfortable in the instruments area?

A. I really don't think I really felt any more comfortable than I was. You know, because I really don't know for sure if I was going to be faster.

Q. Okay.

A. I felt more comfortable because she showed me a better way of putting some instruments in.

Q. Okay. And were they -- did -- Amanda timing you when you were going through the retraining program?

A. Eventually she did. You know, not at first. Not at the beginning.

Q. So she didn't time you all of the time during the retraining program?

A. Right.

Q. I'm sorry, was that a yes?

A. Right.

---

**82**

Q. During the retraining program, was Amanda focusing on teaching you how to do the trays correctly?

A. They was just trying to get me faster. I don't know if it was, you know, correctly.

Q. And why do you think they were trying to get you to go faster?

A. Because I was taking too much time otherwise.

Q. Did they tell you that?

A. Pretty much, yeah. I was going too slow or...

Q. Who told you that you were going too slow?

A. Heather and David.

Q. Okay. And what about during the retraining program, did Amanda ever tell you you were going too slow?

A. At that meeting she said that, Oh, I've got some tricks under my sleeve, I'll -- I might be able to get you to go a little bit faster.

Q. Okay. And were the tricks that she was referring to, are those the shortcuts that you mentioned earlier, she had some shortcuts to put together the trays?

A. Yes.

Q. And did -- did her showing you those help

---

**83**

you put together the trays more accurately?

A. Like I said, she helped me to put them in there more where they -- everything would fit better.

Q. Okay. So that -- those are the kind of tricks up her sleeve?

A. Yes.

Q. She just helped you put everything on the trays so they would fit together better?

A. Yes.

Q. Okay. Are there any other times during the training session that you had with Amanda where she said that you needed to go faster?

A. No.

Q. Okay. Once the six-week training program was over, how did you feel?

A. Okay.

Q. Okay?

A. And that's -- at that meeting, you know, that was the end, that's where Annette Hoffman said, "Good job. You did it."

Q. Good. So you felt like you successfully completed the training?

A. For I -- like I said, I was so confused that I just got...

Q. And what were you confused about?

---

**84**

A. Everything. I didn't really -- I was trying, trying. For the training, yes, I did it to make them -- to try to understand more. Yes, I understand better to put them in.

Q. Uh-huh.

A. But to go faster, I don't know. Because the way everything was set up, if everything is pretty high for me to reach, so that took time to reach what I was getting.

Q. To reach the instruments and put them on the trays?

MR. HOLM: You have to say yes.

THE DEPONENT: Yes.

MR. HOLM: You can't nod.

THE DEPONENT: Oh, I...

MS. SAVORY: Okay. Thank you.

THE DEPONENT: So you have to hit me once in a while.

Q. (By Ms. Savory) So once the retraining was over, did you feel like you understood how to put all the instruments on the trays properly?

A. Yes.

Q. Okay.

A. But I was paid to look for the mis- -- the chips better than anybody else. Yes, I was maybe going

---

Exhibit A

12

Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

**85**

a little bit too slow, but was also saving the doctors some time to -- you know, if they have some chips or something wrong with the instruments, that would just take them more time to go get something else or get another tray that has the same instrument in it.

Q.  Sure. So you were --

A.  And they won't have to throw the instrument across the room.

Q.  So you were good at realizing when the instruments were broken and when you needed to get a new one?

A.  Yes. But some others who was going too fast may not -- they wasn't paid to find them -- the mistake or the chips or the bad.

Q.  Okay. Okay.

(Deposition Exhibit 8 was marked for identification.)

(The deponent perused the exhibit.)

Q.  Have you seen Exhibit 8 before?

A.  Yes.

Q.  And what is Exhibit 8?

A.  I mislabeled something. A couple things.

Q.  Okay. And so it's a corrective action form for mislabeling a couple things? And so in -- on Exhibit 8 in Number 1 in the box, it says 4/29/14. And

**86**

it talks about a mislabeling incident. And then it says, "When the error was brought to Roxanne's attention, she stated she knew she made the mistake but did not correct the issue."

Why didn't you correct the issue?

A.  Because I thought -- I was hoping that a few days later or so -- because one or two items, you know, one, they usually use it, you know, within a few days. So I was hoping that they used it and -- yes, I should have, you know, called it down or see if they found it, but...

Q.  So were you hoping --

A.  I was tired, I was just...

Q.  Okay. So you knew you made the mistake and you were hoping that they wouldn't notice?

A.  Yes, more or less.

Q.  Okay. And then on 5/13/14 it says -- it also says -- it talks about mislabeling an Olympus light cord. Do you remember making that mistake?

A.  Well, I thought I tried to explain to them the camera and the light cord, if -- those two items have to be wrapped.

Q.  Okay.

A.  You send it down to the wrap area. How do we know if the wrap person didn't -- and sometimes

**87**

there's two -- you know, there's people helping. So if they put the tape down on the table, they might have picked up -- the other person might have picked up the wrong tape after they wrapped it, so they thought they had one item but it was different item, so they put the tape on it. So how do I know or how does anybody else know that that's what happened?

Q.  So when you're in the instrument tech -- when you're in the instrument tech position, when you would do this type of tray, how would you label them? Can you describe the process for me, just so I can understand it?

A.  Okay. It was the -- that scope and the camera.

Q.  Uh-huh.

A.  Okay. We labeled one are the something lap -- lap cord or -- and then the other one lap camera.

Q.  Okay. And what did you label them with? Like was the label a piece of tape?

A.  Yes. Yes.

Q.  Okay.

A.  Okay. So I put it on the tray that it's supposed to be on.

Q.  Uh-huh.

**88**

A.  Then you send it down to the SO area. Those two trays have to be wrapped, physically wrapped, because they're not in the container.

Q.  Okay.

A.  So if you take the two tapes off because there is more than one person wrapping, how do you know you're going to take the right tape --

Q.  Okay.

A.  -- and put it on the right tray?

Q.  Okay.

A.  How does anybody know that didn't happen?

Q.  Okay. But do you know that that did happen?

A.  It could have.

Q.  Okay.

A.  You know, I can't prove it, no. But how can you prove not?

Q.  Was it possible that they were also labeled incorrectly when you were in the instrument area?

A.  It's a possibility maybe, but...

Q.  Okay.

A.  I just can't see that happening with me.

Q.  And here on Exhibit 8 it said, "This error was brought to Roxanna's attention to make her aware of

Deposition of: Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

89

the mislabeling issue and she did not have a response to the mistake."

So did you say anything once this mistake was brought to your attention?

A. Yes. Yes. I brought that up. How do they know that that didn't happen?

Q. Okay. And who are were you taking to?

A. To Heather and David and whoever else was in the room.

Q. Okay. So on Exhibit 8 it says, "Prior corrective actions," and it talks about one on April 9th, 2014, Verbal coaching. Reminder of training and observations of performance.

Do you remember that conversation?

A. No, not really.

Q. Do you know who might have had that conversation with you?

A. No, not --

Q. Okay.

A. I don't really understand.

Q. Oh, I'm sorry. On page 1 of Exhibit 8.

A. Okay.

Q. On the very top box it says, "Prior corrective actions." Do you see that?

A. Oh, this one?

90

Q. The very bottom one.

A. Okay.

Q. It says, "Verbal coaching. Reminder of the training and observations of performance."

Do you remember having a meeting -- a verbal coaching meeting with anyone around April of 2014?

A. No.

Q. Okay. And then down in box number 3 on the very bottom, Number 3, it says, "Mistakes are addressed with each associate as they occur. If it becomes repetitive, it is a concern for the patient's safety and corrective action will follow."

When mislabeling mistakes are made, what could happen?

A. It takes too much time to look for the items, what they're looking for.

Q. Could it impact patient care and patient safety?

A. Yes.

Q. And did you understand that when you were working in the instrument department?

A. Yes.

Q. Okay. On this corrective action on Exhibit 8 does it talk about working faster or your

91

speed?

A. Where?

Q. Just anywhere on Exhibit 8.

A. Oh, I see. I don't think so.

Q. Okay. And then on the -- on the second page of Exhibit 8 at the very bottom it says "Associate's signature"?

A. Yes.

Q. And is that your signature there?

A. Yes.

Q. So you understood the corrective action?

A. Yes.

Q. So that corrective action that we just looked at in Exhibit 8, that took place after the retraining program, correct?

A. I do believe, yes.

Q. Okay.

(Deposition Exhibit 9 was marked for identification.)

(The deponent perused the exhibit.)

Q. Okay. Have you seen Exhibit 9 before?

A. Yes.

Q. What is Exhibit Number 9?

A. That I read it -- or I didn't go to the area that she was -- she told me to go to after 5, you

92

know, after I do the case cart area.

Q. And when you say "she," who are you referring to?

A. Heather.

Q. Okay. And what area did you not go to?

A. Instrument area.

Q. Okay.

A. But there was another coworker, and it was somewhat busy, and I do believe he was supposed to go home early. But it was busy, so he decided -- not me, but he decided to stay and do instruments and let me go down to SO, the sterilizer operator.

Q. And who was this other coworker?

A. His name was Joshua somebody. It starts with an O, but I can't pronounce it.

Q. Okay. And Josh was supposed to go home, but instead stayed to do instrument area; is that correct?

A. Yes.

Q. Did you tell Josh that you were assigned to do the instrument area?

A. Yes. I told him that, you know you're supposed to go and I'm supposed to do the instruments? He said, Yes, don't worry about it. I'll stay since it's -- you know, it's busy, and he'll do the

Mile High Court Reporting and Video, Inc.   303-202-0210
contact@milehighreporting.com

Exhibit A
14

Deposition of:  Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

93

instruments and I'll go do SO.

Q.  And did you know that you were supposed to be in the instrument area?

A.  Yes.

Q.  Did you know that you were going to another area that you weren't assigned to?

A.  Yes.

Q.  And then on the second page of Exhibit Number 9, is that your signature?

A.  Yes.

Q.  So did you acknowledge and agree with the corrective action?

A.  Well, I acknowledged it, I didn't really agree with it, but...

Q.  Did you say that you didn't disagree with it?

A.  Yes, I do believe I did.

Q.  And who did --

A.  And Heather said that, well, it's -- it was a nice night that I could have done instruments, but... But, you know, like I said, Josh said that he'll stay and he'll do the instruments.

Q.  Did you say -- did you try to stay in the instrument area?

A.  I tried -- I tried to help him, but he

94

kept on telling me to go to SO, it's getting piled up, so I kind of --

Q.  And why didn't you stay in the instrument area?

A.  Mainly because he said that he'll take care of it.

Q.  Okay.

(Deposition Exhibit 10 was marked for identification.)

(The deponent perused the exhibit.)

Q.  Have you seen Exhibit 10 before?

A.  Yes.

Q.  And what is Exhibit 10?

A.  Mislabeling a scope.

Q.  And do you remember what happened that resulted in this corrective action for mislabeling a scope?

A.  Well, I guess it was a loaner scope.  And she sent all the loaners back to the company except for one that they couldn't find.  But I don't really understand it.  Yes, I mislabeled it, but if you know you're missing one, why didn't you look for others that maybe there was one too many.

Q.  Okay.  So you understand that you mislabeled the loaner scope?

95

A.  Yes.

MS. SAVORY:  Okay.  I don't think I have any other questions on that.

It's noon, so should we take a break for lunch?

MR. HOLM:  Sure.

MS. SAVORY:  Do you want to take an hour?

MR. HOLM:  Yeah.  That's fine.

(The lunch recess was taken from 12:02 to 1:01 p.m.)

(Ms. Lori Davis is no longer present for the proceedings.)

Q.  (By Ms. Savory)  All right.  Roxanna, do you understand that you're still under oath?

A.  Yes.

Q.  Okay.  One thing that we talked about earlier was that you moved into a new apartment?

A.  Yes.

Q.  When did you move into -- out of your brother's house and into your new apartment?

A.  Early March.

Q.  Of this year?

A.  Yes.

Q.  Okay.  And then if I can have you look at Exhibit Number 5 that we talked about.  When we talked

96

about Exhibit Number 5, you said that you disagreed with the corrective action.  What specifically did you disagree with?

A.  Okay.  I just felt that they -- that they didn't really give me enough time.  And I don't know --

Q.  Do you remember -- I'm sorry.

A.  I thought I was, you know, doing better.

Q.  Okay.

A.  Maybe not their high, you know -- I kind of wonder if some people will put a little too high, but I can't get up that high.

Q.  Are you talking about their expectations?

A.  Yes.

Q.  Okay.  Did you express that in your meeting with -- with them when you went over this corrective action?

A.  I probably haven't.  I don't remember.

Q.  So the only piece that you disagreed with corrective action in Exhibit Number 5 was that they -- you thought their expectations for you were too high?

A.  Yes.  Uh-huh.

Q.  Okay.  Earlier we talked about Diane Larson.

A.  Yes.

Q.  And you said that she did not put you in

Exhibit A
15

Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

101

Q. As the lead head tech, he has other duties?

A. Yes.

Q. Okay. And then how did that change once Heather became your supervisor?

A. She didn't want David to change me because she wanted people where she wanted them each day.

Q. Okay. When you say she didn't want David to change you, do you mean that she didn't want David to change which area you were working in?

A. Yes.

Q. Okay. So Heather would assign you an area and wanted people to stay in that area --

A. Yes.

Q. -- for your shift?

A. Uh-huh.

Q. And once Heather became your supervisor, were you still working instruments in the other areas?

A. Yes.

Q. Okay. Did you ever work on nursing floor trays? The trays for the nursing floor?

A. Well, that's the floor trays.

Q. Okay. Those are the floor trays. And were those the ones that you would normally work on, or do you work on all trays?

102

A. I worked on all trays.

Q. Okay. Was there ever a time when you only worked on nursing floor trays? The floor trays?

A. Well, yeah. That particular time where, like I said, when Diane wanted somebody to work noon to 8:30 and work on those.

Q. Okay. Okay. And then you would do those?

A. Yeah. Heather and I had a disagreement. Heather wanted to do those last, do the OR instruments first. But like I tried to explain to her, it's not the best idea; but surgery could flash the instruments, the floors can't flash them, if they needed.

Q. Okay.

A. The floors doesn't have anything to get their trays sterile.

Q. Okay.

A. Surgery has a flasher. Yes, it's not the best, but it will do in a flash.

Q. Okay. So under Diane Larson, when she was your supervisor, she -- did she only have you do the nursing trays, the floor trays?

A. No.

Q. She had you do the nursing trays and the OR trays as well?

A. Yeah.

103

Q. Okay. But she would let you do the nursing trays -- floor trays first?

A. Not necessarily. She let you decide. If she's not there, she let you decide what's more important.

Q. Okay.

A. And she pretty much feels the same way as I did. You know, she realizes the floor trays doesn't have a flasher, they can't flash if they're down to zero trays and they need a tray. Surgery can flash. It's not the best thing to do, but...

Q. But then when Heather became your supervisor, she told you to do the OR trays first and then the nursing trays after that; is that correct?

A. Yeah.

Q. What about nursing pumps? Did you ever work with nursing pumps?

A. Yes.

Q. And what are those?

A. Well, there is different pumps. The new pump for surgery we had to make sure they are in working condition.

Q. Okay.

A. Which I, you know...

Q. And when did you work with the nursing

104

pumps? Do you remember about what year?

A. Oh, that was towards the end of last year that I was there.

Q. Okay. Several times you said that you had difficulty with the instrument trays; is that correct?

A. Yes.

Q. What percentage of an instrument tech's job is the instrument trays?

A. I do believe it was 100 percent, you know, because you have to know all of them.

Q. Okay. Actually, can we go back to Exhibit Number 1? And we looked at Exhibit Number 1 earlier, the job description for the instrument techs; is that correct?

A. Yes.

Q. And earlier we looked at the bullet points in the box of page 1 on Exhibit Number 1?

A. Yes.

Q. And you said that those are the duties that all instrument techs were required to do?

A. Yes.

Q. Could you perform all of those duties?

A. Yes, I do believe.

Q. Okay.

(Deposition Exhibit 11 was marked for

Deposition of: Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

---

**105**

identification.)

(The deponent perused the exhibit.)

(Deposition Exhibit 12 was marked for identification.)

Q. And, actually, before we talk about Exhibit Number 11, I want to talk about Exhibit Number 12. Do you want to take a look at that one?

(The deponent perused the exhibit.)

Q. Okay. Do you recognize Exhibit Number 12?

A. Yes.

Q. And what is Exhibit Number 12?

A. Performance improvement.

Q. So it's a performance improvement plan. And it's dated July 30th, 2014. Do you see that?

A. Yes.

Q. Okay. Have you seen this before?

A. Yes.

Q. Did you draft this or help put this performance improvement plan together?

A. Yes.

Q. Who did you work with to put the performance improvement plan together?

A. Annette Hoffman, the HR person.

Q. And why did you work with Annette to put the performance improvement plan together?

---

**106**

A. To try to keep the job.

Q. Okay. And was it your understanding that this performance -- if you followed the steps in the performance improvement plan, then you would be able to correctly perform your job duties?

A. Yes.

Q. Okay. So on Number 2 on the performance improvement plan, it says, "I will use reference materials all the time whenever there is a question about identifying an instrument." Do you see that?

A. Yes.

Q. Did you use reference materials then after you drafted this performance improvement plan and after the plan was in place?

A. Well, I always did use the reference for other -- you know, for spellings.

Q. Okay. So you continued to use the reference materials when you had questions?

A. Uh-huh.

Q. And then you see number 3, it says, "I will double-check the labeling as needed." Do you see that?

A. Yes, uh-huh.

Q. Did you do that?

A. Not all the time.

---

**107**

Q. Okay. And then do you see under Number 7 it says, "I will ask questions if I am not sure"?

A. Yes.

Q. And did you have -- did you ask questions when you had them when you were performing your job?

A. I tried to.

Q. Okay. And what was your understanding of this performance improvement plan? Why did you put it together?

A. Like I said, I was hoping I could save the job.

Q. Okay. So was it your understanding that if you followed the steps that you outlined on your performance improvement plan, then you would be properly performing your job duties?

A. I think so. But I'm only human, so I will make mistakes.

Q. Okay. In your performance improvement plan did you -- and when you were putting together your performance improvement plan, did you mention anything about the speed of your work performance?

A. No. Like I said, I was just totally confused. I was just not all there.

Q. And what were you confused by?

A. By everything. Why -- I felt I was being

---

**108**

attacked.

Q. And did you tell anyone about -- did you say to anyone, "I'm confused, can you explain this to me?"

A. Not really. I don't remember.

Q. Okay. Did you tell Annette that you were confused about what was going on at the time?

A. She pretty much knew.

Q. Okay. So she -- so Annette worked with you to help you put this together to help ensure that your performance would improve; is that correct?

A. Yes.

Q. Now we can turn to Number 11, Exhibit Number 11.

Before we -- can we go back to Number 12? I'm sorry.

A. Okay.

Q. So on Exhibit Number 12, do you see number 6? "My plan is to follow the actions here and to avoid future mistakes. Please give me feedback quickly if I make a mistake so that I can see what was done and how it happened."

A. Yes.

Q. Who put that portion in the performance improvement plan?

---

Exhibit A
17

Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

**109**

A. I did.

Q. And why did you put that portion here?

A. Because if it had been told about two or three weeks later about the mistake --

Q. Okay.

A. -- it's got a why in it.

Q. So you wanted to be informed of your mistakes as they happened?

A. Yes.

Q. Okay. I'm sorry. Now we can turn to number 11.

A. Okay.

(The deponent perused the exhibit.)

Q. What is Exhibit Number 11?

A. The termination form.

Q. Okay. And who gave -- did you ever see Exhibit Number 11 before?

A. Yes.

Q. Did you see it when your employment was terminated?

A. Yes.

Q. Who gave you Exhibit Number 11? Who presented it to you?

A. Heather.

Q. And was anyone else there?

**110**

A. Kathy Smith and Annette Hoffman.

Q. Okay. So you see on Exhibit Number 11 on the first page in the box under the Number 1 --

A. Yes.

Q. -- and there's some incidents of performance or behavior issues. The first one is dated August 17th, 2014. Do you see that one?

A. Yes.

Q. What happened on August 17th, 2014?

A. I was on vacation and I just went in just to make sure my time sheet or thing was ready to go to get paid.

Q. Okay.

A. At the computer to swipe in there, you know, in the SO, sterilizer operator, not everything is sterile at that point. Everybody does it to check in -- check their time on the computer.

Q. And when you mean "everybody does it," what are you referring to?

A. All the employees who wants to make sure their -- they -- the time -- the time is correct.

Q. They go to that computer --

A. Yes.

Q. -- in the SO area?

A. Most of them. Some of them goes to

**111**

another area, which they shouldn't, but...

Q. And where is the computer in the -- what's the other area?

A. The case cart area. And that's where the sterile items are at.

Q. Okay. And is that why you think they shouldn't go to that computer?

A. Right.

Q. And the SO area --

A. It's not -- it's kind of iffy, you know. Diane let us. Diane was going to put a computer in the break room, but she never did. But Heather was working that night, that evening.

Q. Okay.

A. And she just caught me.

Q. So she caught you in the --

A. Street clothes.

Q. -- sterile SO area in your street clothes? And did you know you weren't supposed to be in that area in your street clothes?

A. Like I said, at that point we all did it.

Q. But even though --

A. It's kind of -- Diane just kind of put it in a gray area. It's not the greatest idea, but the only option that we had to do, so...

**112**

Q. When you say it was kind of iffy, did you think that you should have been in a bunny suit? Isn't that -- is that what they're called, a bunny suit?

A. No, it wasn't a bunny suit, that's -- a gown.

Q. A gown. Okay.

A. And hair net. I probably should have took the time, but it was summer, I was hot the way it was.

Q. So you knew that you probably should have been in a gown and a hair net to enter that area, but you did it anyway?

A. Right.

Q. Okay. And then on 8/18 it talks about an instrument set was returned by the manager. Do you remember what happened there?

A. When?

Q. On Exhibit 11, Number 1, the second --

A. Incorrect labeling and no -- that set was -- I forgot to put an indicator in.

Q. Okay.

A. But these bags, these new bags, has an indicator on the bag.

Q. Okay.

A. Which I -- you know, I didn't realize that I had forgot the indicator.

Exhibit A

18

Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

**113**

Q. Okay.

A. But surgery, open heart staff, when they opened it they realized there was no indicator, but they seen the indicator on the bag.

Q. Okay.

A. So they took it on theirselves and decided it was okay to use because that indicator turned like it's supposed to.

Q. And did you know at the time that the indicator was also supposed to go in the bag?

A. Not in the bag, in the set.

Q. Oh, in the set. I'm sorry. So there was an indicator on the bag, and then there was supposed to be another indicator in the set?

A. Yes. But I just totally forgot. And it's very, very -- in a lifetime that I did that. That one set I forgot.

Q. Okay.

A. And pretty much everybody else does it, and here I am one set in 38 years.

Q. Forgot to do it. But you knew that there was supposed to be an indicator in the set and you forgot to put an indicator in the set?

A. Yeah.

Q. And then on August 19, 2014, it looks like

**114**

the indicators did not reflect the set had been sterilized?

A. Oh, the tape.

Q. What happened with that incident?

A. It was a rep item. And the rep people is not supposed to put sterile and unsterile items together, because that's a big no-no.

Q. Right. Right.

A. But they do because to save case carts. If they don't do that and put it on a separate case cart, then they get in trouble using too many case carts, because we don't have -- they didn't have enough case carts.

Q. And who are you talking about, who gets in trouble?

A. The reps.

Q. Okay.

A. Okay. So what do they do? It's just kind of -- so, anyway, they put it on a case cart. It was close to 11:30 p.m., and I was trying to get -- which I did, I got a load in, and it was the rep stuff, all but that one item.

Q. And you got a load into?

A. The sterilizer.

Q. The sterilizer. Okay. Continue.

**115**

A. I didn't see that item, that last small item. Okay. Well, time -- when I left, the sterilizers were still -- is still going because I only put it in there five minutes before I left. It went off after midnight, which I was gone, totally gone.

Q. Okay.

A. There was a helper who comes down from surgery to help. He shut it off. So he had nothing to do with that one item because he never seen that case cart. A night girl unloaded the case cart, the same case cart that the reps had. Here's this unsterile item on the cart wrapped, but the tape didn't turn, so it wasn't sterilized.

Q. Okay.

A. So she sent it up.

Q. Okay.

A. This is 6:30 in the morning. I wasn't even there.

Q. Okay. So you weren't there when the case cart was sent up, but you didn't put that one item in the sterilizer, correct?

A. Right.

Q. Okay.

A. But she had missed it. It was her own fault. She admitted that to me that it was her fault.

**116**

She sent it up.

Q. It was her fault that it got sent up. But was it your fault that it did not get put into the sterilizer, that one item?

A. Not necessarily. I don't know. I don't think it was totally my fault, no.

Q. Whose fault was it then?

A. Like I said, it was a chain.

Q. Right.

A. From the reps to me to the person who entered that sterilizer, which he never seen that case cart. But eventually it was her fault for sending it up.

Q. Okay. But talking about the instrument that wasn't sterilized, was it your fault that it did not get into the sterilizer?

A. Maybe. Like I said, it was a chain. Why should I take all the blame? I'm not going to take all the blame.

Q. Do you know if the other employee who sent the case cart up got disciplined for this?

A. I don't know.

Q. Okay. And you put all of the other instruments in the sterilizer except for the one instrument?

Exhibit A
19

Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

117

A. Yep.

Q. Okay. So during this meeting when they presented this termination form, what happened? What happened during the meeting?

A. Nothing. They just said, you know, Why?

Q. And what did they say?

A. That I forgot that one item, so it got sent up unsterile. Going in the department with street clothes.

Q. Okay. So they talked through these incidences that we just talked through. What else did they say or did you say anything?

A. I was just stunned, so I didn't know what to say.

Q. Okay. Did you understand that your employment was being terminated?

A. Yes.

Q. And did you understand that it was being terminated because of the mistakes that you made?

A. Yes, but...

Q. And then if you turn to page 3 of Exhibit 11, the signature page. For the associate's signature, it says, "The employee refused to sign."

A. Yes.

Q. Why did you refuse to sign this form?

118

A. Because I disagreed with it.

Q. And what did you disagree with?

A. Well, the -- I did -- yes, I went in the department with street clothes. But everybody does it. And that's the only computer that we have to check our time, and we should have the right to check our time to make sure that we're going to get paid like we're supposed to, you know, the accurate amount.

Q. Sure.

A. And for that sterile -- or that unsterile item, no, I don't agree that was totally my fault.

Q. Okay.

A. Because, like I said, the night girl had two chances of catching that item, when she was unloading, put it on the cart, and when she was sending it up to surgery.

Q. Okay. So you disagreed with the August 17 discipline regarding wearing street clothes into the sterile area, even though that you knew you probably should have put on a smock and a hair net to go into that area?

A. (Nodding.)

Q. Is that a yes? I'm sorry.

A. I probably should have. But, like I said, it was a gray area, so it's kind of --

119

Q. Okay. And what about the other two incidences that are on Exhibit 11 on August 18th and August 19th, did you acknowledge those mistakes? On the first page of Exhibit 11 in the box number 1, the one on 8/18 and 8/19.

A. Okay. Well, the one -- the indicator, like I said, I feel once the surgery -- open heart surgery people took it on themselves saying, yes, they realized it didn't have the indicator, but it was their decision to use it. I didn't tell them to use it.

Q. Okay. But did you forget to put the indicator in the tray?

A. Yes.

Q. Okay. And --

A. I probably did. I don't know. If they say it wasn't in there, it wasn't in there.

Q. Okay.

A. But the only -- they didn't mean to get anybody into trouble, they just meant for heads up.

Q. Okay.

A. So to me, I just feel that if they said that, it was up -- it should have been them who decided that.

Q. It should have been the surgery team who decided whether or not to get you in trouble and not --

120

A. Not necessarily get me into trouble, because they didn't mean to do that. But if they decided that, they should have got in trouble, not me.

Q. If they decided what?

A. If -- to use that tray. If they decided not to use that tray, yes, then it was my fault.

Q. Okay.

A. I would have said, yes, okay. But if they decided to use that tray, why would it be my fault?

Q. Okay. Do you know that the surgery group that decided to get the tray did or did not get in trouble for using the tray?

A. I don't know.

Q. Okay. Was there anything else on Exhibit 11 that you disagreed with?

A. It was only those three, right?

Q. There's --

A. Incorrect labeling, no --

Q. On the first page of Exhibit 11 in the box of number 1 there is four incidences there. The restricted street clothes, the incorrect labeling, and then the 8/19.

A. Oh, okay. The incorrect labeling, I -- I don't know. I don't know. I -- the only time that a coworker brought me a tray or set back because it

Exhibit A
20

Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

121

didn't have a card for him to put the stamp.

Q.  I'm sorry, can you explain what you're saying?  I'm not sure I understand.

A.  On these instrument containers we had these cards for two reasons, for the stamp, the sterilizer stamp, and then for your initials.

Q.  Right.

A.  Well, he didn't -- on one tray that I sent to him to sterilize didn't have that card, so he brought it back to me to put my card in there.

Q.  To say that it was -- that you completed the tray?

A.  Yeah.

Q.  And what incident -- when did this happen?  Which one is that related to?  Which incident on Exhibit 11?

A.  Maybe the 19th.  I don't know.

Q.  Okay.  So you're not sure, but it may have been related to the incident on the 19th?

A.  Or the 18th.

Q.  And who brought the instrument tray back to you?

A.  A coworker.

Q.  And who was that?

A.  His name was Jeremy something.

122

Q.  Okay.  Jeremy.

A.  But every -- like I said, once in 38 years that happened.  Everybody, even Heather, does that.

Q.  Okay.

A.  And it can -- those kinds of times, it cannot go back -- it cannot go to surgery without that, because the -- the sterilizer operator needs that card for their stamp.

Q.  And when you say it can't go to surgery without that, are you referring to the sterilizer card -- without putting the sterilizer card on the tray?

A.  Yeah.  For one, that card needs the stamp, the sterilizer stamp.

Q.  Sure.

A.  Two, surgery needs it to put it on the patient's chart just in case there is a problem with that particular load.

Q.  Okay.  So you had a meeting with Heather, Annette and Kathy and yourself to go over this form.  Did anything else happen at that meeting?

A.  I don't remember.

Q.  Not that you remember.  Okay.  When they were talking to you about the termination of your employment, did they talk to you at all about other job

123

positions that you were interested in?

A.  At that point I -- no.  I know -- I brought it up to Annette Hoffman.

Q.  Okay.

A.  About transferring out of CP.  And I was a job shadow in the kitchen, cafeteria.

Q.  Okay.

A.  Not as a cashier.  I don't know where anybody got that idea.

Q.  Okay.

A.  But it was supposed to have been for the doctor's lounge, make -- set up their lunch for them and throughout the lunch hour make sure they have enough, you know, food or water and what -- stuff like that.

Q.  Okay.

A.  And then as I was doing that, I was supposed to help in the tray line for their lunches, to relieve them and serve the -- the rest of the help or visitors, their lunches.

Q.  Okay.  So when did you bring -- when did you bring up a transfer to Annette?  When did you talk to Annette about transferring?

A.  A few times.  And she thought that was a good idea.  And I had that shadow; she set it up.

124

Q.  Do you remember about when that was?

A.  That was in August.

Q.  In August.  Was it before you were terminated?

A.  Yes.

Q.  Okay.

A.  Then I asked Annette -- I told her even I would go in housekeeping if that was the only thing there is.  But she said no.  First off she said no because she didn't think I would like it.

Q.  And what did you say when she said no?

A.  I just kind of looked at her.  I was kind of, whoa, you know.  I said, anything, you know.

Q.  Okay.  So you did the food shadow -- the food service shadow, job shadow.  After you did that did you tell anyone that you liked doing that?

A.  Yes.

Q.  And who did you tell?

A.  Well, Annette, Kathy, and the management up in the cafeteria.  But they all told me that I had to wait until the -- the posting of the opening for it --

Q.  Okay.

A.  -- to go up.

Q.  So you did the food -- the job shadow in

Exhibit A
21

Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

125

the food services department, and you liked that, but there was no open position at that time?

A.  Right.

Q.  Okay.  Do you know if there were any other open positions at that time?

A.  No.

Q.  Did you ever talk with Annette or Kathy about not wanting to do any positions?

A.  No.

Q.  Did you ever talk with Annette or Kathy about not wanting to do a cashier position?

A.  They never even mentioned a cashier position to me.

Q.  They never mentioned that position to you?

A.  Never.

Q.  Did you ever talk with Annette or Kathy about not wanting to work directly with patients?

A.  Not quite.  I told them that I can housekeep and I told them I didn't know for sure if I could make the bed correctly or --

Q.  Okay.

A.  But I would do it.

Q.  Okay.  So with a housekeeping position, you weren't sure if you would be able to perform that job; is that correct?

126

A.  Well, I don't know.  You know, you don't know until you try it.

Q.  Okay.  And so during your termination meeting do you know what positions were open that you were interested in?

A.  No.  Like I said, I was interested in the doctor's lounge, but it was never mentioned in that meeting about it.

Q.  Okay.

A.  Or at least as far as I remember.

(Deposition Exhibit 13 was marked for identification.)

Q.  Okay.  So will you turn to page 2 of Exhibit 13.

(The deponent perused the exhibit.)

Q.  Okay.  Have you reviewed Exhibit 13?

A.  (Nodding.)

Q.  Do you know what Exhibit 13 is?

A.  This meeting.  The last meeting.

Q.  Okay.  And are these Kathy Smith's notes from that last meeting you had on the day of your termination?

A.  Uh-huh.

Q.  So if you turn to page number 2 of Exhibit 13, on the bottom of the page it says, "RJ:

127

Can I transfer?"  Do you see that?

A.  Yes.

Q.  And then it says, "KS:  I did check to see if there were any positions open that meet your skill set.  Know that you shadowed in FS" -- which is services -- "a couple of weeks ago.  Right now there is nothing open that we could move you into.  There's certain things you've said you can't or won't do -- cashier, cook, cleaning patient rooms -- nothing else open."

Do you see that?

A.  Yes.

Q.  Does this refresh your memory of whether or not you told Kathy Smith there were some positions that you can't or won't do?

A.  Like I said, I don't remember them saying cashier.  And for cooking, I don't even cook for myself, so...

Q.  Okay.

A.  For the patient rooms, like I said -- and I told them I would do it.  I don't know if I could do it, but I'll try.

Q.  Okay.  And this meeting that you had that's reflected in Exhibit 13, did you say -- did you correct Kathy Smith when she said there are things that

128

you've said you can or won't do, cleaning patient rooms?

A.  Like I said, I don't remember saying that.  I never said I won't do it.

Q.  Did you ever tell her that you wanted to do the cleaning patient rooms, or during this meeting did you tell her that?

A.  At that meeting, no.

Q.  Okay.

(Deposition Exhibit 14 was marked for identification.)

Q.  Exhibit 14 is an employee grievance report, and right now if you -- and a packet of information in response to the grievance.

But if you just read the first two pages, the employee grievance report, those are the only pages that you need to read.

(The deponent perused the exhibit.)

Q.  And I'm just going to ask you questions about the first two pages right now, so you don't need to read the rest of them.

A.  Okay.

Q.  Okay.  So on the first page of Exhibit 14 -- well, first, what is Exhibit 14?

A.  The grief -- whatever -- report.

Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

---

**161**

was using too big of words for I could understand. They -- they set the level too high. Higher. I don't know.

Q. Okay. When someone used a word that you couldn't understand, did you ask them to explain what the word meant?

A. Sometimes.

Q. Okay. And when you say they set the level too high, what do you mean by that?

A. Well, like I said, if somebody does their instruments in five minutes, I need a bit more time than that.

Q. Okay.

A. And they didn't understand that.

Q. Okay. Did you ask for more time?

A. Not direct, but...

Q. Okay. So then going on in paragraph 7 it says, "Defendant failed to accommodate Plaintiff's disability."

What type of accommodation did you ask for?

A. You know, I really don't know. Before this -- before the new management, before Heather and David came along, they -- they knew.

Q. Okay. And how do you know that they knew?

---

**162**

A. Like I said, with my cousin talking to Sister Rita, some -- either she passed it on to the next management or it was in my record.

Q. Okay.

A. Or both.

Q. Okay. So now when Heather is the supervisor, did you ask for any sort of assistance to help complete your job? To help perform your job?

A. Well, you know, with that training -- retraining in instruments, that's where the -- really the biggest problem was.

Q. Why was there a problem in the retraining?

A. There wasn't really a problem in the retraining.

Q. Okay.

A. It's just before and then afterwards.

Q. Okay.

A. Like I said, Annette Hoffman says, "Good job. You did it."

Q. Okay.

A. Well, I wasn't. Something else came up. Something else came up.

Q. Okay. And when you're referring -- well, let's go back to before the retraining. You had some performance problems, correct? And did you ask for any

---

**163**

help to perform your job duties before the retraining process so you wouldn't make those mistakes?

A. I might have. I don't exactly remember, but I might have said, Well, can you show me or --

Q. Okay. And then Amanda provided the retraining, correct?

A. Yes.

Q. And you successfully completed the retraining, correct?

A. Yes.

Q. And Annette told you good job, you accomplished the complete -- the retraining; is that correct?

A. Yes.

Q. And then after the retraining, what happened?

A. I thought everything was doing okay until that other -- another meeting saying that I didn't improve any.

Q. Okay. So after the retraining there was a meeting when there was performance problems?

A. Yeah.

Q. Okay.

A. And they said that it looked like to them it was very little or nothing.

---

**164**

Q. It was very what, I'm sorry?

A. Very, very little or nothing improvement.

Q. And when they were talking about improvement, were they talking about your job performance improving?

A. Yes.

Q. So after the retraining, you continued to make mistakes. Did you ask for any other type of assistance to perform your job?

A. I don't think so.

Q. Okay. And then in paragraph number 7 on number 8 -- Exhibit 18 it says, "And retaliated against plaintiff for her protected activity."

What was the -- what was the action that you're alleging is retaliation?

A. I don't know. I don't really understand that word, so...

Q. Okay. What about when they talk about your protected activity, do you know what protected activity you engaged in?

A. No.

Q. Okay. And then on Exhibit 18 in paragraph 8 it says, "As a result of defendant's actions, plaintiff has suffered compensatory and other damages and is entitled to an award of all available damages,

---