**MONTANA DEPARTMENT OF LABOR & INDUSTRY**
**EMPLOYMENT RELATIONS DIVISION**
**HUMAN RIGHTS BUREAU**

| | |
|---|---|
| Roxanna Jackson, | |
| Charging Party, | |
| vs. | Final Investigative Report |
| St. Vincent's Hospital, | HRB Case No.0151017156 |
| | EEOC Case No. 32D 201500035C |
| Respondent | |

**Recommendation:** Based on the investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

## I.    ISSUE PRESENTED

Was the Charging Party subjected to unlawful employment discrimination that was based on her age (60) when she was terminated from her position as an Instrument Technician in violation of the Human Rights Act (Title 49, Chapter 2, MCA) and the Age Discrimination in Employment Act, as amended?

Was the Charging Party subjected to unlawful employment discrimination that was based on her disability when she was terminated from her position as an Instrument Technician in violation of the Human Rights Act (Title 49, Chapter 2, MCA) and the Americans with Disabilities Act, as amended?

## II.    SUMMARY OF THE INVESTIGATION

This report constitutes a summary of the investigation conducted in this case. Content of this report is limited to witnesses, documents and other evidence relevant to the analysis of the issue presented. The case file may contain additional evidence not included in this report.

### A.    Charging Party's Position Statement

**Roxanna Jackson (Jackson)** was hired as an Instrument Technician by the Respondent in or about March 1977. She performed the duties of her job satisfactorily.

Jackson states she has had speech and learning disabilities since she was a child. The disability causes problems with the speed of her work and she is often not as fast as other employees. Respondent has been aware of these disabilities for the entire duration of Jackson's employment.

SVH 1180

Exhibit O

1

Sometime in 2012, Respondent hired a new director, David Dobson. He stated to some of the employees that it is easier to train new people than it is to deal with older employees.

On or about August 27, 2014, Jackson was terminated from her position. Her manager, Heather Franzel (Franzel), told Jackson that her work was too slow.

Jackson believes the Respondent discriminated against her because of her age and/or her disability when it terminated her employment.

**B.    Respondent's Position Statement**

**Respondent, St. Vincent's Hospital,** terminated Charging Party's from her position as an Instrument Technician on or about August 27, 2014 due to poor performance that went uncorrected even after Respondent re-trained Charging Party, provided her with an advocate and eventually placed her in a progressive disciplinary process that included a performance improvement plan. Neither her age nor disability were factors in the decision to terminate her employment.

In fact, Respondent states due to the fact that Jackson had been such a long term employee, it offered her at least two other positions in the hospital even though its policy is generally to decline making such offers to employees who were in disciplinary processes. Jackson declined both positions, stating that she did not wish to work around patients or people in housekeeping, or the cafeteria area.

Respondent states it was unaware of the nature of Jackson's disability until October 2013. Jackson submitted a note from her physician, Dr. Phillips, stating that Jackson "has been classified as special needs" and may require additional time to learn and perform certain tasks. "Please consider this when performing her job evaluations."

After this, St. Vincent ordered an independent medical assessment to evaluate Jackson's abilities and to determine if any accommodations were needed to support Jackson in performing the essential functions of her job. The assessment, performed by Psychologist, Dr. David Gumm, recommended Jackson would learn best by repetition, she was not confident in all her skills as an instrument technician and might do better to focus on skills she felt more comfortable with and he suggested that an advocate might be helpful.

Following the assessment, Respondent developed a special re-training program for Jackson to ensure she could adequately perform the essential functions of her job. An advocate from the Human Resources Department, Annette Hoffman, was also appointed to Jackson.

Respondent asserts that Jackson did very well with the training, and also with the evaluation that followed the six-week training period. Despite the additional training and provision of an advocate, Jackson continued to make critical mistakes that placed patient safety at risk.

On multiple occasions, Jackson failed to properly label surgical instrument trays and abide by Respondent's established sanitization protocols. Despite providing Jackson with multiple verbal and written warnings, as well as placement on a performance improvement plan

SVH 1181

Exhibit O

2



(PIP), it became apparent to Respondent that Jackson could not, or would not safely perform the duties of her job.

Instrument technicians must perform their jobs accurately and ensure the quality of their work. Obviously, this environment requires proper and safe functioning of the operating room, cleanliness of instruments and the correct labeling of instrument trays. Despite having been assigned an advocate, Jackson's performance fell within the "needs improvement in order to meet the requirements of this job" in her 2012 performance review given in January 2013. Between July 2013 and October 2013, Heather Franzel, Unit Manager met with Jackson once a week for six weeks to attempt to bolster her score, which barely reached the equivalent of a "meets expectations" score.

Jackson seemed to have interpreted the discipline and training as meaning that she needed to work faster when in fact the problem was with the quality of her work rather than the speed. She consistently had problems assembling instrument trays with the appropriate instruments and the more complicated a tray was; the more likely it was to contain the wrong instruments. There were multiple times that the trays were sent back from operating rooms because they contained the wrong instruments.

At the completion of her re-training, Jackson indicated to Respondent that she felt capable of performing all functions of her job and she was no longer in need of any accommodation. Nonetheless, between June 25, 2014 and August 21, 2014, Jackson made six mistakes that Respondent considered to be critical. The mistakes were not related to speed, as Jackson asserts in her complaint, but rather they were quality and safety issues such as mislabeling of instruments delivered to the operating room, failing to wear sterile clothing in the operating room area and providing incorrect instruments in trays delivered to the operating room.

On July 28, 2014, Jackson received a final written warning for delivering mislabeled instruments to the operating room. She received a two day suspension and was placed on a performance improvement plan (PIP). In the plan, Jackson committed to using reference materials, double checking her work and asking questions when it doubt.

Unfortunately, there were four more critical incidents that occurred following placement on the PIP:

> On August 17, 2014, Jackson entered a sterile area in street clothes. When asked why she had done so by Franzel, she stated she needed to complete her time card;

> On August 18, 2014, the operating room returned a surgical instrument for mislabeling in one of Roxanne's trays;

> On August 19, 2014, the operating room returned another set because the indicators did not reflect that the tray had been sterilized, yet the stickers on the set indicated it had been; and

> On August 21, 2014, the operating room complained that a tray was missing a critical instrument for open heart surgery cases.

SVH 1182

Exhibit O

3

The essential need for quality performance had been routinely overlooked by Jackson and, despite extensive training, the provision of an advocate; regular meetings with her advocate, and progressive discipline, Jackson's performance did not improve. Respondent felt that it had no choice but to terminate her employment for the safety and well-being of its patients.

Neither age nor disability were factors in Respondent's decision. Speed was not a factor in the decision. The issues were quality and safety. Jackson's mistakes had become too frequent and too serious to allow her to remain in her position.

Respondent reiterates due to the length of time Jackson had been an employee at St. Vincent; it offered her the opportunity of accepting other positions. In both instances, she refused, stating that she did not want to work directly with patients and people in the cafeteria.

Respondent points out that Jackson did her job effectively for many years without any disciplinary problems, or issues with her performance. It was only after Franzel became her supervisor that Jackson's performance deteriorated. Respondent surmises this is related to the fact that Jackson was allowed to pick and choose what tasks she wished to perform under David Wilcox' (lead worker of the evening shift) supervision but, when Franzel became her supervisor, Jackson was expected to perform all the essential functions of her job satisfactorily.

Further, prior to October 2013, Jackson never indicated she was disabled, she never requested accommodations of any kind and she never asked for any type of job modification. She also never had disciplinary issues or problems prior to 2013.

## C.    Rebuttal

Charging Party asserts she provided Respondent with a note from her physician in October 2013 stating that she "may require additional time to learn and perform certain tasks." Thereafter, she was "forced" to undergo a psychological evaluation in November 2013. She reported having difficulties at work because she had a new supervisor who was "not patient with her."

The psychologist recommended that Jackson may learn best by having things demonstrated to her, rather than explained orally. She might also need more repetition than others. He also recommended that she have a third party appointed to act as a mediator since she seemed to have difficulty with her supervisor.

Jackson contends rather than accommodating those requests, Respondent "forced" her to participate in additional training, even though she had been performing the job for over twenty years. When she returned to work after training she attempted to work faster, but to no avail. She began to receive write ups for mislabeling instrument trays, mislabeling instruments and giving trays that had not been sterilized to the operating rooms. Jackson denies that she made these mistakes.

Jackson asserts in addition to being disabled, she was the oldest employee on the Sterile Processing Unit.

SVH 1183

Exhibit O

4

**D.    Witnesses**

**David Wilcox, former Team Leader for the Evening Instrument Section,** submits in a written statement that he worked with Jackson from January 2011 to August 2014. He was the lead technician on his shift and his primary duty was "making sure the department ran okay." Over the years, Wilcox observed that Jackson and other employees had specific strengths and weaknesses with regard to completion of her duties. His tendency was to assign her to tasks that he knew she would complete effectively at a slower pace than other tasks. In or about October 2013, Wilcox was told that he could no longer assign selective duties to any employee and, if he continued to do so, he would be disciplined.

Wilcox states his job was to keep the work flowing. He did not have the authority to issue discipline to anyone, but if he observed issues of concern, he was to report them to Franzel. He acknowledges that he did not report any issues with Jackson's performance to Franzel, or any other manager.

Wilcox states the problem was not that Jackson worked too slow; rather the problem was she had trouble grasping what needed to go into some of the more complicated trays. "She had problems and I tried to work around her deficits." Her biggest weakness was putting together instrument sets.

Wilcox does remember Respondent ordered a psychological evaluation for Jackson shortly before he left. He believes Respondent had concerns about her intellectual functioning. Wilcox does not believe that Jackson was terminated because she was disabled. Rather he thinks the problem was that she would not admit that she was making mistakes. No one ever told Wilcox that Jackson was disabled but he realized that she had problems grasping what needed to go in certain trays. Wilcox "always thought Roxanne was valuable" because she had worked for Respondent for so long.

**Heather Franzel, Unit Supervisor of Sterile Processing** states it became apparent to her that Jackson and Wilcox were "shifting around and doing jobs that were in their areas of strength" rather than each performing the essential functions of their jobs. There was one other employee involved in this issue and corrective action was issued.

In October 2013, Jackson was given a performance appraisal that was less than positive. Jackson responded by giving Franzel a note from her physician that stated she needed extra time to assemble instruments. It was at that time that Respondent referred Jackson for a psychological evaluation.

The essential diagnosis was that Charging Party was at the lower range of intellectual functioning. Dr. Gumm noted that Jackson's strengths were her nonverbal abilities and he recommended that she might learn better by having things demonstrated to her, and she might also need to have more repetition that the average employee. He suggested giving her work in areas where she felt confident and also recommended assigning an advocate to her as she seemed to have a strained relationship with the new department manager. Franzel states there is no speed expectation for assembling instrument trays. The most important factor was that each tray was assembled correctly.

SVH 1184

Exhibit O

5

Jackson received a performance appraisal at the end of 2013 and her overall rating was lower than it had been in the past. The appraisal stated it would like to see improvement in the tray assembly area, multi-tasking, and accuracy of tray assembly. It was at this time that Respondent developed a six-week training period for Jackson and it also appointed an advocate, Annette Hoffman (Hoffman), to Jackson.

In December 2013, Jackson received an assessment. Her score from the previous assessment had dropped. Under "manager comments," Amanda Mordhorst, another unit supervisor, wrote, "We would like to see Roxanne improve in the instrument assembly area, her assembly times, her multi-tasking skills and the accuracy of the instrument set. She will be undergoing six weeks of training to help her improve... Roxanne needs to focus more on the quality of her work rather than her co-workers' ethics and processes. Roxanne struggles with adhering to change and the demands in volumes. She often refers to the way things used to be rather than looking towards the future and supporting management decisions. We would like to see some improvement in this area..."

The six-week training and assignment of an advocate started in January 2014. Each week for six weeks Jackson received training and she was also tested on the training she received before moving on to something new.

Franzel points out that there is no speed expectation for assembling instrument trays. The most important factor was that each tray was assembled correctly. Franzel states that Jackson "did very well with the training" as well as the assessment that followed each week.

Following the training, to Franzel's surprise, Jackson continued to make mistakes in the assembly of trays following the training that had been designed specifically for Jackson. An advocate had been appointed to Jackson based on the psychological evaluation that had been done, but Franzel doesn't think Jackson reached out to that individual, Annette Hoffman, if she was struggling.

Jackson "made mistakes regularly" following her training. She was subjected to progressive discipline. She always wanted Hoffman present when she was disciplined and she had a tendency to accept the seriousness of the problems she was making. She also had a tendency to blame the mistakes on others.

Jackson's times in assembling were average, but she made more mistakes than others. It was explained to her multiple times that she would be subjected to additional discipline if the mistakes continued.

**David Dobson, Department Director, Sterile Processing,** states despite Jackson being given training, an advocate and access to supervisors if she needed assistance, she continued to make significant mistakes despite the fact that "she had been given all the right training." Her termination was the result of quality being compromised. It was never about speed. She alleged in her grievance that she was not fast enough but that was not the problem. Trays were mislabeled, they contained incorrect instruments and, Franzel herself found Jackson in a sterile area in street clothes on one occasion. Such mistakes really compromised patient safety and could not be allowed to continue.

SVH 1185

Exhibit O

6



**Amanda Mordhorst, Direct Supervisor, Sterile Processing,** states she is the person who provided the six week training to Jackson. The training was based on her doctor's comment that she needed more time and training to perform well.

Mordhorst primarily focused on instrument training. Jackson's strengths were her knowledge of the instrument area and also particular trays that she seemed to be most comfortable with. Her weakness was the more complex the tray, the more uncomfortable Jackson was with assembling it properly and she had a tendency to avoid those trays. Wilcox, her previous supervisor, allowed this to go on with Jackson and other employees, and it became a significant issue with his performance.

During her training Jackson's speed improved but there continued to be significant issues with quality and mislabeling. Mordhorst trained her for six weeks and made it plain to Jackson that if she needed help or assistance, Mordhorst was available to her. Jackson did not ask for help.

**Kathy Smith, Human Resources Officer,** states she was involved in Jackson's discipline along with Jackson's direct supervisor. Jackson never said she didn't understand the issues and she seemed to understand that the discipline she received was related to issues of quality and mislabeling. At no time did she raise age or disability as a defense for her problems. The issue was never that she was too slow, the issue was always the quality of her work.

Jackson was very quiet in her termination meeting. Although Respondent does not reassign employees who are being disciplined, it made an exception in Jackson's case because she had been employed by Respondent for such a long time. She was allowed to job shadow a position in the dietary department and also in housekeeping, but she stated that she did not want to work around patients. She declined other offers that were made to her, stating she had no interest in the jobs.

**Annette Hoffman, Human Resources Advocate,** states she met with Jackson whenever Jackson met with Franzel and they would discuss her options. Hoffman had the impression that Jackson thought her way of doing things was better. Hoffman states Jackson was given the opportunity to work in other areas but she made it plain that she did not want to work with patients.

Hoffman thinks that Jackson saw Franzel as being the problem. Jackson did not like Franzel. Hoffman was disappointed that there was no change in Jackson's behavior after the training, because she thought the training had been successful. She thinks it is unfortunate that Jackson returned to making the same mistakes.

E.    Documents

> Letter from Dr. William Phillips, dated October 13, 2013, that states Jackson has been classified as "special needs" and may require additional time to learn and perform certain tasks. "Please consider this when performing job evaluations";

SVH 1186

Exhibit O

7

> Psychological assessment conducted by Dr. David Gumm on November 14, 2014. He recommends that she be assigned to duties that she feels comfortable in completing, and he further recommends that she may learn best by having things demonstrated to her rather than explained to her. Finally, he notes that since she reports having a strained relationship with her supervisor (Franzel), it might be helpful to have a third party act as a mediator in their conversations.
> Six-week training plan and follow up assessments completed by Mordhorst;
> Respondent states that all disciplinary actions Charging Party received prior to training were cleared from her record. The only disciplinary actions that were considered in making a determination about her termination occurred after she completed the training with Mordhorst. They are as follows:
> Verbal reminder issued to Jackson on June 25, 2014 by Amanda Mordhorst for sending the wrong surgical tray with mislabeling to an operating room;
> Written reminder issued on July 16, 2014 by Franzel for failure to follow leadership's directions and failure to remain in her assigned work area. Jackson was supposed to have been working in the instrument area but, instead, she was working in the wrapping area;
> Final Written Warning issued to Jackson on July 28, 2014 as a result of sending the wrong tray with incorrect instruments to the operating room;
> Performance Improvement plan, dated July 30, 2014 as a result of having sent mislabeled trays to the operating room. A list of seven actions Jackson needs to take to improve her performance is included. The plan is signed by Jackson and Franzel;
> On August 18, 2014, an instrument tray was returned to Franzel because it had been labeled incorrectly. The count sheet showed that Jackson was the person who had prepared the tray;
> On August 19, 2014, an instrument tray was returned to Franzel as indicators did not reflect that the set had been sterilized and it was labeled incorrectly. Jackson acknowledged having prepared the tray;
> On August 21, 2014, the count sheet and a missing sticker was given to Franzel by the operating room because a critical instrument for open heart surgery was missing. The missing instrument was found sitting on a table and documentation showed that Jackson had been responsible for preparing the set.
> Termination of employment form given to Jackson on August 27, 2014. The form states that in addition to the above, Jackson entered a restricted sterile area in street clothes on August 17, 2014. Franzel asked why she was in the sterile area and Jackson answered she came to get her time card signed;
> Handwritten notes taken by Smith during exit interview. Jackson was relatively quiet although she did mention several times that she believed the hospital was "just trying to get rid of me." The notes do indicate that the subject of reassignment was discussed with Jackson during the meeting;
> Jackson did file a grievance to her termination, but she was to have submitted additional information to Smith no later than September 22, 2014. On September 23, 2014, Smith wrote Jackson a letter informing her that her failure to submit the additional documentation by the deadline date effectively ended her grievance.

F.    **Comparative Evidence**

SVH 1187

Exhibit O

8

At the time of Jackson's most recent employment a total of 37 employees worked on the Sterile Processing unit. Their ages are as follows:

| 60's | 50's | 40's | 30's | 20's |
|------|------|------|------|------|
| 8    | 10   | 8    | 7    | 4    |

In 2012, six instrument techs were disciplined for making mistakes. In 2013, eight instrument techs were disciplined for making mistakes. In 2014, nine instrument techs were disciplined for making mistakes. With the exception of Jackson, none of these individuals claimed a disability.

From 2012 to 2014 medical accommodations were provided to ten individuals. Three of them resigned. None had medical conditions that were related to developmental delays or intellectual functioning.

### G.    Omissions

Charging Party provided a list of seven names of people she expected to provide witness testimony on her behalf. Wilcox is one and his statement is contained within. Bernice Moorhouse is a recent co-worker but she stated that she did not wish to get involved with the investigation.

I left messages for Josh Overfelt and Cindy Duncan, former co-workers, on March 23, 2014, April 1, 2015 and April 2, 2015, but the calls were not returned.

Three other separate former employees stated they had worked with Jackson but it had been many years since they worked with her. Chris Harris, Diane Larson and Shirley Wittman stated they all retired, the most recent one being four years ago. None of these individuals had any knowledge of Jackson's circumstances at the time of her termination.

### III.    ANALYSIS

### Analysis – Age Discrimination

Jackson alleges Respondent unlawfully discriminated against her in the area of employment because of her age. CP establishes she filed a timely complaint. The Montana Human Rights Bureau has jurisdiction over the complaint.

Jackson alleges disparate treatment. To establish a prima facie case, she must establish:

1) she is a member of a protected class;
2) she was qualified for the position;
3) Respondent subjected her to an adverse act; and
4) Respondent did not similarly terminate persons outside of her protected class.

SVH 1188

Exhibit O

9

Jackson was 60 years old at the time of her termination and her qualifications are not in dispute. She was terminated from her position as an instrument technician on August 27, 2014. Persons outside her protected class were not terminated.

Based on the above-cited information, Jackson successfully establishes a prima facie case of age discrimination.

Once Jackson establishes a prima facie case, the burden of production shifts to Respondent to articulate a legitimate, nondiscriminatory reason for terminating Jackson's employment.

Respondent, St. Vincent's Hospital, terminated Charging Party's from her position as an Instrument Technician on or about August 27, 2014 due to poor performance that went uncorrected even after Respondent re-trained Charging Party, provided her with an advocate and eventually placed her in a progressive disciplinary process that included a performance improvement plan. Neither her age nor disability were factors in the decision to terminate her employment.

Despite having been re-trained, Jackson mislabeled instrument trays, failed to put the correct instruments in the proper trays and did not follow Respondent's protocols for sterile areas.

Respondent states due to the fact that Jackson had been such a long term employee, it offered her at least two other positions in the hospital even though its policy is generally to decline making such offers to employees who were in disciplinary processes. Jackson declined both positions, stating that she did not wish to work around patients or people in housekeeping, or the cafeteria area.

Unfortunately, Jackson continued to makes mistakes that were critical to the safety and well-being of the hospital's patients and, after a critical instrument had been excluded from a heart surgery tray, Respondent felt that it had no choice but to terminate her from her position, especially in light of the fact that she was unwilling to be considered for other positions.

Based on the above-cited information, Respondent successfully articulates a legitimate, nondiscriminatory reason for terminating Jackson's employment.

Once Respondent articulates a legitimate, nondiscriminatory reason for terminating Jackson's employment, she may prevail by proving by a preponderance of the evidence that the reason offered was not the true reason for her termination, but rather it was a pretext for discrimination. Pretext may be proven by evidence that a discriminatory motive was the reason for Respondent's actions or that evidence to show that Respondent's explanations are not credible and unworthy of belief.

Jackson asserted a belief that she was older than everyone else that worked on the Sterile Processing Unit; however, comparative evidence shows there were at least seven employees as old, or older, than Jackson that remain in their position. Referring to the age chart in the Comparative Data section of this report, evidence shows that the unit to which Jackson was assigned had a very balanced mix of ages. In fact, the lowest number of employees were in their 20's and the highest number were in their 50's.

SVH 1189

Exhibit O

10

In addition, there is sufficient evidence to show that Jackson was making a lot of mistakes, even after she had been assessed, re-trained and given an advocate to support her when she was having difficulty.

Further, the Bureau finds Respondent's assertion that it offered Jackson other positions in the hospital to be credible.

The Bureau finds that a preponderance of the evidence does not support the charge of discrimination based on age.

**Disability Discrimination**

Jackson alleges Respondent unlawfully discriminated against her in the area of employment because of her disability. She establishes she filed a timely complaint. The Montana Human Rights Bureau has jurisdiction over the complaint.

Jackson alleges disparate treatment. To establish a prima facie case, she must establish:

5) she is a member of a protected class;
6) she was qualified for the position;
7) Respondent subjected her to an adverse act; and
8) Respondent did not similarly terminate persons outside of her protected class.

Jackson has a speech and learning disabilities. Her qualifications are not an issue of dispute. She was terminated from her position as an instrument technician on August 27, 2014. Persons outside her protected class were not terminated.

Based on the above-cited information, Jackson successfully establishes a prima facie case of disability discrimination.

Once Jackson establishes a prima facie case, the burden of production shifts to Respondent to articulate a legitimate, nondiscriminatory reason for terminating Jackson's employment.

Respondent states it was never advised that Jackson was disabled until October 2013. Following a less than positive performance appraisal, Jackson brought a note from her physician. The letter from Dr. William Phillips, dated October 13, 2013, states Jackson has been classified as "special needs" and may require additional time to learn and perform certain tasks. In particular, he requests that her classification as special needs be considered when she is given performance evaluations. After this,

Respondent referred Jackson to a psychologist for an assessment. It should be noted that whether Respondent's medical examination or inquiry was proper is not subject to investigation as it happened outside of the statutory time frame the Bureau has the authority to investigation. *Mont. Code Ann. 49-2-501.*

The psychological assessment conducted by Dr. David Gumm on November 14, 2013 at the request of the Respondent. He recommends that she be assigned to duties that she feels comfortable in completing, and he further recommends that she may learn best by having

SVH 1190

Exhibit O

11

things demonstrated to her rather than explained to her. Finally, he notes that since she reports having a strained relationship with her supervisor (Franzel), it might be helpful to have a third party act as a mediator in their conversations.

In response, it appears undisputed that Respondent assigned Amanda Mordhurstto work with Jackson and a six-week training plan and follow up assessment was developed to address Dr. Gumm's recommendations.

Jackson completed the training and the follow-up evaluation. According to Respondent she did quite well with the process. Unfortunately, many of the mistakes that Respondent had previously noted re-appeared following the training. Jackson mislabeled trays, left out critical instruments, failed to sterilize items as required and similar mistakes that gave Respondent serious concern about patient safety and well-being.

Jackson was placed on a performance improvement plan on July 30, 2014. She denied having made some of the mistakes that were outlined on the plan and she occasionally blamed others for the mistakes that were assigned to her.

Jackson had an advocate, Hoffman, but she rarely went to her for assistance or advice. Her performance continued to decline and, after a serious omission from a heart tray, Respondent determined that it had no choice but to terminate Jackson's employment for the safety and well-being of the patients.

Because Jackson was a long term employee, other positions were suggested to her in order to continue her employment. She was asked to consider positions in food service and housekeeping, but she declined, stating that she did not want to work with patients. Respondent points out that it rarely offers a position to an employee who is in a disciplinary process but because of the length of time Jackson had worked for Respondent, it made an exception in her case.

Because Jackson refused to consider other positions, her employment was terminated on August 27, 2014. She did file a grievance following her termination, but she failed to submit required documentation the hospital requested by a specific deadline date, her employment was ultimately terminated.

Respondent points out that Jackson did her job effectively for many years without any disciplinary problems, or issues with her performance. It was only after Franzel became her supervisor that Jackson's performance deteriorated. Respondent surmises this is related to the fact that Jackson was allowed to pick and choose what tasks she wished to perform under Wilcox' supervision but, when Franzel became her supervisor, Jackson was expected to perform all the essential functions of her job satisfactorily.

Further, prior to October 2013, Jackson never indicated she was disabled, she never requested accommodations of any kind and she never asked for any type of job modification. She also never had disciplinary issues or problems prior to 2013.

Once Respondent articulates a legitimate, nondiscriminatory reason for terminating Jackson's employment, she may prevail by proving by a preponderance of the evidence that

SVH 1191

Exhibit O

12

the reason offered was not the true reason for her termination, but rather it was a pretext for discrimination. Pretext may be proven by evidence that a discriminatory motive was the reason for Respondent's actions or that evidence to show that Respondent's explanations are not credible and unworthy of belief.

Jackson asserts she started getting written up and getting in trouble after Franzel became her supervisor because Jackson was expected to perform faster. She contends that she could not keep up with the expectations and therefore made many mistakes.

Jackson does not offer an explanation for why she was able to do so well with the re-training and evaluation, yet she returned to making multiple mistakes following those processes. She also does not state why she did not seek out help from her advocate.

It appears that problems and issues arose for Jackson when Wilcox left and Franzel became her supervisor. Testimony shows that a problem existed on the Sterile Processing Unit under Wilcox' supervision because employees were allowed to select the tasks they wanted to work on. Once this behavior was discovered, Wilcox was threatened with discipline for his failure to require all technicians to perform all the essential functions of their positions.

The Bureau finds Respondent took appropriate action by having Jackson assessed once she advised them of a disability; they provided extensive training to her and evaluated her abilities to perform the duties of her position following the training. It does not seem reasonable to conclude that Respondent would not have taken these actions had it simply wanted to "get rid of" Jackson, as she claimed.

Even after Respondent determined that it could no longer allow Jackson to remain in an instrument technician position due to the safety and well-being of the patients, Respondent offered her other positions in violation of its own policies about offering positions to employees who had been subjected to discipline. If Respondent had a discriminatory animus towards Jackson based on her disability; it would not have offered her other positions.

The Bureau finds there is insufficient evidence to support the charge of employment discrimination that was based on a disability.

**Conclusion**
Based on the investigation, the Bureau finds **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

Meg McNelly Bennett, Investigator            May 14, 2015
Montana Human Rights Bureau

SVH 1192

Exhibit O
13