Eric E. Holm
Ben T. Sather
SATHER & HOLM, PLLC
2301 Montana Ave., Ste. 202
P.O. Box 1115
Billings, MT  59103
Telephone: (406) 294-1700
Facsimile:  (406) 794-0673
eric@satherandholm.com
ben@satherandholm.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BILLINGS DIVISION**

| | | |
|---|---|---|
| ROXANNA JACKSON, | ) | Case No.  CV-15-115-BLG-SPW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PLAINTIFF'S STATEMENT OF** |
| | ) | **DISPUTED FACTS** |
| ST. VINCENT HEALTHCARE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Pursuant to Local Rule 56.1(b), Plaintiff Roxanna Jackson submits this

Statement of Disputed Facts in opposition of Defendant's Motion for Summary

Judgment.

//

//

**I.** **<u>Materials Filed in Support of Plaintiff's Statement of Disputed Facts</u>**

**<u>EXHIBITS</u>**

Documents evidencing the disputed facts and supporting Plaintiff's Response Brief Opposing Defendant's Motion for Summary Judgment are attached hereto as the following exhibits:

A. Excerpts from deposition of Roxanna Jackson (Roxanna Jackson Depo.)

B. Excerpts from deposition of Amanda Mordhorst (Mordhorst Depo.)

C. Excerpts from deposition of Annette Hoffman (Hoffman Depo.)

D. Declaration of Eric E. Holm

E. Excerpts from deposition of Douglas "D.K." Jackson (DK Jackson Depo.)

F. Excerpts from deposition of Heather Franzel (Franzel Depo.)

G. Excerpts from deposition of Kathy Smith (Smith Depo.)

H. Excerpts from 30(b)(6) deposition of Kathy Smith (Smith 30(b)(6) Depo.)

I. Excerpts from deposition of David Dobson (Dobson Depo.)

J. Defendant's Responses to Plaintiff's First Combined Discovery Requests to Defendant

K. Defendant's Responses to Plaintiff's Third Combined Discovery Requests to Defendant

L. Depositions Exhibits (Depo. Ex.):

L-1   Depo. Ex. 1 (Instrument Tech Job Description 07/2006)

L-2    Depo. Ex. 2 (William L. Phillips, DO letter – Oct. 16, 2013)

L-3    Depo. Ex. 3 (Psychological Evaluation – Nov. 14, 2013)

L-4    Depo. Ex. 4 (William L. Phillips, DO letter – Apr. 16, 2014)

L-5    Depo. Ex. 5 (Corrective Action Form – Oct. 10, 2013)

L-6    Depo. Ex. 6 (Corrective Action Form – Nov. 5, 2013)

L-7    Depo. Ex. 8 (Corrective Action Form – June 25, 2014)

L-8    Depo. Ex. 9 (Corrective Action Form – July 16, 2014)

L-9    Depo. Ex. 10 (Corrective Action Form – July 28, 2014)

L-10   Depo. Ex. 11 (Corrective Action Termination Form –
       Aug. 27, 2014)

L-11   Depo. Ex. 12 (Performance Improvement Plan – July 30, 2014)

L-12   Depo. Ex. 14 (Grievance – July 2014)

L-13   Depo. Ex. 15 (Grievance – September 2014)

L-14   Depo. Ex. 17 (Charge of Discrimination – Oct. 6, 2014)

L-15   Depo. Ex. 24 (Grievance correspondence – Aug. 2014)

L-16   Depo. Ex. 25 (Jackson appeal – Aug. 2014)

L-17   Depo. Ex. 30 (SVHC Response to Dept. Labor – Oct. 21, 2014)

L-18   Depo. Ex. 31 (Instrument Assembly Time Trials)

L-19   Depo. Ex. 32 (Instrument Assembly Time Trials)

L-20   Depo. Ex. 34 (Emma Nagengast letter – April 27, 2015)

L-21 Depo. Ex. 35 (Performance Planning & Review 2013)

L-22 Depo. Ex. 36 (2011 Employee Annual Performance Review)

L-23 Depo. Ex. 38 (Franzel / Dobson email – Dec. 16, 2013)

L-24 Depo. Ex. 39 (Smith / Hoffman email – July 31, 2014)

M. Declaration of Roxanna Jackson

## II. Defendant's Statement of Undisputed Facts (Doc. 16-2)

1. Roxanna Jackson is an individual who, at all relevant times, resided in Billings, Yellowstone County, Montana. (Doc. 12, p. 2, ¶ 3.A), *Roxanna Jackson Dep.*, 5:24-25; 17:7-8, June 22, 2016, attached as *Exhibit A*.

*Undisputed.*

2. Plaintiff currently resides in Colorado. (Doc. 12, p. 2, ¶ 3.A), *Jackson Dep.,* 5:15-17, *Ex. A*.

*Undisputed.*

3. St. Vincent Healthcare ("St. Vincent") is a Montana public benefit corporation doing business in Billings, Yellowstone County, Montana. (Doc. 12, ¶ 3.B at p. 2); *Exhibit B,* p. 2.

*Undisputed.*

4. St. Vincent is a charitable corporation. *Ex. B,* p. 2.

*Disputed. Def.'s Ex. B. Defendant's Exhibit B is a hearsay document with no foundation that does not state it is a "charitable corporation." The statement is also an improper legal conclusion.*

5. St. Vincent employed Plaintiff as an Instrument Technician or Instrument Tech until August 27, 2014. *Exhibit C.*

*Undisputed.*

6. An Instrument Tech assists in disassembling, cleaning, disinfecting, sterilizing and/or storing procedure trays, surgical trays, equipment and also assembles case carts and fills the needs of the Operating Room ("O.R.") for supplies and Instruments. *Jackson Dep.,* 38:25-39:10, *Ex. A*; *Exhibit D.*

*Disputed. Def.'s Ex. D.*

7. The essential functions of the Instrument Technician are laid out in the job description and include:

    a. Disassembles carts and follows Universal Precaution for decontamination;
    b. Sterilizes equipment and instruments, wraps clean supplies and instruments, maintains records for all instruments and transports sterilized items back to the floor;
    c. Assembles instruments and rechecks all instruments for cleanliness and/or impairment and properly checks power equipment with use of nitrogen;
    d. Takes measures to allow for easy instrument tracking including maintaining the color coding tape on all instruments, properly using the instrument engraver, reporting and documenting all missing instrument and implants replaced in trays and properly handles loaner instrument tray;

e. Inventories and communicates the implant and equipment inventory status with C.P. staff and the O.R. Charge Nurse including current order status, back orders and/or changes;

f. Appropriately responds to emergency situations by making sure that all emergency, trauma, and add-on cases are picked properly and sent to the O.R. in a timely manner. Remains knowledgeable in the proper procedure to follow during a cardiac arrest in the O.R.

*Id.*

***Disputed. Def.'s Ex. D. This statement is an improper legal conclusion.***

8. The job description states the functions of the Instrument Tech position. *Id.*

***Undisputed.***

9. Plaintiff acknowledged that she read the job description and that she could meet all the requirements for the Instrument Tech position and that the duties and responsibilities may change at any time with notification. *Exhibit E.*

***Undisputed.***

10. St. Vincent required all Instrument Techs to perform all of the functions of the position because, at times, an Instrument Tech may work alone on a weekend shift or may need to quickly respond to a request for a tray needed for an emergency. *Jackson Dep.,* 38:2-6, 39:8-10, *Ex. A*; *Ex. D.*

***Disputed. Ex. A, Roxanna Jackson Depo., 22:6-10, 26:7-22, 27:7-8, 27:12-28:16, 29:18-25, 38:2-6, 39:16-18, 40:3-8, 99:14-24.***

11. Instrument trays were an important aspect of the Instrument Tech's job. *Jackson Dep.,* 104:7-10, *Ex. A*.

**Disputed. Ex. A, Roxanna Jackson Depo., 104:7-10.**

12. Plaintiff testified that instrument trays were "100 percent" of an Instrument Tech's job duties. *Id.*

**Disputed. Ex. A, Roxanna Jackson Depo., 104:7-10.**

13. Plaintiff made mistakes when compiling instrument trays. *Jackson Dep.,* 77:19-21, *Ex. A*.

**Undisputed.**

14. In October 2013, Plaintiff received a correction action. *Jackson Dep.,* 66:19-20, *Ex. A*; *Exhibit F*.

**Undisputed.**

15. In response to the corrective action, Plaintiff presented St. Vincent with a note from her physician. *Jackson Dep.,* 57:11-17, *Ex. A*.

**Disputed. Ex. A, Roxanna Jackson Depo., 57:11-17.**

16. The note from Plaintiff's physician, Dr. Phillips, dated October 16, 2013, read: "This patient has been classified as special needs and may require additional time to learn and perform certain tasks. She also is a diabetic with a heart condition. Please consider this when performing job evaluations." *Jackson Dep.,* 53:25-54:15, *Ex. A*; *Exhibit G*.

***Disputed. Def.'s Ex. G.***

17. St. Vincent arranged for Plaintiff's evaluation by Dr. Gumm. *Jackson Dep.,* 58:22-59:3, *Ex. A.*

***Disputed. Ex. A, Roxanna Jackson Depo., 58:22-59:3; Ex. L-3, Depo. Ex. 3.***

18. Dr. Gumm provided findings and suggested recommendations for Plaintiff:

> 2. The patient appears to have a relative strength in her nonverbal abilities. She might learn best by having things demonstrated to her, rather than explained to her orally. She might also need to have more repetition than the typical employee.
>
> 3. The patient stated that there are some part [sic] of her work that she feels more confident in. She stated that she is not as confident in her skills regarding sterilization of instruments but there are other areas of her work that she is much more comfortable and confident with. She might be allowed to perform some areas of her job that she has more confidence in.
>
> 4. The patient reports that she feels that she has a strained relationship with a new department manager. She might have a third party act as a mediator to ensure that communication is as effective as possible.

*Exhibit H*, p. 4.

***Disputed. Ex. L-3, Depo. Ex. 3.***

19. Plaintiff only asked for accommodation with the instrumentation area. *Jackson Depo.* 57:18-20, *Ex. A*.

***Disputed. Ex. L-2, Depo. Ex. 2; Ex. L-3, Depo. Ex. 3; Ex. L-4, Depo. Ex. 4; Ex. A, Roxanna Jackson Depo., 57:3-20.***

20.     St. Vincent appointed Annette Hoffman to act as a mediator to ensure effective communication between Plaintiff and her new department manager. *Jackson Dep.,* 61:20-62:3, *Ex. A*.

***Disputed. Ex. A, Roxanna Jackson Depo., 61:20-62:3.***

21.     Plaintiff did not ask for anyone else as her mediator. *Jackson Dep.,* 62:4-7, *Ex. A*.

***Disputed. Ex. A, Roxanna Jackson Depo., 61:20-62:3.***

22.     St. Vincent developed a six-week retraining program for Plaintiff. *Jackson Dep.,* 80:13-81:12, *Ex. A*; *Exhibit I*.

***Disputed. Ex. B, Mordhorst Depo., 21:18-22:1.***

23.     During this retraining, Plaintiff worked one-on-one with her manager, Amanda Mordhorst, in the instrumentation area. *Jackson Dep.,* 74:7-9, 76:15-21, *Ex. A*.

***Undisputed.***

24.     Plaintiff did not object to going through the retraining program. *Jackson Dep.,* 76:12-14, *Ex. A*.

***Undisputed.***

25. Plaintiff successfully completed the retraining program. *Jackson Dep.,* 77:10-14, 83:14-20, *Ex. A*.

***Undisputed.***

26. Plaintiff testified that during the retraining program, she felt comfortable with and knew how to complete the instrument trays. *Jackson Dep.,* 79:10-12, *Ex. A*.

***Undisputed.***

27. Plaintiff testified that after the retraining program she felt more comfortable with the instrument trays because she learned a better way to put the instruments in the trays. *Jackson Dep.,* 81:14-15, *Ex. A*.

***Disputed. Ex. A, Roxanna Jackson Depo., 81:7-11.***

28. Plaintiff testified that she understood how to put the instruments on the trays properly. *Jackson Dep.,* 84:19-22, *Ex. A*.

***Undisputed.***

29. After the retraining program, Plaintiff did not request any additional accommodations. *Jackson Dep.,* 68:10-11, 164:7-10, *Ex. A*.

***Disputed. Ex. L-4, Depo. Ex. 4.***

30. On June 25, 2014, Plaintiff received a corrective action for mislabeling multiple instruments incorrectly. *Jackson Dep.,* 85:19-22, *Ex. A*; *Exhibit J*.

*Disputed.  Ex. A, Roxanna Jackson Depo., 85:19-22; Ex. L-7, Depo. Ex. 8.*

31. On July 16, 2014, Plaintiff received a corrective action for insubordination for failing to follow her leader's instruction. *Jackson Dep.,* 91:21-92:6, *Ex. A*; *Exhibit K.*

*Disputed. Ex. L-8, Depo. Ex. 9.*

32. Plaintiff admitted that she was assigned to work in the instrument area but instead switched job duties with another co-worker and went to the sterilizer operator area. *Jackson Dep.,* 92:20-93:7, *Ex. A.*

*Disputed.  Ex. A, Roxanna Jackson Depo., 91:21-93:1.*

33. On July 28, 2014, Plaintiff received another corrective action for mislabeling an instrument. *Jackson Dep.,* 94:13-95:1, *Ex. A*; *Exhibit L.*

*Undisputed.*

34. Plaintiff developed a performance improvement plan indicating that she would use reference materials, would double-check the labeling as needed, and would ask questions if she had them. *Jackson Dep.,* 105:11-107:11, *Ex. A*; *Exhibit M.*

*Disputed.  Ex. A, Roxanna Jackson Depo., 105:11-107:11; Def.'s Ex. M.*

35. Plaintiff's performance improvement plan did not indicate that Plaintiff needed any further accommodation. *Ex. M.*

*Undisputed.*

36. On August 17, 2014, Plaintiff entered a sterilized area of the hospital in street clothes, knowing that she should have taken the time to put on a sterilized gown and hairnet. *Jackson Dep.,* 110:5-8, 111:16-112:12, *Ex. A*; *Ex. C.*

***Disputed. Ex. A, Roxanna Jackson Depo., 110:5-112:12.***

37. On August 18, 2014, Plaintiff incorrectly labeled another instrument set and failed to put in a sterilization indicator as required. *Jackson Dep.,* 112:13-113:17, *Ex. A*; *Ex. C.*

***Disputed. Ex. A, Roxanna Jackson Depo., 42:4-20, 112:17-113:20.***

38. On August 19, 2014, Plaintiff failed to properly sterilize an instrument. *Jackson Dep.,* 113:25-114:3, 115:19-22, *Ex. A*; *Ex. C.*

***Disputed. Ex. L-10, Depo. Ex. 11; Ex. A, Roxanna Jackson Depo., 120:19-121:13, 122:2-3.***

39. Finally, on August 21, 2014, Plaintiff failed to place an instrument required for open heart surgery on a tray. *Jackson Dep.,* 119:6-13; 120:14-18, *Ex. A*; *Ex. C.*

***Disputed. Ex. A, Roxanna Jackson Depo., 114:4-116:19, 118:13-16.***

40. Plaintiff's mistakes placed patient safety at issue and created safety concerns for the hospital. *Jackson Dep.,* 90:14-20, *Ex. A.*

***Disputed. Ex. A, Roxanna Jackson Depo., 90:14-20.***

41.    Plaintiff job shadowed for a job in the cafeteria department, but it was not an open position at the time.  *Jackson Dep.,* 124:14-125:3, *Ex. A.*

**Disputed. Ex. C, Hoffman Depo., 37:1-13.**

42.    Jackson did not indicate that she was interested in any other open position. *Jackson Dep.,* 126:20-128:8, *Ex. A*.

**Disputed.  Ex. A, Roxanna Jackson Depo., 122:23-123:6, 124:7-9, 126:20-128:8.**

43.    On October 9, 2014, Plaintiff filed a Charge of Discrimination alleging age and disability discrimination.  (Doc. 12, pp. 2-3, ¶ 3.C); *Exhibit N.*

**Disputed.  Def.'s Ex. N.**

44.    Plaintiff's Charge did not address retaliation.  *Id.*

**Disputed.  Def.'s Ex. N; Ex. D, Decl. of Eric E. Holm, ¶ 2 (Nov. 17, 2016).**

45.    The HRB investigated the Charge and found no reasonable cause to believe unlawful discrimination occurred.  *Exhibit O*, p. 13.

**Undisputed.**

46.    Plaintiff appealed the HRB's finding to the Human Rights Commission, which upheld the no cause finding.  *Exhibit P.*

**Disputed.  Def.'s Ex. P, p. 2.**

47.    During Plaintiff's deposition, Plaintiff did not mention what protected activity she engaged in.  *Jackson Dep.,* 164:18-21, *Ex. A.*

*Undisputed.*

48.    Plaintiff filed for Social Security Disability Income.    On her application, Plaintiff stated, under oath, "I became unable to work because of my disabling condition on August 26, 2014." *Exhibit Q*.

***Disputed.    Def.'s Ex. Q is a hearsay summary document apparently drafted by someone at the Social Security Administration.***

## III.    Plaintiffs' Additional Facts in Opposition to Defendant's Motion

49.    Roxanna graduated from Senior High School in Billings, Montana, in 1973.  Ex. A, Roxanna Jackson Depo., 12:6-13.  During high school, Roxanna worked at the public library, in laundry at a nursing home, as a janitor, and doing dishes in the cafeteria of now Billings Clinic.  *Id.*, 12:17-14:24.

50.    Roxanna's next job after high school was at St. Vincent Healthcare in Central Processing ("CP").  *Id.*, 14:25-15:3. This was in 1976 or 1977.  *Id.*, 19:6-8.  Her job title was C.P. Aide.  *Id.*, 19:19-21.

51.    Sister Rita hired Roxanna.  *Id.*, 22:13.  Roxanna and DK's cousin knew the director of St. Vincent Healthcare at the time and spoke to her about hiring Roxanna.  *Id.*, 23:1-4; Ex. E, DK Jackson Depo., 65:20-66:2.  She then talked to the director, Sister Rita, about hiring Roxanna. Ex. A, Roxanna Jackson Depo., 23:3-7.  DK Jackson was present when they discussed Roxanna's life history and disability and decided to hire Roxanna.  Ex. E, DK Jackson Depo.,

65:20-68:2. DK knew they understood Roxanna could perform the functions of the position even with her disability, which she did for over 35 years. *Id.*, 68:3-6. They were made aware of Roxanna's disability. Ex. A, Roxanna Jackson Depo., 23:9-10.

52. Her job duties as a C.P. Aide when she first started in 1976 or 1977 were "pretty much the same" as what she did at the time of her termination. *Id.*, 19:6-14. She mostly worked "issue," which was delivering sterile trays, linens, and machines throughout the hospital. *Id.*, 19:12-21. She also washed dirty instruments in "decontam," putting items in the sterilizer and wrapping them in "S.O.," or the Sterile Operator area, and occasionally filling up carts with items during the night shift for delivery. *Id.*, 19:12-20:25.

53. Because Sister Rita knew Roxanna was disabled, she had Roxanna doing issue and exchange carts. *Id.*, 23:9-12. Other Aides were getting trained and doing other duties, but Roxanna was initially limited to issue and exchange carts because of her disability. *Id.*, 23:13-18.

54. Roxanna was on the day shift for several years because she had no car to drive home after the buses closed for the night. *Id.*, 23:24-24:3. When she got a car, Sister Rita put her on the evening shift, working 3:00 p.m. to 11:30 p.m. *Id.*, 24:12-16. She worked this shift until her termination, with an occasional change to day shift when they needed help. *Id.*, 24:12-16, 26:23-25, 28:18-20. Roxanna

always worked the evening shift from at least 2007 until her termination. Ex. F, Franzel Depo., 18:6-12. During that evening shift, four or five other employees were on shift with Roxanna. *Id*., 19:11-21. She was also regularly scheduled the weekend shift where she was the only Tech on duty at that time. *Id*., 20:12-19. Despite this, Roxanna was never moved off of weekend shifts. *Id*., 21:24-25.

55. Roxanna was a C.P. Aide for the first six years of her employment, after which she asked to become a C.P. Tech. Ex. A, Roxanna Jackson Depo., 21:17-22:1. Her supervisor, Barbara Jones, specifically asked Roxanna to become an instrument Tech. *Id*., 25:3-5. After becoming a Tech, Roxanna was trained in the additional duty of instrument sets. *Id*., 25:14-25. She was not trained in anything else as part of the promotion, since she knew all other job duties. *Id*., 25:19-23.

56. The Aide position went away in the 1990's, after which there were only Techs. *Id*., 37:8-10. The Techs, including Roxanna, had to do all parts of the job in case a Tech was working a weekend by him- or herself and had to perform all duties. *Id*., 37:15-38:6.

57. Deposition Exhibit 1 is Roxanna's job description containing a Tech's duties. Ex. L-1, Depo. Ex. 1; Ex. A, Roxanna Jackson Depo., 104:16-21; Ex. G, Smith Depo., 10:9-18. This description was drafted in 2006. Ex. L-1, Depo. Ex. 1;

Ex. G, Smith Depo., 10:9-11:11. The description was not revised or updated since 2006. Ex. L-1, Depo. Ex. 1; Ex. G, Smith Depo., 11:16-20.

58. Roxanna could perform all of those duties contained in her job description. Ex. A, Roxanna Jackson Depo., 104:22-23; Ex. H, Smith 30(b)(6) Depo., 23:11-16. She was able to demonstrate she was able to do this work. Ex. G, Smith Depo., 12:15-24.

59. St. Vincent Healthcare's HR Director was not sure if Roxanna actually had a disability, because she "could function in the job." *Id*., 24:10-19.

60. In reviewing Roxanna's job description as part of the interactive process, Annette Hoffman concluded there were no duties Roxanna could not perform with or without an accommodation. Ex. C, Hoffman Depo., 21:9-16. "She could do the job." *Id*., 21:17.

61. When Roxanna became a Tech, St. Vincent Healthcare management understood Roxanna's disability, so they did not put her in instruments that much. Ex. A, Roxanna Jackson Depo., 22:6-10. Her supervisors did not really put Roxanna on instruments without another Tech or if it was going to be a "very nice, easy night" with instruments. *Id*., 26:7-19. So Roxanna worked instruments, but not too often. *Id*., 26:20-22.

62. When Roxanna was an instrument Tech, there were four or five Techs working the same shift as her. *Id*., 39:16-18. On the weekends, there was one

person on the morning shift, one on the evening shift, and one on the graveyard shift. *Id*., 40:3-8.

63. Diane Larson was Roxanna's supervisor prior to her final supervisor, Heather Franzel. *Id*., 27:7-8, 29:18-25. Roxanna worked for Larson for many years and talked to Larson about her having a disability, so Larson had full knowledge of her disability. *Id*., 27:12-28:7. Larson saw Roxanna work on each of Roxanna's shifts, five days a week. *Id*., 28:8-16. Larson did not put Roxanna in instruments unless it was going to be a "very nice night." *Id*., 27:12-18.

64. Another accommodation St. Vincent Healthcare had allowed Roxanna is a process when she was learning something new to be able to read, be told, and be shown the information or task, and she would show it back to them. *Id*., 51:23-52:3. This was done the whole time during her employment. *Id*., 52:23-25.

65. Evening head tech David Wilcox would switch Roxanna out of instruments to another task if the instrument area got busy. *Id*., 99:14-24.

66. There are certified and noncertified Techs at St. Vincent Healthcare. Ex. B, Mordhorst Depo., 7:23-8:1. Roxanna was a noncertified Tech. *Id*., 8:13-14. The only job difference is that a certified Techs are expected to help the noncertified Techs with any questions they may have, and it is okay for noncertified Techs to go to certified Techs for help. *Id*., 9:3-17.

18

67.     Roxanna had never been subjected to any discipline for any reason prior to 2013.  Ex. G, Smith Depo., 29:10-19.

68.     Heather Franzel started at St. Vincent Healthcare as an instrument Tech in 2007.  Ex. F, Franzel Depo., 15:19-16:4.  She became the CP department manager since 2012 or 2013.  *Id*., 11:20-22, 13:22-25; Ex. A, Roxanna Jackson Depo., 30:1-3.  Franzel had worked with Roxanna as an instrument Tech before she became a manager, and she knew Roxanna had a disability.  Ex. A, Roxanna Jackson Depo., 155:24-156:7.  All of management that Roxanna worked with knew she had a disability.  *Id*., 156:1-3.

69.     David Dobson was hired by St. Vincent Healthcare in 2012.  Ex. I, Dobson Depo., 4:13-15.  Dobson had worked for companies outside of healthcare where he was schooled in "organizational change management," which is the process of introducing and implementing change to an organization.  *Id*., 36:15-25.  Dobson specializes in change management.  *Id*., 50:16-19.  Dobson utilized change management strategies in the healthcare field and, in particular, at St. Vincent Healthcare.  *Id*., 37:8-38:1.  Specifically, he used them to try to improve "efficiency levels" of CP.  *Id*., 41:20-25.

70.     Dobson was also trained and specializes in "lean management," which focuses on improvement of the business and its bottom line.  *Id*., 42:12-43:4, 50:16-19.  Lean management was developed by Toyota, where Dobson started his

career.  *Id.*, 42:13-15, 43:7-13.  Improved efficiency is an anticipated outcome of lean management principles.  *Id.*, 43:17-22.  "Waste elimination" is another one of the tenants of lean management.  *Id.*, 44:23-24.  Dobson implemented these lean management principles at St. Vincent Healthcare.  *Id.*, 45:20-25.

71.  Dobson was also trained and specializes in "Six Sigma," which is an "improvement philosophy" started by Motorola.  *Id.*, 48:23-49:2, 50:16-19.  It is a methodology to improve an entity or department.  *Id.*, 49:12-16.  Dobson implemented Six Sigma principles along with his lean management approaches.  *Id.*, 50:1-15.

72.  Before St. Vincent Healthcare, Dobson was a "Lean Manager" for a semiconductor corporation; worked "operations and their specific version of lean" for a corporation; Director of Operations for E-Z-Go golf carts; Lean Manager at General Motors; and Group Leader for Toyota. *Id.*, 51:18-24, 52:4-10, 52:20-24, 53, 5-10, 53:17-19.

73.  Dobson was hired as St. Vincent Healthcare's director of material management for one year, but then in 2013 became the director of OR, surgical, procedural, and support services.  *Id.*, 4:16-5:9.  This includes oversight of CP.  *Id.*, 7:4-18, 8:10-16.  He hired Franzel and was her immediate supervisor.  *Id.*, 9:19-21; Ex. F, Franzel Depo., 11:23-25.

74. At the time Dobson came over the CP department, Roxanna told Dobson she was special needs. Ex. A, Roxanna Jackson Depo., 49:13-50:12. Dobson responded that he had worked with special needs people before. *Id*., 50:13-15.

75. Dobson had control or input over policies and procedures in CP. Ex. I, Dobson Depo., 9:7-10. Outside of national standards, Dobson had final say over policies and procedures that were implemented in CP. *Id*., 9:22-10:3. He played a role in the discipline of CP instrument Techs. *Id*., 11:4-11; 14:7-25; Ex. L-5, Depo. Ex. 5.

76. When Franzel became supervisor after Larson, she did not allow Wilcox or others to make accommodations for Roxanna regarding instruments. Ex. A, Roxanna Jackson Depo., 101:4-7.

77. There were no changes made to Roxanna's job description or duties after Franzel became her supervisor. Ex. G, Smith Depo., 15:9-18. In fact, the job duties of an instrument Tech have not changed since at least 2007. Ex. F, Franzel Depo., 15:19-16:4, 17:11-14.

78. Franzel did not respect Roxanna and treated her unfairly. Ex. A, Roxanna Jackson Depo., 40:14-22. HR Director Kathy Smith did not treat Roxanna fairly. *Id*., 45:21-23. Smith did not seem to understand Roxanna's problems. *Id*., 45:21-46:1.

79. Franzel told Roxanna she was going too slowly on instruments. *Id*., 30:10-12.

80. Roxanna told Franzel about her frustrations with Franzel not understanding her disability and putting too much pressure on her. *Id*., 40:19-25, 41:18-24.

81. St. Vincent Healthcare looked down on Roxanna. They did not respect her. They lied about things she did not do. *Id*., 10:22-11:5.

82. Hoffman was another employee in human resources. *Id*., 45:7-9. She is the manager for workers' compensation, associate safety, and employee health. Ex. C, Hoffman Depo., 5:25-7:15. Roxanna went to Hoffman with concerns over things changing in her department and people making decisions she did not understand. *Id*., 10:7-11:13. Hoffman helped Roxanna understand what was going on. Ex. A, Roxanna Jackson Depo., 45:12-13. Roxanna went to Hoffman about once a week to talk about these issues. *Id*., 47:4-7. Hoffman was aware Roxanna had developmental and intellectual disabilities. Ex. C, Hoffman Depo., 15:9-18.

83. Franzel was in a "Leader" position as a supervisor. Ex. H, Smith 30(b)(6) Depo., 8:4-13. She was assigned an employee in HR to go to with disability discrimination issues (*Id*., 7:10-8:7), but Franzel has never undergone any training whatsoever regarding disability discrimination (Ex. F, Franzel Depo.,

22

36:21-23).  Disability discrimination is not even covered by the company every year.  Ex. H, Smith 30(b)(6) Depo., 12:25-13:14.

84.    No training whatsoever is provided to staff-level employees on disability discrimination. *Id*., 13:23-14:3.

85.    Roxanna received increases in her hourly pay rate in 2010, 2011, 2012, 2013, and 2014.  Ex. J, Def.'s Resp. to Pl.'s Disc. Req., Ans. to Interrog. No. 7, p. 11 (May 19, 2016); Ex. H, Smith 30(b)(6) Depo., 25:17-26:10.  Those increases were all merit-based, stemming from Roxanna's annual performance evaluations. Ex. H, Smith 30(b)(6) Depo., 26:10-16, 28:15-21.  Roxanna received the last of these pay raises on March 30, 2014.  Ex. J, Def.'s Resp. to Pl.'s Disc. Req., Ans. to Interrog. No. 7, p. 11.

86.    Roxanna also received bonuses in 2009 and 2012 because her merit-based increases were so high they raised her above the pay range for her position for that year. Ex. J, Def.'s Resp. to Pl.'s Disc. Req., Ans. to Interrog. No. 7, p. 11 (May 19, 2016); Ex. H, Smith 30(b)(6) Depo., 27:19-28:14.

87.    Deposition Exhibit 5 is an October 10, 2013, Corrective Action Form ("CAF") Roxanna received because they felt she was going too slowly in instruments and they felt she did not improve on her speed.  Ex. A, Roxanna Jackson Depo., 67:1-5.  The Form states in part:

> On July 24, 2013, Roxanne Jackson met with the Materials Management Director and the Central Processing Manager to have a

23

conversation from a high, medium and low perspective of Productivity in the Central Processing Department to establish expectations. David Dobson and Heather Franzel are meeting with Roxanne to follow up from initial conversation to give Roxanne an update of how she is perceived toward meeting expectations.

Based on our conversation on the 24th we requested for you to continue to address and look for opportunities to improve productivity within the department. As to date we have seen little efforts from you to take opportunities in this area. It's not to say that they have gotten worse but little has been done to improve in this area. Our expectation as stated on the 24th is that you need to demonstrate actions that will result in improvement in this area.
…

The expectation has been to observe for a couple weeks for changes in productivity skills that we talked about, and then to follow up and reinforce the expectations with Roxanne.

Ex. L-5, Depo. Ex. 5, p. 1. Roxanna's "productivity" was the concern at the time. Ex. I, Dobson Depo., 21:2-8. The concern was not performance. Ex. L-5, Depo. Ex. 5, p. 1; Ex. F, Franzel Depo. 30:6-23. Dobson and Franzel believed Roxanna was closer to the "low" level of productivity on certain tasks, and their goal was to get her to improve one level up, at a minimum. Ex. I, Dobson Depo., 21:15-25. Franzel admits she wanted Roxanna to "improve on her instrument assembly times." Ex. F, Franzel Depo., 47:24-48:1.

88. After this meeting, Roxanna told Dobson she had a learning disability. Ex. I, Dobson Depo., 24:12-25:10. Dobson believes Franzel was there too. *Id*., 25:11-15. Dobson told Kathy Smith in HR about Roxanna's disability. *Id*., 26:2-

18. He did not have any follow-up discussions with Roxanna about her disability. *Id.*, 26:23-25.

89.     Roxanna's treating provider, Dr. Phillips, wrote an October 16, 2013, note, which Roxanna gave to Franzel, reminding management of Roxanna's disability and request accommodations.  Ex. L-2, Depo. Ex. 2; Ex. A, Roxanna Jackson Depo., 53:25-54:15.  Dr. Phillips' note states:

> [Roxanna] has been classified as special needs and may require additional time to learn and perform certain tasks….  Please consider this when performing job evaluations.

Ex. L-2, Depo. Ex. 2.  St. Vincent Healthcare considered this letter an accommodation request. Ex. G, Smith Depo., 20:14-17.  The tasks she was requesting additional time for were in instruments.  Ex. A, Roxanna Jackson Depo., 55:4-12.  She brought this in to Franzel because she had received discipline regarding the instruments and asked Franzel for additional time to perform those tasks because of her learning disability. *Id.*, 57:11-17.

90.     Franzel said nothing to Roxanna when she received this. *Id.*, 57:21-23.  Franzel never discussed with HR any restrictions that Roxanna may have.  Ex. F, Franzel Depo., 32:14-33:3.  Franzel never discussed with Roxanna her disability or any restrictions she had. *Id.*, 33:8-13.  Franzel never went through Roxanna's job description to determine if Roxanna could accomplish the job duties. *Id.*, 34:15-20.  Nothing changed. Ex. A, Roxanna Jackson Depo., 58:19-21.  CP

supervisor Amanda Mordhorst never discussed with anyone Roxanna's restrictions. Ex. B, Mordhorst Depo., 16:7-10, 21-24.

91. Franzel was trying to get Roxanna to go faster with her instrument tasks. Ex. A, Roxanna Jackson Depo., 58:2-6. During write-ups and the retraining, Franzel told her she needed to go faster. *Id*., 58:8-13. Roxanna expressed concerns to Hoffman that Franzel was asking her to work too fast. Ex. C, Hoffman Depo., 21:19-21.

92. The head of HR testified that when she saw Dr. Phillip's letter, she would have asked for further clarification from the provider, but St. Vincent Healthcare failed to do so. Ex. G, Smith Depo., 15:21-17:20. Roxanna's supervisor testified Dr. Phillip's letter was "vague," but she never attempted to make any contact with him to clarify. Ex. F, Franzel Depo., 32:6-20, 34:21-23. This was never discussed. *Id*., 34:24-35:2.

93. Deposition Exhibit 6 is an unrelated November 5, 2013, CP Roxanna received for being rude to a co-worker in the locker room on October 18, 2013, in which Roxanna raised her voice because she had to work late to do work the co-worker was supposed to do. Ex. A, Roxanna Jackson Depo., 70:3-71:17; Ex. L-6, Depo. Ex. 6.

94. St. Vincent Healthcare states that Hoffman performed the "interactive process" with regard to Roxanna Jackson. Ex. H, Smith 30(b)(6) Depo., 15:24-

16:2; Ex. C, Hoffman Depo., 18:5-8. St. Vincent Healthcare has no knowledge what communications Hoffman had with Roxanna and Franzel to fulfill the interactive process under the ADA. Ex. H, Smith 30(b)(6) Depo., 16:10-23.

95.    Dobson and Franzel did not discuss the possibility of allowing Roxanna to have more time to accomplish certain tasks in her job. Ex. I, Dobson Depo., 32:5-10.

96.    St. Vincent Healthcare had Roxanna undergo a psychological evaluation with Dr. Gumm on November 14, 2013. Ex. L-3, Depo. Ex. 3. Roxanna did not object to the psychological evaluation only because she was trying to save her job and tried to do everything they asked her to do. Ex. A, Roxanna Jackson Depo., 59:4-8. Franzel had no idea Roxanna even underwent this psychological evaluation. Ex. F, Franzel Depo., 37:17-20. Dr. Gumm is an employee paid by St. Vincent Healthcare. Ex. G, Smith Depo., 22:23-23:3.

97.    Dr. Gumm drafted a report summarizing his analysis and findings. Ex. L-3, Depo. Ex. 3. Among other things, Dr. Gumm found Roxanna had a full scale IQ of 73 and that Roxanna had "always functioned in the borderline range of intellectual abilities." *Id.*, p. 3. Dr. Gumm's impressions included mood disorder, not otherwise specified; borderline intellectual functioning, work-related problems, and a global assessment functioning of 75. *Id.*, p. 4. Dr. Gumm noted:

> 1. The patient reports that she has recently been having some difficulties at work. She feels that the difficulties are in part related to

a new manager who is not as patient with her. She is experiencing some work-related stress that takes the form of feeling tight, tense and having a headache.

2. The patient appears to have a relative strength in nonverbal abilities. She might learn best by having things demonstrated to her, rather than explained to her orally. She might also need to have more repetition than the typical employee.

3. The patient stated that there are some part[s] of her work that she feels more confident in. She stated that she is not as confident in her skills regarding sterilization of instruments but there are other areas of her work that she is much more comfortable and confident with. She might be allowed to perform some areas of her job that she has more confidence in.

4. The patient reports that she feels that she has a strained relationship with a new department manager. She might have a third party act as a mediator to ensure that communication is as effective as possible.

*Id.*, p. 4. Dr. Gumm stated Roxanna was having difficulties because of the stress having to try and go faster in instruments. Ex. A, Roxanna Jackson Depo., 59:22-60:5. Dr. Gumm stated that Roxanna's difficulties were due to Franzel not being patient with her. *Id.*, 60:10-15.

98. Dr. Gumm did not request or recommend retraining for Roxanna. Ex. L-3, Depo. Ex. 3; Ex. G, Smith Depo., 26:15-22. Neither did Dr. Phillips. Ex. L-2, Depo. Ex. 2; Ex. G, Smith Depo., 26:23-27:2. St. Vincent Healthcare's head of HR does not know why Roxanna was not simply given additional time to learn and perform certain tasks instead of undergoing a psychological evaluation and retraining, even though she approved all of those actions. Ex. G, Smith Depo.,

28

27:3-6. In fact, Smith was not even involved in any conversations with Roxanna at the time she approved those actions. *Id*., 27:8-12.

99. St. Vincent Healthcare did not decide whether Roxanna had a disability. Ex. H, Smith 30(b)(6) Depo., 17:13-20. It relied on Roxanna's health care provider, who stated Roxanna was special needs. *Id*., 17:13-24. St. Vincent Healthcare has nothing to dispute what provider's statements about Roxanna's disability. *Id*., 18:10-19.

100. St. Vincent Healthcare does not know if it followed up with Roxanna's health care providers for additional information regarding Roxanna's disability. *Id*., 18:20-21, 20:2-24.

101. The head of HR does not know if she or anyone else in HR reviewed Roxanna's job description when analyzing Roxanna's accommodation requests. Ex. G, Smith Depo., 11:21-12:6.

102. St. Vincent Healthcare determined that the only accommodations being requested by or on behalf of Roxanna were to have things demonstrated to her rather than explained orally and for other job opportunities within the company. Ex. H, Smith 30(b)(6) Depo., 22:21-23:8.

103. St. Vincent Healthcare determined that the only accommodations Roxanna was qualified for were "to be able to learn differently" and "to be able to look for other opportunities within the company." *Id*., 22:2-7.

104. St. Vincent Healthcare determined that Roxanna could perform the essential functions of her position. *Id*., 23:11-16. This is true both before any retraining – since Roxanna had previously been doing the work – and after the retraining. *Id*., 24:10-16.

105. Deposition Exhibit 31 is a summary table of how long it takes CP employees – including Roxanna – to perform certain job tasks. Ex. L-18, Depo. Ex. 31; Ex. G, Smith Depo., 56:21-57:7; Ex. F, Franzel Depo., 52:6-13. St. Vincent Healthcare was having its CP employees go through instrument assembly time trials. Ex. L-18, Depo. Ex. 31; Ex. G, Smith Depo., 58:7-11. It is not a policy or procedure of CP to have periodic time trials to measure the amount of time it takes to put trays together, but it happened here. Ex. F, Franzel Depo., 53:2-19.

106. The sole purpose of the time trials was "to determine how long trays were taking various employees to complete." Ex. B, Mordhorst Depo., 26:4-7.

107. The time trials were not anonymous, so management knew which employees had which times, including Roxanna. Ex. F, Franzel Depo., 54:20-55:13.

108. Franzel contacted Hoffman, concerned about Roxanna's "time" during the "time studies." Ex. C, Hoffman Depo., 12:4-17. "[T]here was an issue with [Roxanna's] times." *Id*., 24:24:15.

109. Franzel emailed the time trial summary table to Dobson and Hoffman on December 16, 2013. Ex. L-23, Depo. Ex. 38; Ex. C, Hoffman Depo., 29:4-20.

110. Following the time trial but before retraining, Franzel, CP supervisor Amanda Mordhorst, and HR business partner Melissa Young all met with Roxanna to discuss a plan to help Roxanna meet these targets. Ex. C, Hoffman Depo., 13:1-14. At this meeting, there was no discussion of Roxanna's disabilities or restrictions. *Id*., 13:25-14:5.

111. The retraining was to try to get Roxanna to go faster in instruments. Ex. A, Roxanna Jackson Depo., 44:1-8, 73:8-14. Mordhorst performed the retraining. Ex. F, Franzel Depo., 39:8-9. The point of the retraining was to relearn the instrument tasks and do them faster. Ex. A, Roxanna Jackson Depo., 73:15-19. The purpose was just to get Roxanna to go faster, not necessarily to do the trays correctly. *Id*., 82:1-4. During retraining, St. Vincent Healthcare specifically told Roxanna to go faster. *Id*., 73:25-74:3. Franzel and Dobson told her she was going too slowly. *Id*., 82:12-13. The retraining only concerned going faster in instruments, because in all other areas she was fine. *Id*., 76:15-21. Mordhorst even timed Roxanna during the retraining. *Id*., 81:16-19.

112. During the retraining program, Roxanna felt comfortable with all of the instrument trays. *Id*., 79:10-13. She understood how to put all the instruments on the trays properly. *Id*., 84:19-22.

31

113. During the retraining, Roxanna was being subjected to assembly time trials. Ex. G, Smith Depo., 60:3-8; Ex. B, Mordhorst Depo., 38:6-9. Deposition Exhibit 32 is a summary table showing Roxanna's individual instrument assembly time trial results. Ex. L-19, Depo. Ex. 32; Ex. F, Franzel Depo., 55:18-56:15. Smith says this was used to identify where Roxanna was less confident in her work; however, Roxanna could have just verbalized that. Ex. G, Smith Depo., 59:20-60:2. It was used to identify those areas, "[s]o that she could work in those areas quicker." *Id.*, 61:19-61:5.

114. Deposition Exhibit 32 is color coded for "Average Time," trays she needs to focus on, and trays she is doing well on. Ex. L-19, Depo. Ex. 32; Ex. F, Franzel Depo., 58:20-59:1. This was based solely on time. Ex. F, Franzel Depo., 59:2-5. The last page of Deposition Exhibit 32 lists the trays on which Roxanna had "Great Tray Time," "Average Time Trays," and "Trays to Continue to Improve Time." Ex. L-19, Depo. Ex. 32, p. 10.

115. Roxanna was the only established employee who was subjected to individual time trials. Ex. F, Franzel Depo., 56:16-20.

116. During Roxanna's retraining, if the department was short-staffed, Roxanna was simply asked to stop the retraining and rejoin the workforce performing her normal duties. Ex. B, Mordhorst Depo., 24:17-25-1.

117. Roxanna did well in the retraining. *Id.*, 32:15-17. Roxanna performed all of the duties in which she was being retrained to Mordhorst's and Franzel's satisfaction. *Id.*, 31:17-23. She demonstrated she was competent in the instrument area. *Id.*, 32:18-19. After the training, Hoffman told Roxanna, "Good job; you did it." Ex. A, Roxanna Jackson Depo., 46:22-25.

118. Following the retraining, it was never considered to restructure Roxanna's position or to alter her job duties in any way. Ex. B, Mordhorst Depo., 41:23-42:7.

119. On March 7, 2014, St. Vincent Healthcare drafted Roxanna's 2013 performance review, which was Roxanna's final evaluation before she was terminated. Ex. L-21, Depo. Ex. 35; Ex. F, Franzel Depo., 45:23-25. Roxanna was meeting expectations for the review year of 2013. Ex. L-21, Depo. Ex. 35; Ex. F, Franzel Depo., 46:6-14. The evaluation stated in part:

> Roxanne is strong in the decontamination and sterilization areas of the department....
>
> She is very familiar with the SR instrumentation and a great source of knowledge….
>
> We would like to see Roxanne improve…her instrument assembly times.

Ex. L-21, Depo. Ex. 35, p. 4; Ex. F, Franzel Depo., 46:15-47:8.

120. St. Vincent Healthcare did not produce a 2012 annual performance evaluation for Roxanna. Ex. D, Decl. of Eric E. Holm, ¶ 9.

121.  Deposition Exhibit 36 is Roxanna's 2011 annual performance. Ex. L-22, Depo. Ex. 36; Ex. F, Franzel Depo., 48:11-19.  For each of the duties and values listed, Roxanna was rated either "Fully Contributes" (meaning "Performance consistently meets position, behavioral or practice expectations") or "Role Model" (meaning "Performance consistently exceeds position, behavioral or practice expectations). Ex. L-22, Depo. Ex. 36; Ex. F, Franzel Depo., 49:8-50:5.  According to Franzel, there was not anything Roxanna needed further development on.  Ex. F, Franzel Depo., 50:6-9.

122.  Dr. Phillips wrote a second letter regarding Roxanna on April 16, 2014.  Ex. L-4, Depo. Ex. 4.  The letter states in part:

> [Roxanna] feels that she is being mistreated and harassed as she does her best with her physical limitations to meet the demands of her supervisor.  She typically goes home in tears and is not getting the support that she needs to continue to provide diligent, faithful services in her capacity.  Please help this employee to get the support that she needs.

*Id*.  Franzel and Dobson were mistreating and harassing Roxanna by repeatedly telling her she needed to go faster.  Ex. A, Roxanna Jackson Depo., 64:1-6.  Roxanna felt she was under a microscope, as Franzel and management were watching every step Roxanna made.  *Id*., 75:13-18.

123.  St. Vincent Healthcare never conducted any sort of investigation into these statements made by Roxanna and Dr. Phillips.  Ex. G, Smith Depo., 21:18-24; Ex. L-4, Depo. Ex. 4.

124. Deposition Exhibit 8 is a June 25, 2014, write-up for allegedly mislabeling instruments. Ex. A, Roxanna Jackson Depo., 85:21-22; Ex. L-7, Depo. Ex. 8.

125. Deposition Exhibit 9 is a July 16, 2014, write-up for not going to an area Franzel asked her to go to. Ex. A, Roxanna Jackson Depo., 91:21-92:4; Ex. L-8, Depo. Ex. 9. On that day, a co-worker named Josh decided to stay after his shift because it was busy, so he stayed in the instrument area and let Roxanna go to the SO area. Ex. A, Roxanna Jackson Depo., 92:8-12. Roxanna told Josh he was supposed to go and she was supposed to do instruments, but he insisted. *Id*., 92:20-93:1.

126. Deposition Exhibit 10 is a July 28, 2014, write-up for mislabeling an instrument. Ex. L-9, Depo. Ex. 10. Franzel provided some of the input that went into the contents of this CP, even though she had no personal knowledge of this issue. Ex. G, Smith Depo., 29:25-31:6. No HR investigation was ever conducted into this issue. *Id*., 31:7-10. HR did not speak to Roxanna before issuing this CAF. *Id*., 31:11-13.

127. Deposition Exhibit 12 is a July 30, 2014, Performance Improvement Plan. Ex. L-11, Depo. Ex. 12. Roxanna helped draft this plan in an effort to try to keep her job. Ex. A, Roxanna Jackson Depo., 105:18-106:1. The Plan stemmed

from the July 28, 2014, issue with mislabeling an instrument.  Ex. L-11, Depo. Ex. 12.

128.  It was the decision of Franzel, Smith, and Dobson to terminate Roxanna.  Ex. F, Franzel Depo., 59:6-11.

129.  Deposition Exhibit 11 is an August 27, 2014, Termination Form for Roxanna.  Ex. L-10, Depo. Ex. 11.  The first item noted on the Termination Form is from August 17, 2014, for entering a "sterile area" in street clothes to approve her time card.  *Id*.  In actuality, not everything is sterile in the S.O. area where the computer was.  Ex. A, Roxanna Jackson Depo., 110:14-16.  All of the employees either go to that area in street clothes to use the computer to check time cards, or some of them even go in street clothes in the case cart area, which actually does contain the sterile items.  *Id*., 110:16-111:5.  The supervisor before Franzel allowed employees to do so, since it was the only option they had.  *Id*., 111:11-25.  This is the only computer they had to check their time.  *Id*., 118:2-8.  Even though all employees do this, Roxanna is the only employee to ever be written up since 2012 for that.  *Id*., 110:16-111:5; Ex. F, Franzel Depo., 61:23-62:3.

130.  The second issue was on August 18, 2014, for not putting an indicator inside one of the bags to show that it had been sterilized.  Ex. A, Roxanna Jackson Depo., 42:4-11, 112:17-19. The new bags, however, have indicators built into the bags, and the surgery team simply noted the built-in indicator demonstrated

sterilization and used the instruments without incident. *Id*., 42:4-15, 112:21-113:8. The indicator built into the bag turned like it was supposed to. *Id*., 113:2-8. Everybody has done this at one time or another. *Id*., 42:9-11. This was the first time Roxanna had done that in 38 years. *Id*., 113:15-20. Franzel met with Roxanna to give her a "heads up" about this and to not worry about it. *Id*., 42:16-20. Instead, Franzel later wrote Roxanna up for this. *Id*., 42:20-22.

131. A third issue was that a tray was returned to Roxanna to put her card in the tray indicating it was she who completed the tray. *Id*., 120:19-121:13. This was the first time in 38 years this happened to Roxanna. *Id*., 122:2-3. Everybody does this, even Heather Franzel. *Id*., 122:2-3.

132. A fourth issue was allegedly not including an instrument in a tray that was sterilized and sent up to surgery. Ex. L-10, Depo. Ex. 11; Ex. A, Roxanna Jackson Depo., 114:4-116:1. However, another person had this item wrapped separately, so Jackson did not include it in the sterilization. Ex. A, Roxanna Jackson Depo., 114:4-24. When another employee shut off the sterilizer that night after Roxanna had left for the night, he did not see the unsterile instrument to include in the sterilization. *Id*., 115:1-10. That night another employee sent the wrapped, unsterilized item up for surgery. *Id*., 115:10-13. That final employee had two chances to catch the item – when she was unloading it onto the cart and when she was sending it up – and she missed both opportunities, yet Roxanna is

37

being blamed for it. *Id.*, 118:13-16. She admitted to Roxanna this was her fault. *Id.*, 115:25. This was not Roxanna's fault, as she sent the items as presented through the sterilizer, and two other employees did not catch the unsterilized item before they, not Roxanna, sent it up to surgery. *Id.*, 116:2-19.

133. During the termination meeting, Franzel told Roxanna she was being terminated because her "work was too slow." *Id.*, 157:22-158:5.

134. Smith states that Roxanna was not fired for an inability to perform her job functions but for perceived mistakes in the quality of her work. Ex. G, Smith Depo., 24:10-22. Franzel, Smith, and Dobson all contributed to the decision to fire Roxanna. Ex. G, Smith Depo., 44:12-17.

135. Not counting Roxanna, six instrument Techs in 2012, eight instrument Techs in 2013, and nine instrument Techs in 2014 were disciplined for making mistakes. Ex. L-20, Depo. Ex. 34, pp. 4-5. None of those other employees had a disability. Ex. F, Franzel Depo., 43:12-15. Roxanna was the only instrument Tech terminated from October 2012 to October 2014. Ex. L-20, Depo. Ex. 34, p. 4; Ex. F, Franzel Depo., 40:11-41:13.

136. A few times Roxanna brought up to Hoffman her request to transfer out of CP. Ex. A, Roxanna Jackson Depo., 122:23-123:5, 123:21-24. Roxanna expressed a desire to transfer to the kitchen or to housekeeping. *Id.*, 123:2-6, 124:7-9. Roxanna did a job shadow in the kitchen after July 31, 2014, but

Hoffman said no to a housekeeping position. *Id*., 123:5-6, 124:7-10; Ex. C, Hoffman Depo., 37:22-38:23; Ex. L-24, Depo. Ex. 39. No one ever mentioned a cashier position to Roxanna. Ex. A, Roxanna Jackson Depo., 125:10-13.

137. Roxanna expressed she was interested in the kitchen position. Ex. A, Roxanna Jackson Depo., 148:5-8. Hoffman testified the kitchen position was not offered to Roxanna simply because Roxanna said she was not interested (Ex. C, Hoffman Depo., 37:1-13), while Roxanna testified they kept telling her she had to wait until it was posted (Ex. A, Roxanna Jackson Depo., 148:5-8).

138. When terminating Roxanna, Franzel, Smith, and Hoffman did not talk to Roxanna about other job positions at St. Vincent Healthcare. *Id*., 109:22-110, 122:23-123:2.

139. Smith lied in the meeting with Roxanna, stating that Roxanna has said she "can't or won't do" cashier, cook, or cleaning patient rooms. *Id*., 126:24-128:4. Roxanna never said that. *Id.*

140. There were open and available positions at that time that Roxanna qualified for. Ex. C, Hoffman Depo., 35:21-23.

141. Roxanna filed a grievance on July 29, 2014, objecting to the CAF she received the day before. Ex. L-12, Depo. Ex. 14, p. 1; Ex. G, Smith Depo., 31:16-32:5. HR never discussed this grievance with Roxanna. Ex. G, Smith Depo., 33:4-8. Dobson denied the grievance on August 7, 2014. Ex. L-15, Depo. Ex. 24, p. 2.

The supervisor is generally made aware of the denial.  Ex. G, Smith Depo., 35:15-19.  Roxanna appealed the decision on August 14, 2014.  Ex. L-16, Depo., Ex. 25.  Franzel was made aware of the appeal. Ex. G, Smith Depo., 37:2-6.  At that point, the grievance is still considered open and unresolved.  *Id*., 37:7-10.  The appeal was denied on August 28, 2014 – the day after Roxanna was fired.  Ex. L-12, Depo. Ex. 14, p. 8.  The grievance was not finally resolved until September 12, 2014.  *Id.*, p. 9.

142.   Roxanna submitted another grievance on September 5, 2014 – approximately one week after her termination – with regard to her termination.  Ex. L-13, Depo. Ex. 15, pp. 1-3.  The grievance objects to each of the reasons given for Roxanna's termination.  *Id.*  Smith responded she could not process the report because it was unclear what was being grieved (*Id.*, p. 4), despite the fact Smith knew the grievance was related to some of the things on her termination document and her assumption was that Roxanna was disputing those items and either wanted the discipline removed or wanted her position back.  Ex. G, Smith Depo., 45:17-46:21.  Based on the timing and the contents of the grievance, it would have been safe for Smith to assume that Roxanna disagreed with the reasons for her termination and did not want to be terminated.  *Id*., 48:14-49:6; Ex. L-13, Depo. Ex. 15, p. 1-3.  Instead, Smith refused to process Roxanna's grievance.  Ex. G,

Smith Depo., 49:10-50:8.  The grievance was not finally closed until September 23, 2014.  Ex. L-13, Depo. Ex. 15, p. 5.

143.  Roxanna's final termination was based on Roxanna's prior history of discipline. Ex. L-10, Depo. Ex. 11; Ex. G, Smith Depo., 42:8-11.  Some of that discipline, including the July 29, 2014, CAF was not even resolved until two weeks after she was fired. Ex. G, Smith Depo., 42:8-14.

144.  Roxanna had no family in Montana anymore and, when she lost her job, her brother, D.K. Jackson, helped her with expenses for a couple of months until she moved to Colorado in December 2015 to live with her brother. Ex. A, Roxanna Jackson Depo., 17:7-20.  She lived with her brother and his family when she first moved to Colorado. *Id*., 18:25-19:1.  She moved because she was unemployed and had no ability to support herself.  Ex. E, DK Jackson Depo., 11:15-17.  Roxanna did not want to move from Montana, but her brother insisted. *Id*., 12:3-8.

145.  Roxanna currently works at Goodwill as a sales clerk, where her duties are putting books away.  Ex. A, Roxanna Jackson Depo., 15:4-14.

146.  Roxanna applied for unemployment benefits with her brother's assistance. Ex. E, DK Jackson Depo., 32:1-7.  During a call with unemployment to consider whether Roxanna should be awarded unemployment benefits, St. Vincent

Healthcare stated it did not even know the circumstances of Roxanna's termination. *Id.*, 32:13-33:8.

147. St. Vincent Healthcare provided a response to the state regarding Roxanna's claim for unemployment benefits. Ex. L-17, Depo. Ex. 30; Ex. G, Smith Depo., 55:11-17. Smith wrote, "Issues addressed were related to quality of work – not the speed at which the work was completed." Ex. L-17, Depo. Ex. 30, p. 2. Smith does not know why she wrote that. Ex. G, Smith Depo., 55:18-56:12.

148. Depo. Ex. 17 is the Charge of Discrimination. Ex. L-14, Depo. Ex. 17. Somebody drafted this for Roxanna, as she could not have drafted it herself. Ex. A, Roxanna Jackson Depo., 153:21-154:3. Meg Bennett of the Montana Human Rights Bureau ("HRB") drafted the Complaint. Ex. E, DK Jackson Depo., 69:2-12.

149. Roxanna's new counsel advised HRB investigator Bennett on April 13, 2015, that Roxanna would also be pursuing discrimination and retaliation claims. Ex. D, Decl. of Eric E. Holm, ¶ 2. On May 7, 2015, counsel emailed Bennett noting the claims being pursued were discrimination and retaliation. *Id.*, ¶ 4. On May 8, 2015, counsel again emailed Bennett stating that claims being alleged were "failure-to-accommodate, discrimination, retaliation." *Id.*, ¶ 5. Subsequently on May 8, 2015, counsel emailed Bennett, stating, "I have informed you previously that we are also pursuing a claim for retaliation. Please update that

in your records if necessary." *Id.*, ¶ 6. On May 11, 2015, Bennett acknowledged

counsel's asserted claim for retaliation and stated:

> [T]he Bureau does not have an administrative rule regarding amendments. When a Charging Party chooses to amend new allegations late in the Bureau's investigation, the Bureau typically does not make findings on the new allegations. Here, the Bureau will docket an amended complaint that has been submitted and notice out the parties. The Bureau will ask for acknowledgement of a receipt from Respondent, but will not ask for a detailed response. If a respondent chooses to take issue with the amendment or addition of parties, that can be considered in the next forum (be it district court of by an administrative law judge) that is assuming that the Charging Party chooses to go forward.

*Id.*, ¶ 8.

150. Roxanna was always treated as a special needs individual up until the time she got a new manager. Ex. E, DK Jackson Depo., 47:12-48:20. The new manager asked her to perform her duties over and above what she was doing in the past, at a faster rate than she was capable of performing accurately. *Id*., 48:21-25. Roxanna wanted to be able to do her work at the level of perfection that she had done up until that point in time, as she had no record of errors in her entire work history until she got the new manager. *Id*., 52:13-20.

151. St. Vincent Healthcare does not admit that it should maintain a workplace free of discrimination. Ex. K, Def.'s Resp. to Pl.'s 3rd Disc. Req. (Aug. 26, 2016), Ans. to Req. for Admission No. 2, p. 4. It denies that all employees have the right to work in an environment free of discrimination. *Id*., Ans. to Req.

for Admission No. 6, p. 5.  It does not believe employers should make every effort possible to prevent discrimination from happening in the workplace.  *Id*., Ans. to Req. for Admission No. 3, p. 4.

152.   St. Vincent Healthcare denies that it should enforce its policies and procedures consistently among all covered employees.  *Id*., Ans. to Req. for Admission No. 33, p. 15.  St. Vincent Healthcare even denies that an employer should not fire an employee because she has a disability.  *Id*., Ans. to Req. for Admission No. 9, pp. 6-7.

153.   St. Vincent Healthcare denies that an employer should treat its employees with dignity, respect, and courtesy.  *Id*., Ans. to Req. for Admission No. 12, pp. 7-8.  It denies that it acknowledges and respects diversity by appropriately responding to each individual.  *Id*., Ans. to Req. for Admission No. 16, p. 9.  It denies that it does the right thing with openness and pride.  *Id*., Ans. to Req. for Admission No. 17, p. 9.

154.   As part of Roxanna's application for Social Security Disability Insurance benefits, Social Security Administration documents list all of the physical or mental conditions that limit Roxanna's ability to work, including learning disabilities, heart condition, and type 2 diabetes. Ex. D, Decl. of Eric E. Holm, ¶ 10.

155.   Prior to Franzel becoming Roxanna's supervisor, Roxanna was allowed to perform her duties, including instruments, at her own speed. Ex. M, Decl. of Roxanna Jackson, ¶ 2 (Nov. 14, 2016).  There were times before Franzel becoming Roxanna's supervisor that Roxanna worked weekends and on-call duty. *Id.*

DATED this 17th day of November, 2016.

> By:       /s/ Eric E. Holm
> Eric E. Holm
> SATHER & HOLM, PLLC
> 2301 Montana Ave., Ste. 202
> P.O. Box 1115
> Billings, MT  59103
> Telephone: (406) 294-1700
> Facsimile:  (406) 794-0673
> eric@satherandholm.com
> *Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of November, 2016, a copy of the foregoing was served on the following interested parties, by the means indicated:

  1-3   CM/ECF
_____   Hand Delivery
_____   Mail
_____   Overnight Delivery Service
_____   Fax
_____   E-Mail

1.   Clerk, U.S. District Court

2.   Eric Edward Nord
     CRIST, KROGH & NORD, PLLC
     The Securities Building
     2708 First Avenue North, Suite 300
     Billings, MT 59101
     enord@cristlaw.com

3.   Emma L. Savory
     HUSCH BLACKWELL LLP
     1700 Lincoln St., Suite 4700
     Denver, CO 80203
     emma.savory@huschblackwell.com

By:   /s/ Eric E. Holm
      Eric E. Holm
      SATHER & HOLM, PLLC
      *Attorneys for Plaintiffs*