IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

Cause No. CV-15-115-BLG-SPW

DEPOSITION OF ROXANNA JACKSON
June 22, 2016

ROXANNA JACKSON,

Plaintiff,

vs.

ST. VINCENT HEALTHCARE,

Defendant.

PURSUANT TO NOTICE, the deposition of ROXANNA JACKSON, called for examination by the Defendant herein, was taken at Husch Blackwell LLP, 1700 Lincoln Street, Suite 4700, Denver, Colorado 80203, commencing at 9:29 a.m., on Wednesday, June 22, 2016, before Aimee S. Reisinger, a Registered Professional Reporter and Notary Public in and for the State of Colorado.

**EXHIBIT**

**A**

9

Q. Are you taking any medications or do you have any medical conditions that prohibit you from understanding and communicating today?

A. No.

Q. Are you taking any medications?

A. Yes.

Q. Do any of the medications that you're currently taking impact your memory?

A. No.

Q. Do you have any questions about these rules or the process today?

A. No.

Q. Okay. What did you do to prepare for the deposition today?

A. I read over my notes.

Q. And what -- what kind of notes do you have?

A. What -- the paperwork that they gave me.

Q. Paperwork that who gave you?

A. The hospital when they was writing me up.

Q. Okay. Did you do anything else?

A. No.

Q. Did you talk with anyone before today to prepare for today?

A. No.

10

Q. Did you look at any other documents other than the termination papers --

A. No.

Q. -- that the hospital gave you when your employment was terminated?

A. No.

MR. HOLM: Wait until she is completely done before you start to answer.

THE DEPONENT: Sorry.

MR. HOLM: That's okay.

Q. (By Ms. Savory) Have you discussed this case with anyone else before?

A. No.

Q. Have --

A. Well, I talked, you know, to my lawyer.

Q. Sure. And I don't want to know about the conversations that you've had with your lawyer, because that's protected by the attorney/client privilege.

Have you talked with anyone else, like your brother?

A. Yes.

Q. Can you describe the conversations that you've had with your brother about this case, what you've talked about?

A. I just told him how I felt how they

11

treated me.

Q. And what did you tell him?

A. That they looked down on me. They didn't respect me. They -- a few things they said that I did but I didn't do.

Q. Is that it?

A. I felt that they discriminated me.

Q. Okay. Have you talked to anyone else that you worked with at the hospital about this case?

A. Not really. Not lately. When I was there, yes. You know, I was --

Q. Who did you talk to when you were working there about this case?

A. What was going on. We -- you know, we talked, but for sure what I said, I don't remember. I was flustered.

Q. Okay. So you talked with other coworkers about what was going on at the time, but that was when you were employed?

A. Yes.

Q. Okay. Have you talked to David Wilcox about this case?

A. I haven't talked to him for ages. We talked, but not -- he didn't really tell me, you know, specifically what he said, I didn't really tell him

12

what -- for sure what I, you know, was going through.

Q. Have you talked to David Wilcox since you worked at St. Vincent's?

A. A little bit, but not too much of the case.

Q. Have you attended high school?

A. Yes.

Q. Did you graduate from high school?

A. Yes.

Q. Where did you go to high school?

A. Senior high in Billings.

Q. And when did you graduate?

A. '73.

Q. Did you attend any other post high school education?

A. No.

Q. What was your first job?

A. Easter Seals. That was my first job in school.

Q. And that was when you were in high school?

A. Yes.

Q. And what did you do in that job?

A. Janitor.

Q. Okay. How long did you work there?

A. About half a year of the school year.

Deposition of: Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

13

Q. Okay. And then what was your next job after that?

A. Next job after that I think was the library, the public library.

Q. And when did you work there?

A. When? The year?

Q. Uh-huh.

A. I can't remember if it was the last part of sophomore or the beginning of junior year.

Q. Okay. So when you were in high school?

A. Yes.

Q. How long did you work at the library?

A. It's usually only half a year, because we do two jobs in a year's time, usually.

Q. During high school?

A. Yes.

Q. And then after you worked at the public library, what was your next job?

A. A nursing home in the laundry part.

Q. Okay. and you worked in the laundry part there?

A. During the school year.

Q. Again during the school year. Okay. How long did you work at the nursing home?

A. About half a year, roughly.

14

Q. And then what was your next job after you worked at the nursing home?

A. Okay. At a different hospital than the last hospital, in the kitchen, cafeteria.

Q. Do you remember what that hospital was called?

A. Back then was Deaconess Hospital, but now it's Billings Clinic.

Q. Okay. How long did you work in the kitchen area there?

A. That was last part of junior year for about four years.

Q. Okay. So you worked there during high school and then after high school?

A. Yes.

Q. And was your job the same the whole time that you worked there?

A. Yeah. In the kitchen, cafeteria. My first one was in the cafeteria, then I ended up in the dish room.

Q. Okay. And what types of job duties did you do in the dish room when you were working there?

A. Washing the dishes and sending them through the dishwasher.

Q. Okay. And then after that what was your

15

next job?

A. Then I worked at St. V's hospital in central processing.

Q. And where -- are you working right now?

A. I work at Goodwill.

Q. Okay. When did you start working at Goodwill?

A. Last October.

Q. What do you do at Goodwill? What's your job title?

A. Sales clerk, I think.

Q. Okay. As a sales clerk, what do you do on the day to day? What are your normal responsibilities?

A. I do -- I put the books away.

Q. Okay.

A. Circle the area and put them away.

Q. Are you working at a Goodwill store?

A. Yes.

Q. Who is your supervisor at your current job?

A. Her name is Helen. I don't know her last name.

Q. Okay. Do you like working at Goodwill?

A. Yes.

Q. How much are you paid?

16

A. $8 and some cents, I do believe.

Q. Okay. Per hour?

A. Yes.

Q. How many hours a week do you normally work?

A. I work three days, five hours a day. So it's 15 hours a week.

Q. Would you like to work more hours or do you like just working 15 hours?

A. 15 is --

Q. Is good? How long do you plan to work at Goodwill?

A. I'm not sure. I don't know.

Q. Do you plan to work there until you retire?

A. Probably.

Q. Do you know when you're planning to retire?

A. No.

Q. Okay. Do you receive any benefits in your current job?

A. No.

Q. Do you receive --

A. I don't think so. I only work part time, so...

Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

17

Q.  Do you receive health insurance?

A.  I'm on Medicaid disability.

Q.  Okay.  And when did you start Medicaid disability?

A.  When did I start?  Oh, when I was – a few months after I moved here.  So I was 60.

Q.  When did you move to Colorado?

A.  It was in December of 2015.

Q.  And why did you move to Colorado?

A.  Well, I lost the job and no family live in Montana anymore, my family was here, so – and my brother was helping me for about three or four months. I was still in Montana, so it was just easier for him money-wise.

Q.  Did you want to move to Colorado?

A.  I think eventually I would have, but it was just sooner than I expected.

Q.  And when you said your brother was helping you, how was he helping you?

A.  He was helping me paying bills.

Q.  Okay.  Was he helping you search for another job?

A.  At that point, no, because we was just concentrating on the process of, you know, getting me help, seeing where I should go.  Yes, I was trying to

18

apply for jobs there, but...

Q.  When you said your brother was helping you find help, what do you mean by that?

A.  Well, like here, he was trying to help me find organizations where they would help me to get back on my feet.

Q.  Okay.

A.  If I needed – you know, he couldn't really help me find a job because he didn't live in Billings at that time, so he didn't know what –

Q.  Okay.

A.  So he was trying to, you know, find people to help me to find a job.

Q.  Okay.  Do you live with your brother now?

A.  Right now, no.

Q.  Did you live with him when you moved here?

A.  Yes.

Q.  And how long did you live with him?

A.  A little bit more than a year.

Q.  Okay.  And when did you decide to move – into your own apartment, I assume?

A.  Yes.  To give them more room, because getting kind of crowded.  And I would like to have my more independence.

Q.  Okay.  Who else did you live with when you

19

lived with your brother?

A.  His wife, his youngest daughter, and her two little girls.

Q.  Okay.  And now you live by yourself?

A.  Yes.

Q.  Okay.  When did you start work at St. Vincent's?  Do you remember the year?

A.  1976, '77.

Q.  What position did you start in when you started working at St. Vincent's?

A.  It was a central processing aide.

Q.  Okay.  And what were your duties as a central processing aide?

A.  Pretty much what I did before I left.  I worked in what they called issue mostly.  That was just delivering the stuff throughout the hospital, whatever they needed.

Q.  And when you say "delivering the stuff," what type of stuff?

A.  You know, their trays, if they have to use sterile trays, linen, machines.

Q.  Okay.  So you delivered those all around the hospital?

A.  Yes.

Q.  Were there any other job duties that you

20

did as a central processing aide?

A.  Then I was working in the sterile area – or the SO area, which is called sterilizer operator. And that's wrapping the stuff; putting them in the sterilizers and getting them sterilized.

Q.  Okay.  Anywhere else?  Any other duties?

A.  And then decontam.  That's the dirty area. And wash the instruments and send them through the washers and stuff.

Q.  Okay.

A.  And then I used to work the night shift every now and then, the graveyard shift.

Q.  Okay.

A.  And that was putting on – filling these carts up and exchange them throughout the hospital.

Q.  Okay.

A.  Because they would take that – their stuff out of that first before they call us if they need more stuff.

Q.  And by "stuff," do you mean instruments? Surgical tools?

A.  Well, not necessarily instruments. Bandages.  Mostly it was bandages.  For maternity ward was their packs for them – for the mothers to take home for the newborns.

Deposition of:  Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

21

Q.  Okay.  Were there any other job duties as a central processing aide?

A.  At the beginning they didn't have techs.

Q.  Okay.

A.  So everybody did what we did before.  They didn't really put me in instruments.  It took -- you know, they had to step me along for six years pretty much doing the issue part, delivering, and then the exchange carts.

Q.  And that was the first six years of your employment, right when you started?

A.  Yep.  Yes.

Q.  And then when you were -- but you said that central processing aides, the job duties were very similar to the instrument tech?

A.  Yes.

Q.  So when did your title change to instrument tech?

A.  When the pay thing, the pay raise, you know, the ladder, as each management was, you know, changing, they changed the rules.  So eventually the aides weren't going to be around anymore, but there was me and a few others was grandfathered in to be an aide all the time, but the raise wasn't going to be that good.  So I asked if I could transfer over to being a

22

tech to get the raise.

Q.  Okay.  And do you remember when you asked, about when that was?

A.  Maybe in the 1990's maybe.

Q.  Okay.  And --

A.  But they understood about my disability, so they didn't really put me in instruments that much.

Q.  What do you mean they understood your disability?  Who --

A.  The management.

Q.  Okay.  And who was the management at that time?

A.  Sister Rita hired me.  And then there was a Kathy Jones -- no, sorry.  Kathy Tony.  She came down from surgery to be a manager central processing.  There was a Pam somebody.  I can't remember her last name.

Q.  Okay.

A.  And then there was a Barbara Jones.

Q.  And these were your managers in the 1990s, about?

A.  Yeah.  And then -- the last one is Heather.

Q.  So you said they understood your disability.  How do you know that they understood your disability?

23

A.  Okay.  When I first started, like I said, Sister Rita didn't really want to hire me.  A cousin of mine stepped -- she knew a nun there.  She talked to this nun and this nun talked to Sister Rita --

Q.  Okay.

A.  -- you know, to try to convince her to hire me, to give me a chance.

Q.  Okay.

A.  So they knew back then I was, you know, disabled.  So that's why -- so Sister Rita didn't put me anywhere except for the issue part and exchange carts.

Q.  And how do you know that they knew you were disabled?

A.  Because everybody before me and after me who got hired, they was doing everything else.  They was getting trained, you know, everywhere, but they left me on -- between issue and exchange carts.

Q.  Okay.  And when you were doing issuing and exchange carts, were you doing any specific type of carts or were you doing all of the issuing and all of the carts?

A.  Back at that time I only did the exchange carts.  And then I used to -- I used -- before I got a car, she kept me on day shift.

24

Q.  Okay.

A.  Because of the city bus.  I was able to catch the city bus.  On the evening shift they don't have the city bus like they do here on the evening -- in the evening.

Q.  Okay.

A.  So they -- she left me alone on the day shift.  But as soon as they realized that I got -- or as soon as Sister Rita got me -- sorry, I'm going too fast for my mind.

Q.  That's okay.  Take your time.

A.  As soon as I got a car, Sister Rita put me on the evening shift all the time.

Q.  Okay.  And what hours was the evening shift, do you remember?

A.  It was 3:00 p.m. to 11:30 p.m.

Q.  And do you remember about when that was, about when you got the car?

A.  '80s maybe.

Q.  Okay.

A.  '90s.

Q.  So in the '90s when you asked to be changed into the instrument techs because you understood that they were making more money and had a higher raise potential, did you have to fill out any

Deposition of:  Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

25

application?
A. No.
Q. Do you remember who specifically you asked to become an instrument tech?
A. Her name was Barbara Jones.
Q. Okay. It was Barbara Jones then. And then once you became an instrument tech, what shift did you work?
A. Once they got done training me, it was the evening shift.
Q. Okay.
A. They knew that I wanted to work evenings because it was a bit more money.
Q. Okay. And what did they do to train you to become an instrument tech at that time?
A. They have a trainer who came down from surgery. That's her main – that was her job was doing instruments and train new people in.
Q. Okay. When you were trained for the instrument techs, were you trained for all of the different roles, including the instrument sets?
A. Well, at that point I knew everything else.
Q. Okay.
A. So it was just instruments.

26

Q. Okay.
A. But then, unfortunately, every time that I got trained in instruments, they decided to do something different.
Q. Okay.
A. So then I didn't have to do instruments.
Q. So when you got trained on instruments, what did they do next right when you became an instrument tech?
A. When I became an instrument tech all the time?
Q. Uh-huh.
A. We did pretty much everything else. You know, like I said, most of the management knew that I had -- you know, there was a problem with the instruments, and so they didn't really put me on instruments unless they know for sure that I'm going to have a helper or it was going to be a very nice, easy night.
Q. Okay. So you did work instruments sometimes?
A. Every -- yeah. Not too often though.
Q. What shift did you work prior to your termination of employment?
A. 3:00 to 11:00.

27

Q. And at that time you were still an instrument tech; is that right?
A. Yes.
Q. So let's talk about your daily activities. We've kind of talked about what the instrument techs do, but...
Was Diane Larson one of your supervisors?
A. Yeah. Yes.
Q. And what were your daily activities as an instrument tech when Diane Larson was your supervisor?
A. Say that again. Sorry.
Q. That's okay. What were your daily activities or your job duties as an instrument tech when Diane Larson was your supervisor? What kind of jobs were you doing then?
A. She knew that I had this disability, so she -- she didn't put me in instruments, you know, unless it's a very nice night.
Q. Okay.
A. Or I had a helper, there is an extra person.
Q. Okay. And how did you know that she knew you had a disability?
A. She was one of -- a regular worker for many years, so she got to know me.

28

Q. Did you ever talk with her about your disability?
A. Yes.
Q. What kind of things did you tell her about your disability?
A. That I was -- I went to special ed and, you know, we just generally talked about our pasts.
Q. Okay. Did you like Diane Larson?
A. Yes.
Q. How often did you see her when she was your supervisor?
A. Well, at work --
Q. Right.
A. -- was five days a week pretty much.
Q. Would you see her every shift you worked?
A. Yes.
Q. Okay.
A. But, you know, yes, she did put me on days for a while because that's where they needed help, and she knew that I wouldn't really complain about it.
Q. Did she work days or did she work the evening shift?
A. She worked days. She was a manager. So it's --
Q. Okay. So would you see her on a

Deposition of: Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

29

day-to-day basis when you were working the graveyard shift, the evening shift?

A. Yeah. If I worked the evening shift, she's there until about 4:30, 5:30.

Q. Okay.

A. And I go in -- I went in at 3:00 p.m. So it's -- and then the graveyard shift she came in at 7:00 in the morning and I leave at 7:30, so...

Q. And did you trust Diane Larson?

A. Yes.

Q. Did you feel like she was honest with you?

A. Yes.

Q. Did you ever ask to not do instrument trays or would you just do whatever duties they assigned you to?

A. We did -- or I did do whatever she -- they told me to.

Q. Okay. And then who was your next supervisor after Diane Larson left?

A. Her name is Heather.

Q. Okay.

A. I don't know her last name. I can't pronounce it.

Q. Is it Heather Franzel?

A. Yeah.

30

Q. How -- do you remember when Heather Franzel became your supervisor?

A. 2012, 2013.

Q. Okay. And did you like working with Heather?

A. That's when the problem was starting.

Q. And what problem are you referring to?

A. The write-ups, the going too slow on the instruments.

Q. Did Heather tell you that you were going too slow on instruments?

A. Yes.

Q. When did she tell you that?

A. When? I don't remember. When I very first started to have a problem.

Q. Okay. How often did you work with Heather when she became your supervisor? How often would you see her?

A. Pretty much the same amount at the time.

Q. Okay. Were you still on the same shift when Heather became your supervisor?

A. Yes.

Q. Okay. So let's talk a little bit more in detail about the different job duties as an instrument tech.

31

Can you describe all of the different areas that the instrument techs worked in?

(Ms. Lori Davis entered the proceedings.)

A. We did everything. We did the instruments, washing the instruments, sterilizing them, putting up the case carts and sending them up.

Q. So would you start with disassembling the trays?

A. No. There's people in decontam, that's where we start.

Q. Okay.

A. They get them washed.

So the instrument people are supposed to empty the washers and start putting them up.

Q. And what do you mean by "putting them up"?

A. Making them into sets, you know, different --

Q. Okay.

A. We had a computer with the pick sheets or the -- the recipe.

Q. The recipe cards. Okay.

A. And we start building the instruments into a tray.

Q. So in decontam the tray would come in and the people that were working in that area would take

32

apart the tray and sterilize the tray; is that correct?

A. Not sterilize. Washing it.

Q. Wash it. Okay. And then they would send it to the instrument area?

A. To the washers.

Q. Through the washers. And then the instrument techs would unload --

A. And start putting them together.

Q. -- the trays.

A. Yeah.

Q. So how would you know what trays you needed to build?

A. Most of them had a color code tape on it.

Q. Okay.

A. So that will tell us -- like brown was neuro, black is ortho.

Q. Okay.

A. And then red and white is maternity.

Q. Were there any trays that you had to prioritize and do before other trays?

A. Yes.

Q. Which trays were those?

A. The trauma trays, the implant trays. One of a kind, like the doctor's trays.

Q. Okay. And so once you identified you

**37**

A. The instrument tech has to do everything -- had to do everything. The aides didn't -- at one point they didn't have to do everything.

Q. Okay. And were there any aides that worked in that area when Heather was the supervisor?

A. No.

Q. When, if you can remember, did the aides go away?

A. 1990s.

Q. Okay. So there haven't been any aides for a while. So for a while everyone was instrument techs and they had to do all of the different stations --

A. Right.

Q. -- is that correct? Do you know why everyone had to do all of the different stations?

A. Because the weekends there is no supervisor, and there is only -- now there is only one on mornings and one on evening.

Q. Okay.

A. So, yes, you had to know everything because you would have to know in the decontam how to wash the instruments and then instruments you had to put them up.

Q. Okay.

**38**

A. And sterilize them.

Q. So it was important for all of the instrument techs to know all of the different areas of your job in case you were working the weekends and were working by yourself?

A. Right.

Q. Okay. I'm going to show you.

(Deposition Exhibit 1 was marked for identification.)

Q. Okay. So take a minute to read what's been marked as Exhibit 1.

(The deponent perused the exhibit.)

Q. And you really only need to read over the first page. Let me know once you've read the first page, once you're ready.

Are you ready?

A. Uh-huh. Yes.

Q. Have you seen this before, this document marked Exhibit 1?

A. It looks familiar, but...

Q. Okay. Is this a job description for the instrument tech position?

A. You know, I think so. It could have changed, you know, throughout the years, so it's --

Q. Sure. Okay. So in the middle of Exhibit

**39**

1 on the first page where there's the bullet points under where it says "Essential duties and responsibilities." Do you see that?

A. Yes.

Q. Do those bullet points describe the job functions that we just talked about?

A. Yes.

Q. And those are the job functions that every instrument tech was responsible for, correct?

A. Yes.

Q. Okay. When you were -- okay. So we're done with that, so you can put it away for now.

When you were working as an instrument tech, how many other people were on the same shift as you? How many other instrument techs?

A. There was one -- four to five. Sometimes there are five, and that fifth person was the floater type.

Q. Okay. And what would the floater do?

A. They do the case cart area, you know, taking care of that. On the evening shift we were responsibility (sic) of sealing up the cases for the next day.

Q. Okay.

A. Then once they're done with that, then

**40**

they're supposed to float around to see whether they're needed somewhere else.

Q. Okay. And then on the weekends, how many people were working?

A. One in the morning, one in the evening.

Q. Okay.

A. And there's a call person on the graveyard shift.

Q. Okay. Generally did you like working at St. Vincent's?

A. Yes.

Q. You liked your job?

A. Yes.

Q. Did you feel like you were treated fairly when you were working there?

A. The only part that I didn't feel like I was treated properly, the last -- with Heather. The rest of the time, yes, but...

Q. And why did you feel like you weren't treated fairly during the last part?

A. I just felt -- I felt that she didn't respect me. She didn't understand that I had this disability. She didn't understand that I could have -- the pressure was just a little too much. I tried and tried, but...

Deposition of: Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

41

Q. Did you ever talk to Heather about this?

A. I tried.

Q. Okay. How often did you talk to Heather?

A. The write-ups or just general?

Q. Either one.

A. We can do both.

Q. So how often did you talk with her about the write-ups?

A. There was quite a few, so I don't...

Q. Okay. And what about how often did you talk to her about just general struggles with your work performance?

A. Not too much of -- you know, in general, we didn't -- we didn't talk too much. There was one item that I didn't think it was -- she told me about it and then she turned around and wrote me up a few weeks later. That, I didn't understand.

Q. Okay. And so when you talked to Heather -- when you talked to her about your frustrations, what did you tell her?

A. I don't exactly remember.

Q. Okay.

A. I told her I didn't understand. I was trying.

Q. Okay. You said that there was one

42

incident where Heather talked to you about it and then later wrote you up. Can you tell me a little bit more about that?

A. We got these new bags and -- for the instrument trays because we used to just have to wrap it in another small wrapper, but she got these new bags to put the sharps into these bags instead of the wrappers. Well, these bags have these indicators built in on the bag. Okay. Well, on one tray, which everybody does at one time or another, I forgot to put an indicator in this one tray. Surgery, the open heart team, opened the tray seeing that there was no indicator, but they seen the bag with this indicator and it turned, so they just took it on themselves to say it was okay to use.

Well, they reported it to my manager, Heather, saying what happened. Well, okay. So she put me in the office and she told me about it and she says, Don't worry about it; it's just heads up. They just wanted to let us know, heads up. Okay. Well, two weeks later we have this big meeting and I was getting written up for that mistake.

Q. And do you remember about when this happened, when your first meeting with Heather was?

A. No.

43

Q. And then when you say you had a big meeting, who was all at that meeting, do you remember?

A. Well, Heather, the director of HR.

Q. And who was that?

A. Kathy Smith.

Q. Okay.

A. And then I don't remember if David Dobson was there or not. He's the director of surgery.

Q. Okay.

A. And then there was Annette Hoffman, I do believe she was there, and me.

Q. Okay. And what did you talk about at this meeting?

A. Oh, we had several meetings.

Q. But what about this one where -- that Heather had talked to you about this before, what did you talk about at the following meeting?

A. Okay. Well, there was a few that -- I think there was one or two more items that she had, and I just -- it's all in -- I just don't remember exactly when it happened, which part.

Q. Okay. So during your meeting where you had -- where you spoke with Heather, she gave you kind of a coaching on a mistake that happened; is that correct?

44

A. Yeah. I -- I got put on a training --

Q. Okay.

A. -- deal. And that was with Annette somebody. I can't even think of her name right now.

Q. Was it --

A. She's a new supervisor for central processing. She retrained me in instruments to try to get me faster.

Q. And was that before or after this meeting that you had with Heather, Kathy, Annette and David Dobson?

A. Well, the incident with the indicator, no, it was before.

Q. Okay.

A. But it was this -- you know, I had about two or three meetings with them before I -- they decided to put me in this new training.

Q. Okay. So it was one of those meetings?

A. Yeah.

Q. And you mentioned that Kathy Smith was there, and she's the director of HR?

A. Yes. And she is supposed to be our go person -- go-to person for central processing.

Q. Okay. Did you like Kathy Smith?

A. Not really.

Deposition of: Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

45

Q. And why not?

A. Well, you know, I really didn't -- before that I really didn't know her, but I just felt that she wasn't listening to me.

Q. Okay. And what made you feel like she wasn't listening to you?

A. I really can't explain it. I just, you know, this Annette Hoffman, I went to her and she was the HR -- another HR person. But I felt more comfortable with her.

Q. Okay.

A. She was paid to help me to understand what was going on, this Annette Hoffman.

Q. Annette?

A. Kathy Smith couldn't.

Q. Kathy Smith couldn't do what?

A. To help me to understand.

Q. Okay. So instead you worked with Annette Hoffman to help you understand?

A. Right. Yes.

Q. Did you feel like Kathy Smith treated you fairly?

A. Not really.

Q. And why not?

A. Like I said, I just felt that she just

46

didn't understand that there was a problem with me, that I couldn't grasp the -- because I felt that I was doing okay. I was trying.

Q. Do you think that should have --

A. But she just --

Q. Go ahead.

A. She just didn't think that I was trying that hard. Hard enough, or...

Q. And why do you think she thought that?

A. I don't know. I just -- I really don't know. I guess I really didn't know her that well too.

Q. Okay. Did you believe that Kathy Smith was honest with you?

A. Not really, because she -- she never worked in central processing herself.

Q. Okay.

A. So I just don't -- didn't really understand how can she really knew (sic) what was the problem down there if she didn't do it herself? So she was taking Heather's and David's word.

Q. Okay.

A. Then mine. At this one meeting that we had right after the training, retraining up in the instruments, Annette Hoffman looked me in the eye and says, "Good job; you did it." Well, okay. Thank you.

47

But nobody else did, said that. Kathy didn't say that. But then it didn't work -- really work because I was still having problems with instruments and other areas.

Q. Okay. So you mentioned Annette Hoffman. How often did you go to talk with Annette Hoffman, do you remember?

A. It seemed like once a week.

Q. Okay.

A. But then it got where it just -- if I needed to talk to her, I called her.

Q. And did you like Annette Hoffman?

A. Yes.

Q. And do you feel like Annette Hoffman was honest with you?

A. Yes. Like I said, she helped me to understand.

Q. Okay. And do you feel like she treated you fairly?

A. Yes.

Q. Did you ever meet with anyone else in the human resources department?

A. There was one other lady, I don't really remember her name for sure because she wasn't -- for whatever reason, Kathy stepped down to be our go person for a while, I don't know why, so this other lady took

48

over for where we could go to her if there was any problems that we had.

Q. Did you ever go to this other person?

A. Yes, but --

Q. Do you remember about when this was?

A. No, not for sure. It was in that -- doing stuff, you know. And she just didn't understand what was going on. She tried, but -- to really understand their part and my part. She was just -- she didn't know. She came in in the middle of it.

Q. Okay. And about how long was she over the central processing group, do you remember?

A. Maybe four months maybe.

Q. Okay. Was it Heidi? Was her name Heidi?

A. That could be. Sounds familiar, yeah.

Q. Okay. And you mentioned David Dobson before. Who was David Dobson?

A. He was the director of central -- of central process, surgery -- surgery service.

Q. And did you meet with him?

A. Yes.

Q. How often did you meet with David?

A. Just whenever that meeting -- we had to have that meeting -- those meetings that if there's a problem that came up.

Deposition of: Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

49

Q. Okay. Did you like David Dobson?

A. No.

Q. Why not?

A. He's too strong for me, a little bit too firm. I don't know how to put it.

Q. Firm in his personality; is that what you mean?

A. Yes.

Q. Did you feel like David Dobson was honest with you?

A. I don't know. I -- he was another person I just didn't really care for.

Q. When was the first time you met David Dobson?

A. He used to have been a director for distribution, then he became a director for surgery service. In that -- in that time I really met him, you know, he just had an individual meeting with everybody.

Q. What did he say in that individual meeting? What did you guys talk about?

A. He told me about his past a little bit. And I plain out told him that I was disabled or special need, so at that meeting, yes, he knew.

Q. And when was that meeting, do you remember?

50

A. When he first started being the -- or, no, wait a minute. Sorry. Back up a little bit. He -- for whatever reason, we was under surgery service. And then for whatever reason, he wanted us to be with him -- his group. So Heather decided to go ahead and go into his group of distribution, because we were all down in the basement. That's when we had the individual meeting was when. That's when I first started.

Q. Okay. And you told him you were special needs?

A. Yes.

Q. And then what did he say?

A. That he worked with special need people before.

Q. Did you --

A. And that was 2012, 2013, whenever he --

Q. Whenever he started?

A. Yes.

Q. Why did you tell him that you were special needs?

A. No reason. I'm not ashamed of it. It's just the way it is.

Q. So you were just informing him, you weren't asking him for help --

51

A. Right.

Q. -- or anything like that?

A. Just talking about my past.

Q. Okay. Kind of getting to know each other?

A. Uh-huh.

MS. SAVORY: Okay. We've been going for about an hour. Can we take a break?

MR. HOLM: Sure.

(A recess was taken from 10:27 to 10:43 a.m.)

Q. (By Ms. Savory) Do you understand that you're still under oath?

A. Yes.

Q. Can we have the other parties identify themselves for the record, please.

MS. FRANQUI: My name is Ann Franqui, and I am a mentor for North Metro Community Services.

MS. SAVORY: Okay. Thank you.

Q. (By Ms. Savory) Okay. Roxanna, so you mentioned to us that you have a disability. What is your disability?

A. Speech and learning.

Q. Okay. Did your disability impact your job at all?

A. I think so, you know, because -- you know,

52

they had to show me -- tell me, show me -- and there was three steps. Tell me, show me -- oh, and then I was supposed to read it.

Q. Okay. And what are you referring to when you say they had to tell me, show me, and then read it?

A. Well, you know, whenever there's something new come in -- came in -- we had -- they had a meeting and they was telling everybody. But they had -- they actually had to show me how to put something together, then I showed them how to put it together to make sure that I understood what they were showing me.

Q. Okay. When was the first time you remember telling anyone at St. Vincent's about your disability?

A. Like I said, I was never really shy about it. So if -- once I got to know a person, you know, a new employee, then we would talk about our backgrounds.

Q. Okay. And when was the first time you -- they implemented this tell me/show me process that you were talking about?

A. I think they pretty much knew that, so they just did it.

Q. They did that the whole time during your employment?

A. I'm pretty sure, yeah.

Deposition of:  Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

53

Q.  So with your disability -- you said you had a learning disability?

A.  Yes.

Q.  What does that mean?

A.  It takes me longer to learn anything new.

Q.  Okay.  So it takes you longer to learn new things, so to help with that you had this tell me/show me and then you would do it process?

A.  Yes.

Q.  Okay.  Who is your medical doctor?

A.  I can't really pronounce his name, Dr. Rieher, or something like that.

Q.  Is that your doctor here in Colorado?

A.  Yes.

Q.  And how often do you see him?

A.  Once in three months or so.  Right now I'm getting my skin tags off, so about once a month.

Q.  Okay.  And who was your medical doctor when you were living in Montana?

A.  I can't think of his name right now.  Huh. I don't remember.

Q.  Okay.

A.  I don't remember names too well.

Q.  Okay.

(Deposition Exhibit 2 was marked for

54

identification.)

A.  Okay.  Dr. Phillips.

Q.  Was Dr. Phillips your doctor in Montana?

A.  Yes.

Q.  Have you seen this document before?

A.  Yes.

Q.  What is this document?

A.  He's just letting the job know that, yes, I am disabled.  I have diabetes and heart condition. With all the, you know, stress and --

Q.  Did you bring this note in to someone at St. Vincent?

A.  Yes.

Q.  Who did you bring this note in to?

A.  I gave it to Heather.

Q.  Okay.  And do you remember when you brought it in?

A.  No.  It was one of my deals that I was hoping would help for her to understand it.

Q.  And when you say it was one of your deals, what do you mean by that?

A.  You know, with all the stuff that I was going through, I was hoping that she would understand that I was disabled or special need that -- consider that, you know, give me a bit more time to...

55

Q.  So you said -- was this -- did you bring this in after you received a corrective action?

A.  Yes.

Q.  And in the note it says in Exhibit 2, "May require additional time to learn and perform certain tasks."

What certain tasks were you learning at that time?

A.  It was, you know, the instruments.

Q.  Okay.  And doing the instrument trays; is that what you're referring to?

A.  Yes.

Q.  Had you ever asked for additional time before you brought this note in to Heather?

A.  I don't remember if I actually asked her, but...

Q.  So this is the first time you remember asking for additional time to perform certain tasks and to learn?

A.  Yes.

Q.  Okay.

A.  Like I said, I don't really remember too well.

Q.  So you said that you were learning the instrument trays.  Why were you learning those tasks

56

now, or around the date of this note in October 2013?

A.  That's when I was starting to relearn the instruments.

Q.  Okay.

A.  I did the instruments but was slower.  I was more cautious.  I was actually finding more mistakes with, you know, with the instruments, a lot that wasn't working, they were chipped.  Even the new supervisor was surprised that she didn't see it before me.

Q.  Okay.

A.  She said, Whoa.  I says, Well, yeah, it...

Q.  So you were finding some mistakes with the instruments themselves?

A.  Yes.

Q.  Were there any new instrument trays around that time that you were learning or was it just relearning all of the trays that had been processed by the department then?

A.  It was pretty much all of the instruments.

Q.  Okay.  And so here you brought this in to ask Heather for additional time and to perform certain tasks.  Were those -- excuse me, additional time to learn and to perform certain tasks.  Were those the only requests that you needed help with to perform your

57

job?

A. I don't understand.

Q. So in here you -- so you said that you brought this letter in to ask Heather for additional time to learn and perform certain tasks, right?

A. Yes.

Q. Were those -- was that the only thing you asked for help?

A. Mainly was the instruments was the main problem.

Q. Okay. So you brought this note in because you had received some discipline regarding the instruments, and you asked Heather -- you brought this note in to ask Heather for additional time to learn and perform certain tasks because of your learning disability; is that correct?

A. Yes.

Q. Were there any other accommodations that you asked for because of your learning disability?

A. Not in any other area.

Q. Okay. And what did Heather tell you when you brought this note in?

A. Nothing. She just put it in my record.

Q. Okay.

A. I don't remember if she said anything with

58

it.

Q. Did you talk with Heather at all about the speed of your performance, the speed it took you to do the instrument tasks?

A. I don't think so. I don't remember. She was just trying to get me faster. I don't know how fast they expected for anybody to go.

Q. And how do you know that she was trying to get you faster?

A. Well, with all the write-ups, then the retraining.

Q. And during those they told you --

A. That I need to go faster.

Q. Were you ever -- did you ever receive a write-up for going too slow?

A. That's when it was first started. But I -- you know, if they used those exact words, I don't...

Q. Okay. What happened after you brought this note in? Did anything change?

A. No.

Q. Do you remember meeting with a doctor named Dr. Gumm?

A. Yes.

Q. Do you remember why you met with him?

59

A. Annette Hoffman thought that maybe it would help everybody to understand where I am with my disability, if I was disability, and so...

Q. Did you have any objection with going to meet Dr. Gumm?

A. No. Like I said, I'm not ashamed of my disability. And I was just trying to save my job, so I was trying to do everything that they asked me to do.

Q. Sure.

(Deposition Exhibit 3 was marked for identification.)

Q. Have you seen this document before?

A. It doesn't really look like one that I have, but...

Q. Okay. So I'll direct you to page four, the last page, of Exhibit 3. And if you can read on page 4 where it says recommendations. Read 1, 2, 3 and 4 to yourself.

(The deponent perused the exhibit.)

Q. Okay. Are you done?

A. Yes.

Q. Okay. So on Number 1 on Exhibit 3, page 4, it says, "The patient reports she has recently been having some difficulties at work."

Do you know what difficulties the doctor

60

is referring to here?

A. Was just the stress in instruments.

Q. And what in instruments was causing you stress?

A. Well, to try and go faster. Trying to understand.

Q. Trying to understand what?

A. The process. Like I said, I was trying, but -- I don't know.

Q. It says, "She feels that the difficulties are in part related to a new manager who is not patient with her."

Do you know who the doctor is referring to there?

A. Heather.

Q. Heather. Okay.

And then in Number 2 it says, "She might learn best by having things demonstrated to her rather than explained orally." Do you see that?

A. Yes.

Q. Do you know what he was referring to -- what you night need to learn? It says "She might learn best." Was there a new part of your job that you needed to learn?

A. I really don't understand. Like I said in

Deposition of: Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

61

instruments, this is just --

Q. Okay. So he's referring to the instruments there?

A. Uh-huh.

Q. And earlier you talked about the three-step process and when you were learning new tasks. So did St. Vincent demonstrate things to you when you were learning new -- new instruments or new parts of your job?

A. I usually didn't really go to the management. There were some coworkers who understood that, you know, I had this problem, and they -- when the instrument came, they showed me how to put it together better. You know, because I actually -- like in decontam, if there was a certain way to clean it, they helped me to show me to clean.

Q. Okay.

A. And then the instrument area, they helped me to put it together.

Q. Okay. And then number 4 it says, "She might have a third party act as a mediator to make sure that communication is as effective as possible."

Do you see that?

A. Yes, uh-huh.

Q. Do you know who St. Vincent appointed as

62

your mediator?

A. Well, you know, like I said, Annette Hoffman was at the meetings for me.

Q. Okay. So she was the person that was selected as your mediator. Did you ask for anyone else?

A. No.

Q. No. Okay.

So when you look at these four recommendations that are here on Exhibit Number 3 on the last page, did you feel that St. Vincent did these four recommendations?

A. I think they tried maybe, but they -- I guess they truly didn't understand. I don't know if Heather really worked with a special need before, so she really didn't know -- I don't think she was really qualified to under- -- I don't -- you know, I don't know.

Q. Did you say you don't think Heather was qualified to work with a special needs person?

A. Right. Yeah. I don't think she really was -- you know, she never really worked with a special need.

Q. Okay.

(Deposition Exhibit 4 was marked for

63

identification.)

(The deponent perused the exhibit.)

Q. Are you done?

A. Yes.

Q. Have you seen Exhibit Number 4 before?

A. Yes.

Q. What is Exhibit Number 4?

A. My doctor back then in Billings was really trying to help me to get -- help them to understand that I need more help than...

Q. And what type of additional help did you need?

A. Well, with the instruments. You know, to understand more that I need more time than a normal, regular person.

Q. Okay. And did you bring this note to someone at St. Vincent's?

A. Yes, to Heather.

Q. To Heather. Why did you bring in this note?

A. I was hoping that she would understand that -- that I need more help, that I need more time.

Q. Okay. In this note do you see where it says, "She feels she is being mistreated and harassed"?

A. Yes.

64

Q. Who -- who was mistreating and harassing you?

A. Heather and David Dobson.

Q. And what were they doing?

A. Well, they just kept on telling me I need to go faster, that --

Q. Had you told them before that you felt like they were mistreating you?

A. Yes. Well, I didn't really come -- you know, say those words, but --

Q. What did you say?

A. That -- that I felt that I -- I just told them that I was confused, that I was trying, and I really didn't know what they expect from me.

Q. And what do you mean you when you say you didn't know what they expected from you?

A. Well, you know, they put the bar a bit too high for me to do. Maybe it took a regular person five minutes to do a tray where it might take me 10, 15 minutes to do a tray. You know, they didn't understand that I may -- I might have needed just a bit more time.

Q. Okay. And did you ask them for more time?

A. Well, not -- I didn't -- I never really came out with it, but...

Q. Okay.

Deposition of: Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

65

A. Because I was really trying to.

Q. Okay. And in here it says, "She does her best with her physical limitations." What physical limitations is the doctor referring to in Exhibit 4?

A. Is not lifting. And I don't... I don't -- you know, with a special need, I don't know what.

Q. Okay. So you think he's referring to special needs there?

A. We never -- I never really had a problem with lifting, but...

Q. Okay.

A. There was no --

Q. So physically you didn't have any limitations at work?

A. Right. I didn't really let it to interfere with my -- because, you know, 50 pounds is quite heavy, so it's --

Q. But when you were performing the job duties as an instrument tech, did you ever have any physical things that you could not do as part -- that were your job duties?

A. No.

Q. Okay.

A. We was -- I do believe it was 50 pounds

66

that we were supposed to lift.

Q. Okay. And then in Exhibit 4 the doctor also says, "She is not getting the support that she needs." What additional support did you need?

A. They didn't really -- I think where he was coming from that he -- we felt that they didn't really support me. You know, saying that -- they never said "good job." They always said, "Well, you're doing lousy."

Q. Okay.

A. I -- you know, I felt they didn't really expect me, so it's...

Q. They didn't expect you...

A. Respect.

Q. Oh, respect. Okay.

(Deposition Exhibit 5 was marked for identification.)

(The deponent perused the exhibit.)

Q. (By Ms. Savory) What is Exhibit 5?

A. The write-up for not improving.

Q. Okay. And do you remember if this was the first corrective action form that you've ever received when you were working at St. Vincent?

A. You know, maybe. I don't know. I don't remember for sure.

67

Q. Okay. Why did you receive this corrective action?

A. Because they felt that I was going too slow in instruments, and that they -- and then they felt that I didn't improve.

Q. So in the box under number 1 it says that "On July 24th, 2013, Roxanna Jackson met with the Materials Management Director and the Central Processing Manager to have a conversation from a high, medium, low perspective of the productivity in the Central Processing Department to establish expectations."

Do you remember having that meeting with David Dobson and Heather Franzel?

A. Yes.

Q. And then it says, "Based on our conversation, we requested that you continue to address and look for opportunities to improve productivity within the department."

Does it say anywhere in that box that they had a conversation with you about the speed of your performance?

A. No, but they said that I didn't improve.

Q. Okay.

A. Improve.

68

Q. Okay. And then in box number 2 on Exhibit 5, about halfway through the box it says, "The request to improve your technical skills to be able to maintain the instrumentation area has not been met." And then it says, "Based on our previous discussion we asked that if you need assistance to make us aware and we would provide the training and means of measure to improve on." Do you see that?

A. Yes.

Q. Did you ever ask for any assistance?

A. Probably not. I was so confused at that time that --

Q. Did you ever let Heather or David Dobson know that you were confused?

A. I might have. I don't remember for sure.

Q. Okay. And during that meeting as it says in Exhibit 5, box 1, you talked about the productivity in the department. What did they mean by that?

A. They want, you know, certain stuff done more --

Q. Accurately?

A. Yeah. Yes.

Q. Was it after this corrective action form that you brought in the note from your doctor that we looked at in Exhibit 2?

Deposition of: Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

---

**69**

A. That could be.

Q. Okay. Okay. So then if you look back at Exhibit 5 and turn the page to the second page of the corrective action form, it says, "Associate's Signature," "Refused to sign." Do you remember why you refused to sign?

A. I didn't agree with it.

Q. Okay. And did you tell them that you didn't agree with the corrective action?

A. I might have. I don't remember for sure.

Q. Okay. Do you remember what happened after you received this first corrective action in Exhibit 5?

A. Remember what happened before?

Q. Afterwards.

A. Oh, afterwards?

Q. Yes.

A. I don't remember if it's about that time when I was getting retrained in instruments maybe.

Q. Okay. Sometime after you think you were getting retrained?

A. Yes.

Q. Okay.

A. Like I said, I don't remember dates.

Q. That's okay.

(Deposition Exhibit 6 was marked for

---

**70**

identification.)

(The deponent perused the exhibit.)

Q. Have you seen Exhibit 6 before?

A. Yes.

Q. What is Exhibit 6?

A. I was being rude to a coworker in the locker room.

Q. Do you remember who the other coworker was?

A. Yeah. Yes.

Q. Who?

A. Her name was Kelly Campbell.

Q. Okay. And what happened?

A. She was -- one of the times she was working in decontam with me, but I thought she was on break, but she was talking to the new evening supervisor, you know, with -- you know, being on a break and talking to her and got overtime. The evening supervisor decided to send her home.

Well, in between time, I needed help in decontam. So I asked whoever, you know, closest if they knew where she was, where Kelly was. They said she was in the office. Okay. Well, then they came out and the supervisor said that the evening supervisor said that she was sending her home. And I says, Oh,

---

**71**

well -- you know, it was 5:00, I -- you know, I need to go to supper, so -- but there was stuff to do in decontam that people needed, you know, before -- to put their trays up before I could go to supper. But that's why there's an evening -- or the day person goes home at 5:30, so I could go at 5:00.

Q. Okay.

A. So I says, oh, well, okay. Then I kind of blew up with her in it.

Q. And when you say you kind of "blew up with her," what do you mean by that?

A. I told her I didn't understand -- I said, okay, fine, I'll just do it, you know.

Q. Uh-huh.

A. I'll just forget about the supper part for now. And she says, Well, you know, she'll go back there. I says, no, that's fine.

Q. And when you're talking about -- you're referring to "her," are you referring to the --

A. The evening supervisor.

Q. And who was that?

A. Ann -- no, not -- Ann. Amanda.

Q. Okay. And when you said, "Fine, I'll just do it," did you raise your voice?

A. Yes.

---

**72**

Q. Okay. And it also says Exhibit 6 in Box 1 it says: "Roxanna made inappropriate comments to both the associate and the evening supervisor."

What did you say to Kelly?

A. Well, and then maybe it was a few days later because I didn't really see her that much, I says, "Well, I would appreciate if you do your job, rah, rah, rah, rah."

Q. And was raising your voice to a supervisor a violation of work rules?

A. Yes. And I did apologize -- I did apologize to the supervisor, but I didn't apologize to Kelly, because her -- well, her and I never really see eye to eye, so I tell her and she'll get mad and me and tell me where I can stick it, and I'll tell her eventually. And we just go back and forth.

Q. So you didn't really get along with Kelly?

A. Right.

Q. Did you know at the time that you were breaking the rules when you were getting upset with Kelly and with Amanda?

A. I probably did, but I didn't really thought about it until later.

Q. Okay. And then on page 2 of Exhibit 6. It says "Associate signature." Is that your signature?

---

73

A. Yes.

Q. And so you signed this acknowledging the corrective action, correct?

A. Yes.

Q. Okay.

A. That's one thing, I will admit -- if I feel that I was wrong -- in the wrong, I will admit it.

Q. Okay. So you've talked a little bit about this retraining program that you had to go. Do you remember when this retraining program took place?

A. The dates, no.

Q. And do you remember why you had to go through the program?

A. Try to go faster in instruments.

Q. And what -- can you tell me a little bit about the program? What did you do in the program?

A. Mainly to relearn how to do the instruments and go faster. That's really the main thing, to go faster.

Q. And why did -- do you think the main thing of the retraining program was to go faster?

A. The pro- -- however you want to pronounce it, to make the department go faster, to get the stuff done faster.

Q. Did anyone during the retraining program

74

tell you to go faster?

A. At the beginning, yes. They told me that -- to help me go faster.

Q. Okay.

A. To see if I could, you know, speed up. This -- to show me how to do cuts -- shortcuts.

Q. Okay. Who performed the retraining program?

A. Amanda, the new supervisor.

Q. Okay. And did you like Amanda?

A. Yes. I didn't really know her that well, but...

Q. Did you feel like Amanda was honest with you?

A. Yes.

Q. And could you trust Amanda?

A. I think so.

Q. Was Amanda available to ask questions if you had questions on the instrument trays?

A. She tried to be, you know. She -- you know, as the time went on, she went to do her other work that she needed to get done, but I knew I could go to her if I --

Q. Okay. When they told you that you were going to go through a retraining program, how did you

75

feel?

A. Okay. Like I said, I tried to do everything that they asked me to.

Q. Did you feel like St. Vincent was trying to help you?

A. Maybe. Like I said, I don't think Heather herself knew how to work with me.

Q. Okay.

A. She really didn't understand that she was pushing it too hard. I might have always needed that little bit of extra time.

Q. Okay.

A. But I don't know if anybody would really feel that comfortable in you're going to be under a microscope all the time.

Q. What do you mean, "under a microscope"?

A. They was watching me, like, you know, every step that I made.

Q. And who are you referring to?

A. Heather. The management.

Q. When Heather -- what shift was Heather on when you were working?

A. When I was getting retrained?

Q. Uh-huh.

A. She was working mornings and I was working

76

at noon to 8:30.

Q. Okay. And you did the training primarily with Amanda?

A. Yes.

Q. Did you feel like Amanda understood you?

A. I think so. But then she was new, so she really didn't know me too well. Like I really didn't know her.

Q. Okay. So you were both getting to know each other around the same time?

A. Yeah.

Q. Did you have any objection to going through the retraining program?

A. No.

Q. And what areas did you -- did you go through in the retraining program? Can you tell me just a little bit about what you did in the retraining program?

A. I only did instruments.

Q. Okay.

A. Because every other area, I was fine.

Q. Okay. And when the retraining program started, do you remember what you and Amanda did as part of the retraining program? What was your day like?

Deposition of: Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

77

A. Just doing instruments. Like a new employee, learning the new -- the instrument area. So the first week I didn't empty washers or I didn't empty the window, or anything like that, I just ignored that, and I just did instruments. Whatever Amanda, you know, gave me.

Q. Okay. So you would just work on the instrument trays?

A. Yes.

Q. How did you feel like the retraining program went?

A. Okay.

Q. Was it helpful?

A. I think so. I don't -- I really didn't know for sure if it was going to really speed me up because -- and I don't really think it really -- maybe it speed me up to a point, but not as fast as anybody else.

Q. When you were doing instrument trays, did you ever make mistakes with instrument trays?

A. Oh, yes. Yes.

Q. Okay. And so what would you do to try to prevent making those mistakes?

A. I -- there's -- you know, there's books to read to look at if you're not sure of an item, they --

78

they're trying to put pictures in with the new items because, you know, that would help you to see, you know, if you have the right item or not.

Q. Okay.

A. So I tried to use those. Mainly I used those for the most part is the spellings. I'm the worst speller there is.

Q. Some of the tool names are pretty hard to spell, aren't they?

So when you were putting together the instrument trays, you would -- there were books you could look at, there were recipe cards you could look at to tell you what needed to go on each tray and how to do it?

A. Yes.

Q. During the retraining program did you go through different trays to learn what needed to go on each of the trays?

A. Yeah. I only relearned every -- all the trays.

Q. Okay.

A. Amanda had a better way of putting instruments in that they fit better.

Q. Okay.

A. And it kind of helped them to understand

79

that maybe some of the trays were a little too small for the -- all the stuff.

Q. Okay.

A. So -- which was a good thing, because they understood what we were going through.

Q. Yeah.

A. So they was made to put it into more trays than one. So that helped.

Q. Okay. So you were going through all the trays. And during the retraining program did you feel pretty comfortable with all of the trays, that you knew how to do the trays?

A. I think so.

Q. Okay. During the retraining program, could you ask Amanda questions if you had questions throughout?

A. Yes.

Q. Was Heather present at all during the retraining program?

A. Very little. She tried to stay out of that.

Q. Okay.

A. Because if there was a concern, then she would just pull Amanda, you know, away and talk to her.

Q. Okay. So you were working primarily with

80

Amanda during the retraining program?

A. Yes.

Q. Okay.

(Deposition Exhibit 7 was marked for identification.)

(The deponent perused the exhibit.)

Q. And you don't have to read everything in the document, just to get a general understanding of what it is.

A. Yes, okay.

Q. Have you seen Exhibit 7 before?

A. Yes.

Q. And what is Exhibit 7?

A. This is the sheets that we sign saying that I did this, you know, at each -- like week one I say what tape it was, you know, the color code and some of the trays that...

Q. Okay. So is this a list of what you went through during the retraining program?

A. Yes.

Q. Okay. And then you -- when -- is this your signature or your initials here on Exhibit 1 (sic) on the first page under Roxanna Jackson?

A. Yes.

Q. And would you sign Exhibit 7 in those

Deposition of:  Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

81

boxes with your initials when you completed the tasks?

A. Yes.

Q. And then it looks like Amanda put her initials in there?

A. Uh-huh. Yes.

Q. And then Heather as well.

So once you went through the six-week retraining program, did you feel pretty comfortable in the instruments area?

A. I really don't think I really felt any more comfortable than I was. You know, because I really don't know for sure if I was going to be faster.

Q. Okay.

A. I felt more comfortable because she showed me a better way of putting some instruments in.

Q. Okay. And were they — did — Amanda timing you when you were going through the retraining program?

A. Eventually she did. You know, not at first. Not at the beginning.

Q. So she didn't time you all of the time during the retraining program?

A. Right.

Q. I'm sorry, was that a yes?

A. Right.

82

Q. During the retraining program, was Amanda focusing on teaching you how to do the trays correctly?

A. They was just trying to get me faster. I don't know if it was, you know, correctly.

Q. And why do you think they were trying to get you to go faster?

A. Because I was taking too much time otherwise.

Q. Did they tell you that?

A. Pretty much, yeah. I was going too slow or...

Q. Who told you that you were going too slow?

A. Heather and David.

Q. Okay. And what about during the retraining program, did Amanda ever tell you you were going too slow?

A. At that meeting she said that, Oh, I've got some tricks under my sleeve, I'll — I might be able to get you to go a little bit faster.

Q. Okay. And were the tricks that she was referring to, are those the shortcuts that you mentioned earlier, she had some shortcuts to put together the trays?

A. Yes.

Q. And did — did her showing you those help

83

you put together the trays more accurately?

A. Like I said, she helped me to put them in there more where they — everything would fit better.

Q. Okay. So that — those are the kind of tricks up her sleeve?

A. Yes.

Q. She just helped you put everything on the trays so they would fit together better?

A. Yes.

Q. Okay. Are there any other times during the training session that you had with Amanda where she said that you needed to go faster?

A. No.

Q. Okay. Once the six-week training program was over, how did you feel?

A. Okay.

Q. Okay?

A. And that's — at that meeting, you know, that was the end, that's where Annette Hoffman said, "Good job. You did it."

Q. Good. So you felt like you successfully completed the training?

A. For I — like I said, I was so confused that I just got...

Q. And what were you confused about?

84

A. Everything. I didn't really — I was trying, trying. For the training, yes, I did it to make them — to try to understand more. Yes, I understand better to put them in.

Q. Uh-huh.

A. But to go faster, I don't know. Because the way everything was set up, if everything is pretty high for me to reach, so that took time to reach what I was getting.

Q. To reach the instruments and put them on the trays?

MR. HOLM: You have to say yes.

THE DEPONENT: Yes.

MR. HOLM: You can't nod.

THE DEPONENT: Oh, I...

MS. SAVORY: Okay. Thank you.

THE DEPONENT: So you have to hit me once in a while.

Q. (By Ms. Savory) So once the retraining was over, did you feel like you understood how to put all the instruments on the trays properly?

A. Yes.

Q. Okay.

A. But I was paid to look for the mis- — the chips better than anybody else. Yes, I was maybe going

Deposition of: Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

85

a little bit too slow, but was also saving the doctors some time to -- you know, if they have some chips or something wrong with the instruments, that would just take them more time to go get something else or get another tray that has the same instrument in it.

Q. Sure. So you were --

A. And they won't have to throw the instrument across the room.

Q. So you were good at realizing when the instruments were broken and when you needed to get a new one?

A. Yes. But some others who was going too fast may not -- they wasn't paid to find them -- the mistake or the chips or the bad.

Q. Okay. Okay.

(Deposition Exhibit 8 was marked for identification.)

(The deponent perused the exhibit.)

Q. Have you seen Exhibit 8 before?

A. Yes.

Q. And what is Exhibit 8?

A. I mislabeled something. A couple things.

Q. Okay. And so it's a corrective action form for mislabeling a couple things? And so in -- on Exhibit 8 in Number 1 in the box, it says 4/29/14. And

86

it talks about a mislabeling incident. And then it says, "When the error was brought to Roxanne's attention, she stated she knew she made the mistake but did not correct the issue."

Why didn't you correct the issue?

A. Because I thought -- I was hoping that a few days later or so -- because one or two items, you know, one, they usually use it, you know, within a few days. So I was hoping that they used it and -- yes, I should have, you know, called it down or see if they found it, but...

Q. So were you hoping --

A. I was tired, I was just...

Q. Okay. So you knew you made the mistake and you were hoping that they wouldn't notice?

A. Yes, more or less.

Q. Okay. And then on 5/13/14 it says -- it also says -- it talks about mislabeling an Olympus light cord. Do you remember making that mistake?

A. Well, I thought I tried to explain to them the camera and the light cord, if -- those two items have to be wrapped.

Q. Okay.

A. You send it down to the wrap area. How do we know if the wrap person didn't -- and sometimes

87

there's two -- you know, there's people helping. So if they put the tape down on the table, they might have picked up -- the other person might have picked up the wrong tape after they wrapped it, so they thought they had one item but it was different item, so they put the tape on it. So how do I know or how does anybody else know that that's what happened?

Q. So when you're in the instrument tech -- when you're in the instrument tech position, when you would do this type of tray, how would you label them? Can you describe the process for me, just so I can understand it?

A. Okay. It was the -- that scope and the camera.

Q. Uh-huh.

A. Okay. We labeled one are the something lap -- lap cord or -- and then the other one lap camera.

Q. Okay. And what did you label them with? Like was the label a piece of tape?

A. Yes. Yes.

Q. Okay.

A. Okay. So I put it on the tray that it's supposed to be on.

Q. Uh-huh.

88

A. Then you send it down to the SO area. Those two trays have to be wrapped, physically wrapped, because they're not in the container.

Q. Okay.

A. So if you take the two tapes off because there is more than one person wrapping, how do you know you're going to take the right tape --

Q. Okay.

A. -- and put it on the right tray?

Q. Okay.

A. How does anybody know that didn't happen?

Q. Okay. But do you know that that did happen?

A. It could have.

Q. Okay.

A. You know, I can't prove it, no. But how can you prove not?

Q. Was it possible that they were also labeled incorrectly when you were in the instrument area?

A. It's a possibility maybe, but...

Q. Okay.

A. I just can't see that happening with me.

Q. And here on Exhibit 8 it said, "This error was brought to Roxanna's attention to make her aware of

89

the mislabeling issue and she did not have a response to the mistake."

So did you say anything once this mistake was brought to your attention?

A. Yes. Yes. I brought that up. How do they know that that didn't happen?

Q. Okay. And who are were you taking to?

A. To Heather and David and whoever else was in the room.

Q. Okay. So on Exhibit 8 it says, "Prior corrective actions," and it talks about one on April 9th, 2014, Verbal coaching. Reminder of training and observations of performance.

Do you remember that conversation?

A. No, not really.

Q. Do you know who might have had that conversation with you?

A. No, not --

Q. Okay.

A. I don't really understand.

Q. Oh, I'm sorry. On page 1 of Exhibit 8.

A. Okay.

Q. On the very top box it says, "Prior corrective actions." Do you see that?

A. Oh, this one?

90

Q. The very bottom one.

A. Okay.

Q. It says, "Verbal coaching. Reminder of the training and observations of performance."

Do you remember having a meeting -- a verbal coaching meeting with anyone around April of 2014?

A. No.

Q. Okay. And then down in box number 3 on the very bottom, Number 3, it says, "Mistakes are addressed with each associate as they occur. If it becomes repetitive, it is a concern for the patient's safety and corrective action will follow."

When mislabeling mistakes are made, what could happen?

A. It takes too much time to look for the items, what they're looking for.

Q. Could it impact patient care and patient safety?

A. Yes.

Q. And did you understand that when you were working in the instrument department?

A. Yes.

Q. Okay. On this corrective action on Exhibit 8 does it talk about working faster or your

91

speed?

A. Where?

Q. Just anywhere on Exhibit 8.

A. Oh, I see. I don't think so.

Q. Okay. And then on the -- on the second page of Exhibit 8 at the very bottom it says "Associate's signature"?

A. Yes.

Q. And is that your signature there?

A. Yes.

Q. So you understood the corrective action?

A. Yes.

Q. So that corrective action that we just looked at in Exhibit 8, that took place after the retraining program, correct?

A. I do believe, yes.

Q. Okay.

(Deposition Exhibit 9 was marked for identification.)

(The deponent perused the exhibit.)

Q. Okay. Have you seen Exhibit 9 before?

A. Yes.

Q. What is Exhibit Number 9?

A. That I read it -- or I didn't go to the area that she was -- she told me to go to after 5, you

92

know, after I do the case cart area.

Q. And when you say "she," who are you referring to?

A. Heather.

Q. Okay. And what area did you not go to?

A. Instrument area.

Q. Okay.

A. But there was another coworker, and it was somewhat busy, and I do believe he was supposed to go home early. But it was busy, so he decided -- not me, but he decided to stay and do instruments and let me go down to SO, the sterilizer operator.

Q. And who was this other coworker?

A. His name was Joshua somebody. It starts with an O, but I can't pronounce it.

Q. Okay. And Josh was supposed to go home, but instead stayed to do instrument area; is that correct?

A. Yes.

Q. Did you tell Josh that you were assigned to do the instrument area?

A. Yes. I told him that, you know you're supposed to go and I'm supposed to do the instruments? He said, Yes, don't worry about it. I'll stay since it's -- you know, it's busy, and he'll do the

93

instruments and I'll go do SO.

Q.  And did you know that you were supposed to be in the instrument area?

A.  Yes.

Q.  Did you know that you were going to another area that you weren't assigned to?

A.  Yes.

Q.  And then on the second page of Exhibit Number 9, is that your signature?

A.  Yes.

Q.  So did you acknowledge and agree with the corrective action?

A.  Well, I acknowledged it, I didn't really agree with it, but...

Q.  Did you say that you didn't disagree with it?

A.  Yes, I do believe I did.

Q.  And who did --

A.  And Heather said that, well, it's -- it was a nice night that I could have done instruments, but... But, you know, like I said, Josh said that he'll stay and he'll do the instruments.

Q.  Did you say -- did you try to stay in the instrument area?

A.  I tried -- I tried to help him, but he

94

kept on telling me to go to SO, it's getting piled up, so I kind of --

Q.  And why didn't you stay in the instrument area?

A.  Mainly because he said that he'll take care of it.

Q.  Okay.

(Deposition Exhibit 10 was marked for identification.)

(The deponent perused the exhibit.)

Q.  Have you seen Exhibit 10 before?

A.  Yes.

Q.  And what is Exhibit 10?

A.  Mislabeling a scope.

Q.  And do you remember what happened that resulted in this corrective action for mislabeling a scope?

A.  Well, I guess it was a loaner scope.  And she sent all the loaners back to the company except for one that they couldn't find.  But I don't really understand it.  Yes, I mislabeled it, but if you know you're missing one, why didn't you look for others that maybe there was one too many.

Q.  Okay.  So you understand that you mislabeled the loaner scope?

95

A.  Yes.

MS. SAVORY:  Okay.  I don't think I have any other questions on that.

It's noon, so should we take a break for lunch?

MR. HOLM:  Sure.

MS. SAVORY:  Do you want to take an hour?

MR. HOLM:  Yeah.  That's fine.

(The lunch recess was taken from 12:02 to 1:01 p.m.)

(Ms. Lori Davis is no longer present for the proceedings.)

Q.  (By Ms. Savory)  All right.  Roxanna, do you understand that you're still under oath?

A.  Yes.

Q.  Okay.  One thing that we talked about earlier was that you moved into a new apartment?

A.  Yes.

Q.  When did you move into -- out of your brother's house and into your new apartment?

A.  Early March.

Q.  Of this year?

A.  Yes.

Q.  Okay.  And then if I can have you look at Exhibit Number 5 that we talked about.  When we talked

96

about Exhibit Number 5, you said that you disagreed with the corrective action.  What specifically did you disagree with?

A.  Okay.  I just felt that they -- that they didn't really give me enough time.  And I don't know --

Q.  Do you remember -- I'm sorry.

A.  I thought I was, you know, doing better.

Q.  Okay.

A.  Maybe not their high, you know -- I kind of wonder if some people will put a little too high, but I can't get up that high.

Q.  Are you talking about their expectations?

A.  Yes.

Q.  Okay.  Did you express that in your meeting with -- with them when you went over this corrective action?

A.  I probably haven't.  I don't remember.

Q.  So the only piece that you disagreed with corrective action in Exhibit Number 5 was that they -- you thought their expectations for you were too high?

A.  Yes.  Uh-huh.

Q.  Okay.  Earlier we talked about Diane Larson.

A.  Yes.

Q.  And you said that she did not put you in

**97**

the instruments area unless there was a helper or it was an easy night; is that correct?

A. Yes.

Q. What did you do if you weren't in the instruments area?

A. Usually it's case carts, decontam, SO, or the floor runner. For a while there we had enough people and there was a helper, and he did the -- a noon to 8:30. And that's all he did was the runner -- being a runner for the other floors.

Q. Okay.

A. Well, when he stopped coming or when he quit, Diane realized that we could -- we could use that kind of a person.

Q. Okay.

A. So she asked around if one of us would be interested.

Q. Okay.

A. So which I did, I was interested.

Q. Okay. And when did you do that runner duty?

A. The year, I don't remember when she was there.

Q. Okay.

A. 2010, 2011, somewhere in that area.

**98**

Q. Okay. And were there specific instruments that you would run, or would it be all of the instrument trays that needed to be taken?

A. Yes, I was the -- what they call SR person. I put up their trays, you know, the floor trays, and I run the ones that got done before my shift got, you know, finished, then I took them up to the floors and deliver them.

Q. Okay. And so were you doing that -- only that function then?

A. Yes.

Q. The runner, the SR runner function?

A. Yes. Then if I had time, I'll go and help other people, you know.

Q. So if you had time, how would you decide which area to go and help other people?

A. I look around to see who's the busiest. If I can't decide, there was a head tech, I'll ask him where he would like me.

Q. Okay. And how long were you in this SR runner role? How long were you doing that for?

A. It wasn't long, because then we got too short of people where I -- needed somewhere else.

Q. Okay.

A. Maybe a year, if that.

**99**

Q. Okay. And so then what happened once the kind of SR runner role was over, then where would you go?

A. Then I became back to the regular instrument -- or, yeah, the tech.

Q. Okay.

A. And did the regular duties.

Q. Okay. And does that include the instruments?

A. Yes. Like I said, with Diane, she didn't really put me in instruments unless I have a helper or it was a quiet night.

Q. Okay.

A. Although, she -- the evening head tech, she felt that he was her when she's not there, so it was up to him to make sure the work flow was still steady.

Q. Okay.

A. Was still working.

Q. Okay.

A. So if the instrument area got a little bit too busy, he'll change me for -- you know, put somebody else in instruments and put me where that person is, or was.

Q. And who was that?

**100**

A. David Wilcox.

Q. David Wilcox. Okay. So when you were working under Diane Larson as your supervisor, she wouldn't normally put you in instruments unless you had a helper or unless you had -- or unless it was an easier night?

When you say unless you had a helper, does that mean unless there was someone else also working in instruments?

A. Like I -- if there's a fifth person, and when they get done with case cart area, they become a helper, a floater.

Q. Okay.

A. So they would come and help.

Q. The instrument area?

A. Yeah.

Q. So in that case, how many people would be in the instrument area? Three?

A. Well, if you're counting David, the head tech, yes, three.

Q. Okay.

A. Otherwise, two.

Q. Okay.

A. But -- because David has other duties to do, too, you know.

Deposition of: Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

101

Q. As the lead head tech, he has other duties?

A. Yes.

Q. Okay. And then how did that change once Heather became your supervisor?

A. She didn't want David to change me because she wanted people where she wanted them each day.

Q. Okay. When you say she didn't want David to change you, do you mean that she didn't want David to change which area you were working in?

A. Yes.

Q. Okay. So Heather would assign you an area and wanted people to stay in that area --

A. Yes.

Q. -- for your shift?

A. Uh-huh.

Q. And once Heather became your supervisor, were you still working instruments in the other areas?

A. Yes.

Q. Okay. Did you ever work on nursing floor trays? The trays for the nursing floor?

A. Well, that's the floor trays.

Q. Okay. Those are the floor trays. And were those the ones that you would normally work on, or do you work on all trays?

102

A. I worked on all trays.

Q. Okay. Was there ever a time when you only worked on nursing floor trays? The floor trays?

A. Well, yeah. That particular time where, like I said, when Diane wanted somebody to work noon to 8:30 and work on those.

Q. Okay. Okay. And then you would do those?

A. Yeah. Heather and I had a disagreement. Heather wanted to do those last, do the OR instruments first. But like I tried to explain to her, it's not the best idea; but surgery could flash the instruments, the floors can't flash them, if they needed.

Q. Okay.

A. The floors doesn't have anything to get their trays sterile.

Q. Okay.

A. Surgery has a flasher. Yes, it's not the best, but it will do in a flash.

Q. Okay. So under Diane Larson, when she was your supervisor, she -- did she only have you do the nursing trays, the floor trays?

A. No.

Q. She had you do the nursing trays and the OR trays as well?

A. Yeah.

103

Q. Okay. But she would let you do the nursing trays -- floor trays first?

A. Not necessarily. She let you decide. If she's not there, she let you decide what's more important.

Q. Okay.

A. And she pretty much feels the same way as I did. You know, she realizes the floor trays doesn't have a flasher, they can't flash if they're down to zero trays and they need a tray. Surgery can flash. It's not the best thing to do, but...

Q. But then when Heather became your supervisor, she told you to do the OR trays first and then the nursing trays after that; is that correct?

A. Yeah.

Q. What about nursing pumps? Did you ever work with nursing pumps?

A. Yes.

Q. And what are those?

A. Well, there is different pumps. The new pump for surgery we had to make sure they are in working condition.

Q. Okay.

A. Which I, you know...

Q. And when did you work with the nursing

104

pumps? Do you remember about what year?

A. Oh, that was towards the end of last year that I was there.

Q. Okay. Several times you said that you had difficulty with the instrument trays; is that correct?

A. Yes.

Q. What percentage of an instrument tech's job is the instrument trays?

A. I do believe it was 100 percent, you know, because you have to know all of them.

Q. Okay. Actually, can we go back to Exhibit Number 1? And we looked at Exhibit Number 1 earlier, the job description for the instrument techs; is that correct?

A. Yes.

Q. And earlier we looked at the bullet points in the box of page 1 on Exhibit Number 1?

A. Yes.

Q. And you said that those are the duties that all instrument techs were required to do?

A. Yes.

Q. Could you perform all of those duties?

A. Yes, I do believe.

Q. Okay.

(Deposition Exhibit 11 was marked for

Deposition of: Roxanna Jackson – June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

105

identification.)

(The deponent perused the exhibit.)

(Deposition Exhibit 12 was marked for identification.)

Q. And, actually, before we talk about Exhibit Number 11, I want to talk about Exhibit Number 12. Do you want to take a look at that one?

(The deponent perused the exhibit.)

Q. Okay. Do you recognize Exhibit Number 12?

A. Yes.

Q. And what is Exhibit Number 12?

A. Performance improvement.

Q. So it's a performance improvement plan. And it's dated July 30th, 2014. Do you see that?

A. Yes.

Q. Okay. Have you seen this before?

A. Yes.

Q. Did you draft this or help put this performance improvement plan together?

A. Yes.

Q. Who did you work with to put the performance improvement plan together?

A. Annette Hoffman, the HR person.

Q. And why did you work with Annette to put the performance improvement plan together?

106

A. To try to keep the job.

Q. Okay. And was it your understanding that this performance -- if you followed the steps in the performance improvement plan, then you would be able to correctly perform your job duties?

A. Yes.

Q. Okay. So on Number 2 on the performance improvement plan, it says, "I will use reference materials all the time whenever there is a question about identifying an instrument." Do you see that?

A. Yes.

Q. Did you use reference materials then after you drafted this performance improvement plan and after the plan was in place?

A. Well, I always did use the reference for other -- you know, for spellings.

Q. Okay. So you continued to use the reference materials when you had questions?

A. Uh-huh.

Q. And then you see number 3, it says, "I will double-check the labeling as needed." Do you see that?

A. Yes, uh-huh.

Q. Did you do that?

A. Not all the time.

107

Q. Okay. And then do you see under Number 7 it says, "I will ask questions if I am not sure"?

A. Yes.

Q. And did you have -- did you ask questions when you had them when you were performing your job?

A. I tried to.

Q. Okay. And what was your understanding of this performance improvement plan? Why did you put it together?

A. Like I said, I was hoping I could save the job.

Q. Okay. So was it your understanding that if you followed the steps that you outlined on your performance improvement plan, then you would be properly performing your job duties?

A. I think so. But I'm only human, so I will make mistakes.

Q. Okay. In your performance improvement plan did you -- and when you were putting together your performance improvement plan, did you mention anything about the speed of your work performance?

A. No. Like I said, I was just totally confused. I was just not all there.

Q. And what were you confused by?

A. By everything. Why -- I felt I was being

108

attacked.

Q. And did you tell anyone about -- did you say to anyone, "I'm confused, can you explain this to me?"

A. Not really. I don't remember.

Q. Okay. Did you tell Annette that you were confused about what was going on at the time?

A. She pretty much knew.

Q. Okay. So she -- so Annette worked with you to help you put this together to help ensure that your performance would improve; is that correct?

A. Yes.

Q. Now we can turn to Number 11, Exhibit Number 11.

Before we -- can we go back to Number 12? I'm sorry.

A. Okay.

Q. So on Exhibit Number 12, do you see number 6? "My plan is to follow the actions here and to avoid future mistakes. Please give me feedback quickly if I make a mistake so that I can see what was done and how it happened."

A. Yes.

Q. Who put that portion in the performance improvement plan?

109

A. I did.

Q. And why did you put that portion here?

A. Because if it had been told about two or three weeks later about the mistake --

Q. Okay.

A. -- it's got a why in it.

Q. So you wanted to be informed of your mistakes as they happened?

A. Yes.

Q. Okay. I'm sorry. Now we can turn to number 11.

A. Okay.

(The deponent perused the exhibit.)

Q. What is Exhibit Number 11?

A. The termination form.

Q. Okay. And who gave -- did you ever see Exhibit Number 11 before?

A. Yes.

Q. Did you see it when your employment was terminated?

A. Yes.

Q. Who gave you Exhibit Number 11? Who presented it to you?

A. Heather.

Q. And was anyone else there?

110

A. Kathy Smith and Annette Hoffman.

Q. Okay. So you see on Exhibit Number 11 on the first page in the box under the Number 1 --

A. Yes.

Q. -- and there's some incidents of performance or behavior issues. The first one is dated August 17th, 2014. Do you see that one?

A. Yes.

Q. What happened on August 17th, 2014?

A. I was on vacation and I just went in just to make sure my time sheet or thing was ready to go to get paid.

Q. Okay.

A. At the computer to swipe in there, you know, in the SO, sterilizer operator, not everything is sterile at that point. Everybody does it to check in -- check their time on the computer.

Q. And when you mean "everybody does it," what are you referring to?

A. All the employees who wants to make sure their -- they -- the time -- the time is correct.

Q. They go to that computer --

A. Yes.

Q. -- in the SO area?

A. Most of them. Some of them goes to

111

another area, which they shouldn't, but...

Q. And where is the computer in the -- what's the other area?

A. The case cart area. And that's where the sterile items are at.

Q. Okay. And is that why you think they shouldn't go to that computer?

A. Right.

Q. And the SO area --

A. It's not -- it's kind of iffy, you know. Diane let us. Diane was going to put a computer in the break room, but she never did. But Heather was working that night, that evening.

Q. Okay.

A. And she just caught me.

Q. So she caught you in the --

A. Street clothes.

Q. -- sterile SO area in your street clothes? And did you know you weren't supposed to be in that area in your street clothes?

A. Like I said, at that point we all did it.

Q. But even though --

A. It's kind of -- Diane just kind of put it in a gray area. It's not the greatest idea, but the only option that we had to do, so...

112

Q. When you say it was kind of iffy, did you think that you should have been in a bunny suit? Isn't that -- is that what they're called, a bunny suit?

A. No, it wasn't a bunny suit, that's -- a gown.

Q. A gown. Okay.

A. And hair net. I probably should have took the time, but it was summer, I was hot the way it was.

Q. So you knew that you probably should have been in a gown and a hair net to enter that area, but you did it anyway?

A. Right.

Q. Okay. And then on 8/18 it talks about an instrument set was returned by the manager. Do you remember what happened there?

A. When?

Q. On Exhibit 11, Number 1, the second --

A. Incorrect labeling and no -- that set was -- I forgot to put an indicator in.

Q. Okay.

A. But these bags, these new bags, has an indicator on the bag.

Q. Okay.

A. Which I -- you know, I didn't realize that I had forgot the indicator.

113

Q. Okay.

A. But surgery, open heart staff, when they opened it they realized there was no indicator, but they seen the indicator on the bag.

Q. Okay.

A. So they took it on theirselves and decided it was okay to use because that indicator turned like it's supposed to.

Q. And did you know at the time that the indicator was also supposed to go in the bag?

A. Not in the bag, in the set.

Q. Oh, in the set. I'm sorry. So there was an indicator on the bag, and then there was supposed to be another indicator in the set?

A. Yes. But I just totally forgot. And it's very, very -- in a lifetime that I did that. That one set I forgot.

Q. Okay.

A. And pretty much everybody else does it, and here I am one set in 38 years.

Q. Forgot to do it. But you knew that there was supposed to be an indicator in the set and you forgot to put an indicator in the set?

A. Yeah.

Q. And then on August 19, 2014, it looks like

114

the indicators did not reflect the set had been sterilized?

A. Oh, the tape.

Q. What happened with that incident?

A. It was a rep item. And the rep people is not supposed to put sterile and unsterile items together, because that's a big no-no.

Q. Right. Right.

A. But they do because to save case carts. If they don't do that and put it on a separate case cart, then they get in trouble using too many case carts, because we don't have -- they didn't have enough case carts.

Q. And who are you talking about, who gets in trouble?

A. The reps.

Q. Okay.

A. Okay. So what do they do? It's just kind of -- so, anyway, they put it on a case cart. It was close to 11:30 p.m., and I was trying to get -- which I did, I got a load in, and it was the rep stuff, all but that one item.

Q. And you got a load into?

A. The sterilizer.

Q. The sterilizer. Okay. Continue.

115

A. I didn't see that item, that last small item. Okay. Well, time -- when I left, the sterilizers were still -- is still going because I only put it in there five minutes before I left. It went off after midnight, which I was gone, totally gone.

Q. Okay.

A. There was a helper who comes down from surgery to help. He shut it off. So he had nothing to do with that one item because he never seen that case cart. A night girl unloaded the case cart, the same case cart that the reps had. Here's this unsterile item on the cart wrapped, but the tape didn't turn, so it wasn't sterilized.

Q. Okay.

A. So she sent it up.

Q. Okay.

A. This is 6:30 in the morning. I wasn't even there.

Q. Okay. So you weren't there when the case cart was sent up, but you didn't put that one item in the sterilizer, correct?

A. Right.

Q. Okay.

A. But she had missed it. It was her own fault. She admitted that to me that it was her fault.

116

She sent it up.

Q. It was her fault that it got sent up. But was it your fault that it did not get put into the sterilizer, that one item?

A. Not necessarily. I don't know. I don't think it was totally my fault, no.

Q. Whose fault was it then?

A. Like I said, it was a chain.

Q. Right.

A. From the reps to me to the person who entered that sterilizer, which he never seen that case cart. But eventually it was her fault for sending it up.

Q. Okay. But talking about the instrument that wasn't sterilized, was it your fault that it did not get into the sterilizer?

A. Maybe. Like I said, it was a chain. Why should I take all the blame? I'm not going to take all the blame.

Q. Do you know if the other employee who sent the case cart up got disciplined for this?

A. I don't know.

Q. Okay. And you put all of the other instruments in the sterilizer except for the one instrument?

117

A. Yep.

Q. Okay. So during this meeting when they presented this termination form, what happened? What happened during the meeting?

A. Nothing. They just said, you know, Why?

Q. And what did they say?

A. That I forgot that one item, so it got sent up unsterile. Going in the department with street clothes.

Q. Okay. So they talked through these incidences that we just talked through. What else did they say or did you say anything?

A. I was just stunned, so I didn't know what to say.

Q. Okay. Did you understand that your employment was being terminated?

A. Yes.

Q. And did you understand that it was being terminated because of the mistakes that you made?

A. Yes, but...

Q. And then if you turn to page 3 of Exhibit 11, the signature page. For the associate's signature, it says, "The employee refused to sign."

A. Yes.

Q. Why did you refuse to sign this form?

118

A. Because I disagreed with it.

Q. And what did you disagree with?

A. Well, the -- I did -- yes, I went in the department with street clothes. But everybody does it. And that's the only computer that we have to check our time, and we should have the right to check our time to make sure that we're going to get paid like we're supposed to, you know, the accurate amount.

Q. Sure.

A. And for that sterile -- or that unsterile item, no, I don't agree that was totally my fault.

Q. Okay.

A. Because, like I said, the night girl had two chances of catching that item, when she was unloading, put it on the cart, and when she was sending it up to surgery.

Q. Okay. So you disagreed with the August 17 discipline regarding wearing street clothes into the sterile area, even though that you knew you probably should have put on a smock and a hair net to go into that area?

A. (Nodding.)

Q. Is that a yes? I'm sorry.

A. I probably should have. But, like I said, it was a gray area, so it's kind of --

119

Q. Okay. And what about the other two incidences that are on Exhibit 11 on August 18th and August 19th, did you acknowledge those mistakes? On the first page of Exhibit 11 in the box number 1, the one on 8/18 and 8/19.

A. Okay. Well, the one -- the indicator, like I said, I feel once the surgery -- open heart surgery people took it on themselves saying, yes, they realized it didn't have the indicator, but it was their decision to use it. I didn't tell them to use it.

Q. Okay. But did you forget to put the indicator in the tray?

A. Yes.

Q. Okay. And --

A. I probably did. I don't know. If they say it wasn't in there, it wasn't in there.

Q. Okay.

A. But the only -- they didn't mean to get anybody into trouble, they just meant for heads up.

Q. Okay.

A. So to me, I just feel that if they said that, it was up -- it should have been them who decided that.

Q. It should have been the surgery team who decided whether or not to get you in trouble and not --

120

A. Not necessarily get me into trouble, because they didn't mean to do that. But if they decided that, they should have got in trouble, not me.

Q. If they decided what?

A. If -- to use that tray. If they decided not to use that tray, yes, then it was my fault.

Q. Okay.

A. I would have said, yes, okay. But if they decided to use that tray, why would it be my fault?

Q. Okay. Do you know that the surgery group that decided to get the tray did or did not get in trouble for using the tray?

A. I don't know.

Q. Okay. Was there anything else on Exhibit 11 that you disagreed with?

A. It was only those three, right?

Q. There's --

A. Incorrect labeling, no --

Q. On the first page of Exhibit 11 in the box of number 1 there is four incidences there. The restricted street clothes, the incorrect labeling, and then the 8/19.

A. Oh, okay. The incorrect labeling, I -- I don't know. I don't know. I -- the only time that a coworker brought me a tray or set back because it

121

didn't have a card for him to put the stamp.

Q. I'm sorry, can you explain what you're saying? I'm not sure I understand.

A. On these instrument containers we had these cards for two reasons, for the stamp, the sterilizer stamp, and then for your initials.

Q. Right.

A. Well, he didn't -- on one tray that I sent to him to sterilize didn't have that card, so he brought it back to me to put my card in there.

Q. To say that it was -- that you completed the tray?

A. Yeah.

Q. And what incident -- when did this happen? Which one is that related to? Which incident on Exhibit 11?

A. Maybe the 19th. I don't know.

Q. Okay. So you're not sure, but it may have been related to the incident on the 19th?

A. Or the 18th.

Q. And who brought the instrument tray back to you?

A. A coworker.

Q. And who was that?

A. His name was Jeremy something.

122

Q. Okay. Jeremy.

A. But every -- like I said, once in 38 years that happened. Everybody, even Heather, does that.

Q. Okay.

A. And it can -- those kinds of times, it cannot go back -- it cannot go to surgery without that, because the -- the sterilizer operator needs that card for their stamp.

Q. And when you say it can't go to surgery without that, are you referring to the sterilizer card -- without putting the sterilizer card on the tray?

A. Yeah. For one, that card needs the stamp, the sterilizer stamp.

Q. Sure.

A. Two, surgery needs it to put it on the patient's chart just in case there is a problem with that particular load.

Q. Okay. So you had a meeting with Heather, Annette and Kathy and yourself to go over this form. Did anything else happen at that meeting?

A. I don't remember.

Q. Not that you remember. Okay. When they were talking to you about the termination of your employment, did they talk to you at all about other job

123

positions that you were interested in?

A. At that point I -- no. I know -- I brought it up to Annette Hoffman.

Q. Okay.

A. About transferring out of CP. And I was a job shadow in the kitchen, cafeteria.

Q. Okay.

A. Not as a cashier. I don't know where anybody got that idea.

Q. Okay.

A. But it was supposed to have been for the doctor's lounge, make -- set up their lunch for them and throughout the lunch hour make sure they have enough, you know, food or water and what -- stuff like that.

Q. Okay.

A. And then as I was doing that, I was supposed to help in the tray line for their lunches, to relieve them and serve the -- the rest of the help or visitors, their lunches.

Q. Okay. So when did you bring -- when did you bring up a transfer to Annette? When did you talk to Annette about transferring?

A. A few times. And she thought that was a good idea. And I had that shadow; she set it up.

124

Q. Do you remember about when that was?

A. That was in August.

Q. In August. Was it before you were terminated?

A. Yes.

Q. Okay.

A. Then I asked Annette -- I told her even I would go in housekeeping if that was the only thing there is. But she said no. First off she said no because she didn't think I would like it.

Q. And what did you say when she said no?

A. I just kind of looked at her. I was kind of, whoa, you know. I said, anything, you know.

Q. Okay. So you did the food shadow -- the food service shadow, job shadow. After you did that did you tell anyone that you liked doing that?

A. Yes.

Q. And who did you tell?

A. Well, Annette, Kathy, and the management up in the cafeteria. But they all told me that I had to wait until the -- the posting of the opening for it --

Q. Okay.

A. -- to go up.

Q. So you did the food -- the job shadow in

Deposition of: Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

125

the food services department, and you liked that, but there was no open position at that time?

A. Right.

Q. Okay. Do you know if there were any other open positions at that time?

A. No.

Q. Did you ever talk with Annette or Kathy about not wanting to do any positions?

A. No.

Q. Did you ever talk with Annette or Kathy about not wanting to do a cashier position?

A. They never even mentioned a cashier position to me.

Q. They never mentioned that position to you?

A. Never.

Q. Did you ever talk with Annette or Kathy about not wanting to work directly with patients?

A. Not quite. I told them that I can housekeep and I told them I didn't know for sure if I could make the bed correctly or --

Q. Okay.

A. But I would do it.

Q. Okay. So with a housekeeping position, you weren't sure if you would be able to perform that job; is that correct?

126

A. Well, I don't know. You know, you don't know until you try it.

Q. Okay. And so during your termination meeting do you know what positions were open that you were interested in?

A. No. Like I said, I was interested in the doctor's lounge, but it was never mentioned in that meeting about it.

Q. Okay.

A. Or at least as far as I remember.

(Deposition Exhibit 13 was marked for identification.)

Q. Okay. So will you turn to page 2 of Exhibit 13.

(The deponent perused the exhibit.)

Q. Okay. Have you reviewed Exhibit 13?

A. (Nodding.)

Q. Do you know what Exhibit 13 is?

A. This meeting. The last meeting.

Q. Okay. And are these Kathy Smith's notes from that last meeting you had on the day of your termination?

A. Uh-huh.

Q. So if you turn to page number 2 of Exhibit 13, on the bottom of the page it says, "RJ:

127

Can I transfer?" Do you see that?

A. Yes.

Q. And then it says, "KS: I did check to see if there were any positions open that meet your skill set. Know that you shadowed in FS" -- which is services -- "a couple of weeks ago. Right now there is nothing open that we could move you into. There's certain things you've said you can't or won't do -- cashier, cook, cleaning patient rooms -- nothing else open."

Do you see that?

A. Yes.

Q. Does this refresh your memory of whether or not you told Kathy Smith there were some positions that you can't or won't do?

A. Like I said, I don't remember them saying cashier. And for cooking, I don't even cook for myself, so...

Q. Okay.

A. For the patient rooms, like I said -- and I told them I would do it. I don't know if I could do it, but I'll try.

Q. Okay. And this meeting that you had that's reflected in Exhibit 13, did you say -- did you correct Kathy Smith when she said there are things that

128

you've said you can or won't do, cleaning patient rooms?

A. Like I said, I don't remember saying that. I never said I won't do it.

Q. Did you ever tell her that you wanted to do the cleaning patient rooms, or during this meeting did you tell her that?

A. At that meeting, no.

Q. Okay.

(Deposition Exhibit 14 was marked for identification.)

Q. Exhibit 14 is an employee grievance report, and right now if you -- and a packet of information in response to the grievance.

But if you just read the first two pages, the employee grievance report, those are the only pages that you need to read.

(The deponent perused the exhibit.)

Q. And I'm just going to ask you questions about the first two pages right now, so you don't need to read the rest of them.

A. Okay.

Q. Okay. So on the first page of Exhibit 14 -- well, first, what is Exhibit 14?

A. The grief -- whatever -- report.

Deposition of: Roxanna Jackson - June 22, 2016
Roxanna Jackson v. St. Vincent Healthcare

145

Q. Okay. But you've told her about the case?

A. Not -- I didn't really get into the detail.

Q. What did you tell her?

A. That I was having -- that -- you know, I told her why I got fired.

Q. Okay.

A. That I was having problems there. That -- you know. And so it's -- she said that if I needed her for anything, to let her know, so...

Q. Okay. So you told her that you were having performance problems and that you were fired and that you have a case against St. Vincent?

A. Uh-huh.

Q. Okay. And who is Chris Harris?

A. Clarice Harris.

Q. Clarice Harris?

A. Yes.

Q. Thank you for clarifying that.

A. She was an old supervisor years ago.

Q. Okay. And when did she --

A. When I first started there.

Q. Oh, okay. When you first started in 1976 or '77?

A. Yes.

146

Q. When was the last time you talked to Ms. Clarice -- Ms. Harris?

A. Clarice Harris.

Q. I'm having a hard time.

A. Oh, it was before I moved here.

Q. Okay. And what did you talk about?

A. I told her, you know, that I was moving here because I didn't really have anything there anymore; that my brother was here.

Q. Okay. And have you talked to her about this case?

A. No, not really.

Q. Okay. Why don't we take another break. It's been about an hour since lunch.

(A recess was taken from 2:15 to 2:36 p.m.)

Q. Roxanna, do you understand that you're still under oath?

A. Yes.

Q. Okay. Thank you.

Earlier you talked a little bit about a job shadow that you did.

A. Yes.

Q. Can you tell me a little bit more? So you were job shadowing in the doctor's lounge area for the

147

food services department; is that correct?

A. Yes, uh-huh.

Q. When did you do this job shadow?

A. It was the -- maybe July of --

Q. Of 2013?

A. Yes.

Q. Or 2014?

A. '14.

Q. '14. Okay. And why did you do the job shadow?

A. Well, I knew the CP job was getting shaky, that, you know, I didn't -- and I just felt that maybe once I got out of there, things would get settled.

Q. Okay.

A. You know, settle down.

Q. So when you say that you knew the CP job was getting shaky, do you mean that you knew you were having performance problems?

A. Kind of. You know, I wasn't real sure if I'm going to stand their -- you know, their high level of performance.

Q. Okay. So you weren't sure if you were going to meet their expectations because you were having some performance problems, so you wanted to look into another job?

148

A. Uh-huh.

Q. And who did you -- who arranged the job shadow?

A. Annette Hoffman.

Q. Okay. And after the job shadow, did you indicate that you wanted to transfer to that job?

A. Yes. But they kept on telling me I had to wait until it was posted.

Q. Okay. So who did you tell that you liked the job that you job shadowed for?

A. Annette Hoffman.

Q. Okay. And what did she tell you?

A. Well, she said that she would look into it, but they also said that I have to wait until it was posted.

Q. Okay. So you had to wait until the position was available?

A. Yeah.

Q. Okay.

(Deposition Exhibit 15 was marked for identification.)

(The deponent perused the exhibit.)

Q. Okay. What is Exhibit Number 15?

A. Grievance -- whatever -- report.

Q. The grievance report?

153

A. Uh-huh.

Q. Have you ever loaned your brother money before?

A. We borrow money from each other, just like any...

Q. Okay. And when did you loan your brother money the last time, do you remember?

A. No, I don't remember.

Q. And you said you borrow money. So do you borrow money from him as well?

A. Yes.

Q. And then who keeps track of how much money the other person owes? Do you both keep track of that?

A. He pretty much does.

Q. Okay.

(Deposition Exhibit 17 was marked for identification.)

(The deponent perused the exhibit.)

Q. Have you seen Exhibit 17 before?

A. Yes.

Q. What is Exhibit 17?

A. A charge of whatever.

Q. Charge of discrimination?

A. Yes.

Q. Did someone help you fill out this charge

154

of discrimination?

A. I would -- I think so. I couldn't do it myself.

Q. Okay. Do you remember who?

A. No.

Q. Did you go to the EEOC office to file your charge?

A. I probably have. It's the -- more than likely I did.

Q. But you don't remember?

A. Yeah.

Q. Okay.

A. Yes.

Q. So on Exhibit 17 in the -- about middle of the page, a little bit above, do you see where it says "Basis of Discrimination," and then there's boxes to check?

A. Yes.

Q. Can you tell me which boxes are checked?

A. "Age," "disability."

Q. Anything else?

A. No.

Q. Okay. Do you see on -- in letter B on Exhibit 17, under "Particulars of the charge," do you see the letter B there?

155

A. Yes.

Q. That says, "I am 60 years of age and I have speech and learning disabilities since I was a child. This causes problems with the speed of my work and I am often not as fast as other employees. The respondent was aware of these disabilities for the entire period of my employment."

A. Yes.

Q. Do you know how the -- when they're referring to the respondent there, they're talking about St. Vincent Hospital. Do you know how they were aware of your disabilities for the entire period of your employment?

A. Well, I know for David Dobson, when he had that meeting with individuals, you know, one by one to get to know each other, I mentioned to him that I had -- I'm a special need person.

Q. Okay.

A. I have a disability.

Q. Did you tell anyone else?

A. You know, different coworkers.

Q. Okay. And then --

A. Once I got to really know them and --

Q. Do you remember if you told any specific -- any other supervisors besides David Dobson?

156

A. I -- well, I know everybody -- all the management that I worked with knew that I had a disability. For Heather, she was another one. Just like Diane Larson, she actually worked with me as a coworker --

Q. Okay.

A. -- before she came a manager.

Q. Okay. And did you ever tell Heather that you had a disability?

A. To come right out of it, I don't know.

Q. Okay. Okay. And what about Kathy Smith, did you ever tell Kathy Smith that you had a disability?

A. That part, I'm not real sure.

Q. Okay.

A. Up to the time that the problem started, we never really talked to each other, so...

Q. Okay. And when you say "up to the time the problem started," what problem are you referring to?

A. The problem that each write-up.

Q. Okay. So your performance problems, up to that time you hadn't talked to Kathy Smith?

A. Right.

Q. During -- when you were meeting with Kathy

157

Smith to go over the write-ups, did you ever bring up your disability?

A. No. Like I -- I was just -- I was assuming that it was in my record.

Q. Okay.

A. And it should have been in my record.

Q. Okay.

A. If it wasn't, then I don't know why. Because Sister Rita knew that I was special need because my cousin told this other nun and this other nun told -- talked to her.

Q. Okay. So during the time when you were going through corrective actions with Kathy Smith, you don't recall ever telling her that you had a disability; is that correct?

A. I don't remember.

Q. Okay. Did -- okay. So do you see on Exhibit 17 under "Particulars of the Charge" the letter D. It says, "My manager, Heather, terminated me for poor performance. In particular, Heather cited in my termination materials that my work was too slow."

Do you remember if Heather told you in your termination meeting that you were terminated because your work was too slow.

A. I don't remember exactly -- if she said

158

that exactly.

Q. Okay. So what made you -- why did you decide to say that in your charge?

A. If I said that at that time, yes, maybe -- it probably happened. But right this minute, I don't remember.

Q. Okay. Okay. So number -- on Exhibit Number 17, the "Particulars of the Charge," letter C. Do you see that?

A. Yes.

Q. It says, "Sometime in 2012 a new director was hired, David Dobson." He said that no employee -- he said that the employee that -- to the employee, excuse me -- "He said to the employees that it is easier to train new people than to deal with older employees." Do you --

A. Yes.

Q. Do you see that?

A. Yes.

Q. Who did David say that to?

A. At a staff meeting that they had.

Q. And were you there at the staff meeting?

A. No.

Q. And when was the staff meeting?

A. When it was, I -- I'm not real sure.

159

It's -- Cindy Duncan told me about that meeting.

Q. So Cindy Duncan told you what -- that David Dobson said --

A. Yes.

Q. -- it's easier to train new people than to deal with older people?

A. Right.

Q. Did she tell you who else was at that staff meeting?

A. No.

Q. Okay.

(Deposition Exhibit 18 was marked for identification.)

(The deponent perused the exhibit.)

Q. Have you ever seen Exhibit 18 before?

A. I don't remember seeing it before.

Q. Do you know what Exhibit 18 is?

A. The -- the District Court, Yellowstone County.

Q. Is Exhibit 18 the complaint --

A. Yes.

Q. -- for this lawsuit?

A. Yes.

Q. Okay. Have you reviewed the contents of the complaint?

160

A. Just now, yes.

Q. Okay. Are they all accurate?

A. Yes.

Q. Okay. So when we turn to page 2 of Exhibit 18, paragraph number 5, it says, "Plaintiff is a qualified individual with a physical or mental disability."

Do you have a physical disability?

A. Not -- I don't think it was physical.

Q. Okay. And do you have a mental disability?

A. Well, a learning disability and speech.

Q. Okay. And then at paragraph 7 of Exhibit Number 18 it says, "Defendant intentionally discriminated against plaintiff on the basis of her disability or disabilities, failed to accommodate plaintiff's disability or disabilities, and retaliated against plaintiff for her protected activity, all in violation of the Americans with Disabilities Act and the Montana Human Rights Act." Do you see that?

A. Yes.

Q. Can you describe how defendant intentionally discriminated against you on the basis of your disability?

A. Well, they was pushing too hard where they