Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

-----------------------------------------------

ROXANNA JACKSON,

   Plaintiff,

  vs.     NO. CV-15-115-BLG-SPW

ST. VINCENT HEALTHCARE,

   Defendant.

-----------------------------------------------

DEPOSITION OF AMANDA MORDHORST
1:18 p.m., Tuesday, August 30, 2016

    Pursuant to notice, the deposition of AMANDA MORDHORST was taken in behalf of Plaintiff in accordance with the applicable Federal Rules of Civil Procedure at the offices of Sather & Holm, PLLC, 2301 Montana Avenue, Suite 202, Billings, Montana, before Vonni R. Bray, Certified Realtime Reporter and Notary Public of the State of Montana.

Page 2

APPEARANCES

FOR PLAINTIFF:
  Mr. Eric E. Holm
  Sather & Holm, PLLC
  2301 Montana Avenue, Suite 202
  P.O. Box 1115
  Billings, MT 59103
  Telephone: (406) 294-1700 Fax: (406) 794-0673
  E-mail: eric@satherandholm.com

FOR DEFENDANT:
  Ms. Emma L. Savory
  Husch Blackwell LLP
  1700 Lincoln Street, Suite 4700
  Denver, CO 80203
  Telephone: (303) 749-7267 Fax: (303) 749-7272
  E-mail: emma.savory@huschblackwell.com

Page 3

INDEX TO WITNESSES

         PAGE

AMANDA MORDHORST
  Direct Examination by Mr. Holm ................4
  Cross-Examination by Ms. Savory ..............42
  Deponent's Signature Page ....................44
  Reporter's Certificate ......................45

EXHIBITS

EXHIBIT   DESCRIPTION   PAGE

2  October 16, 2013, Letter from Dr. .......14
   Phillips

3  November 14, 2013, Psychological ........17
   Evaluation of Roxanna Jackson

5  October 10, 2013, Corrective ............14
   Action Form for Roxanna Jackson

7  Instrument Training Competency .........30
   Sign-Off Sheet

31  Instrument Assembly Time Trials ........25

32  Instrument Assembly Time Trials ........35

38  December 16, 2013, E-mail from .........29
   Annette Hoffman Regarding Time
   Trials

42  Roxanna Jackson's Training Plan .........21

Page 4

AMANDA MORDHORST, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HOLM:

 Q. Can you state your full name for the record, please.

 A. Amanda Rebecca Mordhorst.

 Q. Okay. Ms. Mordhorst, have you ever had your deposition taken before?

 A. No.

 Q. Okay. My name's Eric Holm. We just met. I represent Roxanna Jackson, and I'm going to ask you some questions today on her behalf.

 One thing that's unusual about this setting is we have a court reporter typing down everything that's said. And so we need to be aware of that and make it easier on her so that when the typed out transcript comes out, it's real clear who is talking at what time.

 So let's try not to interrupt each other, and I'll wait until you are completely finished answering a question before I start to talk again, and I'll ask you to wait until I fully complete my question until you start to answer. And you're doing a great job right



EXHIBIT
B

Page 5

now. But does that make sense?

A. Yes.

Q. Okay. You're also doing a great job of answering out loud so that she can hear you and in words rather than body motions, nodding or shaking your head. It can't really go into a transcript, and sometimes it's hard to decipher between "uh-huh" and "huh-uh." So try to give a "yes" or "no."

A. Okay.

Q. Okay. If you need clarification on a question, let me know. I'd be happy to repeat or rephrase any question. Otherwise, we'll assume that you understood all of my questions and you answered honestly and to the best of your ability. Is that fair?

A. Yes.

Q. Okay. I want to go through your background a little bit, starting off by, who is your current employer?

A. My current employer is St. Vincent Hospital.

Q. Okay. Is that the same as St. Vincent Healthcare?

A. Yes.

Q. Okay. How long have you worked there?

A. It will be three years in September.

Page 6

Q. So just shy of three years right now?

A. Yes.

Q. Okay. What's your current job title?

A. I'm a central processing supervisor.

Q. How long have you had that role?

A. The entirety of my employment there.

Q. What did you do before you worked at St. Vincent Healthcare?

A. I was a central processing supervisor.

Q. Whereabouts?

A. In Phoenix, Arizona, at John C. Lincoln Hospital.

Q. So do you remember what your start date was here in Billings?

A. Not the specific date, no.

Q. Okay. Approximately September of 2013?

A. Yes.

Q. Okay. How long did you work at that hospital in Phoenix?

A. I would say approximately three years. Three or four years.

Q. During that whole time, were you sterile processing supervisor?

A. No.

Q. Okay. Tell me what different job titles you

Page 7

had.

A. I was a sterile processing tech II. So I was certified.

Q. For how long did you do that?

A. Approximately two years.

Q. And you became a supervisor?

A. Yes.

Q. What did you do before that?

A. I worked at Methodist Hospital -- or, no. Hold on. Sorry.

I worked at Banner Desert Hospital in Phoenix, Arizona. And I was a sterile processing tech III.

Q. What's the differentiation between the levels of tech processors?

A. So a tech III at Banner Desert was a core tech that mainly worked in the operating room, bringing them what they needed as they called for it. But then I would also cover down in central processing when they were shorthanded. So I had that knowledge and would use that up in the OR as well. Not every hospital has different tiers of techs.

Q. Does St. Vincent Hospital have different tiers of techs?

A. We have a certified tech and a noncertified

Page 8

tech and then a lead technician.

Q. What's the difference between a noncertified and a certified tech?

A. The certified technicians, they take a national test from the -- there's two bodies that certify technicians, IAHCSMM and CBSPD. So the certified techs take the test and -- I mean the noncertified techs take the tests, and they become certified.

Q. Can you still work as an instrument tech without being certified?

A. Yes.

Q. Do you know if Roxanna Jackson was certified?

A. She was not.

Q. What's the breakdown at St. Vincent Healthcare between certified versus noncertified techs?

A. Can you explain, like, "breakdown."

Q. Yeah. I understand there's a number of instrument techs at St. Vincent Healthcare. I'm just wondering how many of them are certified versus how many are noncertified.

A. Oh, I'm not sure of the exact number --

Q. That's okay.

A. -- of certified versus noncertified. But there is a mix.

Page 9

Q. Is it more than half are certified?

A. No. No.

Q. Okay. Are there any changes to job duties based on whether you're certified or not certified --

A. Yes.

Q. -- at St. Vincent Healthcare?

A. Yes.

Q. What are the differences?

A. The certified technicians are expected to help the noncertified technicians with any questions they may have. Because they do have that certification, they have more knowledge of the job and the technical aspect of the job, and they can help the noncertified techs.

Q. And is that okay for the noncertified techs to go to certified techs for help?

A. Yes.

Q. Okay. Regarding your position as central processing supervisor, what are your job duties?

A. My job duties include -- I have the same job duties as an instrument technician. So I'm expected to do the job duties as needed on the floor, to backfill, to help the technicians out when we're short staffed due to vacations. And then also I am part of -- I do the instrument ordering. I work with the operating

Page 10

room staff to meet the physicians' needs.

I make the daily -- I make the schedule for the -- six-week schedule for all the staff. I do Heather's duties when she's not there. There's a lot. I also assist in interviews of new hires, participate in corrective action. There's more to it, but that's what I can recall right now.

Q. Did you ever undergo any training when you were hired at St. Vincent Healthcare here in Billings?

A. I underwent the new employee hire, you know, that training for all new employees.

Q. What did that entail?

A. It's learning the policies and procedures of St. Vincent Healthcare, you know, the core values and behaviors. And then you learn about the organization, fire safety, the basics of working at a hospital.

Training in the department -- I did not receive much training in the department because I had years of experience. So I worked in the department as a tech to see how their processes went, and that was the sort of training I received.

Q. When you became a central processing supervisor, did you have supervisory authority over Roxanna Jackson?

A. Yes.

Page 11

Q. Okay. I assume you were able to observe her perform her job duties during the period of time when you supervised her?

A. Yes.

Q. Okay. Focusing on the first month or two that you were on the job here in Billings, tell me what your impressions were of Roxanna and her job performance.

A. Her job performance -- she performed the job in every area of the department. There were specific areas that she was stronger in than others. And the reason I can tell that is because of the amount of work in that area. So in central processing, it's a process. So it kind of goes in a circle. And that person is responsible for the area that they are assigned in.

So I could tell areas of struggle for her because of the amount of work that would get backed up in that area and then witnessed, kind of multitasking wasn't her strong suit.

So -- and then also, I would, you know -- all the employees, you know, we're human. They all make mistakes. So I would, you know -- see, I'd watch all the employees as a supervisor.

And my impression of her was, you know, she

Page 12

knew the department because she had been there so long. But, of course, I noticed areas of struggle, but I also noticed areas that she succeeded in as well.

Q. What areas did she succeed in particularly?

A. She did well in decontamination area and also the sterilization area. And case cart area, she didn't work there very often, but when she did, she did well over there as well.

Q. What were the areas she struggled with?

A. The one area she struggled in was instrumentation. And it's the instrument assembly.

Q. During the time that you were -- supervised Roxanna, did you ever get the sense that she had an intellectual disability?

A. No.

Q. Was that ever discussed with you by anyone?

A. It was discussed with me by Heather Franzel after -- I believe after she received the letter from the physician, from the assessment done on Roxanne. That's when it was discussed with me.

Q. Okay. As the supervisor, did you have authority to discipline Roxanna?

A. Yes.

Q. Okay. Did you also share that authority with the manager, who would be Heather?

Page 13

A. Yes.

Q. Tell me how that process would work when you're disciplining an employee.

A. Sometimes it would depend on the discipline needed. So if it was a verbal warning, HR didn't have to be there. So Heather would usually deliver the corrective action. In some instances, I would write up the corrective action. In some instances, she would. If it was something I witnessed personally, then I would write it up.

But Heather would deliver the corrective action. If she wasn't there, if she was on vacation or on leave, then I would. But if it was a verbal, I would be in the room with Heather as a witness to the corrective action. And then sometimes I would take notes.

If it was higher than a verbal, then HR is required to be there. So I wasn't always there for those corrective actions.

Q. Okay. So in that scenario, someone from HR might be there instead of you?

A. Right. HR would always be there if it was a written reminder or higher.

Q. And you may or may not be there if it's higher than that?

Page 14

A. Yes.

Q. The October 2013 write-up that Roxanna received, do you recall if you drafted that or Heather did?

A. Do you have it to show me?

Q. Yes.

(Exhibit 5 identified)

BY MR. HOLM:

Q. I'll show you Exhibit 5.

A. I did not draft this.

Q. Okay. Do you remember if Heather did?

A. I'm not aware if she did or not.

Q. Okay. Do you know who hired you?

A. Heather Franzel and David Dobson hired me.

Q. Okay. Would David Dobson ever sit in on disciplinary actions, to your knowledge?

A. Yes.

Q. Do you know under what circumstances he would sit in on those?

A. No, I do not.

(Exhibit 2 identified)

BY MR. HOLM:

Q. I'll show you Deposition Exhibit 2. Have you ever seen that document before?

A. No, I have not.

Page 15

Q. And just for the record, this is an October 16th, 2013, letter from William Phillips, DO.

Were you ever made aware that Dr. Phillips had written this letter in Exhibit 2?

A. Yes. Heather Franzel made me aware of it.

Q. How did she make you aware?

A. She told me that she received a letter, and she told me that -- just the content of the letter; that she may require -- she's been classified as special needs, may require additional time to learn and perform certain tasks.

Q. Did you do anything else after that conversation?

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. What did you do after that?

A. Can you rephrase the question.

Q. Sure. After Heather informed you that Dr. Phillips had written a letter and related to you what the contents of that letter were, did you do anything else in relation to that letter?

MS. SAVORY: Objection. Form.

You can go ahead and answer.

THE WITNESS: Oh, okay.

We did create a training plan for Roxanna.

Page 16

But I am unsure as to if this was the only -- the only item that caused that training plan to be created.

BY MR. HOLM:

Q. Did you ever discuss with anyone from HR this letter or its contents?

A. I don't remember.

Q. Did you ever discuss any restrictions that Roxanna might have, with anybody?

A. I don't recall specifically discussing restrictions.

Q. Did you discuss with anybody implementing the request that Dr. Phillips had made about allowing Roxanna additional time to learn and perform certain tasks?

A. Yes. The training plan allowed -- you know, because she needed more time to learn, it gave her -- I gave her my time during that training plan to help her learn her job better. And...

Q. Anything else about that topic?

A. No.

Q. Did you ever talk with Roxanna about any restrictions that she has?

A. Personally, no, I did not talk to her about restrictions.

///

Page 21

say we're doing an instrument set. I could demonstrate for her how to do it, how to identify the scissors, for example. And then she would demonstrate it back to me.

I was told that that's how she learns the best, so that's what I did during retraining. And like I mentioned with the bathroom breaks, I was told to allow her to take as much time as she needed.

(Exhibit 42 marked)

BY MR. HOLM:

Q. I've just handed you what we've marked as Deposition Exhibit 42. Can you tell me what this document is.

A. This is Roxanne's training plan.

Q. Who drafted this?

A. I did.

Q. Were you provided any guidance when you were drafting this training plan?

A. I drafted the training plan -- and I just want to mention that this is not the -- there should be a week five and a week six on the back page of this document. The training plan ran two weeks over the four-week schedule.

Q. Would this, then, have been the initial training plan that you drafted, that did not include a week five and week six?

Page 22

A. Yes.

Q. Tell me what your overall approach was to this retraining program.

A. The overall approach was to break it down by week and then by day. I wanted to ensure that, you know, each day, we went over -- for example, week one, day one would be going over all of the things you would do in the instrument area every day, just to ensure that she was comfortable with that. So as you can see here, demonstrate to Roxanne first, and then Roxanne would demonstrate back to me.

This training plan was -- I mean, the intent is to also keep me on track, keep the training plan on track, because there are multiple interruptions during the day in our department. So I just wanted to make sure that she was able to do all of the tasks in the instrument area.

Q. Did anyone else assist you in this retraining program?

A. Could you clarify the question as far as "assist."

Q. Sure. I understand that you worked directly with Roxanne during this six-week training program.

A. Uh-huh, yes.

Q. Did anyone else fill in the same type of role

Page 23

that you did in assisting Roxanne and retraining her?

A. Yes. Heather would fill in for various reasons. If I was sick or absent or if I had a meeting, she would fill in.

Q. Do you know how many times she filled in?

A. No, I do not.

Q. Was it less than ten, do you think?

A. Yes.

Q. So just a handful?

A. Yes.

Q. Okay. Anybody else besides Heather?

A. No.

Q. Did you provide periodic updates to anybody regarding how the retraining was going?

A. Yes. As far as how frequent, I'm unsure. But Annette Hoffman, David Dobson, and, of course, Heather Franzel would receive updates on how the training was going.

Q. How would you do those updates?

A. I recall having -- I can only recall having one meeting with Annette and Heather about the retraining and how it was going. I recall having conversations with Annette. But -- you know, discussing the training plan, and Annette was, you know, happy with the training plan. So -- but as far

Page 24

as beyond that, I can't remember the specific conversations.

Q. Did Annette review your training plan?

A. Yes.

Q. Okay. Did she approve it?

A. I can't recall for sure if she approved it before we started training.

Q. Did she review it before you started the training?

A. I am unsure if she did or not.

Q. Did Annette make any changes to your training program at any time?

A. No.

Q. Did anyone make any changes to your training plan at any time?

A. No.

Q. Why did it run two extra weeks?

A. Absences, and then some days, if we were short staffed or, you know, if I was unable to work with her and Heather wasn't able to work with her, then we wouldn't train that day. I'm unsure as to how many days that was. But absences played a role in that.

Q. If Roxanna wasn't able to do the training on a particular day, was she then just allowed to rejoin the workforce?

Page 25

A. Yes.

Q. And do you remember how many times that happened?

A. No, I do not.

(Exhibit 31 identified)

BY MR. HOLM:

Q. I'm going to show you Deposition Exhibit 31. Have you seen this document before?

A. Yes.

Q. Tell me what this is.

A. It's instrument assembly time trials, and it's for various employees on various instrument trays ranging from small, medium, to large instrument trays.

Q. So this document here is a table showing the various employees, the tasks that they were doing, and what their times were; is that accurate?

A. Yes. The instrument training is -- you could call that a task, yes.

Q. Okay. Do you know who drafted this document?

A. I drafted this document but -- and sent it to Emma. And then Emma, of course, took out the employee names to leave it confidential.

Q. Do you remember when the instrument assembly time trials took place?

A. I do not.

Page 26

Q. Were they before or after Roxanna's retraining?

A. I do not recall when.

Q. Do you know what the purpose of the time trials was?

A. The purpose was a tool to determine how long trays were taking various employees to complete.

Q. Was that important to find out?

A. Yes.

Q. Why was that important?

A. Because we don't have an abundance of instrument trays, so it's important to turn them around timely. Because if we have a trauma come in and the tray is not assembled, then that patient doesn't have what they need to have surgery, and it negatively impacts patient care and then the quality of care that we provide our patients.

So, you know, this would tell us what distractions they would encounter during their workday that would, you know, make this tray take them a certain amount of time.

Q. Did you have concerns with Roxanna's times in completing her tasks before these time trials took place?

A. I had concerns with the amount of

Page 27

distractions that she encountered and how she was handling them, which, in turn, increased the amount of time it took her to do a tray. So I was concerned about minimizing the distractions for her and for all my staff to ensure that no patient care was interrupted.

Q. So the purpose of the time trials, was that specific to Roxanna to determine how fast she was performing her duties?

MS. SAVORY: Objection. Vague.

BY MR. HOLM:

Q. Did you understand my question?

A. Could you rephrase it.

Q. Was the purpose of the time trials specific to Roxanna in determining how fast she was performing her tasks?

A. No. It was a tool used to see how -- to get an average of the amount of time it took to do specific trays. And then we would use that average to determine how long it would take and then to determine why it would take that long; distractions, was the count sheet incorrect, was the writing in the tray on the implants difficult to read? All these various factors that would lead to that.

So it was just kind of used as a tool to see

Page 28

kind of what -- the average amount of time it would take to do a set.

Q. So I guess my -- what I'm trying to find out is whether concerns over Roxanna's efficiency are what sparked the idea of having these time trials.

MS. SAVORY: Objection. Form.

MR. HOLM: What was objectionable about the form?

MS. SAVORY: Asked and answered, and then the -- I think it's vague. Your question is still vague.

BY MR. HOLM:

Q. Did you understand my question?

A. Could you repeat it, please.

Q. Were concerns over Roxanna's efficiency in performing her job duties what sparked the idea to have these instrument assembly time trials?

MS. SAVORY: Same objection.

THE WITNESS: Can I answer?

MS. SAVORY: Yeah, you can answer.

THE WITNESS: Oh, okay.

I don't remember when the time trials took place. I believe the purpose -- and it came about because during retraining, in order for me to gauge if she was doing well, if she was getting better, I had to

Page 29

use time as a tool because it did tell me when the distractions, what distractions took place, how she was handling it.

And then I could provide her my insight and tools, you know, to guide her to get the amount of time to do a tray lowered, which was due to the distractions being lowered and making the tray, the count sheet easier for her to do.

BY MR. HOLM:

Q. So with that in mind, does that, then, refresh your recollection that these team-wide time trials would have taken place before the retraining took place?

A. I honestly don't remember if it was before or during. I don't recall.

(Exhibit 38 identified)

BY MR. HOLM:

Q. Let me hand you Deposition Exhibit 38.

A. Okay.

Q. And this is an e-mail which attaches a document called instrument assembly time trials.

A. Uh-huh.

Q. Do you see that?

A. Yes.

Q. Does this Exhibit 38 in any way refresh your

Page 30

recollection of when the time trials would have been performed?

A. It doesn't refresh my memory. But according to the document, it, you know, took place around December 16th, 2013.

Q. And the retraining took place in January of 2014? That's when it started?

A. I believe so, yes.

(Exhibit 7 identified)

BY MR. HOLM:

Q. Handing you Deposition Exhibit 7. Can you tell me what that document is.

A. This is the instrument training competency sign-off sheets.

Q. What does that mean?

A. So during the retraining, at various times, we would go over the competencies for the instrument area based on the week the training was taking place. So, for example, you know, tape identification, day one, week one, that occurred. She was trained to that in week one on the first day.

So we would sign off -- after I, you know, viewed her and thought she was competent, I would sign off, and then Roxanne would sign off as well.

Q. It also looks like Heather Franzel signed off

Page 31

on all of these too?

A. Yes.

Q. Tell me how that process would work if she wasn't personally working with you and Roxanne.

A. Uh-huh. So she would -- so the signing off of the competencies, I would do it first, with Roxanne. And then Heather would do it after, so it varied as to when she would do it, as far as what day or what time.

But she would take this form and go with Roxanne and verify the competency with her. So she wouldn't perform the retraining. But after I signed off and Roxanne signed off on competency, Heather was the final person to sign off on competency.

Q. So Heather would go and basically test Roxanna on that day's projects?

A. Yes.

Q. Okay. So did Roxanne eventually perform all the duties that you were training her in?

A. Yes.

Q. Okay. To your satisfaction?

A. Yes.

Q. Okay. And to Heather's satisfaction?

A. Yes.

Q. The typed comments toward the end of Exhibit 7 that start on page SVH0669, who wrote those

Page 32

comments?

A. I did.

Q. So you wrote all the comment sections in Exhibit 7?

A. Yes.

Q. Did you review those comments with Heather before you published them in this document?

A. No. I would type the comments up usually at the end of the week or the end of the day. And then after I would type them up, Heather and I would go over them.

Q. Did she ever make any changes to your comments?

A. No.

Q. How do you think Roxanna did in the retraining program?

A. Roxanna did well in the retraining program. She demonstrated that she was competent in the instrument area. She improved greatly. She was able to multitask better. And then I gave her, you know, tips and tools that she could use to make it easier for her to work in that area and so she could, you know, feel comfortable working in the instrument area.

Q. Were you comfortable putting her back out there on the floor?

Page 37

were at instead of having to go through the entire tray again.

Q. So the comment section would be an area to note any distractions that you observed?

A. Right. Yes.

Q. What are the -- strike that.

What's the significance of the green and yellow highlighting?

A. I remember the green highlighting is for trays that she was very comfortable doing. As far as the rest of it -- I think there was a legend on here. Yes. So green is trays she's doing well on. Yellow is she needs to focus on them. And then no color is, you know, average. She's doing average.

Q. Average time?

A. Yes. It's taking her an average amount of time, compared to her other associates, to do the tray.

So as you can see, a lot of -- there's some comments with each color. But the comments really helped me to focus on -- and the colors helped me to focus on the trays that we needed to work on together.

Q. So was this Excel spreadsheet kept up throughout the course of the retraining? Looks like it goes through February 26th.

A. I don't recall the exact dates of the

Page 38

retraining.

Q. Okay. The dates listed on this document, Exhibit 32, say January 22nd, and they go down to February 26th. Do you see that?

A. Uh-huh, yes, I do.

Q. Okay. These individual time trials with Roxanna, they were performed in conjunction with her retraining; is that right?

A. Yes.

Q. Okay. So the retraining at least lasted from January 22nd through February 26th?

A. Yes.

Q. Okay. Tell me what the last page shows. It has a page number SVH0685.

A. Uh-huh. This page is just kind of a summary of the spreadsheet. So it's trays to continue to improve time. So if you read on these, these are all fairly difficult trays to do. So those are trays that she should focus on if she's in the instrument area. She should grab one of those trays and do it, assemble it so she can get more comfortable doing the tray.

And then average trays are in the middle.

And then trays she was doing really well with are on the end.

Q. Was the goal to move as many trays as

Page 39

possible to either average times or great times?

A. No. The goal was to just get her more comfortable in that area. To get her to be confident in that area, timing her on the trays, you know, would show her that she's, you know, multitasking well, she's dealing with the distractions, which is allowing her to focus more on her trays.

And the times, like I said before, were used to kind of identify which trays were difficult, which ones -- and then, of course, you know, the distractions that occurred, and then using it as a motivator for her to see how well she's doing.

Q. But you wanted her to improve her times on these trays; correct?

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. Did you want to have her improve her times on these trays?

A. No. I mean, there was --

Q. Well, the last page says "trays to continue to improve time."

A. Right. So time was used as a tool. Like, we don't have a tracking system. We don't have any way of monitoring how much our staff does. Like, I don't -- time is -- you have to use it as a tool to see how long

Page 40

it takes a person. But then it identifies -- you have to identify what is causing it to take a certain amount of time. And you have to -- like, I would have to work with her to improve that.

So the time, if she improved it, it meant that she was comfortable with the tray. So -- and she was multitasking better in the instrument area. So that's how we used time as a tool.

So did she want to improve her time, and did I want her to improve? You know, yes, I did. But it was used as a tool to -- for her to see that, you know, you've got this tray down. You know, you're doing great.

And if she didn't improve her time -- sometimes it's not possible to improve your time on a tray. There's various factors. There's implant trays. If they used 30 implants out of it, it would take you longer to do that in comparison to if they didn't use any implants out of it.

So the time was just used as that tool. It -- we couldn't assign a specific time or goal for her to meet because the various factors that contributed to that, there's too many to identify. So the ones that we did identify, those are the ones that I would work with her on.

**Page 41**

But like I said, there's things that you can't improve.

Q. Through the retraining program, were you able to determine what delays Roxanna may have in a tray, whether that was related to disruptions versus the intellectual capabilities of Roxanne?

A. No.

Q. Was that ever discussed, that she had intellectual or mental limitations that would restrict her ability to improve her time on these tasks?

A. The only thing discussed with me was the letter from the doctor and then the psychological evaluation and that I needed to -- she needed to see me do it and then demonstrate it back to me.

The only time Roxanna ever mentioned anything was that she had a hard time spelling some things and she would have to look it up on the computer, which many of my employees have a hard time spelling things because surgical instrumentation is very complex. It doesn't make sense to a -- you know, why they would name some things something. So, I mean, that was, you know, the only time that that was discussed.

Q. Okay. Was Roxanna's job restructured in any way following her retraining?

A. No.

**Page 42**

Q. Was that ever considered?

A. No.

Q. Were her job duties altered in any way following the retraining?

A. No.

Q. Was that ever considered?

A. No.

MR. HOLM: Those are all the questions I have for you.

THE WITNESS: Okay.

MS. SAVORY: Let's take a little break. I might have some follow-up questions.

(Recess taken 2:27 to 2:33 p.m., August 30, 2016)

CROSS-EXAMINATION

BY MS. SAVORY:

Q. Amanda, we've returned from break. You understand you're still under oath?

A. Yes.

Q. Okay. I just have a couple of clarifying questions for you. You talked about the retraining process that Roxanna went through. After that retraining process was complete, did you ever time Roxanna's work performance?

A. No.

**Page 43**

Q. Was Roxanne ever disciplined for going too slowly after the retraining process?

A. No.

Q. After the retraining process, did Roxanne ever express to you that she needed to go slower or that she was required to work too fast?

A. No, she did not.

MS. SAVORY: Okay. Those are all the questions I have.

MR. HOLM: Nothing further.

(Proceedings concluded at 2:34 p.m., August 30, 2016.)

**Page 44**

DEPONENT'S CERTIFICATE

I, AMANDA MORDHORST, do hereby certify, under penalty of perjury, that I have read the foregoing transcript of my testimony consisting of 43 pages, taken on August 30, 2016, and that the same is, with any changes noted below, a full, true, and correct record of my deposition.

PAGE LINE     CORRECTION     REASON FOR CORRECTION

_____

Amanda Mordhorst  Date