Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

-------------------------------------------------------

ROXANNA JACKSON,                    )
                                    )
            Plaintiff,              )
                                    )
       vs.                          )  NO. CV-15-115-BLG-SPW
                                    )
ST. VINCENT HEALTHCARE,             )
                                    )
            Defendant.              )

-------------------------------------------------------

DEPOSITION OF ANNETTE HOFFMAN
8:18 a.m., Tuesday, August 30, 2016

Pursuant to notice, the deposition of ANNETTE HOFFMAN was taken in behalf of Plaintiff in accordance with the applicable Federal Rules of Civil Procedure at the offices of Sather & Holm, PLLC, 2301 Montana Avenue, Suite 202, Billings, Montana, before Vonni R. Bray, Certified Realtime Reporter and Notary Public of the State of Montana.

Page 2

APPEARANCES

FOR PLAINTIFF:
      Mr. Eric E. Holm
      Sather & Holm, PLLC
      2301 Montana Avenue, Suite 202
      P.O. Box 1115
      Billings, MT 59103
      Telephone: (406) 294-1700 Fax: (406) 794-0673
      E-mail: eric@satherandholm.com

FOR DEFENDANT:
      Ms. Emma L. Savory
      Husch Blackwell LLP
      1700 Lincoln Street, Suite 4700
      Denver, CO 80203
      Telephone: (303) 749-7267 Fax: (303) 749-7272
      E-mail: emma.savory@huschblackwell.com

Page 3

INDEX TO WITNESSES

                                        PAGE
ANNETTE HOFFMAN
     Direct Examination by Mr. Holm .................4
     Cross-Examination by Ms. Savory ...............48
     Redirect Examination by Mr. Holm .............49
     Deponent's Signature Page ....................52
     Reporter's Certificate .......................53

EXHIBITS

EXHIBIT          DESCRIPTION              PAGE
2        October 16, 2013, Letter from Dr. .......16
         Phillips

37       November 2013 Recommendations for .......20
         Roxanna Jackson
38       December 16, 2013, E-mail String ........29
39       July 31, 2014, E-mail String ...........37
40       August 12, 2014, E-mail String .........40
41       Regional Manager, Workers' .............47
         Compensation Job Description

Page 4

ANNETTE HOFFMAN, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HOLM:

Q. Can you state your full name for the record, please.

A. Annette Lea Heidema Hoffman.

Q. Ms. Hoffman, my name's Eric Holm. I represent Roxanna Jackson in this case. I'm here to take your deposition.

A. Okay.

Q. Have you ever had a deposition taken before?

A. Yes.

Q. Okay. When was that?

A. Several times. I work with workers' compensation.

Q. Okay. So you're deposed routinely in workers' compensation?

A. Not often, but it's happened a handful of times over the years, yeah.

Q. Okay. Let me remind you of a couple things. Because we have a court reporter here -- she's trying to take down everything that we say -- we can't talk at the same time. So you have to wait until I'm

Bray Reporting - (406) 670-9533



Page 5

completely finished with my question before you start to answer. Okay?

A. Uh-huh.

Q. The other thing is it's hard for her to say -- to type down "uh-huh" and "uh-huhs." So try to answer these verbally with a "yes" or "no" if that's the correct answer.

A. I will.

Q. Okay. The other thing is shaking or nodding of the head. The court reporter isn't necessarily looking at you at all times. So that may or may not get into the record, okay.

A. Okay.

Q. Okay. And the other thing, if I ask a bad question or you're unclear on my question, ask me to repeat it or rephrase it. I'd be happy to do that. Otherwise, we'll just assume that you understood the question and answered to the best of your ability. Is that fair?

A. That is fair.

Q. Okay. Tell me who your current employer is.

A. St. Vincent Healthcare.

Q. How long have you worked there?

A. Thirty-five years.

Q. What is your current position?

Page 6

A. My current position is regional manager of workers' compensation, associate safety, and employee health.

Q. So from that description, it sounds like you have three different areas that you work in; workers' comp, associate safety, and employee health. Or are they all wrapped into one?

A. They are three distinct areas. They align with each other.

Q. Okay. I know what workers' comp is. Tell me what associate safety is.

A. Associate safety is the process of following up with associates who are injured, following up on near-miss events, and implementing strategies to reduce the risk of associate injury.

Q. Okay. How about employee health? What does that entail?

A. Employee health is -- includes things like setting up our influenza immunization program, looking at safe work practices, patient handling, environmental concerns, air quality, those types of things.

Q. Who's your supervisor?

A. I currently report to Katie York, who is at the Broomfield office.

Q. At the what office?

Page 7

A. Broomfield, Kansas, office.

Q. Okay. How long have you held that position?

A. I have done workers' compensation since the mid 1990s. How that has been structured and how these things have rolled together has varied over time. I was the employee health nurse for seven years prior to taking over workers' compensation.

Q. Are the associate safety and employee health duties things that have been added to your job title over the years?

A. Correct.

Q. Okay. Approximately how long have you had those job titles?

A. Approximately -- I would estimate four to five years.

Q. Would you consider yourself under a particular department or as part of a particular department?

A. Human resources is where my office is at St. Vincent Healthcare.

Q. Are you a part of the human resources department?

A. I am a part of the human resources department; activities, huddles, that type of thing.

Q. Okay. So you join the HR team for certain

Page 8

meetings and --

A. I am part of the HR team.

Q. Okay.

MS. SAVORY: Just a reminder, let him finish.

THE WITNESS: Okay. I'm sorry.

MS. SAVORY: Okay.

BY MR. HOLM:

Q. Okay. So that was my question. You're a part of the HR team?

A. Correct.

Q. Okay. How many members of then HR team are there currently?

A. There are three HR people. There's an additional person out of the education department that sits in HR. There is an HR representative for the provider service organization that sits in HR. And I sit in HR.

Q. So you're not one of the three HR people that you mentioned earlier?

A. No.

Q. Okay. Who is the provider service organization that you mentioned?

A. It is the structure of our clinics, our physician provider clinics.

Q. So there's somebody that represents that

Page 9

organization?

A. Their human resources director sits in the HR department at St. Vincent Healthcare.

Q. Okay. Is there a particular title for that organization?

A. Right now, it's -- to the best of my knowledge, it's being referred to as the provider service organization.

Q. Okay. I want to ask you about Roxanna Jackson, who was a former employee with St. Vincent Healthcare. Are you familiar with Roxanna?

A. I am.

Q. When did you first become involved with Roxanna Jackson?

A. It's difficult to give you an exact date. I have known Roxanne for a long time. I was -- I have been a nurse at St. Vincent for many years, and Roxanne has worked there for many years.

Q. So the two of you have -- you both worked at St. Vincent for over 30 years. You probably saw her coming and going, and you dealt with her in various capacities over the years?

A. Correct.

Q. Okay. Let's focus in on the time period of 2013 and 2014, when Roxanna had some disciplinary

Page 10

issues at work and there was an issue about her disability. Did you ever become involved in that particular issue with Roxanna?

A. I did.

MS. SAVORY: Objection. Vague.

BY MR. HOLM:

Q. Okay. Tell me what your first involvement in Roxanna's disability issue was.

A. In this particular issue, as I recall, Roxanne came to talk to me because she had concerns and wanted to know if she could visit, stopped by and wanted to know if she could visit. Her supervisor had also talked with me about some studies they were doing and some concerns that she had.

Q. Okay. Let me break that down into two follow-up areas. The first thing you mentioned was that Roxanna Jackson came to you with some concerns and wanted to have a conversation?

A. Correct.

Q. How did she do that?

A. She stopped by my office.

Q. And did you have a conversation at that time?

A. We did.

Q. When was that?

A. That was in -- regarding this event, this

Page 11

situation, that was in 2013.

Q. Do you remember what time of year that was in 2013?

A. I do not, not without my calendar here.

Q. Okay. What did you talk about?

A. She was concerned about things changing in the department. There was new leadership in the department.

Q. What were her concerns?

A. Mainly regarding -- you know, she -- basically, I would say it was mainly regarding change, things changing, did the people making the decisions really understand what they were doing.

Q. Did she describe what changes were being made?

A. Not in great detail, no. It was just regarding change.

Q. Okay. And what was your response to Roxanna?

A. You know, I listened to her. She and I have talked off and on when there have been issues. I listened to her. We talked through them. Invited her to come back and talk again. Talked about how she might ask questions if she had questions, how she might voice concerns if she had concerns.

Q. Did you document this conversation?

Page 12

A. You know, I don't think that I documented the initial conversation. I did not anticipate the direction it was going to be going.

Q. Okay. The other thing you mentioned earlier was that you also talked to Roxanna's supervisor about some studies they were doing; is that right?

A. Correct.

Q. Is that supervisor Heather Franzel?

A. Correct.

Q. When is -- when in time did you have that conversation with Heather?

A. I was contacted by Heather. They had done some time studies for processing different types of instrument trays. And she was concerned about Roxanne's time.

Q. And what was your response to that?

A. I asked to see the time studies for every associate in that department just to make sure that, from my perspective, there really was an issue or a concern.

Q. And were you provided with those time studies?

A. I was provided with those, yes.

Q. What happened after you received those studies?

Page 13

A. I reviewed them. I followed up with Heather. And then I also met Heather, and Amanda was the supervisor. And the HR business partner was Melissa Young. And I met with Roxanne. Initially I was not going to be in that meeting. And Roxanne asked me if I would accompany her, so I did.

Q. What was discussed at that meeting?

A. Essentially the needs of the job, what were the expectations, and what the time studies were. And the intent was to come up with a plan to help Roxanne succeed and meet those targets.

Q. Was this meeting before Roxanna went through retraining?

A. Yes.

Q. Okay. Was the meeting -- strike that.

At the meeting, was there a discussion about retraining that Roxanna would go through.

A. It was discussed as an option.

Q. Were there other options discussed?

A. I think that was the only really viable option. I know there was discussion about, well, maybe we need to change the standards. It was a difficult meeting. Roxanne was fairly tearful. So I was sitting with her.

Q. Was there any discussion in that meeting

Page 14

about any disability that Roxanna may have?

A. Not that I recall.

Q. How about a discussion of any restrictions that Roxanna would have had?

A. Not in that meeting, no.

Q. The conversation that you had with Roxanna that you were talking earlier about, where she expressed some concern about changes, was that before this meeting where the retraining was discussed?

A. As I recall, it was.

Q. Okay. Do you recall if it was days before or weeks or months before?

A. Probably days.

Q. Okay. Were you ever made aware that one of Roxanna's treating medical providers had written a letter to St. Vincent Healthcare stating that she had a disability?

A. I did see a letter from her treating provider at some point along the way. Roxanne has always been very open with me about her condition.

Q. What has she said about that?

A. She kind of jokes about it sometimes. She's -- she says, you know, "I have a brother." She talks about her brother and says, "My brother is ordinary, and I am special."

Page 15

Q. What else did she say about her condition?

A. Sometimes she would express that sometimes she felt uncomfortable talking with people. She really wanted to do her job well.

Q. Did it seem to you that she cared about her job?

A. She cared about her job, from my perspective, yes.

Q. Okay. Were you aware, then, that Roxanna had some developmental disabilities?

A. Yes.

Q. Intellectual disabilities?

A. I did not know what her disabilities actually were. We did not ever discuss that earlier on.

Q. It sounds like later on you did?

A. (Witness nods head.)

Q. You're nodding yes.

A. Yes.

Q. Okay. I guess kind of going back to when you got involved in this issue, did you have a particular role in addressing this situation with Roxanna and her disabilities and the changes that were being made?

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. Did you understand my question?

Page 16

A. (Witness shakes head.)

Q. You're shaking no.

A. No.

Q. Okay.

A. It kind of moves from one thing to another.

Q. Okay. Let me actually show you Exhibit 2.

(Exhibit 2 identified)

BY MR. HOLM:

Q. This is an October 16th, 2013, letter from Dr. William Phillips. Do you see that?

A. I see it.

Q. Okay. Is this the letter that you were referencing earlier that you saw later on?

A. It is.

Q. Okay. So is it -- do I understand correctly that you did not see this immediately after it was written on October 16, 2013?

A. I cannot honestly tell you exactly what date I saw it. I know that it was not on October 16 or within a few days after.

Q. Okay. Did you have any conversations with anyone at HR about this letter and the disclosures that it's making within this letter?

A. The HR business partner at that time for Roxanne's department was Melissa Young, and Melissa had

Page 17

told me that there were some issues going on and that they would be meeting with Roxanne.

Q. What issues did Melissa say were going on?

A. My understanding at that point -- were performance issues.

Q. In your job duties, do you ever get involved when employees make requests for accommodations under the Americans with Disabilities Act?

A. The majority of those always are referred back to me.

Q. Okay. Tell me what process you go through in that situation.

A. Essentially, the process I use is the interactive process that they outline. My first step is always to meet with the associate and find out from their perspective what is going on, what do they think is needed, how can I assist. It depends on what the situation is. You know, is it a renovation of the work area? Are there modifications that need to be made? Is it how we design the process, how we set up the communications? It really depends. It's all individually.

Q. Were you asked to take on that interactive process with Roxanna Jackson?

A. I was not formally asked to do so, no.

Page 18

Roxanna asked me if I would work with her, and Melissa asked me if I would get involved.

Q. So did you get involved in that?

A. I did, yes.

Q. Okay. Is it fair to say that you were the HR representative who went through the interactive process with Roxanna?

A. I think that would be fair.

Q. Okay. So tell me what you did to go through that process.

A. I spent time with Roxanne to find out what was going on. I spent time -- I talked with the supervisors and wanted to see all of their time studies. I looked at the work area. And I sat with Roxanne every time she met with her supervisors.

And then Roxanne and I would do some problem solving where there was opportunity, and I would also do some problem solving with the supervisors where there was opportunity.

Q. What was your understanding of the accommodations that were being requested for Roxanna?

A. Probably one of the physical ones was to make a slight modification to the workstation she worked at so that it would be easier for her to reach things and move things around. The other accommodation really was

Page 19

looking at doing some retraining because many things -- to give Roxanne an opportunity to kind of start fresh with what the expectations were and the best recommended processes for doing that job.

Q. Did you consider allowing Roxanna additional time to learn and perform certain tasks?

A. We did. And she went through a retraining program. The other thing I offered her -- she talked about being special in school. And I asked her if she actually -- if she wanted to have some kind of evaluation to see where her skills actually were and how she could best succeed and said that I would help make that happen for her. So we did do that.

Q. Is that the evaluation that Dr. Gumm performed?

A. Correct.

Q. Okay. What was Roxanna's response when you suggested that?

A. She said she would like to do that.

Q. Okay. Did you help set that up?

A. I did help set that up.

Q. Okay. Did you review the results of that analysis?

A. Actually, they did send me the report. The only thing I was really looking for was the

Page 20

recommendations page. So the recommendations are what I was working from.

Q. Okay.

(Exhibit 37 marked)

BY MR. HOLM:

Q. I have just handed what you we've marked as Deposition Exhibit 37. Is this the recommendations portion that you're referring to?

A. It is.

Q. Okay. And is this the portion of Dr. Gumm's analysis that you were provided?

A. Yes.

Q. Tell me what you did after you reviewed these recommendations?

A. I asked Roxanne if I could share these recommendations with her supervisor, and I did share them with the supervisor. And these recommendations were used in developing the retraining plan for her.

Q. How were they used in developing the retraining program?

A. Instead of having -- you know, there are different ways you could train someone to do that -- those tasks. Part of this included the supervisor working with her and actually demonstrating things, demonstrating easier ways to do things, demonstrating

Page 21

the proper ways do things, rather than just talking about it or saying, "Here. Read this policy, and practice."

So that is what was done. And she did really well. There are parts of her work that she felt very, very comfortable with, parts that she did not. But I would say that she succeeded with that training plan. She did well.

Q. Going back to the interactive process that you worked through with Roxanna, did you review Roxanna's job description through that process?

A. Yes.

Q. Okay. Did you identify any duties in there that Roxanne could not perform with or without an accommodation?

A. No. Actually, I had sent the job description over to Dr. Gumm as well. She could do the job. And she liked the job.

Q. Did Roxanna ever discuss with you her concern that she was being asked to work too fast?

A. Yes.

Q. What did she express her concern was with that?

A. She did not have a specific concern about working too fast. She understood -- at least when we

Page 22

were talking, she seemed to understand the need -- that some of those trays -- instrument trays needed to be turned around so that they were available again.

She would often be critical of coworkers, of the shift supervisor, and of her supervisor, and those were usually things -- when she was frustrated about something like that, she would stop by my office and say, "I want to talk about this," or, "Can I visit?" and would express her frustration, and we would just simply kind of talk through it.

So a couple of issues that she had with an evening supervisor, I forwarded on. I would always ask her if I could forward things on if she had a concern and if she wanted me to do that.

Q. Who would you forward them on to?

A. The supervisor. The manager or the supervisor.

Q. Heather or Amanda?

A. Heather or Amanda, uh-huh.

Q. During the interactive process, did you have any discussions with David Dobson?

A. I think we -- I had very few discussions with David Dobson. I asked questions about the time study because I wanted to make sure the time study was done for everyone and that it was the same study to the same

Page 23

standards for everyone. I wanted to make sure that Roxanne was not being singled out.

I also wanted to know if there was anyone else who was having trouble meeting the standards, that they were having some follow-up as well. They may not have been following up with me, but I wanted to make sure that something was happening with each of these people.

And then my only other real interaction with David was twice when he wanted to know what needed to happen. And I said, "This is what needs to happen," and gave him a copy of this. I said, "These are the things that we need to take into consideration."

Q. And you're referencing Dr. Gumm's recommendation?

A. I am referencing Dr. Gumm's recommendation. These are things we need to be taking into account.

Q. Were Dr. Phillips' recommendations also taken into account?

A. Yes. Those were early on -- earlier, they were vague, so that's why I was looking for something more specific. Because his recommendations are very clear, but it doesn't give us a tool to tell me how do I help Roxanne succeed. So Roxanne and I also were visiting frequently throughout this process.

Page 24

Q. When you were having those discussions about the time trials, were you comparing Roxanna's times with the other employees' times to see how she was performing?

A. Her supervisor had brought that to me in that type of a format initially, so then my question was -- I want to see the other times. And if there are other people in the department who are not meeting the targets that you've determined, do we reevaluate the targets? Or do -- are you doing training with these people as well? I said, "Is there follow-up?"

There were a couple of other people who were not quite where they needed to be, as I recall. I don't have the numbers with me. But Roxanne did have -- there was an issue with her times.

In addition, like I said, I've known Roxanne for years, so she would come to me anytime there was an issue or concern so she could talk it out and we could see if we could come up with some ideas for her. So...

Q. Did you consider recommending that Roxanna simply be allowed to have additional time to perform these duties because of her disability?

A. You know, I -- we discussed that, not in great detail. The thing with the times is that sometimes -- there isn't always the option to take

**Page 29**

over the years.

(Exhibit 38 marked)

BY MR. HOLM:

Q. I just handed you Deposition Exhibit 38. Can you tell me what this document is.

A. This is a tally of the time studies that were done. And it's times for instrument trays; small trays, medium trays, and large trays.

Q. So you're referencing the handwritten notes on the bottom of the page?

A. Uh-huh.

Q. Okay. Yes?

A. Yes. Sorry about that.

Q. That's okay. And so the top is an e-mail from Heather Franzel to you and David Dobson regarding instrument time trials?

A. Correct.

Q. Okay. And it actually attached the Excel spreadsheet that showed the time trials; is that right?

A. Correct.

Q. Okay. So you were able to review those. And are these your notes on the bottom?

A. These are my notes.

Q. Okay. And you drafted the -- you wrote these notes to show the minutes that it took each of the

**Page 30**

employees to take these -- to do these particular tasks?

A. Correct.

Q. Okay.

A. And this is just where I was -- I was wanting to compare to make sure that nobody was being singled out.

Q. That everyone was going through these time trials?

A. Everyone was going through it and that if anyone else was having issues, that those were also going to be addressed.

Q. What is the far right column, where it starts with 25, 20? Do you know?

A. I do not recall, to tell you the truth. I do know that these were the numbers that I tallied to tell me where people had had delays, how far off they were. So there was somebody who was also close to where Roxy was.

Q. It looks like she was on the slower end of all three of them, but --

A. Uh-huh.

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. Does it appear to you that she was on the

**Page 31**

slower end of all three categories?

A. It does.

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. And yet on each one of them, she was as fast or faster than at least one of her coworkers?

A. Uh-huh.

Q. Yes?

A. Yes. So that was my concern. I wanted to make sure that she was not being singled out and that where there were other issues, that the supervisor had a plan to manage those other issues.

Q. Did any of the other instrument technicians go through the retraining that Roxanna went through?

MS. SAVORY: Objection. Foundation.

BY MR. HOLM:

Q. Do you know?

A. For most of them, it was not a retraining issue. For a couple of them that were involved, it was not a retraining issue; it's that they were picking and choosing the kinds of trays they liked to do, so they were not good at doing the other ones. So it was really a point of the manager saying, "This -- when I make these assignments, this is what you will do."

Q. But do you know if any of those employees

**Page 32**

went through retraining to get good at the tasks that they were choosing not to do?

A. I think that the manager and the supervisor worked with them, with those two people, and made sure that they were following through and that they knew how to do the tasks they were supposed do.

Did they go to the extent that we did with Roxanne? No. This was -- these were not people who had issues or voiced anything about issues being able to do it. It's that they didn't like doing some of the tasks, so they would trade them off.

Q. And in your mind, that was different because Roxanna was saying that she had difficulties actually understanding and --

A. Correct.

MS. SAVORY: Objection. Form and foundation. Let him finish the question.

BY MR. HOLM:

Q. Did you say correct?

A. Correct.

Q. After Roxanna went through her retraining in January and February of 2014, did you have any discussions with the supervisor or the manager about the retraining and the results?

A. Once she successfully completed that

Page 33

retraining, when I would encounter the manager, I would check to see if things were going well, are things still going okay. Roxanne would -- after that, she would stop by my office usually once or twice a week, just casually stop by and let me know how things were going.

Q. Do you recall what she would say?

A. She would say -- you know, I would always ask her, "Is it going okay?" And she would say it was going okay. Sometimes she'd have a suggestion for how to make something better, and I'd say, "You really should share that suggestion with your manager. That might be something they could implement."

She would -- she was critical of how they made assignments sometimes, critical about some things that coworkers might do or how they might do them. So if that was something that I could share with the manager, that, you know, there were some concerns -- but I always encouraged Roxanne as well, if she voiced a concern to me, that she should take that to her manager and speak directly to her manager.

Q. Did you ever consider placing Roxanna in a different position within St. Vincent Healthcare?

A. She and I discussed it. She was thinking about looking for something else.

Page 34

Q. When was that discussion?

A. I do not recall the dates.

Q. Was it before or after the retraining?

A. It was after the retraining.

Q. Tell me what you did.

A. She was interested in looking at whether there was something else in the organization that she could do. So we talked about what she might like to do. She's not -- she told me that she's not comfortable talking with people. She thought something in food services might be good or something in environmental services might be good.

She did not want to be involved in patient contact. So we talked about that and what environmental services people do and what happens in food services. I did set up her with a contact with one of the food services supervisors. There are a few roles in food services where people are in the kitchen and not dealing with being a cashier or going into patient rooms, which she did not want to do.

So I did set her up with that supervisor so that she could come in and just shadow someone for a little bit and see what they do. That didn't -- did not go very well. She did not like it, and the supervisor had concerns.

Page 35

As far as the environmental services, those roles are almost all out and with people, in areas where there are patients and visitors.

There was a job that was being arranged for the Frontier Cancer Center where, like, the initial plan was, like, we would have an environmental services person come in there as soon as the clinic closed, and they would clean during the night. So they would essentially be there alone. And that kind of interested Roxanne.

However, as the department was looking at developing that role, they decided it was -- there's too much square footage there for one person to clean. It was not going to work to have somebody there alone at night and that they were not going to go down that path.

So it was something that I knew was out there. Roxanne I don't think was particularly interested. But it never -- that position never actually developed.

Q. Were there any open and available positions, at that time, that Roxanna qualified for?

A. There were -- well, what she was looking at is that she doesn't want to be around people or interact with people. She feels uncomfortable with

Page 36

that. So those were really the positions that were there. I contacted the recruiter and said, "What is available here?" And that is what was available.

Q. The food services position that she job shadowed for and the environmental services positions that --

A. That had --

MS. SAVORY: Objection. Form. Go ahead.

THE WITNESS: It fell apart. The environmental services one fell apart and was abandoned before it was ever even posted.

And then the food services one, she didn't feel it would be good for her.

BY MR. HOLM:

Q. Okay. So I just wanted to clarify that those were the two positions.

A. Those were the two at the time.

Q. That were identified?

A. Uh-huh.

Q. Yes?

A. Correct.

Q. Okay. And the environmental services one fell through before it was posted, so that wasn't -- didn't turn out to be an actual position?

A. It did not turn out to be an actual position.

Page 37

Q. Okay. And the food services one, was that cooking or dish washing? Do you know?

A. It was general kitchen work back in the kitchen because she did not want to have interaction with people.

Q. Okay. Was that position offered to Roxanna?

A. It was not. Neither she nor the supervisor felt that it would be a good fit.

Q. Do you know why?

A. I do not know why. But Roxanne was not interested. So...

Q. Did she say that?

A. She told me that she was not interested.

Q. Okay. Do you remember when she said that?

A. I do not.

Q. Were any other open and available positions identified potentially for Roxanna?

A. No. As I said, she did not want to be in public areas. She did not want to enter patient rooms.

(Exhibit 39 marked)

BY MR. HOLM:

Q. Okay. I've just handed you Deposition Exhibit 39. Can you tell me what this document is.

A. This was my e-mail to Kathy Smith, who was the HR manager, saying that Roxanne asked if it might

Page 38

be possible for her to job shadow.

Q. And this was for the general food services?

A. It was.

Q. Okay.

A. And Kathy Smith advised me to talk with Sam, who was the food services manager.

Q. What's Sam's last name?

A. I do not know. He's no longer there. So -- actually Sam passed it off to Lisa Linday, who is the supervisor now.

Q. In food services?

A. Correct.

Q. So your e-mail here to Kathy about the job shadow was on July 31st, 2014?

A. Uh-huh.

Q. Is that right?

A. Correct.

Q. Does that refresh your recollection about approximately when Roxanna would have asked you about this job shadow opportunity?

A. Yes. And I sent this same e-mail, this e-mail on July 31st, to Kathy Smith right after Roxanne left my office.

Q. Okay. Did you then follow up with Sam?

A. I followed up with Lisa Linday. Sam referred

Page 39

me to Lisa, and I followed up with Lisa Linday.

Q. Okay. What do you recall about your communications with Lisa?

A. Lisa was -- had some -- two positions open. I don't know the nature -- I don't recall the nature of those positions. But they were back in the kitchen, which was something that Roxanne felt more comfortable with. And so Lisa and Roxanne were going to contact each other and set up an opportunity for her to come in and just job shadow someone for an hour or so.

BY MR. HOLM:

Q. Still looking at Exhibit 39, there's handwriting on this document that says Monday through Thursday, starts at 1500?

A. That's my handwriting.

Q. Okay. Do you know what that means?

A. I made a phone call to Lisa and asked her what positions she had open, and she said she had a position that was Monday through Thursday, starts at 3:00.

Q. Do you know what position that was?

A. That was one of those two positions back in the kitchen.

Q. Okay.

A. I do not know which one.

Page 40

(Exhibit 40 marked)

BY MR. HOLM:

Q. I've just handed you Exhibit 40, and this is a two page e-mail string. Have you seen this before?

A. I have long ago.

Q. Now, this starts off with e-mails between Lisa Linday and Charlotte Hawkey and then is forwarded to you and Kathy Smith on August 12th, 2014?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Okay. Charlotte Hawkey's signature block describes her as the senior recruiter?

A. Correct.

Q. Did you play any role in working with Charlotte about this job search?

A. Charlotte is the recruiter, so all jobs go through her, or you have to go online. So I had contacted her and let her know that I was working with someone who would like to make a move and what types of positions she might be interested in.

And so Charlotte is the person who let me know about the food services position, which turned out to be in the retail area. And Roxanne does -- did not want to be working with people.