IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

Cause No. CV-15-115-BLG-SPW

---

DEPOSITION OF DOUGLAS "D.K." JACKSON
June 23, 2016

---

ROXANNA JACKSON,

Plaintiff,

vs.

ST. VINCENT HEALTHCARE,

Defendant.

---

PURSUANT TO NOTICE, the deposition of DOUGLAS "D.K." JACKSON, called for examination by the Defendant herein, was taken at Husch Blackwell LLP, 1700 Lincoln Street, Suite 4700, Denver, Colorado 80203, commencing at 12:57 p.m., on Thursday, June 23, 2016, before Aimee S. Reisinger, a Registered Professional Reporter and Notary Public in and for the State of Colorado.

EXHIBIT
E
tabbies®

8

A. She said it was a long day.

Q. Okay. And did she tell you anything else about her deposition?

A. Other than she got asked the same question a whole lot of times.

Q. And did she tell what that question was?

A. No, just the same -- or a series of questions over and over.

Q. Okay. And did she tell you any of -- any of the specific questions or answers that she provided yesterday?

A. No.

Q. Okay. Did you review any documents in preparation of your deposition today?

A. No.

Q. Okay. Have you discussed this case with anyone else? With anyone at all?

A. My family.

Q. Okay. And who in your family have you discussed the case with?

A. My wife, my daughter.

Q. Okay. And what have you told them about this case?

A. That my sister was terminated and that she had to move in with us.

9

Q. Okay. So did -- we're going to go through your education and employment history.

Did you attend high school?

A. I did.

Q. And where did you attend high school?

A. Billings Senior High School.

Q. Okay. Did you graduate?

A. I did.

Q. Okay. Did you receive any other post high school education?

A. I did.

Q. And did you go to college?

A. I did.

Q. And where did you attend college?

A. Montana State University, Columbia College, Stanford.

Q. Did you receive any degrees from those three schools?

A. I did.

Q. And which -- what types of degrees did you receive and which school did you receive them from?

A. From Columbia College I received my Bachelor of Arts in business administration.

Q. Okay.

A. And from Stanford I received a certificate

10

in negotiations.

Q. Okay. Did you attend any other education besides those three colleges? Any -- any other education after you received those degrees?

A. I have a number of certificates in a number of disciplines.

Q. Okay. And what types of certificates do you have?

A. Digital communications, inbound marketing, project management. Those are the essential ones.

Q. Okay. Are you currently employed?

A. I am.

Q. Where do you work?

A. I have a home office. I work for TeleTech Corporation here in Denver.

Q. Okay. What do you do for TeleTech?

A. I support the contact center operations for the American Red Cross.

Q. Okay. And can you describe a little bit of what your job duties are on a day-to-day basis? What do you do every day?

A. It's primarily helping customers understand the options that they have available for first aid CPR training.

Q. Okay. And you primarily work out of your

11

home. Do you have any other office?

A. No.

Q. How much -- what is your salary?

A. $13.50 an hour.

Q. Okay. And how many hours per week do you work?

A. 40.

Q. Okay. So you mentioned earlier that Roxanna moved in with you. When did she move from Montana to Colorado?

A. In December of -- was it two years ago now? Let's see, '16. 2014.

Q. Okay. And did she live with you?

A. She did.

Q. Why did she move from Montana to Colorado?

A. She was unemployed; had no ability to support herself.

Q. Okay. And so she moved from Montana to Colorado and moved in with you. When did she first start discussing her move from Montana to Colorado with you?

A. I initiated the conversation.

Q. Okay. And what do you mean by that?

A. She was obviously not going to be able to pay her bills; I was covering for those bills. I

Deposition of:  Douglas "D.K." Jackson – June 23, 2016
Roxanna Jackson v. St. Vincent Healthcare

12

decided that it was less expensive to have her living with me than for me to try to support her in Billings.

Q. Okay. So you encouraged her to move down from Billings for financial reasons?

A. I rather insisted.

Q. Okay. Did she want to move down from Billings?

A. No.

Q. Okay. Had she ever talked about moving to Colorado prior to December of 2014?

A. With me?

Q. Yes.

A. No.

Q. Does she still currently live with you?

A. No.

Q. When did she move out?

A. Let's see. March of this year.

Q. Okay. And why did she move out?

A. She was able to get assisted living at an apartment.

Q. Okay. And when you say "assisted living," what do you mean by that?

A. She is in the system, so the city, the county, the state and federal government have programs that will allow her to get some compensation for her to

13

be able to have a place of her own.

Q. Okay.

A. And she also has an assistant. I'm sure you met her yesterday.

Q. Yes, we did.

So she has an assistant. Does the assistant help her every day?

A. No. No. It's not required.

Q. How often does the assistant help her out?

A. I don't know.

Q. Okay. And so she moved out of your house into an apartment. Is her apartment subsidized?

A. Yes. It's not directly subsidized; it's just a lower rent that they charge.

Q. Okay. And do you know what her rent is?

A. $1,060 a month.

Q. Okay. When she was living with you, did she pay you rent?

A. Not directly. We had expenses that we -- you know, she tried to contribute to. She was receiving Social Security disability, so she would help out with food or whatever.

Q. Okay. And about how much per month did she pay you to help out with those expenses?

A. It was inconsistent. It just depended.

14

Her annual -- but her income from Social Security was $1,496 a month.

Q. And when did she start receiving that income?

A. In January, I believe.

Q. January --

A. Of 2015. No, that would have been too soon. It took a while to process it. I'm going to say March.

Q. March of 2015?

A. Yes.

Q. When did she apply for Social Security disability income, do you know?

A. She applied in Montana.

Q. Okay.

A. Was denied.

Q. Okay.

A. So after she moved to Colorado, we reapplied and she was accepted.

Q. Okay.

A. So she applied in January, and then was accepted in March.

Q. Okay. And so when she lived with you, she would contribute to some household expenses, and you said it varied. Can you give me a range of how much,

15

approximately, per month she provided?

A. It would -- like I say, it would vary. So maybe $500 a month.

Q. Okay. Prior to when Roxanna moved to Colorado, how often did you and Roxanna talk?

A. Well, that depended on the circumstances.

Q. Okay.

A. After she was terminated, we were in conversation quite a bit. Prior to her termination, maybe once a month.

Q. Okay. So prior to her termination from St. Vincent's you spoke on the phone about once a month?

A. Uh-huh.

Q. Is that a yes?

A. Yes. Sorry.

Q. Thank you.

And after she was terminated, how often did you talk? About once a week? Once a day?

A. Sometimes every day. Sometimes we would let three or four days go by.

Q. Okay. When she was working at St. Vincent, did she ever tell you about her job?

A. In general terms, yes.

Q. And what kind of general terms -- what

32

Q.   Okay.  And so after her termination, did Roxanna apply for unemployment?

A.   With my help, yes.

Q.   Okay.  So you helped her with the unemployment application?

A.   With every aspect of when she was terminated, I was involved.

Q.   Okay.

A.   Every aspect.

Q.   Okay.  So do you know if she received unemployment?

A.   Not immediately.  She was denied.

Q.   Okay.  And did she eventually receive unemployment?

A.   Yes.  After a very brief call with the unemployment people who said, "Are you out of your minds?"  They didn't even know why she had been terminated when she was on the call.  So the workforce people said granted, back pay all the way back to whatever the date was, and it was a two-minute call.

Q.   Okay.  And who was on this call?

A.   Her manager, whatever her name was.  No, was it -- I think it was Annette.  It might -- no.  I can't remember on the St. Vincent's side exactly who it was.

33

Q.   Okay.

A.   But whoever it was didn't know the circumstances of the termination.

Q.   Okay.

A.   And so workmen's comp, or whatever they're called, the unemployment people, they basically were, you know, indignant, granted her unemployment, and that was the end of the conversation.

Q.   Okay.  So then she did receive unemployment.

After her termination did Roxanna apply for any jobs?

A.   To my knowledge, yes.

Q.   Okay.

A.   But that -- again, that was because of my involvement in getting her involved with workforce placement individuals.

Q.   Okay.  So were these workforce placement individuals in Montana?

A.   Yes.

Q.   Or in Colorado?

A.   In Montana.  Everything in Montana came to a very abrupt end when I decided to move her.  So she never really had a chance to get in and interview for a position because she was being trained on how to

34

interview for a job, how to do a resume, how to do those things.

Q.   Okay.  So in Montana she was working for -- with a -- with an agency to help her find a job?

A.   A number of agencies, actually, but one in particular that was a job placement agency.

Q.   Okay.  And which agency was that, do you recall?

A.   Don't remember their name.

Q.   Was it the Montana Department of Public Health and Human Services?

A.   I think that was the agency that was looking into her termination.

Q.   Okay.

A.   I think.

Q.   I probably going to mispronounce this name, but have you heard the name Astghik Iknatian?

A.   That was the person that was working with her specific to her job placement, yes.

Q.   Okay.  And have you spoken with Astghik Iknatian?

A.   No, I never spoke with her.

Q.   Okay.  But it was your understanding that she was working with that person to find a job in Montana?

35

A.   She was getting training in order to try to apply for a job, yes.

Q.   Okay.  Do you know if she applied for any jobs in Montana?

A.   I'm not sure about that.

Q.   What about when she moved to Colorado, did she apply for any jobs in Colorado?

A.   She did.

Q.   Do you know where she applied for a job in Colorado?

A.   The very first one was a job like she already had, and it was for the veteran's hospital.

Q.   Did you help her apply to that job?

A.   I've helped her with every application, every situation.

Q.   Okay.  So that was the first job she applied for.  Any other jobs that you remember that she applied for?

A.   There were others after that.  We found out from that first position that she had to be certified in order to perform that position in the state of Colorado.

Q.   Okay.

A.   So there was no way that she could pass an exam to be certified for the position, so we had to

44

Q. And --
A. From wages and salaries.
Q. Okay.
A. At the hospital, I would presume.
Q. From your knowledge, do you know if she had any other income in 2014 besides income from St. Vincent's?
A. You mean other than -- other than the distributions?
Q. Right. Just of wages, salaries and tips?
A. No, she had no other income.
Q. Okay. And then going down on Exhibit Number 16 to line 11 -- or 12b, excuse me, $39,727. What is that income from?
A. That is from her 401(k).
Q. Okay. And did you --
A. Paid off a lot of her bills.
Q. Did you cash out Roxanna's 401(k) in 2014?
A. No, it is not cashed out. She still has her 401(k).
Q. Okay. So she still has some money in her 401(k). Did you take out the 39,000 amount that's listed here on Exhibit Number 16?
A. Yes. To pay her bills.
Q. And what bills did you pay with that

45

amount?
A. She had several transactions in Montana that she wasn't able to take care of because she no longer had income.
Q. Okay. And what --
A. She had a car loan, she had utility bills, she had medical bills, she had some loans that -- they looked like personal loans. Anyway, just a variety of things that needed to be handled.
Q. So you paid off all of those bills with that amount. Did you do anything else with that income?
A. That probably -- I don't know exactly what the total amounts would have been paying off everything. Roughly it would have been most of the money. Anything that had been left over she has remaining.
Q. Okay. Do you manage Roxanna's finances?
A. Yes.
Q. You said that she paid off some personal loans. Were those loans with individuals or with banking entities?
A. Companies. Financial institutions.
Q. Okay. How did you decide to take out the $39,000 of her 401(k)? How did you decide to take that

46

amount out?
A. 39,000 is just what it came out to after taxes and such. Because we withheld money so that she would not have a huge tax burden.
Q. Okay.
A. And so it's just an odd number left over after that. But it was the amount that was needed in order to zero out her liabilities.
Q. Okay. Then on Exhibit 16, line 13, there is a $6,100 amount. Do you see that?
A. I do.
Q. And what is that amount for?
A. Unemployment.
Q. Okay. So that's for the unemployment compensation that she received in 2014?
A. That is correct.
Q. And it says "Alaska Permanent Fund Dividends." Did she receive any of those, or was that amount just unemployment total?
A. Just unemployment. I have no idea what the Alaska thing is.
Q. Did you help Roxanna file her 2015 tax return?
A. I did.
Q. And has it been filed?

47

A. It has.
Q. And when was it filed, do you know?
A. Approximately April 13th.
Q. Okay. Do you remember from helping her file her 2015 tax return what her income was in 2015?
A. No, not off the top of my head.
Q. Do you remember an approximate amount?
A. No, not off the top of my head.
Q. Okay. Do you have documents that would reflect her 2015 income?
A. I do.
Q. Okay. Now I will ask that you turn to Exhibit 18 in the binder. Have you seen Exhibit 18 before?
A. I believe I have. Let's see.
Q. Go ahead and take a minute to read it.
(The deponent perused the exhibit.)
A. Okay.
Q. When was the first time you saw Exhibit 18?
A. I don't have a precise memory of when I saw it.
Q. Okay. Have you read the contents of Exhibit 18?
A. Just now.

Deposition of:  Douglas "D.K." Jackson - June 23, 2016
Roxanna Jackson v. St. Vincent Healthcare

48

Q.  And do you recognize them to be accurate --

A.  I do.

Q.  -- to your understanding?

Do you see in paragraph 7 where it says, "Defendant intentionally discriminated against plaintiff on the basis of her disability or disabilities, failed to accommodate plaintiff's disability or disabilities, and retaliated against plaintiff for her protected activity, all in violation of the Americans with Disabilities Act and the Montana Human Rights Act"?

A.  Yes.

Q.  What is your understanding of why defendants, St. Vincent, intentionally discriminated against plaintiff?

A.  I can only go based on her work history that I'm aware of, and that she was always treated as a special needs individual up until the time she got a new manager.

Q.  Okay.  And how did the new manager not treat her as a special needs individual?

A.  Asking her to perform her duties over and above what she was doing in the past, at a faster rate than she was capable of performing accurately.

49

Q.  Okay.  And you know that your knowledge is based on what Roxanna has told you; is that correct?

A.  Told me in what way?

Q.  Your knowledge of her manager telling her to perform faster is based on information that Roxanna has told you?

A.  Yes.

Q.  Is it based on any other information?

A.  Well, not direct information.  It would be documents I've read, it would be information that was a part of the correspondence, so...

Q.  Okay.  Correspondence between who?

A.  Well, like with David Wilcox indicating that he was aware of the situation and that he would allow for her to work so that she could not -- so she would not be unnecessarily burdened by the speed of the task.

Q.  And what types of correspondence did you have with David Wilcox?  Did you email one another or was it a phone conversation?

A.  Initially it was an email.

Q.  Okay.

A.  And I was just inquiring as to -- because my sister was asked to come up with individuals who would have known her particular work situation.

50

Q.  Okay.

A.  And that was asked by the Human Rights Bureau in Montana.

Q.  Okay.

A.  So we had to provide a list of people that she would have worked with, and the Human Rights Bureau was going to talk to each of these individuals and do their own investigation as to what was going on.

Q.  Okay.

A.  So I had reached out to David Wilcox via email; he responded.

Q.  And then did you have further email exchanges with him or phone conversations?

A.  I did not have any direct verbal conversation with David Wilcox, it was -- everything was email.

Q.  Okay.  Other than the emails you had with David Wilcox and what Roxanna told you, is there any other information that has formed your opinion of why defendant intentionally discriminated against plaintiff?

A.  It's anecdotal in the fact -- the number of witnesses that were brought forward to be able to testify, essentially, as to what the situation was. And I tried visiting with them for the purposes of

51

saying, you know, we need you to be able to talk.  Some of them who were still employed did not want to because they were concerned that they would be unfairly treated.  So that was just one of those things where I got some information in general --

Q.  Okay.

A.  -- but no specific conversation with anyone.

Q.  Okay.  And who were these individuals that you're referring to?

A.  I don't remember their names.

Q.  Okay.

A.  There is a list.

Q.  Okay.  And then paragraph 7 continues to say, "Defendant failed to accommodate Plaintiff's disability or disabilities."  And what do you understand that to mean or what facts do you know that support that claim?

A.  Well, I saw the letters that were written by the physicians that you had mentioned previously.

Q.  Okay.

A.  And each of them very clearly, specifically dated, "accommodate her needs."

Q.  Okay.  Do you know if St. Vincent's did accommodate her needs?

52

A.  According to everything I've heard, no.

Q.  And when you say according to everything that you've heard, what do you mean?  What are you referring to?

A.  Well, I've heard from my sister that she wasn't accommodated.

Q.  And what type of accommodation has your sister told you that she wasn't provided with?

A.  Speed.

Q.  And when you say "speed," what do you mean?

A.  The performance of her job.

Q.  So you said that she wasn't provided an accommodation related to speed.  What type of accommodation do you understand that she wanted?

A.  She wanted to be able to do her work at the level of perfection that she had done up until that point in time.  She did not make errors.  She did not have any record of errors in her entire work history except when she got a new manager.

Q.  Okay.  And then paragraph 7 continues to say, "and retaliated against Plaintiff for her protected activity."

Do you know what -- do you have any facts related to --

53

A.  Termination is the ultimate retaliation.

Q.  Okay.  And what is her alleged protected activity?

A.  Her job, which she was protected under for 35 years.

Q.  Okay.  And so you think that she was retaliated against because she was terminated from her job.  Anything else?

A.  I don't know anything else.  I wasn't there.

Q.  Okay.  And then in paragraph 8 on Exhibit 18, page number 2, it says, "As a result of Defendant's actions, Plaintiff suffered compensatory and other damages and is entitled to an award of all available damages, punitive damages, attorneys' fees, and equitable relief."

Do you know what damages Roxanna is alleging?

A.  Income, wages, salaries, benefits, retirement benefits.

Q.  Okay.  And do you know of any amounts for those types of income, wages, benefits?

A.  The total figure that I know, including fees and such that we requested, is $130,000.

Q.  Okay.  And how was that total number

54

calculated?

A.  It was calculated based on at least two and a half years of wages and benefits, access to her pension, and attorneys' fees.

Q.  And when you say "access to her pension," what are you referring to?

A.  She has a pension account that if she was to wait until she could retire would be at a higher rate per month than what she was allowed to get if she was -- after being terminated -- forced to apply for it at that age.

Q.  And has she applied to take her pension?

A.  She will not until -- I will not allow her until it's an amount that makes sense.

Q.  So until it's the maximum amount at her retirement age?

A.  Correct.

Q.  And do you know what age that is?

A.  For the pension, it's 65.

Q.  Okay.

A.  So she's a year -- a year and a few months away from that.

Q.  Okay.  So let's turn to Exhibit 19 on page 5 of Exhibit Number 19, please.

Okay.  And if you can read paragraph C on

55

page 5 of Exhibit Number 19.

(The deponent perused the exhibit.)

A.  Okay.

Q.  Okay.  So it looks as if Roxanna is claiming lost wages of $38,000 per year.  Do you know where that amount comes from?

A.  It would have been her average wages while she was employed in the past --

Q.  Okay.

A.  -- I'm assuming ten years.

Q.  And in that paragraphs on Exhibit 19 on page 5 where it starts with, "Because she was prematurely terminated, pension payments for the rest of her life will be around $50 less."  Do you know where that information comes from?

A.  From the pension people themselves.

Q.  And when you say "the pension people," who are you referring to?

A.  I don't know their names.

Q.  Do you know who they work for or --

A.  It's the St. Vincent's pension fund or whatever.

Q.  And did you speak with them?

A.  I did.

Q.  And when did you speak with them?

Deposition of:  Douglas "D.K." Jackson - June 23, 2016
Roxanna Jackson v. St. Vincent Healthcare

64

to --

A. No.

Q. So she didn't receive any lump sum payment, but just started receiving monthly payments going forward?

A. Correct.

Q. Okay. Now I will have you turn to Exhibit 17 in the binder.

(The deponent perused the exhibit.)

A. Okay.

Q. Have you seen the document in Exhibit 17 before?

A. I don't recollect seeing this exact document.

Q. Okay.

A. But that's just -- I don't recollect seeing it.

Q. Okay. And do you know what exhibit number 17 is?

A. Yes.

Q. What is it?

A. It is a Charge of Discrimination by my sister against St. Vincent's Hospital.

Q. Okay. On Exhibit 17, in the paragraph that states, "Particulars of the Charge," paragraphs A,

65

B, C, D, and E, do you see that?

A. Yes.

Q. In paragraph letter B it states that Roxanna is 60 years of age, and I have speech and learning disabilities since I was a child, causes problems with my speed of my work and I am often not as fast as other employees. Respondent was aware of these disabilities for the entire period of my employment.

Do you see that?

A. I do.

Q. Do you have any facts regarding the allegations in paragraph B on paragraph 17?

A. Facts as in?

Q. Do you have any knowledge of these facts?

A. I don't understand the question.

Q. Okay. I'm sorry. Can you -- do you have any background knowledge regarding how the respondent, which would be St. Vincent, was aware of Roxanna's disabilities?

A. Well, I'll respond to it this way. When my sister was hired --

Q. Okay.

A. -- at the hospital, it was my cousin who was the director of Social Security and the director of the hospital who knew each other as friends, knew my

66

sister's situation, and hired her into that position, fully aware of her special needs.

Q. Okay.

A. And I was present. So I know all of that as fact.

Q. When you say you were present, where were you present?

A. I was there when she was hired, I was there when the discussions were had, I've known my cousin for my entire life and I understood the relationship that my cousin had with the administrator of the hospital.

Q. Okay. And who was the administrator of the hospital at that time?

A. I don't remember her name.

Q. Okay. And when you say you were there for the discussions, what did they discuss relating to Roxanna's disabilities?

A. Roxanna had been a special needs person, you know, for her entire life.

Q. Okay.

A. She had gone through high school under a special needs program, had received her education under a special needs diploma, had gone to the YMCA/YWCA under a special needs training program so that she

67

could learn how to use a checkbook, how to be domestic. How to take care of herself essentially.

She had been -- because of my cousin's relationship to Social Security, had been given a situation to where they kept a special track of her progress as she went through. I'm assuming that a part of that was the reason that she was accepted immediately into the Social Security disability program when 90-plus percent are not.

So, nonetheless, in her situation, the relationship that was with the administrator of the hospital, when my sister was hired, we went in together. I was responsible for driving my sister, took her there, set up the discussion, and helped fill out the application and she was hired into the position.

Q. And what sort of things did you discuss when you say you set up the discussion?

A. It was her -- her background, her special needs, her ability to be able to perform the function, her desire to be able to, you know, be at that location. It was a protected environment. It was a hospital. It was the Sisters of Charity of Leavenworth. They were a very giving organization, and they -- the administrator of the hospital understood

68

that they were bringing my sister in under these circumstances.

Q. Okay. And was it your understanding that they understood that even with her special needs, she would be able to perform the functions of the position?

A. And she did for 35 years.

Q. Okay. Going down to paragraph C on Exhibit 17. And it says David Dobson -- it's referring to David Dobson and says, "He said to the employees that it was easier to train new people than to deal with older people."

Have you ever heard that comment before?

A. Only anecdotally.

Q. And what do you mean by that?

A. I mean hearsay. I did not hear directly from David Dobson.

Q. Who did you hear it from?

A. My sister, and then another individual I know that works at the hospital.

Q. Okay. And what's that individual's name?

A. Brenda Nagel.

Q. And she told you that she heard David Dobson say the statement here?

A. Apparently it was in an employee meeting.

Q. Okay. And Brenda Nagel told you that?

69

A. That's what I heard.

Q. Did you help Roxanna Jackson prepare this charge of discrimination in Exhibit 17?

A. I did not.

Q. Do you know if anyone did?

A. I believe it was Meg – I'm trying to remember her last name. It would have been the Department of Human Resources.

Q. The Department of Human Resources where?

A. State of Montana.

Q. Okay. Are you referring to Meg Bennett?

A. Meg Bennett.

Q. Meg Bennett helped Roxanna fill out this charge of discrimination?

A. I wasn't there when it was signed, so -- October of 2014, it was not -- I was not around. And so I can only think that -- she's the only one I can think of that may have assisted. If it's not her, then it may have been another individual that she was working with at the time to help try to get her positioned with Medicaid and other services.

Q. Okay.

A. And I can't remember his name off the top of my head. But I -- this was not me.

Q. Okay. Going back to Exhibit Number 17, in

70

paragraph D it says, "On August 27, 2014, the manager, Heather, terminated me for poor performance. In particular, Heather cited in my termination materials that my work was too slow."

Do you see that?

A. I do.

Q. And have you heard this comment before?

A. Many times.

Q. And who have you heard this comment from?

A. My sister primarily.

Q. Okay. And anyone else?

A. David Wilcox.

Q. And what did David Wilcox tell you about this comment?

A. The specific comment, nothing. Just the general situation of slow performance.

Q. Of Roxanna's slow performance?

A. Correct.

Q. Does David Wilcox have any direct knowledge of Roxanna's manager telling her that her work was too slow?

A. I don't know that.

Q. Okay. So what you know is based on what David Wilcox has told you?

A. Correct. And my sister.

71

Q. Okay. Anyone else?

A. Not that I'm aware of.

Q. Okay. Do you know that the Montana Human Rights Bureau found -- made a finding of no probable cause as to Roxanna's charge of discrimination?

A. I do.

Q. And do you know that Roxanna appealed the Human Rights Bureau's finding?

A. I do.

Q. And do you know that the Montana Human Rights Commission upheld the Human Rights Bureau's finding of no probable cause for discrimination?

A. I do.

Q. In this lawsuit against St. Vincent, are you making the decisions in the lawsuit?

A. I am not.

Q. Who is making the decisions?

A. My sister in counsel with her attorney.

Q. Okay. Do you have any say in those decisions?

A. I have not.

Q. Okay. Earlier when we were talking about Roxanna's performance, you said that you reviewed some of -- some documents and some disciplinary actions. Do you remember seeing in the disciplinary actions that