Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

---------------------------------------------------------

ROXANNA JACKSON,           )
                           )
          Plaintiff,       )
                           )
     vs.                   )   NO. CV-15-115-BLG-SPW
                           )
ST. VINCENT HEALTHCARE,    )
                           )
          Defendant.       )
_____

DEPOSITION OF HEATHER FRANZEL
10:29 a.m., Thursday, August 25, 2016
_____

Pursuant to notice, the deposition of HEATHER FRANZEL was taken in behalf of Plaintiff in accordance with the applicable Federal Rules of Civil Procedure at the offices of Sather & Holm, PLLC, 2301 Montana Avenue, Suite 202, Billings, Montana, before Vonni R. Bray, Certified Realtime Reporter and Notary Public of the State of Montana.

Page 2

APPEARANCES

FOR PLAINTIFF:
     Mr. Eric E. Holm
     Sather & Holm, PLLC
     2301 Montana Avenue, Suite 202
     P.O. Box 1115
     Billings, MT 59103
     Telephone: (406) 294-1700 Fax: (406) 794-0673
     E-mail: eric@satherandholm.com

FOR DEFENDANT:
     Ms. Emma L. Savory
     Husch Blackwell LLP
     1700 Lincoln Street, Suite 4700
     Denver, CO 80203
     Telephone: (303) 749-7267 Fax: (303) 749-7272
     E-mail: emma.savory@huschblackwell.com

Page 3

INDEX TO WITNESSES
                                    PAGE
HEATHER FRANZEL
     Direct Examination by Mr. Holm .................4
     Deponent's Signature Page ....................66
     Reporter's Certificate .......................67

EXHIBITS

EXHIBIT          DESCRIPTION                     PAGE
2        October 16, 2013, Letter from Dr. .......32
         Phillips

5        October 10, 2013, Corrective ............25
         Action Form for Roxanna Jackson
31       Instrument Assembly Time Trials .........52
32       Instrument Assembly Time Trials .........55
34       Information Requests for Response .......40
         from Montana Department of Labor
         and Industry
35       Roxanna Jackson's Performance ...........43
         Annual Evaluation Document

36       Employee Annual Performance Tool ........48

Page 4

HEATHER FRANZEL, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HOLM:

Q. Can you state your full name for the record.

A. Heather Joy Franzel.

Q. Ms. Franzel, my name's Eric Holm. I represent Roxanna Jackson in this claim against St. Vincent Healthcare.

A. Okay.

Q. I'm here to take your deposition. Have you ever had your deposition taken before?

A. No.

Q. Okay. We have a court reporter, Vonni, who is writing down everything that we say. So we have to be real aware of that and considerate, so we can't talk at the same time. You'll have to wait until I'm completely finished with my question before you start to answer, even though a lot of times in normal conversation, we interrupt each other because we know how the other person is going to finish their sentence.

A. Sure.

Q. But you'll have to wait until I'm finished, and I'll do the same. I'll wait until I know that you're completely finished answering before I move on.

Bray Reporting - (406) 670-9533



EXHIBIT
F
tabbies'

Page 9

you and your supervisor?

A. And sometimes the staff. It may vary on the situation.

Q. Okay. Who is your supervisor?

A. Amanda Mordhorst.

Q. Okay. How long has Amanda been your supervisor?

A. I want to say it's coming on her third year. I don't recall if it's the second or her third year.

Q. What's Amanda Mordhorst's job title?

A. Supervisor of sterile processing.

Q. So above you is Amanda, who is the supervisor of sterile processing?

A. No. Amanda is below me. I am the manager of the department.

Q. Oh. I asked who your supervisor was.

A. Oh, my supervisor?

Q. Yes. Sorry.

A. My one up is David Dobson.

Q. Okay. So just to clear the record, your supervisor, the person that supervises you, is David Dobson?

A. Correct.

Q. Okay. And the leader just below you, that you supervise, is Amanda Mordhorst?

Page 10

A. Correct.

Q. Okay. So when I was asking you about who directs and implements process changes that might impact a job duty of an instrument tech and you were referring to "we" and then you said your supervisor, were you referring to you and Amanda or you and David?

A. Me and Amanda.

Q. Okay.

A. If there's things that may impact delivery to the OR, which is overseen by David Dobson, then we seek guidance from him as well.

Q. Would there be any other occasion when you would seek guidance from David Dobson?

A. I would share ideas and thoughts about process changes, net that through him, get some feedback from him.

Q. Okay. Did he have authority to either approve or deny those changes?

A. If he felt it was going to pose a risk to anything -- how it may impact the OR, he might. If it was the processes within sterile processing and the delivery, I'm the knowledgeable person in the department. And he would either support or give me a pointer of, "Maybe, well, would this be a different option or choice that we could do?"

Page 11

Q. And is the reason that you guys would consider whether there would be an impact to OR because essentially sterile processing processes the instruments that are used in the OR?

A. Correct.

Q. Okay. Besides Amanda Mordhorst, how many other individuals do you supervise?

A. Between both my departments, or just sterile processing?

Q. Let's talk about each one individually.

A. Okay. In total, there's 27, currently. We do have some open requisitions.

In sterile processing, I believe there's 12.

Q. Has that number fluctuated over the last three years?

A. Yes.

Q. What's the range that it has fluctuated?

A. One person. It may have fluctuated if there was a staff member who left.

Q. How long have you been the sterile processing manager?

A. Since 2012, I believe.

Q. Who hired you to that position?

A. I was promoted from a supervisor to a manager by David.

Page 12

Q. So previous to your manager role, you were in the supervisor role which Amanda now holds?

A. Correct.

Q. Tell me what the job duties of that supervisor role are.

A. Essentially, when I had it, it was the same as a manager role. I did not have a supervisor underneath me. I had one lead tech on evening shift, so the responsibilities of manager and supervisor were as one as a supervisor. The position grew, more responsibilities, where I then was promoted to a manager and I was able to backfill Amanda as the supervisor.

Q. So when you were the supervisor, did you have a manager above you?

A. Yes.

Q. Who was that?

A. There was a few of them. The position at the time reported to the OR manager rather than the director of surgery. At one point, my manager was Joan. And I can't recall Joan's last name. And then Joan left the organization. And then it was Chris. And I don't recall Chris' last name.

Q. Is it Filer?

A. Yes. Thank you.

Page 13

Q. And then when Chris left, there was an interim manager, and that took place within all the transition when, then, I became -- the structuring, reporting structure changed, and that's when I began to report to David.

(Reporter interruption.)

THE WITNESS: Interim. It was a contracted employee.

BY MR. HOLM:

Q. How long were you in sterile processing's supervisor role?

A. 2010 to -- then when I took over the manager position.

Q. I'm sorry. You took over the position in what day -- what date?

A. As manager?

Q. Supervisor.

A. I'm not certain of the exact date, month.

Q. Okay. But that was in 2010, when you became the supervisor. Then you moved up to manager in approximately 2012?

A. I first took over the supervisor in the interim in 2010, transitioned to the supervisor role in '11. And then I believe it was 2012 when -- the manager position. It could have been 2013. I'm not

Page 14

for certain.

Q. And what did you do before you held the supervisor position?

A. I was the lead tech in the department for the day shift.

Q. And tell me what a lead tech does. What are their job duties?

A. Facilitate flow, provide guidance to the staff, be available to answer questions, side projects that may have been handed off from leadership, backfilling of the leader in the department at the time, updating instrument recipe cards or inventory sheets, ordering of implants, ordering of supplies, as well as being a staffed person.

Q. How long were you the lead tech?

A. Not even a year.

Q. Is there a day lead tech and a night lead tech?

A. At that time, there was.

Q. Has that changed since?

A. Yes.

Q. Tell me when and how that has changed.

A. The evening lead tech position has always remained intact. That was -- at the time when I was a day lead tech, David Wilcox was the evening lead tech.

Page 15

He exited, and we backfilled him with an associate in the department. The day lead tech, we transitioned to the supervisor position.

Q. So now there's no day lead tech?

A. No.

Q. Do you recall when that change happened?

A. No.

Q. Was it before or after Roxanna was terminated?

A. Before.

Q. Do you recall, was it before or after the first part of 2013?

A. I don't -- I can't be for certain on that.

Q. Okay.

A. It was before Amanda's entrance into the organization or around that time frame.

Q. And do you remember when that was?

A. No.

Q. Before you became the daytime lead tech, were you an instrument tech?

A. Yes.

Q. How long were you an instrument tech?

A. Three years. Two or three years.

Q. Was that your first position at St. Vincent Healthcare?

Page 16

A. Yes.

Q. When did you first start working at St. Vincent?

A. 2007.

Q. Did you attend any schooling beyond high school?

A. Yes. Current student.

Q. Okay. At which...

A. While -- after high school, I took a year off. Then I went to college. It wasn't a good time. Started school in 2007 when I started my employment with St. Vincent. Took some time off. And then that was through MSUB. And currently I am a student through the University of Phoenix.

Q. Took some time off from MSUB?

A. Correct.

Q. Okay. Did you earn a degree from MSUB?

A. No.

Q. What did you study there?

A. My bachelor's of science and business administration.

Q. You did receive a bachelor of science?

A. No.

Q. Okay. But that's what you were studying in?

A. Correct.

Page 17

Q. And what are you studying at the University of Phoenix?

A. The same.

Q. That's an online university?

A. Correct. Completing my degree.

Q. When you were an instrument tech, did you work alongside Roxanna Jackson?

A. Yes.

Q. Doing the same job duties as she was?

A. Yes.

Q. To your knowledge, has -- had the job duties of an instrument technician changed from the time that you were an instrument tech until now?

A. No.

Q. Going back to the day lead tech and the evening lead tech. Are there two different shifts of instrument techs?

A. There's multiple shifts. I have one person on days, who comes in at 7:00. The remaining of the day shift will come in at 9:00. The evening crew will come in at 3:00. And I have one night person who comes on at 11:00.

Q. Has that schedule been basically the same since you've been in the department?

A. No.

Page 18

Q. Okay. Tell me what it was like before Roxanna's termination in August of 2014. Do you recall what the schedules were like then?

A. That schedule was intact upon her termination.

Q. Okay. And do you know which schedule Roxanna worked?

A. She has always worked the 3:00 to 11:30 shift since I have been employed. Prior to, we worked four ten-hour shifts. We worked 1:00 to 11:30, and that was our shift at the time. She's always been on an evening shift.

Q. The 3:00 to 11:30 shift?

A. Or the 1:00 to 11:30 shift. That predates my leadership.

Q. How many employees were on that either 3:00 to 11:30 shift or -- did you say 1:00 to 11:30 shift?

A. Correct.

Q. Along with Roxanna?

A. It varied. Between the transition of our prior manager and me stepping in, we did have layoffs. The people who were laid off were two evening shift people. So the head count on that shift has varied.

Q. So what time did those layoffs occur?

A. Prior to my leadership. I'm not certain of

Page 19

exact year or date.

Q. When you say "leadership," do you mean your manager position or your supervisor position or the lead tech?

A. Supervisor. It was during when I was a lead tech.

Q. So before 2010?

A. I'm not certain.

Q. Before 2013, at least?

A. Correct.

Q. So from 2013 until, say, the end of 2014, how many employees were on the evening shift with Roxanna?

A. I'm not certain. I want to say it's four. We have had some variable shifts where a person has worked noon to 8:30. They had worked with Roxanna as well.

Q. So at least four other employees besides Roxanna?

A. I believe.

Q. Okay. And possibly five?

A. Possibly. I'm not for certain.

Q. Okay. There would never be a time when Roxanna was the only employee in sterile processing at that time; is that right?

A. No. There is a time where she could be, and

Page 20

that would be on a weekend shift.

Q. Okay. Tell me what the weekend shift entails.

A. The same functions that we process day to day. One person on days, one person on evenings, one person on call Friday and Saturday evening, night. The same functions; the decontamination process, the assembly process, the sterilization process and then sending things up, picking instruments and supplies up on the floors, resterilizing those, delivering those. Phones, picking surgeries.

Q. So is Roxanna assigned regularly to a weekend shift?

A. Yes.

Q. What hours were those?

A. The evening shift, the 3:00 to 11:30.

Q. And would she be the only instrument tech on duty at that time?

A. From 3:30 on, she would.

Q. Was that ever a concern, to have her the only instrument tech there?

A. There was concern when we saw surgeries get done earlier in the day, that then my call person was having to come in and work when there was time for her to work them.

Bray Reporting - (406) 670-9533

Page 21

Q. So there may be times if a surgery finished early, that if Roxanna was the only person there, that you'd have to call in a person on call to come in and assist?

A. There was a handoff in the work. The day shift person would have their tasks that came to them during that shift; surgeries, the other responsibilities I mentioned. If that person didn't get their tasks done, it was handed off to the evening person. Roxanne could have been that person. If she didn't complete her tasks, then we called the call person in. The evening person would call that call person.

Q. At the end of the evening person's shift?

A. Correct.

Q. And was that concerning to you if that happened?

A. Yes. That could happen -- it would be concerning to me if I look at the surgery or the instrumentation that was not complete. If the surgery was done at 4:00 and it was a trauma set, where we potentially need it for a patient coming in and it was not worked, it posed a patient safety risk.

Q. Was Roxanne ever moved off of weekend shift?

A. No.

Page 22

Q. After you became the sterile processing manager, did you ever have any discussions with David Dobson about increasing productivity within the department?

A. Can you clarify increasing productivity.

Q. Did he ever use that terminology in conversation with you, about wanting to increase productivity within sterile processing?

A. No. We had a productivity target that was set for us. It was my responsibility and Amanda's responsibility to manage the processes and the staff to try to meet the targets.

Q. But David Dobson never discussed that -- those targets with you?

A. We reviewed them together. We reviewed them multiple times a year, specifically because the target we have for our department provides a gray area to the work.

Q. Provides a what?

A. Gray area.

Q. What do you mean by that?

A. The target doesn't capture all the work that we do.

Q. Explain that.

A. Our productivity is based on surgical cases.

Page 23

We get X amount of time to process a case from start to finish. Outside responsibilities, we do all the sterile processing for the clinics, the nursing floors, processing of equipment, pumps. None of that is counted in my metric.

Q. Who sets these productivity goals?

A. They are defined for us through a group called Premier.

Q. How do you interpret those?

A. We have a definition. There's various metrics, and they are selected based off of recommendations and benchmarking.

Q. What are the metrics?

A. Surgical cases. Some of them might be patient days. Within the metric, we have -- there's options that may be selected if it fits best for you. However, you have to have enough people in the metric to utilize that metric.

Q. When you say the metrics include surgical cases, do they -- are they based on a set -- a period of time that a particular surgical case should be processed?

A. Not a specific surgical case; any case. A specific time, as an example, 3.85 hours to process a case from start to finish.

Page 24

Q. So the guidelines that you are given from Premier don't specify which type of surgical case would be processing; it's simply identifying a generic surgical case and giving a time frame?

A. Correct.

Q. And is that what you are -- those are the goals for productivity that you are attempting to achieve through your department?

A. Correct.

Q. And are you analyzing whether your instrument techs can perform those goals in order to meet those guidelines?

A. Yes.

Q. And those guidelines were discussed with you and Amanda and David Dobson together?

A. They are handed to us each year. The statistic stays the same unless we can get it changed.

Q. But I was wondering if you and David and Amanda would get together and discuss those guidelines.

A. David and I would, and I would notify Amanda of the changes if the metric changed.

Q. Okay. So just and you David would get together and talk about those guidelines?

A. Correct.

Q. Okay.

Page 29

High-Solid-Low conversation.

Q. The purpose of this October 10th, 2013, corrective action form was to give Roxanna a verbal reminder about performance issues that she was having; correct?

A. Correct.

Q. And in part -- well, strike that.

The performance issues that you and David Dobson were perceiving were first identified to Roxanna on July 24th, 2013; right?

A. Correct.

Q. And this October 10th, 2013, corrective action form was actually written in conjunction with a meeting with Roxanna; is that right?

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. Is that right?

A. Can you restate that.

Q. Did you and David Dobson have a meeting on October 10th, 2013, with Roxanna Jackson?

A. Yes.

Q. And that meeting was to go over this corrective action form, this verbal reminder?

A. Correct.

Q. And the purpose of that meeting and the

Page 30

purpose of this corrective action form was to discipline Roxanna for not improving upon the concerns that you and David had expressed in the July meeting; right?

A. Correct.

Q. And in the July meeting, as it states in here, you discussed where Roxanna was falling on the High-Medium-Low perspective of productivity?

A. We identified where she was falling. We asked her where she thought she was and what she could improve on. Between July 24th and the corrective action date of 10/10, Roxanne was asked to go back and reassess what she thinks she could do to help her performance, to bring forth ideas to us and how we can help her and she can help herself to improve.

Q. To improve in productivity?

A. Performance.

Q. In the first sentence under section one, it talks about a high, medium, and low perspective of productivity, not performance; right?

A. Performance is tied to productivity.

Q. They are not the same thing, though?

A. They are tied. They're not the same.

Q. Okay. And so what you wrote in this corrective action form is that you and David were

Page 31

following up with Roxanna regarding whether she had made any improvements in her productivity; right?

A. Correct.

Q. Okay.

A. That may impact her performance.

Q. Right. And, in fact, you created this verbal reminder because you did not think that she was improving her productivity?

A. She -- at that point, she brought forth no ideas. We sought her to take ownership of her performance, bring suggestions, ideas to us so we could potentially help her improve.

At that point, the corrective action took place because she provided nothing.

Q. As her leader, did you provide her with any suggestions on how she could improve her productivity?

A. Yes.

Q. What did you provide to her?

A. Work flow, not walking away from your workstation, minimize interruptions.

Q. Anything else?

A. Maintaining your area, not switching positions in the department with another associate so you can stay familiarized with the tasks or the responsibility.

Page 32

Q. Anything else?

A. Not that I can recall.

Q. Okay.

(Exhibit 2 identified)

BY MR. HOLM:

Q. I've just handed you Deposition Exhibit 2. Have you seen this document before?

A. Yes.

Q. When did you first see this?

A. In 2013, post this -- from HR.

Q. Who in HR provided this to you?

A. I do not recall if it was Kathy Smith and Annette or just Kathy Smith.

Q. Did you have any discussions with the HR folks about this particular letter?

A. Yes.

Q. Tell me about that.

A. The document states that she may be required additional time to learn or perform certain tasks. It's very vague.

Q. Did you discuss anything else with HR about this letter?

A. No.

Q. Did you discuss any restrictions that Roxanna may have, based on this letter?

Page 33

A. No.

Q. Did you discuss any restrictions that Roxanna may have, based on anything else?

A. No.

Q. Did you ever talk with Roxanna about this letter?

A. No.

Q. Did you ever talk with Roxanna about any disabilities she might have?

A. No.

Q. Did you ever talk with Roxanna about any restrictions she might have?

A. No.

Q. Did you ever talk with Roxanna about any accommodations that she might want or need?

A. On two occasions, she asked me if the position for maintaining the nursing floors and pumps was going to come back. At one point, that was assigned to one person as a task during the day. That responsibility went away when the equipment and the pumps were maintained on the floors. And we managed the overflow stock, so the role was not necessary.

Q. What, in your mind, did that have to do with a request for accommodations?

A. Roxanne asked me if that was coming back

Page 34

because she felt that she could do that and she enjoyed that. She was well known on the floors, and she liked getting out of the department.

Q. Did she say anything else about that?

A. No.

Q. After you were made aware of this letter from Roxanna Jackson's doctor, Dr. Phillips, that's dated October 16th, 2013, did you ever go through Roxanna's job description and determine whether she couldn't perform any of her job duties?

A. When we had a corrective action that pertained to her job performance, she was given the job description, reviewed it, and acknowledged she could do the job.

Q. Okay. But I asked if you, upon receipt of this letter at Exhibit 2, ever went through and reviewed her job description for herself and made the determination whether you felt she could accomplish the job duties.

A. No, I did not.

Q. Did you attempt to make any contact or make any contact with Dr. Phillips?

A. No.

Q. Did you have any discussions with HR about obtaining additional information regarding Roxanna's

Page 35

possible disabilities?

A. No.

Q. Did you think that Roxanna had a disability?

A. No.

Q. Did you ever hear anybody in the department talk about Roxanna having a disability?

A. When I was an instrument tech -- and I don't recall the year -- there was grumbling from other associates about Roxanna's performance then.

Q. Did that have anything to do with a disability?

A. Yes. They stated Diane, who was our manager at the time, would never be able to address the problems with her because she was hired under a disability.

Q. Who said that?

A. Another associate.

Q. Do you know who it was?

A. Yes.

Q. Who?

A. The person's name?

Q. Yes.

A. Her name is Bobbie Licht.

Q. Okay. Does she still work there?

A. No.

Page 36

Q. Anybody else take part in these grumblings about Roxanna's disability?

A. There was multiple.

Q. Who were they?

A. Evening crew. I would have multiple people. We had Josh. He would come in and say that he had to go down and pick up the slack of Roxanne.

David, the lead tech at the time, would complain about the performance and having to cover his area, do his job, plus do other people's.

Q. Because of Roxanna's disability?

A. Correct. I don't know if it was for her disability or not, but for her performance.

Q. What's Josh's last name?

A. Overfelt.

Q. And David is David Wilcox?

A. Correct. None of them are there anymore.

Q. Do you recall what Diane said, if anything, about those grumblings?

A. No.

Q. Have you ever undergone any training regarding disability discrimination?

A. No.

Q. Did you play any role in the request for Roxanna to undergo a psychological evaluation?

Page 37

A. No.

Q. Do you know who made that decision?

A. I believe it was a decision between human resources and David Dobson.

Q. Were you made aware of that decision?

A. Yes.

Q. Were you made aware of the results of that psychological evaluation?

A. When you say psychological, is it this?

Q. You're pointing to Exhibit 2?

A. Correct.

Q. No. I'm referring to a psychological evaluation that Roxanna underwent through Dr. Gumm.

A. No, I'm not aware of any of that. I was referring to Exhibit 2.

Q. Okay. Are -- okay. So let me start over.
Are you aware that Roxanna was asked to undergo a psychological evaluation from another doctor besides this Dr. Phillips?

A. No.

Q. Are you aware that Roxanna was asked to go through some retraining in the beginning of 2014?

A. Yes.

Q. Tell me what your understanding of -- why Roxanna went through that retraining.

Page 38

A. To assess where her knowledge was, where there may be gaps, where there may be waste, where there may be opportunity. It was an assessment to understand what she knew and where she potentially was struggling.

Q. And do you -- strike that.
Do you have an understanding as to the purpose of assessing what Roxanna knew and what she was struggling with?

A. Can you rephrase that.

Q. Yeah. Do you know why -- let me start over.
You said you understood that the purpose of the retraining was to assess what Roxanna knew and what she struggled with in parts of her job; is that right?

A. Correct.

Q. And do you know why that was important to determine those things?

A. Yes.

Q. Why?

A. To help her learn, maybe, where she was falling short or see where she was not understanding something.

Q. So that she could improve upon the things that she struggled with?

A. Correct.

Page 39

Q. Any other reason?

A. No.

Q. Did you play any role in developing that retraining program?

A. It was -- once it was a draft, I reviewed it.

Q. Who drafted it?

A. Amanda Mordhorst.

Q. Amanda did the retraining; is that right?

A. Correct.

Q. Did you play any role in the retraining, other than reviewing the draft of the plan?

A. Yes.

Q. Tell me that.

A. There would be days where it would be not a side-by-side work with Amanda; where I would observe, Amanda would tell me what they had worked on, what they had trained on, what she had coached her on. I would observe to see if she'd taken those and put them into practice.

Q. So you played more of an observational role?

A. Correct.

Q. Okay.

A. If Amanda was absent, I may have had to backfill her. There was times where Roxanne would approach me with questions and I would train her or

Page 40

coach her.

Q. You said there may have been times when you had to backfill. Do you recall if there were actually times where you backfilled?

A. I don't recall.

Q. And when you say "backfill," that means take her position and do the retraining?

A. Correct. Correct.

(Exhibit 34 marked)

BY MR. HOLM:

Q. I've just handed you what we've marked as Deposition Exhibit 34. The first page is a letter from your attorney, Emma, and it has attached information requests for response to the Montana Department of Labor and Industry. Have you seen this document before?

A. I don't recall.

Q. If you turn to the third page of the responses, which has a page number in the bottom right corner, SVH0606 -- do you see that?

A. Yes.

Q. Okay. Under No. 7, it asks a question. And the second paragraph of the response states, "Respondent was the only instrument tech terminated from October 2012 to October 2014."

Page 41

Do you see that?

A. Yes.

Q. And just so you know, "Respondent," what we're referring to there is Roxanna Jackson. And I guess my -- just my question for you is whether that's true, that Roxanna Jackson was the only instrument technician terminated from October 2012 to October 2014.

A. I don't recall. I would have to review the HR records of the associates. I believe she is.

Q. Do you recall any other instrument techs who were terminated during that time period?

A. I do not recall.

Q. Okay. And then moving to paragraph 8, also on SVH0606, this question asks about instrument techs who have been disciplined or terminated. And then it asks about 2012, 2013, and 2014. And during those years, you were either the supervisor or the manager of central processing; is that right?

A. Yes.

Q. Okay. So is this correct that in 2012, approximately six instrument techs were disciplined for making mistakes or performing their duties too slowly?

A. No technicians were ever disciplined for working too slowly. They were for quality mistakes

Page 42

that posed patient risks.

Q. Okay. So it would be true that in 2012, approximately six instrument techs were disciplined for making mistakes?

A. For making mistakes, correct.

Q. Yes? Okay.

And in 2013, is it true that approximately eight instrument techs were disciplined for making mistakes or performing their duties too slowly?

A. In -- I'm sorry -- which year?

Q. 2013.

A. I'm not for certain if that number is correct. I don't recall. I would have to review the associates' files.

Q. Do you have any reason, as you sit here today, to believe that that's not true?

A. I'm just not for certain of the number. I do know that associates have been disciplined for mistakes, quality errors. I do not know if eight is an accurate number, or any other number. I would have to review their files.

Q. Okay. How about for 2014? Is it true that approximately nine instrument techs were disciplined for making mistakes or performing their duties too slowly, excluding Respondent, who is Roxanna Jackson?

Page 43

A. Again, it's not for performing their duties too slowly. That was never the situation. It was quality errors due to their -- the mistakes in their performance or behaviors. I'm not for certain of that number nine. Again, I would have to review their files.

Q. Based on your knowledge as the supervisor and manager of sterile processing, is it safe to say that other employees besides Roxanna Jackson were also disciplined for making mistakes in their job duties?

A. Correct.

Q. Okay. Is it also true that no other employee in central processing, from 2012 till the end of 2014, had a disability?

A. I'm not aware of any.

Q. Okay.

MS. SAVORY: We've been going for about an hour. Can we take a quick break?

MR. HOLM: Yeah.

(Recess taken 11:32 to 11:37 a.m., August 25, 2016)

(Exhibit 35 marked)

BY MR. HOLM:

Q. Okay. We're back on the record. Ms. Franzel, do you understand you're still under oath?

Page 44

A. Yes.

Q. Okay. And we've just marked Deposition Exhibit 35. Do you recognize this document?

A. Yes.

Q. What is this?

A. This is the associate's performance annual evaluation document.

Q. For which associate? For Roxanna Jackson?

A. Correct.

Q. Okay. And the review period for this is January 1st, 2013, through December 31st, 2013; is that right?

A. Yes.

Q. Is this basically an annual review of Roxanna's job performance?

A. Yes.

Q. Okay. And if you turn to the third page of Exhibit 35, it has your name listed as the appraiser. Do you see that?

A. Yes.

Q. Is that your signature to the right?

A. No.

Q. Whose signature is that?

A. That's Amanda's.

Q. Tell me why your name is listed there but

Page 45

Amanda signed it.

A. Amanda delivered the performance evaluation to Roxanne.

Q. But you drafted it?

A. We drafted them together.

Q. You and Amanda?

A. Correct.

Q. Okay. So both of you provided input into this performance evaluation?

A. Yes.

Q. Okay. Are performance evaluations done every year?

A. Yes.

Q. Okay. This evaluation is dated -- is that March 7th, 2014, on the third page?

A. Yes.

Q. Okay. Would this have been Roxanna's last performance evaluation?

A. I'm not for certain of her termination date.

Q. Okay. Her termination date was August 27th, 2014.

A. Then yes.

Q. Yes, Exhibit 35 would have been her last performance evaluation?

A. Correct.

Page 46

Q. Okay. Since you and Amanda drafted this together, I want to ask whether you reviewed and approved all of the contents within this performance evaluation.

A. Yes.

Q. On the first page, it has a section called "overall performance level." And it says "meeting expectations." Is that Roxanna's overall performance level for this year in review?

A. Yes.

Q. So overall, Roxanna was meeting expectations during that calendar year of 2013?

A. In using this tool and how the rating is, yes.

Q. Okay. Let me turn you back to the third page, which you have a page number on the bottom right, SVH0180. And under the section from "manager comments," it states, "Roxanne is strong in the decontamination and sterilization areas of the department."

Is that true?

A. Yes.

Q. Okay. And also that, "She is very familiar with the SR instrumentation and a great source of knowledge." Is that true?

Page 47

A. Yes. SR stands for sterile room, and that would be our nursing floor trays.

Q. You go on to state that, "We would like to see Roxanne improve, in the instrument assembly area, her instrument assembly times, her multitasking skills, and the accuracy of the instrument set."

Is that correct?

A. Correct.

Q. So you identified that those were areas that she needed to improve upon in order to increase her overall rating?

A. To overall improve her performance in the instrument area.

Q. So she needed to improve upon those areas that I just identified in order to improve her overall performance at the job?

A. Correct.

Q. Okay. So you identified that these areas were areas she was not particularly strong in?

A. Correct.

Q. Okay. One of which was her instrument assembly times?

A. Correct.

Q. You wanted her to improve on her instrument assembly times?

Page 48

A. Yes.

Q. Okay.

A. It could pose a risk to the patient safety if the tray was needed immediately and she did not have it assembled and ready.

Q. So that was considered a weakness for Roxanne?

A. Yes.

(Exhibit 36 marked)

BY MR. HOLM:

Q. I have just handed you Deposition Exhibit 36. Do you know what this document is?

A. This is the old employee annual performance tool for Roxanna.

Q. This is an actual review -- performance review of Roxanna; right?

A. Correct.

Q. For the year 2011?

A. Correct.

Q. I could not find a year 2012 review. I may have overlooked it. But do you recall if there was or was not a 2012 review of Roxanna?

A. I know we did them annually, but I don't recall.

Q. Okay. Did you draft this 2011 performance

Page 49

review that we've marked Exhibit 36?

A. I believe, but I'm not for certain.

Q. Is that your signature on the last page?

A. Yes.

Q. So this particular review is discussed with Roxanna on January 31st, 2012; right?

A. Correct.

Q. And so this form is a little bit different, but you just explained this was the old form. It looks like this has several categories. Under core value competencies, we have respect, response to need, wholeness, excellence, and stewardship. And then under each one of those categories, there's more specific statements under those categories that you rate on the right-hand side of the form; is that right?

A. Correct.

Q. Okay. And the -- and then there's a separate section, on the second page, for job specific duties and responsibilities. There's a list there, and then you rate those on the right-hand side?

A. Correct.

Q. And the rating system looks like you can either circle "ND," standing for "needs further development," "FC" standing for "fully contributes," or "RM" standing for "role model"; is that right?

Page 50

A. Correct.

Q. And for this year, 2011, all of Roxanna's scores were either "fully contributes" -- and on three of the job duties, you rated her as "role model"?

A. Correct.

Q. Okay. So based on this rating in 2011, you didn't feel there was anything that she needed further development on?

A. No.

Q. On the bottom of the first page, under "comments," you state that Roxanne displays the SVH mission and values. What did you mean by that?

A. The core values are respect, response to need, wholeness, excellence, and stewardship. Roxanne took a great sense of pride in working in our department.

Q. Anything else?

A. No.

Q. Toward the top of the second page, under "comments," you wrote that Roxanne follows proper policies and procedures and manufacturer guidelines. What does that mean?

A. The manufacturer guidelines for the instrumentation, which explains how things are processed, sterilized, she adhered to those. Specific

Page 51

policies for the department could be attendance, breaks. Roxanna adhered to those.

Q. In fact, all policies and procedures of the department, she adhered to?

A. I'm not sure.

Q. Would you have noted that in here if there was an issue of her not following policies and procedures?

A. I'm not sure.

Q. You're not sure if you report, on employees' annual performance reviews, whether they follow or violate department policies and procedures?

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. Is that what your testimony is? Is that your testimony?

A. I'm not sure if in this template, that's how we were supposed to use it, if we were supposed to specifically state if there was issues. I know on this one and the rollout, which was Exhibit 35, we were requested -- if there was an opportunity to improve, that we needed to acknowledge that. I do not recall if -- in 2011.

Q. You don't know if in 2011, you were supposed to include concerns about employees' violations of

Page 52

policies and procedures on their annual performance review?

A. Correct.

(Exhibit 31 identified)

BY MR. HOLM:

Q. I have just handed you what we've marked previously as Deposition Exhibit 31. Do you know what this document is?

A. Yes.

Q. What is this?

A. It's an assessment of the staff and how they were performing for assembly times for various trays that may be categorized either small, medium, or large.

Q. Did you draft this document?

A. No.

Q. Do you know who did?

A. I believe it was Amanda Mordhorst.

Q. Did you play any role in the instrument assembly time trials?

A. I don't recall.

Q. Did you know they were occurring?

A. Yes.

Q. When did they occur?

A. I'm not for certain.

Q. Is this a one-time thing?

Page 53

A.  I'm not for certain.

Q.  Is it a policy or procedure of central processing to have periodic time trials to measure the amount of time it takes to put trays together?

A.  No.

Q.  Is this something that was part of a larger policy that was in place to improve times on these tasks?

A.  No.

Q.  Do you know why the staff was going through instrument assembly time trials?

A.  To assess if there was an issue with assembling, a comparison of associate to associate and then their abilities to assemble things.

Q.  And the time in which it takes, then?

A.  Correct.

Q.  Roxanna was a part of the assembly time trials?

A.  Correct.

Q.  When was the first time you saw this document?

A.  I'm not for certain.

Q.  Was it within the past month of today?

A.  No. I'm not for certain.

Q.  Was it prior to the end of 2014?

Page 54

A.  Yes.

Q.  So you saw this document around the same time that these time trials would have been taking place?

A.  I believe it was post. Post --

Q.  Post?

A.  Time trials.

Q.  Is when you saw it?

A.  Correct.

Q.  Right. Did you go over the results of these time trials?

A.  Yes.

Q.  Did you talk about them with anyone?

A.  I believe Amanda and I reviewed them together.

Q.  What did you talk about?

A.  We were assessing the consistencies in the trays and if there were interruptions, if there were distractions, if other associates potentially were having issues with assembling trays.

Q.  Is Roxanna the one that's listed on the bottom left, Rox?

A.  Yes.

Q.  Why is she the only one that's identified by name?

MS. SAVORY: Objection. I think, in our

Page 55

discovery responses, we redacted the names for privacy purposes of employees.

MR. HOLM:  Okay.

MS. SAVORY:  Okay.

BY MR. HOLM:

Q.  Let me just clarify. When you reviewed this document with Amanda around the time or shortly after the time trials took place, were all the names of the individual employees listed on here?

A.  Yes.

Q.  Okay. So you would have known which individual employees had what times?

A.  Yes.

Q.  Turn to page 32 -- Exhibit 32.

A.  Okay.

(Exhibit 32 identified)

BY MR. HOLM:

Q.  Do you know what Exhibit 32 is?

A.  It's the same template. It's an instrument assembly time trial sheet. It doesn't specific -- identify who.

Q.  Do you know who this was for?

A.  I would assume it's Roxanne, but I'm not for certain.

Q.  What makes you think it was -- or what makes

Page 56

you assume it was Roxanne?

A.  Because when we worked with her, she identified some trays, to us, that she struggled with assembling, whether it be identification of the single instruments or maybe the size of a tray, the complexity of a tray.

So specifically, when we worked with her and coached her and helped her identify certain things and how to check things, there was a -- multiple trials done to understand that if she improved her performance based off of what education or coaching she received from us.

Q.  So these would have been just individual time trials just involving Roxanna?

A.  Correct.

Q.  Do you know if any other employees went through individual time trials?

A.  We assessed another individual, who was newer, out of orientation but newer to the organization.

Q.  Who was that?

A.  Jeremy Whelchel.

Q.  This Exhibit 32, instrument assembly time trial, looks like, based on the dates that were here, was performed over the series of a few weeks. Do you

Page 57

recall that?

A. No.

Q. Do you know if this was a part of Roxanna's retraining?

A. I believe it was part of the assessment to identify if there was potential trays that she struggled with and then a reassessment post-coaching, education, and training, I believe.

Q. Was the basis for identifying areas where she struggled with so that you could exclude those tasks from her requirements, or was it so that she could improve her time on those tasks?

MS. SAVORY: Objection. Form.

THE WITNESS: It was so she could improve the performance, the quality. It wasn't about the times.

BY MR. HOLM:

Q. If it wasn't about the times, then why are you even measuring the times?

A. To help her eliminate the waste that she had when we first assessed her.

Q. The waste in time?

A. Waste in steps, waste in assembly, redundancies.

Q. Which all revolve around time, do they not?

A. Yes. If you eliminate the waste, you improve

Page 58

your time.

Q. And so if the point was just to eliminate mistakes, wouldn't you have an instrument assembly mistake trial test that she would undergo?

MS. SAVORY: Objection. Form.

THE WITNESS: Can you resay that.

BY MR. HOLM:

Q. If the purpose was for her to eliminate the number of mistakes that she was making when putting these trays together, wouldn't you develop a trial plan to identify what mistakes she was making as opposed to how much time it was making -- taking to accomplish that task?

MS. SAVORY: Same objection.

THE WITNESS: This tool was to identify if she improved on wasted steps. The competency tool was used to help her identify where there was potential lack of knowledge that contributed to mistakes.

BY MR. HOLM:

Q. What was your understanding of the green and yellow highlights on Exhibit 32?

A. On the right side, it says, yellow highlight, trays she needs to focus on and, green, trays she's doing well on. No color is average time. This identified the trays that she was doing well on and the

Page 59

trays that she needed help.

Q. And from your understanding, that was based solely on her time that's listed under the total time column; right?

A. Correct.

Q. Whose decision was it to terminate Roxanne from employment?

A. It was a decision between myself, David Dobson, and human resources.

Q. Who at human resources?

A. My HR businessperson is Kathy Smith.

Q. Do you mean business partner?

A. She's my partner that I work directly with for HR items.

Q. Right. And is the term that HR uses for that person a "business partner"?

A. Correct.

Q. Okay. Who informed Roxanna that she was terminated?

A. Myself and Kathy Smith.

Q. Was that in person?

A. Yes.

Q. Tell me about that meeting.

A. It was in the HR conference room. With the termination document, we reviewed the prior corrective

Page 60

actions and the steps that we had taken with the retraining period and then the continued mistakes.

Specifically, it addresses that when there's a pattern state, that there's concerns for the patient safety. If you're not capable of doing quality work and you are contributing mistakes, you're putting our patients' safety at risk.

Q. Anything else discussed?

A. I don't recall.

Q. How did Roxanna react to that?

A. There was minimal response. When she was asked to return her badge or hand her badge over, she slid it across the table, and that was it.

Q. I understand one of the reasons for her termination was that she entered a sterilized area in street clothes?

A. Correct.

Q. Did she say why she entered that sterilized area?

A. She was attempting to approve her timecard.

Q. And do you do that on some sort of computer?

A. Yes.

Q. Where was the computer located at that time?

A. There's multiple computers in the department.

Q. That you can do the same task on?

Page 61

A. Uh-huh, yes.

Q. Where was each computer located at that time?

A. There is one in the case card area, there was one in the sterilization operator area, and then five in the instrument assembly area and one in decontam.

Q. Which of those four areas are considered sterilized areas?

A. All. You are required to wear scrubs or what we reference as a bunny suit, overalls, to confine your clothing and then a bouffant cap to restrict your hair.

Q. So each one of these computers that you just identified, employees were able to log into that to check and approve their timecard; is that right?

A. Correct.

Q. Okay. Were you aware of any other employees entering those sterilized zones without the proper sterilization clothing or hairnet, for purposes of checking their timecard?

A. No.

Q. That has never been brought to your attention?

A. No.

Q. Do you know if anyone in central processing, since 2012, has ever been written up for that, besides Roxanna?

Page 62

A. No.

Q. No, you don't know, or no, they have not?

A. No, they have not.

Q. Was that ever considered a potential issue before Roxanna was disciplined for that?

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. Did you understand my question?

A. No.

Q. Was the location of these computers to check timecards ever a concern for you based on the fact that they are located within a sterilized area?

A. No.

Q. Have any of those computers been relocated since Roxanna was terminated?

A. No. But it might within the next week or two, within our construction that we start -- we will start.

Q. Okay. So since Roxanna was terminated, none of those computers we talked about have been relocated?

A. No.

Q. Have any new computers with the same capabilities been added to any other locations?

A. No.

Q. Following the reconstruction that's going to

Page 63

be taking place here shortly, do you know where any of these computers are going to be relocated to?

A. No.

Q. You don't know exactly where?

A. No. I don't know exact locations. Some of the locations are changing.

Q. Will any of them be located outside the sterilized zones?

A. I'm not for certain.

Q. Have you had discussions about that with anyone?

A. No.

Q. Is that something that you want to raise as a concern to any of your supervisors?

A. No. The associates check -- if it's the end of the pay period, they approve their timecard at the end of their shift before they go home.

Q. Are you aware that Roxanna has said that multiple other employees do the same thing, entering those zones in street clothes?

A. No.

Q. You've never heard that before today?

A. No.

Q. Okay. When Roxanna was terminated, was she the highest paid instrument technician?

Page 64

A. I don't know.

Q. You don't know what your employees made?

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. Do you know what your employees made?

A. If I pulled them up, I would.

Q. Not off the top of your head, though?

A. No.

Q. Is it your understanding that salary -- strike that.

Is it your understanding that -- strike that.

To your knowledge, when Roxanna was terminated, was she the oldest instrument tech?

A. I don't know. I'm not for certain of her age or any of the other associates'.

Q. You were not aware of that information?

A. No. It would be something that I would have to specifically pull from an employee file to look at.

Q. When she was terminated, was she the only employee that you knew had a disability?

A. I was not aware of any disability, other than the letter we were provided, but she was the only one who stated that she had a disability at that time.

Q. And none of the other employees had a disability that you knew of?