**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

---------------------------------------------------

ROXANNA JACKSON,

        Plaintiff,

        vs.          NO. CV-15-115-BLG-SPW

ST. VINCENT HEALTHCARE,

        Defendant.

_____

DEPOSITION OF KATHY SMITH
7:44 a.m., Wednesday, August 24, 2016

Pursuant to notice, the deposition of KATHY SMITH was taken in behalf of Plaintiff in accordance with the applicable Federal Rules of Civil Procedure at the offices of Sather & Holm, PLLC, 2301 Montana Avenue, Suite 202, Billings, Montana, before Vonni R. Bray, Certified Realtime Reporter and Notary Public of the State of Montana.

**Page 3**

INDEX TO WITNESSES

            PAGE

KATHY SMITH

  Direct Examination by Mr. Holm ...............5
  Cross-Examination by Ms. Savory ..............62
  Deponent's Signature Page ....................63
  Reporter's Certificate .......................64

EXHIBITS

EXHIBIT     DESCRIPTION     PAGE

1  St. Vincent Healthcare Job ..............10
  Description for Instrument Tech

2  October 16, 2013, Letter from Dr. .......15
  Phillips

3  St. Vincent Behavioral Health ...........22
  Clinic Psychological Evaluation of
  Roxanna Jensen

4  April 16, 2014, Letter from Dr. .........21
  Phillips

10  July 28, 2014, Corrective Action ........29
  Form

11  August 27, 2014, Employee ...............37
  Termination Form

23  July 29, 2014, Employee Grievance .......31
  Form

24  August 7, 2014, Response to .............33
  Employee Grievance

25  August 14, 2014, Appeal of ..............35
  Grievance from Roxanna Jackson

26  August 28, 2014, Response to ............41
  Grievance

**Page 2**

APPEARANCES

FOR PLAINTIFF:
  Mr. Eric E. Holm
  Sather & Holm, PLLC
  2301 Montana Avenue, Suite 202
  P.O. Box 1115
  Billings, MT 59103
  Telephone: (406) 294-1700 Fax: (406) 794-0673
  E-mail: eric@satherandholm.com

FOR DEFENDANT:
  Ms. Emma L. Savory
  Husch Blackwell LLP
  1700 Lincoln Street, Suite 4700
  Denver, CO 80203
  Telephone: (303) 749-7267 Fax: (303) 749-7272
  E-mail: emma.savory@huschblackwell.com

**Page 4**

EXHIBITS (Cont.)

EXHIBIT     DESCRIPTION     PAGE

27  September 5, 2014, Employee .............45
  Grievance Form

28  September 12, 2014, Return of ...........47
  Grievance Paperwork

29  October 23, 2014, Response to ...........54
  Questions About Employee Grievance

30  October 21, 2014, Letter from ...........55
  Montana Department of Labor and
  Industry Unemployment Insurance
  Division

31  Instrument Assembly Time Trials .........56

32  Instrument Assembly Time Trials .........59

33  October 21, 2014, Fax from Montana ......62
  Department of Labor and Industry
  Unemployment Insurance Center

Bray Reporting - (406) 670-9533



Page 9

employee? What was your impression of her?

A. My impression of Roxanna. She seemed to be, from my perception -- in my interactions with her, she was aware of things that needed to be done as far as -- I'll go back and talk about benefits for a minute. We do annual enrollment. She was on top of time frames and when those deadlines were for annual benefit enrollment, when I was in that role. She, from what I recall, seemed to ask appropriate questions to help her decide what she wanted or needed.

And I didn't have a lot of interaction with her subsequent to moving out of that benefit role, other than working with department leaders and different things that were going on in different departments.

Q. Do you have any personal knowledge regarding Roxanna Jackson's job performance?

A. I do, related to the -- my interactions with her and her leader throughout the process that we went through.

Q. Okay. And that process, you're referring from 2013 until the end of Roxanna's employment?

A. Correct.

Q. Okay. Do you have any knowledge regarding her job performance prior to 2013?

Page 10

A. I don't know that I could specifically speak to anything, really, to that.

Q. Do you recall if anything came up to your level regarding Roxanna Jackson with regard to discipline prior to 2013?

A. Not to my recollection.

(Exhibit 1 identified)

BY MR. HOLM:

Q. I'm going to hand you what we've already marked as Deposition Exhibit 1, and I'll ask you to review this and tell me what this document is, if you know.

A. So this is a job description for the instrument tech -- noncertified instrument tech position in central processing.

Q. Is that the position that Roxanna Jackson held prior to her termination?

A. I believe so, yes.

Q. Do you know who drafts these job descriptions?

A. Job descriptions are drafted by departments. So someone in central processing would have drafted this.

Q. Does human resources have any particular oversight in the job descriptions?

Page 11

A. Yes. We'll review that, you know, ask appropriate questions related to -- it depends on what's in the draft. There may be things that aren't appropriate for a staff level position, or, you know, we'll look at the qualifications and do they make sense for the role and the work that needs to be done. So we'll have some dialogue that we'll have back and forth with the department leader.

Q. Was that done with regard to this description in Exhibit 1?

A. Well, this is back in 2006, so I -- I couldn't say exactly what happened when that was drafted.

Q. This was prior to your time as HR manager?

A. Right.

Q. Okay. During your time as HR manager, were there any revisions made to this job description in Exhibit 1?

A. I don't believe so, just based on the date that's on that job description.

Q. Did you review this job description at any time in the 2013, 2014 time frame while these issues with Roxanna Jackson were being addressed?

A. I don't recall.

Q. Do you know if you or anyone in your

Page 12

department reviewed this job description to determine whether there were any job duties listed in here that Roxanna Jackson could not perform with or without accommodation?

A. Again, I don't recall reviewing this, whether I did or not. I don't remember.

Q. Are you aware that Roxanna Jackson has a disability?

A. I know, based on some information that's come through this process, that there was a note from a provider that indicated she was special needs. But other than that -- you know, just working through this process, that's the only knowledge that I have related to that.

Q. Is there anything that you've come across in this process that has led you to believe that Roxanna does not have an intellectual disability?

A. That she does not have?

Q. Right.

A. Looking at -- and, again, just working with -- through the process, she was able to demonstrate that she was able to do the work through that training process and reorientation. But outside of that, no.

Q. Besides that, there's nothing else that led

Page 13

you to believe she does not have a disability?

A. Again, there's nothing she's demonstrated to me or that I would have gone down the path to say that she's disabled.

Q. You don't believe Roxanna has a disability?

A. That's not my decision to make.

Q. Well, you're the head of HR.

A. True. But I'm not going to perceive that someone has a disability. If there is a documentation provided from a healthcare provider, then we'll go down a path of taking a look at that on a case-by-case basis.

Q. But when somebody makes a request for an accommodation under the Americans with Disabilities Act, isn't it up to the human resources department or the individual who is assigned to that task to determine whether that employee does, in fact, have a disability?

MS. SAVORY: Objection. Form.

You can answer.

THE WITNESS: So can you reask that again. I'm sorry.

BY MR. HOLM:

Q. Isn't is it true that when an employee requests an accommodation based under the Americans

Page 14

with Disabilities Act, that the employer's human resource department or the individual assigned to that task must make a determination whether that employee does, in fact, have a disability or not?

A. It's is not up to us to determine whether that person has a disability. We're going to, again, go through on a case-by-case basis and look for information from a provider, healthcare provider, to give us some direction to be able to look at if there is a limitation, is that something that fits with the role and the person and how do we work through that process.

So there's a -- it's an interactive process that we go through to determine if that individual can perform the functions of the role.

Q. And that would include reviewing the actual job duties of that role, would it not?

A. Uh-huh.

Q. Yes?

A. Sure.

Q. Do you know who Heather Franzel is?

A. I do.

Q. What is her position?

A. She's the manager of central processing.

Q. Okay. Do you know when she was named central

Page 15

processing manager?

A. I believe it was 2011.

Q. And she would have been Roxanna's supervisor, then, as the manager of that department?

A. Correct.

Q. All right. Did you play any role in the decision to hire Heather into that position?

A. No. Not into the decision, no.

Q. Okay. Do you know if there was any change to Roxanna Jackson's job duties after Heather Franzel became central processing manager?

A. Not to my knowledge.

Q. Do you know if there was any change to Roxanna's job description after Ms. Franzel became Roxanna's supervisor?

A. Again, based on this job description and the date that's on it, I'm not aware that there were any changes made to the job description.

(Exhibit 2 identified)

BY MR. HOLM:

Q. I've just handed you Deposition Exhibit 2. Have you seen this document before?

A. I have.

Q. When did you first see this?

A. I don't recall the exact date. It was

Page 16

sometime after -- sometime -- there was an assessment and evaluation and a retraining program. So it was sometime after that that I was involved with this. And that -- it was sometime after that process that I had seen this.

Q. Okay. Well, I have that the retraining took place in January and February of 2014.

A. Okay.

Q. Does that sound correct to you? I don't want to put words in your mouth. But...

A. Yeah, I'm not -- I'd have to look at the document. I don't remember exactly right off the top of my head.

Q. Okay. Tell me what you did when you first saw the letter from Dr. Phillips that is at Exhibit 2.

A. So, again, I wasn't involved in -- at that step in the process. This didn't come directly to me.

Q. Who gave this to you?

A. I believe this initially went to Annette Hoffman.

Q. And then Annette gave it to you?

A. Sometime after that, yes.

Q. Do you recall when she gave it to you?

A. I do not.

Q. Was it within a week or two after this? Do

Page 17

you recall?

A. No.

Q. No, it was longer than that?

A. It would have been longer than that. I don't recall seeing this at the time it came.

Q. Do you recall if you saw this document before Roxanna's retraining?

A. Not that I recall.

Q. When you saw this document, did you understand that Roxanna had a disability?

A. No. Only based on what this says, that she's classified as special needs.

Q. Did that lead you to believe that Roxanna had an intellectual disability?

A. That doesn't -- that can be wide open. That doesn't tell me exactly what that means related to her job.

Q. So you didn't know what this letter meant?

A. For me, I would -- I would ask for further clarification.

Q. When did you do that?

A. I wasn't -- again, I wasn't part of that process when this came and that -- up to that -- through retraining process.

Q. Did you ever ask for additional clarification

Page 18

regarding Roxanna's disabilities or her request for accommodation, from either Roxanna or any of her providers?

A. I specifically did not. That was worked through with Annette Hoffman.

Q. Did you oversee Annette Hoffman's work on that?

A. Not at that time.

Q. You did later?

A. I'm sorry?

Q. You did later? Or you didn't ever?

A. I'm aware that she was going through this process but was not involved in the -- as far as consulting with me, that was not part of that process at that point in time.

Q. So you said that you didn't see a copy of this Exhibit 2 until much later after the date that is on the letter; is that right?

A. Correct.

Q. Were you at least aware that there had been a letter on behalf of Roxanna regarding a potential disability or a potential request for accommodation?

A. I'm aware that she was working with Annette to work through, from the point that this came, what does that mean and how does that impact the ability for

Page 19

her to do her job and that Annette was working with her through that process.

Q. How were you made aware of that?

A. I believe Annette had just shared with me that she was working through this process with Roxanne.

Q. What process?

A. From looking at having an assessment done and looking at what accommodation, if any, would need to be made to her role.

Q. When you say "assessment," do you mean the psychological evaluation?

A. Right.

Q. Okay. So did you have one conversation with Annette about this process or more than one conversation?

A. I don't remember.

Q. Did you give any input or advice on what Annette should be doing?

A. From what I remember, she -- based on what she had shared that she was working through, an evaluation of Roxanne -- to schedule that, and then once we got the results of that, then we would know -- or have a better idea of what direction to go. So from my perspective, that seemed like an appropriate step at that point in time.

Page 20

Q. So you approved that step?

A. Right.

Q. Did Annette ever tell you that a request for an accommodation had been made?

A. No. Not that I remember.

Q. And did she say why she was going through this process?

A. Again, based on this letter from the physician, to try and -- to help us to know what does that exactly mean and what, if anything, would we need to do to help Roxanne be successful in that role if that was -- to help us determine if there needed to be some sort of accommodation made.

Q. Did you consider that Exhibit 2 was a request for an accommodation?

A. Sure, which is why we went through that process.

Q. Well, wasn't the accommodation already specified in Exhibit 2?

A. Again, that doesn't tell me exactly what that means related to her role, related to the job.

Q. Did you ever talk to Roxanna about this letter in Exhibit 2?

A. I did not.

Q. Did Annette ever tell you that she talked to

Page 21

Roxanna about this letter?

A. Annette worked with Roxanne when she got this.

Q. How do you know that?

A. Just because she shared that with me.

Q. Okay. And you don't remember when she shared that with you?

A. I don't remember exactly when. It was sometime after this came.

(Exhibit 4 identified)

BY MR. HOLM:

Q. I just handed you Deposition Exhibit 4. Have you seen this document before?

A. I don't recall seeing this at all.

Q. You don't recall ever seeing this before today?

A. I don't.

Q. Do you know if there was ever an investigation conducted into the allegations that are contained within Exhibit 4?

A. Not to my knowledge.

Q. If that had happened, you would have known about it; right?

A. Right.

///

Page 22

(Exhibit 3 identified)

BY MR. HOLM:

Q. I just handed you Deposition Exhibit 3. Have you seen this document before?

A. I have.

Q. Do you know whose suggestion it was for Roxanna to undergo a psychological evaluation?

A. I don't.

Q. It wasn't yours?

A. No.

Q. Did you agree with that decision?

A. Just through my conversation with Annette, from this initial note from the physician, there was an evaluation that was going to be done to see what's -- what might be recommended as far as how we move forward.

Q. Do you know if this psychological evaluation was something that Roxanne had requested?

A. I don't.

Q. Do you know if it was something that Annette was the first one to suggest?

A. I don't. But I don't know that either.

Q. Okay. Do you know Dr. David Gumm?

A. I know of him.

Q. Is he an employee of St. Vincent Healthcare?

Page 23

A. He is.

Q. Is he paid by St. Vincent Healthcare?

A. He is.

Q. Did you have any contact with him directly regarding Roxanna Jackson?

A. No.

Q. Did you review this report after it was submitted by Dr. Gumm?

A. I've seen this, yes. I've looked at it.

Q. Do you recall when the first time was that you looked at this?

A. Again, I don't.

Q. After reviewing Dr. Gumm's report, did you understand that Roxanna had one or more disabilities?

A. The focus was on the recommendations.

Q. Did you understand that she had a disability?

A. Not specifically.

Q. Did you see that Dr. Gumm stated that Roxanna had a full-scale IQ of 73?

A. I don't see that in here.

Q. It's on the third page.

A. Okay.

Q. Did you understand that?

A. I don't recall focusing on that.

Q. Do you recall if that led you to believe that

Page 24

Roxanna had an intellectual disability?

A. No.

Q. Did you review Dr. Gumm's Axis impressions and his recommendations on the fourth page?

A. I reviewed these, yes.

Q. Did any of those lead you to believe that Roxanna had one or more disabilities?

A. Other than the notation on here of borderline intellectual functioning, no.

Q. So borderline intellectual functioning on the Axis II does lead you to believe that she had a disability?

A. Not necessarily.

Q. Why not?

A. Because she could function in the job.

Q. How do you know that?

A. And, again, saying that after, because I know that there was a retraining done and she was able to demonstrate that.

Q. But she was fired for not performing her job, wasn't she?

A. For quality mistakes, yes.

Q. So did you understand, after reading David Gumm's report, that Roxanna Jackson had a borderline intellectual functioning mood disorder, global

Page 25

assessment of functioning, 75, and full-scale IQ of 73 and that those things may have impacted her ability to perform her job duties?

MS. SAVORY: Objection. Form.

You can answer. Go ahead.

THE WITNESS: Again, we look at that to just help determine what we may want or need to do to help her be successful in the world. Is that -- to function in that role with or without accommodation.

BY MR. HOLM:

Q. So did you understand that those diagnoses would have a potential impact on Roxanna's ability to be able to perform those job duties?

A. Potentially.

Q. Okay. And what did you do after that realization?

A. Again, this was Annette working through this with her at that point in time. And that's where the -- based on this, that's where the retraining came from.

Q. Did you discuss this Dr. Gumm report with Annette Hoffman?

A. I recall a conversation with her related to the recommendation and her -- the plan for going forward and putting together that retraining process.

Page 26

Q. Was that Annette Hoffman's decision to do that?

A. She was involved in that, yes.

Q. Whose decision was it?

A. That was her decision.

Q. Did you approve that decision?

A. I was aware of that decision and felt that it was appropriate.

Q. Why did St. V's felt -- feel it necessary to have Roxanne undergo retaining?

A. Based on the note from the provider, the recommendations from Dr. Gumm, and wanting to make sure that she was comfortable in the role and could demonstrate that she knew how to do the work.

Q. Well, Dr. Phillips didn't request retraining, did he?

A. Not in his letter, no.

Q. Not at any other time either; correct?

A. No, not that I'm aware of.

Q. And Dr. Gumm, in his recommendations, he did not recommend retraining, did he?

A. Not specifically.

Q. Dr. Phillips simply requested that Roxanna be given additional time to learn and perform certain tasks; right? That's what his letter said? His

Page 27

October 16, 2013, letter.

A. Yes, it does say that.

Q. Why wasn't Roxanna just given additional time to learn and perform certain tasks instead of undergoing a psychological evaluation and a retraining?

A. I don't know. I wasn't involved in that conversation with her.

Q. But you approved all of Annette Hoffman's actions in that regard, did you not?

A. Yes. I agreed with those actions. I wasn't specifically involved in the conversations that she had had with Roxanne at that point.

Q. So you don't know why Roxanna wasn't just simply accommodated by allowing her to have additional time to learn and to perform certain tasks in her job; is that right?

MS. SAVORY: Objection to form.

THE WITNESS: I was not -- again, I wasn't involved in those conversations between Annette and Roxanne about that.

BY MR. HOLM:

Q. So you don't know?

A. I don't know what those conversations were.

Q. And why wasn't Roxanna simply allowed to perform areas of her job that she had more confidence

Page 28

in versus areas of her job that she didn't have as much confidence in, as Dr. Gumm had recommended?

A. The role is -- I think we looked to do what we could to help her build up her confidence in those areas, which was part of that retraining process.

Q. But that's not what was being recommended by Dr. Gumm, who was hired by St. V's to perform a psychological evaluation on Roxanna, was it?

A. Not specifically.

Q. So do you know of any other reason why Roxanna could not have been allowed to perform areas of her job that she had more confidence in?

MS. SAVORY: Objection. Foundation.

THE WITNESS: My understanding of various -- we call them stations. Within central processing, individuals need to be able to function in every one of those stations to be able to get the work done that needs to get accomplished as part of the work flow.

BY MR. HOLM:

Q. Did you ever consider whether you could accommodate Roxanna by allowing her to focus more on those stations that she had more confidence in, as Dr. Gumm recommended?

MS. SAVORY: Objection. Foundation. Form.

Go ahead and answer.

Page 29

THE WITNESS: I recall a conversation with Heather about knowing that there are different stations within the department, "What if, you know, Roxanne were able to just focus on one station or two," and that that conversation, based on the work that needs to get done -- individuals are on call; maybe they're by themselves. So they need to be able to perform and work each one of those stations.

BY MR. HOLM:

Q. And you stated earlier that Roxanna had never been subjected to any discipline, prior to 2013, regarding anything; is that right?

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. Is that true?

A. Not to my knowledge.

Q. Okay. So to your knowledge, this had never been a problem before for Roxanna, before 2013?

A. I'm not aware that there were any issues.

Q. Do you know why it was suddenly an issue in 2014?

A. I can't speak to that.

(Exhibit 10 identified)

BY MR. HOLM:

Q. I just handed you Deposition Exhibit 10.

Page 30

Have you seen this document before?

A. I have.

Q. Tell me what this document is.

A. It's a corrective action form that is used to formally document performance concerns.

Q. You signed this on the second page; right?

A. Right.

Q. And this is dated July 28, 2014?

A. Correct.

Q. Were you involved in this corrective action form?

A. I was involved in the meeting to present this to Roxanne.

Q. Did you play any other role regarding this particular discipline of Roxanna?

A. Just in working with Heather to put her document together.

Q. How did you do that?

A. Just talking with the manager to make sure that they stated the issues clearly, and the follow-up actions.

Q. Did you help Heather draft this form?

A. It's a back-and-forth conversation.

Q. Okay. So you would have provided some of the input that went into the contents of this corrective

Page 31

action form?

A. Sure.

Q. Did you have any personal knowledge about the allegations that are contained within Exhibit 10?

A. Personal knowledge only based on my conversation with Heather.

Q. Did you ever conduct any sort of an investigation into these alleged incidents prior to discussing this form and its contents with Heather?

A. I did not do an investigation, no.

Q. Did you speak with Roxanna, prior to this meeting, about this issue?

A. I did not.

(Exhibit 23 marked)

BY MR. HOLM:

Q. I handed you what we've marked as Exhibit 23. Have you seen this document before?

A. Yes.

Q. Tell me what this is.

A. It's a grievance report.

Q. Submitted by who?

A. Submitted by Roxanne.

Q. On July 29th, 2014?

A. Correct.

Q. Okay. Do you recall when you received this?

Page 32

A. The 29th of July.

Q. What did you understand Roxanna was grieving through this report?

A. Her corrective action of -- it's the corrective action of July 28th, it looks like.

Q. That we just talked about on Exhibit 10?

A. Right.

Q. Did you ever discuss this grievance with anyone?

A. The role of human resources with a grievance is really to facilitate that process. So as far as discussing it with anyone, it's providing the grievance report along with the supporting documentation, which, according to the bottom, Roxanne had attached, and the corrective action or the document -- other document that would be pertinent that would cause the employee to file the grievance and send that up through the chain of command for a response.

Q. So who did you send this to?

A. I believe this went to David Dobson, I believe.

Q. And what was David Dobson's position?

A. He was the director.

Q. Of?

A. He was over the central processing

**Page 33**

department, the director that Heather reported to.

Q. Did you ever send this grievance to Heather?

A. No.

Q. Did you ever discuss this with Roxanna?

A. I did not specifically discuss it with Roxanna.

Q. Do you know if anyone else in HR did?

A. I don't recall. I don't know.

(Exhibit 24 marked)

BY MR. HOLM:

Q. This is Exhibit 24. Can you tell me what this document and its attachment are.

A. It's a response to the grievance, from her director.

Q. From David Dobson?

A. Correct.

Q. And what's the first page?

A. The first page is just a -- kind of a cover letter from me to Roxanne with the director's response attached.

Q. Did you ever speak with David Dobson about this issue or his response that we've got here on Exhibit 24?

A. So a conversation with David Dobson certainly around the grievance process and his -- what his role

**Page 34**

is in that.

Q. Did you talk to him about the specific issues that were raised in his letter?

A. I'm reading the letter.

I don't recall having a conversation with him.

Q. Does HR play any role in reviewing the investigations that are done into grievances?

A. Not usually.

Q. That implies that on some occasions they do.

A. I mean, this is pretty thorough. I might ask the follow-up questions if that wasn't there, just to make sure that they did go through a process of determining the -- making a decision as to approving or denying the grievance. But this is pretty thorough.

Q. And when you say "this," you're referring to David Dobson's denial letter on August 7th?

A. Correct.

Q. So you didn't do any follow-ups with David Dobson regarding his investigation?

A. Not that I recall.

Q. But you also didn't have any firsthand knowledge regarding any of the information that's contained within his denial letter; is that right?

A. Only through my initial conversation with

**Page 35**

Heather that resulted in her doing the final written warning.

Q. But you had no personal knowledge regarding those issues?

A. Correct.

Q. Okay. Was this -- to your knowledge, this denial forwarded on or sent to Heather Franzel?

A. I don't recall that it was. I couldn't say for sure.

Q. In general, is the supervisor made aware of the result or the decision of a grievance?

A. Generally, the supervisor is made aware that there has been a grievance filed. And then -- and that we'll work through the process.

Q. But is the supervisor made aware of the final decision?

A. And I would say generally, yes, the supervisor is made aware of that; in this case, that David denied the grievance.

Q. Do you know if Heather was made aware of that?

A. I don't recall exactly.

(Exhibit 25 marked)

BY MR. HOLM:

Q. This is Exhibit 25. Can you tell me what

**Page 36**

that document is.

A. It's a note from Roxanne that she wants to appeal that decision.

Q. Appeal David Dobson's decision?

A. Right.

Q. Okay. Do you recall when you received this letter?

A. I don't. There's no date on it other than her date of August 14th.

Q. Do you recall what you did with this appeal letter after you received it?

A. So the next step in the grievance process is that it goes up to the vice president over that department. So that would have been sent to B. Gilmore.

Q. And was it, in fact, sent to BJ Gilmore?

A. I believe so.

Q. Did you have any discussions with BJ Gilmore regarding this issue?

A. My discussions were, again, related to the grievance process and just kind of orienting her to the documents that would have been sent to her for review and consideration and just facilitating that process.

Q. You didn't have any discussions regarding the substantive issues at hand, with BJ?

Page 37

A. No. Not that I recall.

Q. Okay. Is the supervisor in this case, Heather Franzel, made aware that the denial is appealed?

A. Generally, the supervisor would know, yes. I don't recall if I let her know that.

Q. So when this grievance is on appeal at this point, is the grievance still then considered open and basically unresolved at that point?

A. Right.

Q. Okay.

MR. HOLM: Let's take about a five- or ten-minute break.

(Recess taken 8:40 to 8:50 a.m., August 24, 2016)

MR. HOLM: Okay. We're back on the record.

BY MR. HOLM:

Q. Do you understand you're still under oath?

A. I do.

(Exhibit 11 identified)

BY MR. HOLM:

Q. I've just handed you Deposition Exhibit 11. This is a corrective action termination form. Have you seen this document before?

A. I have.

Page 38

Q. Okay. I believe you signed this on the third page; is that right?

A. Correct.

Q. Did you play any role in the decision to terminate Roxanna's employment?

A. That is the manager's decision. But there's required -- they are required to consult with human resources before doing any terminations.

Q. Do you know if Heather Franzel did that in this occasion?

A. Yes. Yes, she did.

Q. When was that?

A. It would have been sometime before the 27th of August of 2014.

Q. Did she consult with you?

A. She would have, yes.

Q. Tell me what you remember about that conversation.

A. Additional issues have come up; performance concerns; continue to be quality errors; and demonstrating a pattern of unacceptable performance.

Q. Did Heather provide any evidence of those allegations?

A. I can't read what else this says.

MS. SAVORY: Which part? Do you want me to

Page 39

read it to you?

Do you mind if I read her the --

MR. HOLM: No.

MS. SAVORY: So it's, "8/17/14, entered a restricted sterile CP area in street clothes and a hairnet; manager working. And when asked why you were in this area, your response was that you came in to approve your timecard."

And then, "8/18/2014, instrument set return to manager by OR; incorrect labeling and no chemical indicator in the set; RJ documented as having prepared instrument on the count sheet.

"8/19/14, instrument set returned to manager by OR as indicators did not reflect set had been sterilized, yet sticker placed on set and load sheet indicated it had been. RJ documented as having prepared set and admitted via conversation on 8/20/2014 that you had put set in the load, as was indicated by the load sheet.

"8/21/14, count sheet and missing sticker for instrument set submitted to manager by OR, stating tray was missing a critical instrument required in the tray for open-heart cases. Investigation showed the missing item was sitting on the missing instrument table in CP to be replaced in the tray. Roxanne documented as

Page 40

having prepared the set. When asked if you looked for the missing instrument, you stated it wasn't in the open-heart cart and that you had not looked on the missing instrument table for it."

BY MR. HOLM:

Q. So my question, to go back, was, when you were consulting with Heather Franzel regarding Roxanna's termination, prior to completing this form, did Heather provide you with any evidence of those four allegations that your counsel just read to you?

A. At this point, I don't recall.

Q. Did the human resources department conduct any sort of investigation into those allegations?

A. I did not.

Q. Do you know if any of your department members did?

A. Not to my knowledge.

Q. Do you agree with the decision to terminate Roxanna?

A. Based on these, yes.

Q. What do you mean when you say, "based on these"?

A. The continued performance issues.

Q. Do you know what the reasons were for Roxanna's termination?

Page 41

A.  A pattern of behavior related to unacceptable performance in the quality of her work.

Q.  And are those solely based on Heather Franzel's reports to you?

A.  Correct.

Q.  Were you made aware that other employees have also entered the sterile CP area in street clothes and without hairnets?

MS. SAVORY:  Objection. Foundation.

BY MR. HOLM:

Q.  Have you been made aware of that?

A.  No.

Q.  Did you do anything to investigate that particular issue?

A.  Not specifically.

(Exhibit 26 marked)

BY MR. HOLM:

Q.  I've just handed you Deposition Exhibit 26. Can you tell me what this set of two documents is.

A.  So the first page is my cover page, again, related to the grievance from July 29th -- that was received on July 29th.

And it's -- the second page is the vice president's response to her grievance.

Q.  And that response was a denial of her

Page 42

grievance?

A.  Correct.

Q.  Why -- do you know why Roxanna was terminated a day before her grievance was decided?

A.  The grievance doesn't stop the expectation that leaders have to hold their staff accountable to work performance. It doesn't halt all of that.

Q.  But you said earlier that the termination was based, in part, on Roxanna's prior history of disciplining?

A.  Right.

Q.  At least some of which was still open and unresolved based on her grievance; correct?

A.  Correct.

Q.  So how can that particular discipline in July be relied upon to terminate Roxanna when it was still open and unresolved?

A.  The -- we continued through the grievance process. If the prior -- if the grievance would have been -- or the prior final written warning would have been overturned through the VP response, then that would have potentially affected the termination as well. Because at that point, then the final written reminder would have -- whatever -- I don't remember what she asked for -- final written warning be reduced

Page 43

to a verbal.

So the final written warning would have been decreased to something less than that, either a written or verbal or pulled off the table completely, which then would have affected this document, the termination document.

So if that would have happened, we would have gone back and reinstated Roxanne.

Q.  So BJ Gilmore didn't deny the grievance until the day after Roxanna was terminated; right?

A.  Based on the date of the letter, yes.

Q.  So at that point, when you sent Roxanna this letter at Exhibit 26, she was already terminated; right?

A.  Correct.

Q.  And you're saying that if BJ Gilmore had made a different decision and actually ruled in Roxanna's favor on August 28th, that St. Vincent Healthcare would have rehired Roxanna for that position?

A.  We would have reinstated her because the termination, then, would not have been that next step. The next step would have been something other than that.

Q.  Did you assume that BJ Gilmore was going to deny the grievance?

Page 44

A.  I did not.

Q.  Did you ever talk with BJ Gilmore about her decision?

A.  Not that I recall.

Q.  Who else, if anyone, consulted on the decision to fire Roxanna, besides yourself and Heather Franzel?

A.  Again, that's the manager's employee, so it's the manager's decision, consulting with human resources. I would -- usually the department director is aware. So that would have been David Dobson.

Q.  So the three of you -- you, David Dobson, and Heather Franzel -- all contributed to the decision to fire Roxanna; is that correct?

A.  Correct.

Q.  And nobody else contributed to that decision?

A.  No, not to my knowledge.

Q.  Did the three of you -- you, Heather, and David -- when discussing termination of Roxanna, consider the fact that she still had an outstanding grievance?

A.  I was aware that she had an outstanding grievance, yes.

Q.  But did you discuss it with Heather and David?

Page 45

A. I don't recall.

(Exhibit 27 marked)

BY MR. HOLM:

Q. I've handed you Deposition Exhibit 27. Do you know what this document is?

A. A grievance report from Roxanne.

Q. Dated September 5th, 2014?

A. Right.

Q. Have you -- you've seen this document before?

A. I believe I have.

Q. Do you know when you received this, when you first saw it?

A. Based on the date on the top of the document, September 5th.

Q. Is that your handwriting on the top?

A. It looks like it.

Q. Okay. What was your understanding of what Roxanna was grieving through this employee grievance report?

A. She is -- it's related to some of the things that are on her termination document.

Q. That's what she was grieving?

A. Based on her statement, yes.

Q. What was your understanding of what she wanted to have done with those things that were on her

Page 46

termination document?

A. She doesn't request a settlement.

Q. What was your understanding of her request?

MS. SAVORY: Asked and answered.

THE WITNESS: Do I answer that again?

MS. SAVORY: Yes. Sorry.

THE WITNESS: Again, she didn't request anything. What was -- she didn't request an outcome, what did she want to see as a result.

BY MR. HOLM:

Q. Did you consider, based on what she did write, what type of outcome she was requesting?

A. I could make an assumption.

Q. Based on what you received?

A. Uh-huh, sure.

Q. What's that assumption?

A. So the assumption could be that she's disputing one of the items on her termination document; she wants that removed. Or she wants her position back. Or she wants that removed to a final -- or reduced to a final written reminder. It could be a number of things.

Q. This was submitted approximately one week after Roxanna was terminated; right?

A. Okay.

Page 47

Q. Is that right?

A. It looks right, about.

Q. Approximately one week later?

A. Right.

Q. Okay. What did you do when you received this employee grievance report?

A. It's missing information, so I would have contacted Roxanne in some way to have some further dialogue.

Q. Did you call Roxanna?

A. I don't remember calling her. I thought I had sent her a letter. So we have that -- kind of that documentation.

Q. Let me bring up that letter.

(Exhibit 28 marked)

BY MR. HOLM:

Q. This is Exhibit 28. Is this the letter that you sent to Roxanna Jackson on September 12th, 2014?

A. It is.

Q. And you stated that you were unable to process the grievance because it was unclear from the paperwork she submitted what specifically she was grieving or what settlement she was desiring as an outcome?

A. Right.

Page 48

Q. You just clarified that you understand what she was grieving; correct?

MS. SAVORY: Objection. Misstates prior testimony.

You can answer.

THE WITNESS: I could make an assumption as to what she was grieving.

BY MR. HOLM:

Q. Well, when you looked at Exhibit 27, you read through it and told me what she was grieving, did you not?

A. Again, it appears that she's grieving something off of the termination document.

Q. Was it -- would it have been safe for you to assume that Roxanna disagreed with the reasons for her termination and didn't want to be terminated and that's what she was grieving?

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. Would it have been safe for you to assume that?

A. That is an assumption, correct.

Q. In your experience, would that have been a safe assumption based on the timing of her termination of approximately one week later, submitting a grievance

Page 49

that outlines her objections to several of the reasons for her termination?

A. Correct.

Q. So that would have been a safe assumption, in your experience?

A. Yes.

Q. But you did not make that assumption; is that right?

A. I don't want to assume.

Q. And so what you did do is you refused to process her grievance; is that right?

A. No. I -- the letter that was sent to her was asking for clarification, what specifically is she grieving and what is the settlement that she desires.

Q. Well, the letter says, "I am unable to process your grievance," which is true; right?

A. Correct.

Q. You did not process her grievance?

A. I did not forward her grievance.

Q. Okay. And you did not process it either; correct?

A. Other than sending her a letter asking for more clarification.

Q. Well, you say in the letter, "I am unable to process your grievance." And so I'm trying to ask you

Page 50

whether you did or did not process her grievance.

MS. SAVORY: Objection. Asked and answered.

MR. HOLM: Well, she hasn't answered.

THE WITNESS: Correct. I did not send the grievance forward.

BY MR. HOLM:

Q. So you did not process the grievance?

A. I did not -- correct. I did not send it forward. I did not forward it through the chain of command.

Q. So in addition to this letter on Exhibit 28, did you have any other communication with Roxanna regarding her September 5th, 2014, grievance?

A. No.

Q. Did you make any attempts to communicate with Roxanna, other than this letter at Exhibit 28?

A. She -- I recall that she had some conversation with Annette. And I recall asking Annette -- because Annette had shared with me she -- Roxanne had reached out to her. And I had asked Annette if she would -- that I had sent her this letter and asked if she was going to pursue her grievance. And Annette said she was -- I believe she said -- told me she was not.

Q. So Annette told you that she had communicated

Page 51

with Roxanna regarding this grievance?

A. I don't recall the exact conversation or her exact words. Annette was aware that she had submitted this grievance and did share with me, in follow-up to that, that Roxanne was not going to pursue the grievance, from my recollection.

Q. Did Annette tell you what Annette was basing that information on?

A. A conversation that she had with Roxanne.

Q. So Annette told you she had a conversation with Roxanna about this grievance?

A. What -- there was no detail.

Q. But did she say, "I had a conversation with Roxanna"?

A. I know she had a conversation with Roxanna. Yes, she told me that.

Q. That was my question.

A. Okay.

Q. Did she have more than one conversation with her?

A. I don't remember. I don't know.

Q. Did she say whether that was by phone or e-mail or in person?

A. No. I don't know that for sure.

Q. Were you in a meeting with Roxanna when she

Page 52

was informed that she was being terminated?

A. I was.

Q. Tell me what reasons were given to Roxanna for her termination during that meeting.

A. The reasons that were on her termination form and the continued errors.

Q. Prior to the termination form?

A. Based on the termination form.

Q. Based on all of the information contained on the termination form?

A. The pattern of behavior and these new things.

Q. When you say "pattern of behavior," you mean behavior before the termination form?

A. Correct.

Q. Were any other reasons given, besides those reasons?

A. Not to my recollection.

Q. Did Roxanna object to those reasons during that meeting?

A. Not that I remember.

Q. Did she agree with all the reasons?

A. I believe she was fairly quiet.

Q. So you don't recall whether she made any objections to any of the reasons that were given to her for her termination?

Page 53

A. I don't recall right off the top of my head, no.

Q. Are you aware that Roxanna Jackson submitted a claim for unemployment benefits?

A. Correct.

Q. Did you object to that?

A. No.

Q. To your knowledge, St. Vincent Healthcare did not object to Roxanna's claim for unemployment benefits?

A. We provide the documentation that the Unemployment Division requests, but, I mean, that's not our decision to make.

Q. Well, it's your decision to object to it or not; isn't that right?

A. Again, we're responding to requests that come from unemployment about a claim that an individual has filed and providing the documentation that they request. So...

Q. And you did respond to unemployment?

A. Correct.

Q. Okay. Were you the point person for St. Vincent Healthcare on that issue?

A. Right.

///

Page 54

(Exhibit 29 marked)

BY MR. HOLM:

Q. Handing you Deposition Exhibit 29. Did you write this document?

A. Right.

Q. That's your handwriting?

A. It is.

Q. And this was submitted to the state of Montana Unemployment Division?

A. Correct.

Q. Is this what you're referring to where the state of Montana's typed questions and then your written response is on behalf of St. Vincent Healthcare?

A. Right.

Q. I want to ask you about the last sentence that you wrote on here. You say, "Issues addressed were related to quality of work, not the speed at which the work was completed"; is that right?

A. Correct.

Q. Why did you include that on here?

A. This is page 2 of 2.

Q. Is that impacting your ability to answer my question?

A. Yeah. I don't know if there was

Page 55

additional -- some additional information that was part of this that would have caused me to make that -- write that.

MR. HOLM: Let's take a break, and I'll get that.

THE WITNESS: Okay.

(Recess taken 9:23 to 9:26 a.m., August 24, 2016)

(Exhibit 30 marked)

BY MR. HOLM:

Q. Okay. We're back on the record. I've just handed you Deposition Exhibit 30. And that should have the first and second page of correspondence from Montana Department of Labor and Industry and, on the second page, your handwritten responses; is that correct?

A. Correct.

Q. So my question was why you included your last handwritten sentence on page 2, stating that, "The issues addressed were related to quality of work, not the speed at which the work was completed."

A. I don't know, other than that had come up in conversation previously.

Q. With who?

A. It could have been part of the initial

Page 56

unemployment claim.

Q. Do you know?

A. I'm not positive, based on what I'm looking at.

Q. Do you recall the state of Montana asking you whether the complaints were based on the quality of Roxanna's work or the speed of her work?

A. I don't remember.

Q. Did you talk to anybody about that issue before you drafted this response to the state of Montana?

A. No, not that I remember.

Q. Did anybody else contribute any of this information that you provided to the state of Montana for unemployment?

A. Other than through the corrective action documents that are referenced on here and the information, no.

(Exhibit 31 marked)

BY MR. HOLM:

Q. I'm handing you Deposition Exhibit 31. Have you ever seen this document before?

A. Yes.

Q. What is this document?

A. It's a -- kind of a summary of times that it

Page 57

took -- or takes each individual to complete certain tasks.

Q. In the central processing?

A. Right.

Q. One of these employees would include Roxanna Jackson; is that right?

A. Correct.

Q. So somebody is timing the central processing employees as to how long it takes to perform certain job tasks?

A. Correct. To get a sense of how long it takes to do individual tasks.

Q. Do you know why that was important?

A. It's to help identify productivity.

Q. Anything else?

A. Manage the flow of work.

Q. Anything else?

A. Those would be the two main things, in my mind.

Q. Did you ever discuss this with Heather Franzel?

A. No.

Q. Did you discuss it with David Dobson?

A. No.

Q. How were you made aware of this?

Page 58

A. I -- it was one of the documents that I looked at when I was working with Emma yesterday.

Q. Was that the first time you'd seen this document?

A. It was the first time I'd actually seen the document.

Q. Was that the first time you were aware that St. Vincent Healthcare was having their central processing employees go through assembly time trials?

A. I was aware that they were assessing that or looking at that.

Q. When were you first made aware of that?

A. I don't recall.

Q. Was it before or after July 1st, 2013?

A. Again, I don't remember. I honestly don't remember.

Q. Do you know when this testing was performed that is displayed in Exhibit 31?

A. No. I don't see a date on the document.

Q. But do you know?

A. I don't.

Q. Is that -- on the bottom, is that referring to Roxanna, where it says Rox?

A. That would be my assumption, yes.

Q. Do you know who drafted this document?

Page 59

A. I don't.

(Exhibit 32 marked)

BY MR. HOLM:

Q. I've just handed you Exhibit 32. Do you know what this document is?

A. It looks similar to the previous document.

Q. Have you seen this document before?

A. Again, just yesterday.

Q. Do you know who this is -- strike that. This document also says "instrument assembly time trials" at the top.

A. Correct.

Q. And it also appears to show various instrument trays and the timing that it takes to assemble that particular tray; is that right?

A. That's what it looks like, yes.

Q. And do you know who is being timed in this document, Exhibit 32?

A. I do not.

Q. Do you know if during the retraining that you approved for Roxanna Jackson -- whether she was subjected to instrument assembly time trials?

A. My recollection is that was part of that process to help identify where she was less confident in her work, to help identify the areas of focus.

Page 60

Q. Couldn't she have just verbalized that?

A. I suppose she could have.

Q. So going back to my question. Were you aware, then, during this retraining that you approved for Roxanna, that she was being subjected to instrument assembly time trials during that retraining?

MS. SAVORY: Objection. Asked and answered.

THE WITNESS: I would say yes.

BY MR. HOLM:

Q. And from your perspective, what was the purpose of that?

A. Again, to help identify the areas that she -- she would need to focus on to help her be more comfortable in the work.

Q. So was it to identify areas that she was not as confident in so that she could focus more on the areas that she was confident in?

A. No.

Q. So would you agree with me, then, from your perspective, as somebody who approved this training and had knowledge of these time trials, that the speed at which Roxanna performed some of her job duties was an issue?

A. No, not specifically. It's only to identify where we would need to help her be more comfortable in

Page 61

the work that -- that's all it was used for, to my recollection.

Q. So that she could work in those areas quicker; is that right?

A. Sure.

Q. Why did you tell the state of Montana otherwise?

MS. SAVORY: Objection. Form.

THE WITNESS: It wasn't just -- it wasn't to say, "You need to work faster. You need to work faster." It was to help identify where those areas might be that we needed to help her be more comfortable in the work that she was doing, which, again, would certainly help to -- help her to focus on all of the areas that she needed to focus on.

BY MR. HOLM:

Q. So that she would work faster in those areas that she was not confident in; is that right?

A. I don't look at it that way.

MR. HOLM: No further questions.

MS. SAVORY: Let me take, like, a five-minute break.

(Recess taken 9:39 to 9:45 a.m., August 24, 2016)

///

Page 62

(Exhibit 33 marked)

CROSS-EXAMINATION

BY MS. SAVORY:

Q. Okay. We're back on the record. And I want to show you what's been marked as Deposition Exhibit 33. Is Deposition Exhibit 33 the complete fax that you received from the Department of Labor and Industry Unemployment Division?

A. It looks like it based on the date stamp up at the top, from the fax.

Q. Okay. And, Ms. Smith, based on your recollection of the discipline that Ms. Jackson received throughout the course of her employment, was she ever disciplined for the speed of her work?

A. No, not to my knowledge.

Q. Based on your knowledge, was Roxanna Jackson ever asked to perform her job faster?

A. I'm not aware of that either.

MS. SAVORY: Okay. No further questions.

THE REPORTER: Read and sign? Would you --

MS. SAVORY: Yes. We'll take a copy.

(Proceedings concluded at 9:24 a.m., August 24, 2016.)

Page 63

DEPONENT'S CERTIFICATE

I, KATHY SMITH, do hereby certify, under penalty of perjury, that I have read the foregoing transcript of my testimony consisting of 62 pages, taken on August 24, 2016, and that the same is, with any changes noted below, a full, true, and correct record of my deposition.

PAGE LINE    CORRECTION    REASON FOR CORRECTION

_____

Kathy Smith  Date

Page 64

CERTIFICATE

State of Montana
County of Yellowstone

I, Vonni R. Bray, RDR, CRR, freelance court reporter and notary public for the State of Montana, do hereby certify that I did report the foregoing deposition after having duly sworn KATHY SMITH.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 1st day of September, 2016.

_____