## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

------------------------------------------------

ROXANNA JACKSON,

      Plaintiff,

vs.             NO. CV-15-115-BLG-SPW

ST. VINCENT HEALTHCARE,

      Defendant.

------------------------------------------------

30(b)(6) DEPOSITION OF KATHY SMITH
9:52 a.m., Wednesday, August 24, 2016

Pursuant to notice, the deposition of KATHY SMITH was taken in behalf of Plaintiff in accordance with the applicable Federal Rules of Civil Procedure at the offices of Sather & Holm, PLLC, 2301 Montana Avenue, Suite 202, Billings, Montana, before Vonni R. Bray, Certified Realtime Reporter and Notary Public of the State of Montana.

## Page 2

APPEARANCES

FOR PLAINTIFF:

    Mr. Eric E. Holm
    Sather & Holm, PLLC
    2301 Montana Avenue, Suite 202
    P.O. Box 1115
    Billings, MT 59103
    Telephone: (406) 294-1700 Fax: (406) 794-0673
    E-mail: eric@satherandholm.com

FOR DEFENDANT:

    Ms. Emma L. Savory
    Husch Blackwell LLP
    1700 Lincoln Street, Suite 4700
    Denver, CO 80203
    Telephone: (303) 749-7267 Fax: (303) 749-7272
    E-mail: emma.savory@huschblackwell.com

## Page 3

INDEX TO WITNESSES

PAGE

KATHY SMITH

    Direct Examination by Mr. Holm .................4
    Deponent's Signature Page ....................37
    Reporter's Certificate ........................38

## Page 4

KATHY SMITH, having been first duly sworn, testified as follows:

MR. HOLM: Now is the time and place for the corporate deposition of St. Vincent Healthcare through its designated representative.

EXAMINATION

BY MR. HOLM:

Q. Will the witness please state her name for the record.

A. Kathleen Smith.

Q. Ms. Smith, you've been designated to be a representative of the defendant, St. Vincent Healthcare, for purposes of this deposition. Do you understand that?

A. I do.

Q. Okay. And do you understand that you will be testifying on behalf of the corporate entity, as if the company was -- you were speaking on its own behalf?

A. Correct.

Q. And have you been granted authority to speak on behalf of the corporation today?

A. I have.

Q. Okay. And just for the record, what is your current position with St. Vincent Healthcare?

A. I'm the director of human resources.



Page 5

Q. Okay. I'm going to be asking you some questions about the topics we disclosed in our notice of today's deposition. Have you reviewed those particular topics?

A. Yes.

Q. Okay. And are you the most knowledgeable about those topics and prepared to talk about those topics here today?

A. Yes.

Q. Okay. The first thing I want to ask you about is St. Vincent Healthcare's disability discrimination policies. Does St. Vincent Healthcare have disability discrimination policies?

A. We have an EEOC policy that we follow.

Q. Okay. Any other policies that deal with disability discrimination?

A. Not specifically a policy, no.

Q. How about procedures?

A. Sure.

Q. Okay. Are those documented in any written form, those policies -- I'm sorry -- those procedures?

A. Yeah, they're not documented -- detailed documented.

Q. Are they documented not in detail?

A. It's the way that we practice. They're not

Page 6

documented.

Q. Okay. When was the EEOC policy drafted?

A. Can I look?

MS. SAVORY: Yes. You can reference the documents.

THE WITNESS: So -- I'm sorry. What did you ask?

BY MR. HOLM:

Q. When was the policy drafted?

A. When was it drafted? Date of original says February of '91.

Q. When was it last revised?

A. This one says August of '12. I know it's been reviewed since then. So the most current document was reviewed in March of this year.

Q. March 2016?

A. Correct.

Q. Were revisions made at that time?

A. I don't believe so.

Q. How often is the policy reviewed?

A. It's reviewed every three years.

Q. Who reviews it?

A. Human resources.

Q. Was -- the EEOC policy, was that in effect at the time of 2013 and 2014?

Page 7

A. Right, it was.

Q. Okay. Were there any revisions made to the policy during those two years?

A. Not to my knowledge.

Q. Do you know -- you said it was reviewed in March of 2016. But do you remember -- or do you know when the EEOC policy was last revised?

A. I don't know when there were revisions made to it the last time, no.

Q. Are St. Vincent Healthcare employees trained with regard to disability discrimination?

A. Our leaders are trained through a number of different ways; through leadership orientation, through monthly leadership meetings, through quarterly leadership meetings as well, as far as what the human resource structure is and how we support our leaders and our staff.

Q. What does that mean as far as what the human resources structure is?

A. So our structure is with a business partner model where I have a group of departments that I support from an HR perspective. So whatever questions, concerns, issues that may come up, I'm their point of contact. Leaders are trained to contact their business partner with their questions, concerns, issues.

Page 8

Q. The business partners, are those human resource employees?

A. Yes.

Q. So each leader is assigned a particular business partner that they go to with questions or concerns about disability discrimination?

A. Correct.

Q. Tell me what the word "leaders" means?

A. Leaders would be in a supervisor role or higher; supervisor, manager, director, vice president.

Q. So would that include Heather Franzel's current position?

A. Yes.

Q. Okay. How about something like a lead instrument technician position? Are they considered a leader?

A. Not -- no.

Q. Okay. Tell me what disability discrimination training is done during leader orientation.

A. So leader orientation, again, goes through that model with the business partner. And any concerns, issues that come up related to if an employee comes to them and says, "I have a restriction," or there's -- they learn of some sort of discriminatory behavior that's going on in the department, they are

**Page 9**

instructed to consult with human resources. We do that through new leader orientation. We do that through trainings that we do, other trainings that we do.

Q. So essentially, if one of their employees provides notice that they have a disability or a restriction or if they request an accommodation, the leaders are instructed to present that issue to their business partner that's been assigned to them?

A. Right.

Q. Okay. Is there any other training as far as the nuts and bolts of the Americans with Disabilities Act or the accommodation procedure for an employee?

A. We are in the process of standardizing, across the system, some policies and practices related to that. But our practice has been, you know, up through this point, to work with human resources and engage in that interactive process to determine what steps we need to take.

Q. So human resources takes over that part of the process, the ADA process of -- strike that.

So the human resources department is the department that handles the actual procedure of when an employee makes an accommodation request or gives notice of a disability; is that correct?

A. Right. We're involved and keep the leader

**Page 10**

involved as well, and the employee.

Q. Okay. But the supervisor themself are not trained on the nuts and bolts of how to go through that procedure itself?

A. We are trained not to go through that procedure themselves. So correct.

Q. Okay. They're trained to do nothing with regard to that procedure except pass it off to their business partner?

A. Work with their business partner. I don't -- I wouldn't say "pass it off," because they don't pass it off and we take the ball and run with it. They are notifying us, keeping us informed, and we are working alongside them and probably more driving that process in coordination with the leader.

Q. How are they trained to do that during the orientation process?

A. It's the communication that we provide to them.

Q. Is that written or verbal?

A. It's verbal communication. There's PowerPoint slides that we go through.

Q. What does the PowerPoint slide show?

A. It talks about the HR business partner model. It -- it's probably more verbal communication than

**Page 11**

anything else.

Q. Is the business partner model limited to just disability discrimination?

A. No.

Q. What else does it include?

A. It's --

MS. SAVORY: I'm going to say objection. Outside of the scope of the --

BY MR. HOLM:

Q. Well, if you know, you can answer.

A. It's -- regardless of what concern or question you have, it's -- whether it's discrimination, harassment, benefits, compensation, employer relations, training, education, payroll, anything that's kind of HR related, workers' comp, safety, they are instructed and it's communicated to them to bring those things to the attention of their business partner.

Sometimes, depending on what it is, if it's work comp related, we get the work comp person involved. Anything related to that gets brought to the business partner.

Q. Who was the business partner for central processing?

A. I was.

Q. Okay. How long have you been that particular

**Page 12**

business partner?

A. There was a short transition in there in the middle. I would say 2013.

Q. Since 2013?

A. Consistently since then. And prior to that, there was a gap. And then I had them for a period of time before that as well.

Q. When you say, I was the business partner, and I was consistently the business partner, you're referring to Kathy Smith, the individual?

A. Right.

Q. Okay. The PowerPoint that you referenced, does that say anything about the Americans with Disabilities Act?

A. Briefly.

Q. What does it say?

A. It just references the -- these are things that -- laws that we have to be -- we have to consider when we have employees who are -- you know, if we have to work with an employee, related to restrictions, limitations, accommodations, requests, those kinds of things.

Q. Does it say anything else about it?

A. Not that I recall.

Q. Okay. Tell me about the monthly leadership

Page 13

meetings. Are there ever discussions about disability discrimination during those meetings?

A. There could be. It's not -- I would say it's consistent. But it just depends on what things are coming up and the topics that we need to cover on a specific month or the next month.

Q. So that topic has been covered in monthly meetings, but it's not covered every month?

A. Right.

Q. Okay. Would you say it's covered every year?

A. I don't know that I could say that.

Q. Okay. How about the quarterly leadership meeting? Same thing?

A. Uh-huh, correct.

Q. Okay. How does St. Vincent Healthcare ensure that its EEOC policy is being complied with by its employees?

A. Again, it's through communication to leaders. It's working with those concerns or issues that are presented to us to make sure that we're following the right -- you know, the best process to help the employee in their role.

Q. Are employees trained to be able to recognize when an accommodation has been requested?

A. Employees?

Page 14

Q. Yes.

A. I don't know that we specifically provide any training to staff-level employees.

Q. But other employees?

A. Leaders.

Q. Okay. How are leaders trained to recognize when an accommodation is requested?

A. So, again, it's through new leader orientation. It's some examples that can be provided. An employee presents you with a note from a provider that indicates there are limitations or restrictions. If it's someone that's returning from a leave of absence, there can be a number of different ways that that can be presented. And the instruction that those leaders are given are to work with your business partner on those things.

Q. To contact the business partner when they perceive that an accommodation has been requested?

A. Right.

Q. Okay. What did St. Vincent Healthcare do with regard to Roxanna Jackson to ensure that its EEOC policy was being complied with?

MS. SAVORY: Objection. Outside of the scope of the 30(6)(b) [sic] notice.

THE WITNESS: So am I answering? Or...

Page 15

BY MR. HOLM:

Q. Well, I asked you to be prepared today to be the most knowledgeable person to answer my questions regarding the topic of how St. Vincent Healthcare enforces its disability discrimination policies. Do you understand that?

A. Correct.

Q. And so I'm asking you about how it enforced its EEOC policy with regard to Roxanna Jackson. Do you have knowledge of that?

A. So, again, the information that was presented by -- that we got from her provider went through human resources, and we worked through that process with her to ensure that we weren't doing anything that would be discriminatory against her.

Q. Well, what did it do specifically when it received notice from Roxanna Jackson's healthcare provider that there may be some restrictions with regard to Roxanna?

A. So engaging in that interactive process with Roxanne and her leader to determine what we needed to do, what the next steps would be, what we needed to do going forward.

Q. How did St. Vincent Healthcare engage in the interactive process with Roxanna?

Page 16

A. So that was handled through Annette. She gets involved in those types of interactions as well.

Q. What did she do?

A. She was the main point of contact with Roxanne and her leader to work through that process with her.

Q. When you say "her leader," do you mean Roxanna's lead or Annette's leader?

A. Roxanne's leader, Heather.

Q. And what communications did Annette and Heather have with Roxanna in order to comply with the informal process?

A. So I can't speak to those directly.

Q. You don't know?

A. I can't speak to what those conversations were. I know that Annette had several conversations with Roxanne and Heather, but I can't speak to what those were.

Q. So you don't know what discussions were had in order to complete the informal process in response to the letter from Roxanna's healthcare providers regarding her restrictions; is that correct?

A. I don't --

MS. SAVORY: Objection. Outside of the scope of the 30(6)(b) notice.

Page 17

THE WITNESS: I don't -- I can't speak to the exact content of those conversations.

BY MR. HOLM:

Q. Is the informal process that you're describing part of St. Vincent Healthcare's EEOC policy?

A. It would be.

Q. Okay. But you don't know specifically how that portion of the EEOC policy was enforced with regard to Roxanna Jackson?

A. I know that -- what I do know is that Annette worked with Roxanna and with Heather on that process.

Q. Did St. Vincent Healthcare determine if Roxanna had a disability?

A. We did not make that -- I mean, that was not our decision.

Q. So St. Vincent Healthcare did not make that decision?

A. That comes from her provider. That would come from her provider.

Q. And in this case, did it come from her provider?

A. Her provider did provide us with a note that indicated she was special needs, which, again, came to HR, and we engaged that process of having that

Page 18

conversation with Roxanne and her leader.

Q. Was the purpose of that engagement of that process to determine whether Roxanna had a disability?

A. No. Again, that's not our decision to make. We're looking at what the request is that may need to be accommodated and how can we help work through that process to determine if or what type of accommodation would need to be made to allow her to continue in the same role or do we move her somewhere else.

Q. So in determining whether -- strike that.

So in determining what type of accommodations might be appropriate for Roxanna, did St. Vincent Healthcare consider what, if any, disabilities Roxanna had?

A. Only based on the information that we got from the provider.

Q. And St. Vincent Healthcare had nothing to dispute what was provided by the provider; right?

A. No.

Q. It didn't ask for additional clarification from the provider, did it?

MS. SAVORY: Objection. Outside of the scope of the 30(b)(6). I'm not sure -- the 30(b)(6) notice does not indicate that -- to prepare for specific enforcement with specific regard to Roxanna Jackson.

Page 19

So I think these questions are outside of the scope of the notice.

MR. HOLM: Well, the notice describes the topic of how St. Vincent Healthcare enforces its EEOC policies.

MS. SAVORY: Yes.

MR. HOLM: And you've described the process -- you've described that St. Vincent Healthcare does follow a process. And so I'm trying to figure out how you enforce that process with regard to Roxanna Jackson.

There were no objections made to the 30(b)(6) notice or any request for clarification regarding the topics. In fact, under Rule 30(b)(6), it allows the deponent to answer questions that are within his or her knowledge that he or she has been prepared to respond to, even if it is beyond the scope of the 30(b)(6) notice. And so I think that my questions are within the notice.

And even if they are not, the deponent is required to respond to them if he or she is so prepared to do so. So I guess the question is whether you're going to stop the deposition, and we can ask the judge to clarify that issue, or whether I can proceed. And if the deponent doesn't know the answer to my

Page 20

questions, then she can so state.

MS. SAVORY: Okay. We'll continue.

THE WITNESS: So can you ask the question, sir.

MR. HOLM: Read back my question.

(The record was read as requested.)

THE WITNESS: So I believe that we did in follow-up to Dr. Phillips and going through that evaluation to identify ways that -- what were those limitations, to identify how we could work with Roxanne.

BY MR. HOLM:

Q. Did St. Vincent Healthcare request any clarification from Dr. Phillips?

A. I don't know the answer to that.

Q. Did St. Vincent Healthcare request any clarifications from Dr. Gumm?

A. Again, I can't answer that.

Q. Why not?

A. Those -- Annette was working with Roxanna and those providers.

Q. Okay. But you're speaking on behalf of the corporation?

A. Right.

Q. Okay. And the corporation does not have any

Page 21

knowledge regarding those two questions?

A. The only way I can answer that is I know that Annette was working with those providers and Roxanne and her leader.

Q. Did St. Vincent Healthcare, in attempting to enforce its EEOC policy with regard to Roxanna Jackson, determine whether she was qualified for an accommodation?

A. I believe we did work through that process.

Q. And what was its decision?

A. Based on the information from Dr. Gumm, it was identified that she needed more -- there were different ways that she learned better. We provided that. We looked for other opportunities for her, as well, to continue -- allow her to continue her employment.

Q. So the two accommodations that St. Vincent determined Roxanna was qualified for were to be able to learn in different ways and to be able to seek out other job opportunities within the company. Is that what you're saying?

A. We followed the information from Dr. Gumm. And Annette had engaged Roxanne in conversation about are there other things that she has an interest in and would, you know, consider looking at, are there other

Page 22

jobs that she would want to do.

Q. But what were the two accommodations that St. Vincent Healthcare determined Roxanna was qualified for? Were they to be able to learn differently and to be able to look for other opportunities within the company?

A. Right.

Q. Were there any others?

A. I don't recall.

MS. SAVORY: And you can reference the documents if you need to.

BY MR. HOLM:

Q. Did St. Vincent Healthcare ever make a determination as to what accommodations were actually being requested by or on behalf of Roxanna?

A. I don't believe she requested accommodation. That came through her provider.

Q. Right. And that's why I said "by or on behalf of Roxanne."

A. So can you ask the question again.

Q. Did St. Vincent Healthcare ever determine what accommodations were being requested by or on behalf of Roxanna Jackson?

A. Yes, through that interactive process.

Q. Okay. And through the interactive process,

Page 23

what accommodations did it identify were being requested for Roxanna?

A. One was, based on Dr. Gumm's report, that she might learn best by having things demonstrated to her rather than explained to her orally. Might also need to have more repetition. So that retraining process was put in place. And then looking for other opportunities that she may have an interest in.

Q. Any others?

A. I don't think so.

Q. Did St. Vincent Healthcare ever make a determination as to whether Roxanna could perform the essential functions of her job duties?

A. Yes, through that retraining process and her demonstration that she was able to perform the functions of the role.

Q. Okay. So it's St. Vincent's position that Roxanna, after the retraining, was able to --

MS. SAVORY: Objection. This calls for a legal conclusion.

Can we go off the record and speak about this?

MR. HOLM: Sure.

(Discussion held off the record.)

MS. SAVORY: Back on the record. I'm going

Page 24

to make a standing objection that all -- the questions regarding Roxanna Jackson are outside of the 30(b)(6) notice scope.

And then back to Mr. Holm's last question, objection that it calls for a legal conclusion.

MR. HOLM: Okay. And I'll allow the standing objection. I disagree with the objection. But we'll reserve that for later. Okay.

BY MR. HOLM:

Q. So going back to my question. Did St. Vincent Healthcare determine that after Roxanna's retraining, she could perform the essential functions of her position?

A. Yes.

Q. Okay. How about before the retraining?

A. I would say yes, she had been doing the work.

Q. Did St. Vincent Healthcare consider restructuring Roxanna's position to allow her to perform all of her job duties?

A. That was a brief conversation I had with Heather. And the conversation and the decision was that she could not, kind of, segregate one component of the work flow. Just based on the work that needed to get done and individuals could be there by themselves -- so needed to know how to perform in all

Page 25

of the different areas within the department.

Q. When was that discussion?

A. I don't recall exactly.

Q. Okay. I want to ask you about Roxanna Jackson's salary, wages, and benefits earned at St. Vincent Healthcare.

A. Okay.

Q. And to speed up the process, I'm going to hand you a portion of Defendant's discovery responses and kind of go through that with you. I'm not going to mark it as an exhibit. But what I provided you with is our Interrogatory No. 7 and St. Vincent's answer to that interrogatory, which talks about bonuses and increases in pay.

Do you see that?

A. Uh-huh, I do.

Q. Okay. So this answer to Interrogatory 7 lists what Roxanna's hourly rate was going back to 2009. Do you see that in the first couple of sentences?

A. I do.

Q. Okay. So at the time of her discharge, she was earning 16.22 an hour; is that right?

A. Yes. That's what's stated in there.

Q. Okay. And that's correct, to your knowledge?

Page 26

A. To my knowledge, yes.

Q. Okay. And do you know how many hours per week Roxanna worked?

A. She was a full-time employee, so that is generally 40 hours a week that they're scheduled.

Q. So the hourly rate increases that are shown from 2009 until her termination, were those merit based, or were they cost of living based? How were those rates determined?

A. They would have been merit based.

Q. Okay. Tell me how that process works.

A. We do annual performance evaluations on each employee. And hourly pay rates will adjust based on the overall score of the performance evaluation and how that relates to where their rate of pay falls within the pay range for the position they work in.

Q. Okay. Are they also cost of living increases?

A. We don't do cost of living increases. There may be market adjustments.

Q. What's that for?

A. So through an analysis of pay in the market for a similar position, does the market indicate that our pay ranges need to be adjusted? It might be up. It could be down. Generally, if the pay range is

Page 27

adjusted up, the employee will experience an increase in their rate of pay based on the moving of that pay range for the position.

Q. Were there any market adjustments between 2009 and 2014 for Roxanna?

A. I believe there were, but I'd have to look.

Q. So is it safe to say that if Roxanna had continued to work at St. Vincent Healthcare and had continued to score well enough on her annual reviews, she would have received additional pay raises?

A. Pay raise, or if she was at the max -- if her pay rate was at the max of the range, her rate wouldn't move, but she would be eligible for a lump sum bonus equivalent to what that raise would have been.

Q. Was Roxanna at the max of her range at the time she was terminated?

A. I don't recall that. Just by looking at this, I can't tell. I'd have to look specifically.

Q. Okay. In the Response to Interrogatory No. 7, it does state that in 2009, Roxanna received a longevity bonus of $54.40. What's that for?

A. So that would be based on -- her rate of pay at the time was at the -- based on the amount of the longevity bonus, her merit increase took her up to the maximum of the pay range for the position. And then

Page 28

there was a little bit of a difference left, so that difference was paid out in the sum of that longevity bonus.

Q. So she was at the max of her pay range in 2009?

A. It looks to me like she was brought up to the maximum at that point in time.

Q. And then maybe the range increased after that?

A. It could have.

Q. Okay. And what about in 2012? Roxanna received a lump sum bonus of $456.19. Do you know what that was for?

A. Probably a similar scenario.

Q. Okay. How do you determine what the merit-based pay increases are?

A. It's a percentage depending on the score on the performance evaluation.

Q. So the actual numerical score on the evaluation factors in to what your increase is?

A. Correct.

Q. Okay. So it would depend year to year based on what your actual numerical score was?

A. Right.

Q. Okay. Did Roxanna receive any other bonuses