**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

--------------------------------------------------------

ROXANNA JACKSON,

        Plaintiff,

vs.           NO. CV-15-115-BLG-SPW

ST. VINCENT HEALTHCARE,

        Defendant.

_____

DEPOSITION OF DAVID DOBSON
8:23 a.m., Thursday, August 25, 2016

Pursuant to notice, the deposition of DAVID DOBSON was taken in behalf of Plaintiff in accordance with the applicable Federal Rules of Civil Procedure at the offices of Sather & Holm, PLLC, 2301 Montana Avenue, Suite 202, Billings, Montana, before Vonni R. Bray, Certified Realtime Reporter and Notary Public of the State of Montana.

**Page 2**

APPEARANCES

FOR PLAINTIFF:
    Mr. Eric E. Holm
    Sather & Holm, PLLC
    2301 Montana Avenue, Suite 202
    P.O. Box 1115
    Billings, MT 59103
    Telephone: (406) 294-1700 Fax: (406) 794-0673
    E-mail: eric@satherandholm.com

FOR DEFENDANT:
    Ms. Emma L. Savory
    Husch Blackwell LLP
    1700 Lincoln Street, Suite 4700
    Denver, CO 80203
    Telephone: (303) 749-7267 Fax: (303) 749-7272
    E-mail: emma.savory@huschblackwell.com

**Page 3**

INDEX TO WITNESSES

                  PAGE

DAVID DOBSON
    Direct Examination by Mr. Holm .................4
    Deponent's Signature Page ....................55
    Reporter's Certificate .......................56

EXHIBITS

EXHIBIT        DESCRIPTION        PAGE

2      October 16, 2013, Letter from Dr. .......30
        Phillips

5      October 10, 2013, Corrective ............14
        Action Form for Roxanna Jackson

**Page 4**

DAVID DOBSON, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HOLM:

Q. Can you go ahead and state your full name for the record.

A. David Paul Dobson.

Q. Have you ever had a deposition taken before?

A. Yes.

Q. Okay. State who your current employer is.

A. St. Vincent Healthcare.

Q. Okay. How long have you worked for St. Vincent Healthcare?

A. It will be four years in September.

Q. Okay. What's your current job title?

A. Director of surgical, procedural, and support services.

Q. Have you held that job title the whole time you've been there?

A. No.

Q. Okay.

A. It's grown over the course of the time.

Q. Okay. Tell me the progression of your job titles.



Page 5

A. Sure. I came in as the director of material management. Then I became the director of the OR. And then it went from there to surgical, procedural, and support services. So director of materials was about a year, and then the others has been progressive. I can't remember the exact timing.

Q. So the other two, over the course of the last, approximately --

A. Three years, yes.

Q. Okay. One thing I'll just remind you, since we have a court reporter typing down everything, you'll have to wait until I'm completely finished asking my question before you start to answer. Even though you'll know a lot of times where I'm going with my question, you'll have to wait until I'm completely finished. Okay?

A. Sure.

Q. And I'll do the same for you. I'll wait until you're completely done.

Okay. Tell me what your job duties were as director of material management.

A. I oversaw the receiving and distribution of supplies coming into and out of the hospital, from vendors, different distribution providers, things of that nature, and then all material movement within the

Page 6

hospital, from the warehouse to the various departments.

Q. Did you have any supervisory authority in that role?

A. Yes.

Q. How many employees did you supervise?

A. Approximately 15.

Q. Did you work closely with central processing at that time?

A. No.

Q. Okay. Did you have any dealings with central processing?

A. Yes. They were a customer to the warehouse.

Q. Okay.

A. Distribution.

Q. So some of the materials that would come into the hospital would have to be distributed to central processing?

A. Yes.

Q. Okay. Did you have any authority or input on policies and procedures of central processing when you were director of materials management?

A. No.

Q. Okay. And that -- you held that role until approximately September 2013?

Page 7

A. Yes, sir.

Q. Tell me what your job duties were as OR director.

A. I have director -- excuse me. I have responsibilities for all of the surgical procedures that are done within the hospital. So in -- and all the staff that supports that, as well as the majority of the service departments that support the OR, which sterile processing, patient transport, and several other departments are a part of that.

Q. Did you say central processing?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Okay. So central processing was one department amongst several other departments that you would oversee as part of your duties?

A. Correct.

Q. Okay. And I assume you had supervisory roles in that position as well?

A. Correct.

Q. Approximately how many employees did you supervise as OR director?

A. As OR director, there's 72 people within that department. That number fluctuates with volume. But

Page 8

72 is approximately at this time.

Q. And that includes the central processing department?

A. No.

Q. Okay.

A. That's just the OR.

Q. Okay.

A. So the sterile processing department is approximately about 14.

Q. Okay. What other departments besides -- are you calling it "sterile processing"?

A. I call it "sterile processing." They're interchangeable within the hospital based on your date of employment. Really, you would call it multiple names. But "sterile processing" or "central processing" are interchangeable.

Q. Okay. So what other departments besides central processing or sterile processing did you oversee as OR director?

A. I have anesthesia. I have the OR. I have GI. I have OR scheduling. I have surgery plus, which is basically preadmission to the OR; PACU, which is recovery. All of those are part of that.

Q. Okay. Since Roxanna Jackson was an employee of central or sterile processing, I'm going to be more

Page 9

focusing on that particular department as opposed to some of the other departments that you may have overseen.

A. Uh-huh.

Q. Okay?

A. Understood.

Q. Okay. As part of your role as director of the OR, did you have any control or input over policies and procedures in central processing?

A. Okay.

Q. Okay. Explain how that worked.

A. So the manager, Heather Franzel, is the technical expert as it relates to that. But policies and procedures that would affect that department and/or the OR were reviewed with me and -- basically to seek clarification, make sure that the implementation of said policies wouldn't have an interruption on cases, et cetera.

Q. Were you Heather Franzel's immediate supervisor?

A. Yes.

Q. Okay. Did you have the final say, then, in policies and procedures that she would implement in central processing?

A. If it wasn't an AAMI or national standard,

Page 10

yes. We are expected to follow joint commission and those. And so those policies are a given for us. But outside of national standards, then yes.

Q. Okay. So you were director of OR at the time of Roxanna Jackson's termination in August of 2014; is that right?

A. Yes.

Q. Okay. So you didn't start your current position until after Roxanna Jackson had left?

A. Which I had -- you asked about the cadence of my times. The sterile processing came to me before the OR title came to me. So I started September. The sterile processing came into my role as materials management approximately December, January after I came on board.

Q. Okay.

A. So I had sterile processing before I had the OR.

Q. Okay. So you had oversight duties over central processing from approximately December of 2013 or January of 2014 and thereafter?

A. Uh-huh, yes.

Q. Okay.

A. And that's remained to this date.

Q. Okay. So even though you have changed your

Page 11

job title a couple of times during that whole time that I just mentioned, you have overseen central processing?

A. Yes.

Q. Okay. Did you play any role in the discipline of -- I'll focus on the instrument technicians in central processing.

A. I have been involved in some of those corrective actions and/or disciplinary actions with some of the associates. Heather was a new leader at the time. So my role was to help mentor her with that. And so I sat in on some of those.

Q. Okay. When you say she was a "new leader," what time frame are you talking about?

A. She got promoted as I came into having a responsibility for sterile processing.

Q. Okay. Did you play any role in her promotion to that position?

A. Yes.

Q. Okay. Tell me who all had input into that role.

A. Myself --

Q. Into that decision. Sorry.

A. Sure. Myself, the former director of the OR, and there was staff -- there's a process. There's staff interviews, recommendations, and then the leaders

Page 12

interview and take those recommendations and make a decision. So I didn't participate in the staff ones but obviously took their recommendations and worked with the other director, and we made a decision from that.

Q. Do you recall approximately when Heather was promoted into the head of central processing?

A. It was very close to my coming into the -- coming into having responsibility for sterile processing. So around the December time frame, I believe.

Q. 2013?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Okay. So you said that you did play some role in some of the discipline or corrective action -- corrective actions against central processing employees. How did -- how was that determination made as to whether you would be involved or not?

A. The potential for corrective action was reviewed with me by the manager. And this is not just Heather specific. But this would be managers that I have responsibility for.

And if it was -- for example, attendance is

Page 13

much more black and white and straightforward. You're either there or you weren't. And so they would handle those after review. If it was something more than that, I would be involved with that. It was a discretionary type of decision based on the circumstance.

Q. Tell me what role you played, if any, with regard to Roxanna Jackson and her discipline from 2013 through 2014.

A. Initially, as I recall, I was involved in on one of her early verbal corrective actions to help Heather with the process around that. And then subsequently, if directive action for any associate, including Roxanne, would have been done, I would have reviewed that information prior.

Q. Did you provide any input as to what discipline would be levied against Roxanne?

A. I would have basically agreed with any recommendations at that time. So as I recall, for the verbal, given the nature of the incident, yes, I said, "This should be a verbal."

Q. Did you support all of Heather's recommendations with regard to Roxanna Jackson's discipline in 2013 and 2014?

A. Yes.

Page 14

Q. Did you raise any objections to those?

A. No objections. There was points to clarify as things were brought forward. My request for clarification was met, and we went forward.

(Exhibit 5 identified)

BY MR. HOLM:

Q. I've just handed you what we've marked as Deposition Exhibit 5. And this is a corrective action form from October 10th, 2013, for Roxanna Jackson. Do you see that?

A. Yes, I do.

Q. Have you seen this before?

A. Yes, I have.

Q. Okay. You're mentioned a couple times throughout here, so I want to ask some specifics about your recollection. If you go to the middle of the page, under paragraph one of the block of text, it states that -- it references a July of 2013 meeting with materials management director and the central processing manager.

At that time, July 24th, 2013, were you the materials manager -- I mean director?

A. Yes.

Q. Okay. So that's referencing you?

A. Yes.

Page 15

Q. And the central processing manager, that references Heather Franzel?

A. Yes.

Q. Okay. So you were part of a meeting on July 24th, 2013?

A. Yes.

Q. Okay. With Roxanna?

A. Yes.

Q. Okay. At that meeting, did you have a conversation from a high, medium, and low perspective of productivity in the central processing department to establish expectations?

A. Yes.

Q. Tell me what that means, what you discussed.

A. There's a process that we use that guides us on helping associates to understand their performance level and expectations given the context of high, medium, and low. There's prescribed context for that. And we review those questions and those statements with the associate and give them an assessment of where we see their performance in relation to that.

Q. When you say there are assigned levels of productivity, is this a written guideline that you're referring to?

A. I didn't say in regards to productivity.

Page 16

There's -- the high, medium and low are performance indicators. Productivity is an element of that. But it doesn't -- it's not the nature of the form. It encompasses other things.

Q. Exhibit 5 says that you had a conversation about high, medium, and low perspectives of productivity. Is that true?

A. That's true. That's an element, as I mentioned earlier.

Q. Okay. So this doesn't include any of the other elements of production; only productivity; correct?

A. That statement references that one element; that's correct.

Q. Okay. And what does productivity mean, to you?

A. Productivity is a measure of units of service that's provided to a department and/or an organization and how the hours of work that we use stack up against that -- there's credit given for work to be performed. And it's a measure of how we use the hours that are given to us through the associates to achieve that work.

Q. So either to get more work done in the same amount of time or get the same amount of work done in a

Page 21

A. No. I mean Roxanne.

Q. Okay. What level was -- what level of productivity was Roxanna performing at at that time?

A. So there were -- to say a level -- there was concerns about her ability to meet the needs of the role as related both to productivity and quality. But productivity was the concern at that time. I remember some about she was not as efficient.

And we were looking for ways and opportunities both from Heather's insight as well as seeking to get information from Roxanne about her thoughts around that. To say that there's a standard or a scale, there's not one, per se, that I can give you a numerical score or anything like that on.

Q. Could you put her in a category of high, medium, or low productivity?

A. From the high, medium, and low, I would say she was closer to the low on certain tasks at that time.

Q. And the concern with that was that you wanted Roxanna to perform more on a medium or high level of productivity?

A. Our goal is always to try and get someone to one level up, at a minimum. And so, yes, to get to a medium. High would not have been the goal. It would

Page 22

have been to transition, for those tasks of concern, to medium.

Q. Okay. So that's what was discussed at this meeting with Roxanna?

A. Uh-huh. Uh-huh.

Q. Yes?

A. Yes.

Q. Okay. Tell me why you were present at this meeting.

A. Excuse me. It was tied to the fact that Heather was a newer leader. And I felt it appropriate for me to sit in on this one to help her with the process.

Q. Did you provide any input during the meeting?

A. As I recall, I provided some input as we went through the document. I don't remember the specifics. But I recall having some input from the document, yes.

Q. Did you have any follow-ups with Roxanna Jackson following this October 10th, 2013, meeting?

A. I don't remember any specific follow-up that I had with her.

Q. Okay. At any time after this October 10th, 2013, meeting, did you have any follow-ups with Heather Franzel about Roxanna's productivity?

A. We had discussions about the department

Page 23

performance. And any concerns about whether it be any of the other indicators, quality or others, would have been discussed. At that time, specific to Roxanne, only as things progressed through other corrective actions do I recall having those discussions.

MS. SAVORY: Can we take a quick break to grab a Kleenex?

MR. HOLM: Yes. Sorry. Here's some right here.

MS. SAVORY: Sorry about that.

(Discussion held off the record.)

MR. HOLM: Okay. Back on the record.

MS. SAVORY: Thank you.

BY MR. HOLM:

Q. Do you recall any specific discussions or communications with Heather Franzel about Roxanna Jackson's productivity following the October 10th, 2013, meeting?

A. To her specific productivity, I do not.

Q. Okay. Do you recall any communications with Heather Franzel regarding Roxanna Jackson's job performance following this October 2013 meeting?

A. Yes, I do. And that was as things progressed through the corrective action process, we had other discussions tied to those.

Page 24

Q. What role did you play in that corrective action process that you just mentioned?

A. So in the corrective action process, the manager -- managers are expected to bring back any information to me for us to review together. And a decision is made whether or not there is enough information to proceed. And so at those points, I would have had those discussions.

Q. Do you recall what you discussed with Heather Franzel?

A. No. Nothing specific.

Q. Were you ever made aware, during that process, that accommodations had been requested on behalf of Roxanna Jackson for a perceived disability?

A. I became aware -- and I can't remember the exact date -- that Roxanna had a belief in regards to a disability. I can't remember the exact date, but that was from her.

Q. From who?

A. From Roxanne.

Q. Okay. Was it from Roxanna or from her doctors?

A. From Roxanna initially.

Q. Okay. Do you recall how you learned about that?

Page 25

A. It was in a discussion. And, again, I don't remember the exact discussion. But she made reference to having -- I don't want to say the word "disability," but it was a concern, an issue with a learning disability in that nature. I can't remember the exact wording that she used.

Q. Was that before or after this October 10, 2013, meeting?

A. I'm not for sure. But I believe it was after.

Q. Okay. Was this conversation with you and Roxanna directly?

A. As I recall, Roxanna and me were there. I believe Heather was, but I couldn't state that for a fact.

Q. Do you understand that at one point, Roxanna Jackson underwent some retraining for her job?

A. Yes.

Q. Okay. Do you recall if this conversation that you just talked about with Roxanna was before or after that retraining?

A. Before.

Q. Okay. Do you remember how many weeks or months or years before that?

A. Not years. I would recall more months than

Page 26

years.

Q. What did you do after that conversation with regard to the concern about a possible disability?

A. I reviewed her file to see if there was anything documented in regards to that, from a physician, or anything that would give, you know, documented, clinical proof -- clinical recommendations on what to do.

Q. Did you find anything?

A. There was none.

Q. Okay. Did you find any letters from any of her doctors that in any way referenced a disability?

A. No.

Q. Did you do anything else to further investigate this potential disability?

A. I escalated that to HR and made them aware.

Q. Who did you talk to?

A. Kathy Smith.

Q. And do you recall when that was that you spoke with Kathy Smith?

A. Prior to the retraining, but, no, I don't remember the exact date.

Q. Did you have any follow-up discussions with Roxanna about a potential disability?

A. No.

Page 27

Q. Did you have any follow-up discussions with anybody about whether Roxanna had a disability or any accommodations that she was requesting?

A. I discussed it with HR and asked them for advice on how we would -- you know, what we needed to do from a next-step perspective. But that type of information is not something that I would discuss with others outside of HR and Heather, as the department manager. Those would have been the only folks involved.

Q. Okay. So did you have conversations or communications with either HR or Heather after you made Kathy Smith aware of this conversation with Roxanna?

A. So -- yes. I made sure that I followed up with HR, what is -- you know, what do we need to do to basically address and to understand, from a clinical perspective, if there are real issues and/or disabilities, et cetera. So I did have those discussions with them, with Kathy.

Q. Do you recall what Kathy told you?

A. There was a decision made to have an assessment of Roxanna and basically to get the clinical input from that assessment to give us a definition of what we needed to do.

Q. Did you play any role in the decision to

Page 28

implement this psychological assessment?

A. Yes.

Q. Tell me what your input was.

A. There was a discussion about what we should do and what would be the course of action to take. And it was to -- this was one of the elements about having a clinical assessment done of her -- I don't remember that the word "psychological" was used, but a clinical assessment of her -- to validate if there really was a disability or not. And I supported that.

Q. Okay. So you supported the decision to have this assessment performed?

A. Yes, sir.

Q. Okay. Did you play any role in evaluating that assessment after it was done?

A. No.

Q. Have you ever seen the results of that assessment?

A. I have not seen anything official tied to that assessment through that process.

Q. Were you made aware of what the results were of that assessment?

A. I was made aware of, I want to say, certain aspects. I don't know the full report.

So I was -- it was discussed with me that

Page 29

there was a learning disability and that there were opportunities around how she was trained or how she could be trained that would help improve, you know, that situation, and help improve -- there was things that we could do to help in communication with her in regards to the output of that assessment. So less oral, as an example, looking for other ways by which to teach.

Q. Did you play any role in developing or implementing a plan for Roxanna after her retraining?

A. I provided oversight and some input with timing and things of that nature. But not directly tied to content, no.

Q. Okay. Who did you rely on for that?

A. Heather and Amanda. Specifically Heather, as the manager for the department.

Q. Okay. Were you ever made aware of any correspondence from Roxanna's treating medical provider named Dr. Phillips?

A. So I -- was I aware of correspondence between the doctor and the hospital?

Q. Yes.

A. I was aware that there was correspondence, yes.

Q. Okay. And what was your understanding of

Page 30

what that correspondence was?

A. There was results of an assessment --

Q. Let me just stop you right there because I probably confused you.

The psychological assessment was done by a Dr. Gumm.

A. Okay.

Q. So that's not the doctor I was referring to.

A. Okay.

Q. Roxanna had a treating provider named Dr. Phillips. And I'm wondering if you were ever made aware of any correspondence from Dr. Phillips to St. Vincent Healthcare regarding Roxanna and a potential disability or restrictions.

A. I was aware of a physician contacted the hospital. But to remember what name for what item, no.

Q. All right. Did you ever see that correspondence?

A. I have seen an initial letter document, I'll say, from a physician to the hospital related to Roxanna, but I can't remember the exact details.

(Exhibit 2 identified)

BY MR. HOLM:

Q. I'll show you Exhibit 2 right here.

A. Uh-huh.

Page 31

Q. And this is the October 16th, 2013, letter from Dr. Phillips. Is that the letter that you may have seen before?

A. I believe this was the letter I've seen before.

Q. Okay. Did you have any discussions with Kathy Smith about the comments or recommendations by Dr. Phillips in this letter?

A. Yes.

Q. Okay. Tell me about those discussions.

A. The discussions were tied to -- this didn't give us anything definitive by way that we could help to address specifically what learning needs there were. This is generic in that respect.

So basically, how can I take this and do something with it? I need more information. I need a better understanding. That would have been the source of that conversation.

Q. During that conversation or subsequent conversations with Kathy, did you discuss the possibility of requesting additional information from Dr. Phillips?

A. There was a request -- basically, I said that we needed additional information to be able to understand what we needed to do to help with this

Page 32

situation. So to say specifically of Dr. Phillips or how that would go, no. But to say that I needed more to be able to effectively do -- or to make any changes as needed or to decide if that was needed, yes.

Q. Did you ever have any discussions with Heather Franzel about possibly allowing Roxanna Jackson to have more time to accomplish certain tasks in her job?

A. I don't recall any specific discussions around that.

Q. Based on your understanding of central processing and an instrument tech's job duties, would that have been possible to allow Roxanna Jackson additional time to perform certain tasks?

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. You can go ahead and answer.

A. So my understanding of an instrument tech's role is somewhat limited to the specific task that they do. So to -- as we demonstrated as we went through the training process, we were open to giving additional time, and we did so as we went through that retraining process.

Prior to that, I can't speak, you know, to a specific incident where that was said. But we showed

Page 33

proof of that later.

Q. You allowed Roxanna to have additional time to perform her job duties.

A. To learn the job duties, to become validated on those, yes. To allow additional time for her for her job duties, I don't specifically recall having that discussion, no.

Q. After the psychological assessment, did you have any discussions with Heather Franzel about whether or not Roxanna could focus more on specific job tasks that she felt more confident in versus tasks that she did not feel confident in?

A. We did have that discussion, yes.

Q. And tell me about that.

A. So to clarify, I don't know before or after the assessment. So to the time frame, I can't speak to. But we did have discussions.

The discussions centered around the role of an instrument tech and the expectations of an instrument tech and what this would mean to that.

To explain, part of the role of an instrument tech is an expectation that you will take call. And so call is we don't have staff there at the site, but you're on call, you're in -- ready, in cue, in case there is a case or instrumentation that comes down.

Page 34

You have to know all of the instrumentation. You have to know how to do all of the tasks in that because that could be an urgent or emergent need for a specific case within the OR.

And if we allow her or anyone to do a specific job and not keep their skills up in all areas, that would be at the detriment of patient safety and the hospital, would put the hospital at risk. And so that was not something that we were willing to do for her or anyone else at that time.

Q. Were you aware that Roxanna Jackson had been an instrument tech for over 35 years at this point?

A. Yes.

Q. And was it your understanding that she -- well, strike that.

Did -- were you aware that since 2006, that she had no changes to her job description?

A. I was not aware of the exact timing, no.

Q. Since the time that you started overseeing central processing, did you play any role in changing the instrument technician's job description?

A. I've reviewed the instrument tech job descriptions with Heather on a couple of different occasions. The exact changes, I can't speak to. But we were looking at different options around certified,

Page 35

noncertified techs, really a method to grow associates and give them a chance to be recognized by the hospital. That was the nature of those reviews.

Q. Okay. And my question was more specific. Were any changes made to the job description during that time?

A. I don't recall of any being made during that time. That's not to say that there wasn't. I don't recall any.

Q. Okay. Did you play any role in the decision to terminate Roxanna?

A. Yes.

Q. Tell me what your role was.

A. The information and the progression of the corrective actions were presented to me. I was aware of the quality concerns, both as a customer of those being over the OR and the concerns that those caused as well as having responsibility for that site -- or that department. Excuse me.

And as a result of the progression of those, the repeated nature of those, we made a decision that ultimately, after the retraining, the validation of that training and her abilities to do that but yet the subsequent issue with that, that termination was the best course of action at that time.

Page 36

Q. Okay. So who else besides you contributed to the decision to terminate Roxanna?

A. Heather Franzel, Kathy Smith. Amanda was -- and provided input with that.

Q. She was not a decision-maker?

A. No.

Q. Okay.

A. But she provided input. But...

Q. Anyone else?

A. Those were the main ones that come to mind.

MR. HOLM: Can we take a short break.

(Recess taken 9:08 to 9:17 a.m., August 25, 2016)

MR. HOLM: We're back on the record.

BY MR. HOLM:

Q. Mr. Dobson, do you have any experience or training in what's called organizational change management?

A. Yes.

Q. Tell me what the change management or change leadership is.

A. So it's the process by which you introduce change to an organization and to the individuals within that organization. The desire is to have those changes accepted, I'll say adhered to, and have continuity with

**Page 37**

that moving forward. It would be a macro definition, in my mind.

Q. What is your experience in change management? Or have you undergone training, or how did you first learn about that?

MS. SAVORY: Objection. Form.

BY MR. HOLM:

Q. How did you first learn about change management?

A. I've worked in companies outside of healthcare. And in some of our projects, it was brought up as a methodology and practice by which to engage the associates to basically achieve some of the things I mentioned in my definition. There was classes at those sites for that. I can't recall the specific ones to be specific to your question.

Q. Okay. Is this a methodology that you've employed in your positions in the past?

A. I've employed elements of it that I think were appropriate in the departments and areas of responsibility I've had, yes.

Q. Okay. Have you used these particular strategies in the healthcare field?

A. Yes.

Q. Okay. How about at St. Vincent Healthcare?

**Page 38**

A. Yes.

Q. Tell me what type of change management principles you've applied to St. Vincent Healthcare.

A. Not specific to sterile processing but within the OR, we have been had opportunities with scheduling to make changes and improvements involving -- we've brought in the workforce to help us with defining that, to take a look at the opportunities, to become part of that process both in design as well as communication and training for that. That would be an example.

Have -- get the buy-in of the staff and then use their knowledge and their passion for that with the rest of the staff, as an example.

Q. Okay. You said opportunities. What opportunities are you referencing?

A. The scheduling.

Q. Okay.

A. So do you have too many people at a time when you have -- don't have enough cases? Is your staffing misproportioned to the volume of work coming through? That's a tricky one because we don't know when people are going to get sick. And so how do you do that in a responsible manner?

I'm not a nurse. And so you engage them for their clinical insight and experience to help you with

**Page 39**

developing that process. That would be an example.

Q. Okay. Have you ever -- have you employed any change management principles or methodologies that have impacted the central processing at St. Vincent Healthcare?

A. Yes.

Q. Tell me about that.

A. We have a -- we had to do some remodeling within the sterile processing. And the remodeling was particularly cumbersome for us because we had to maintain current operations, provide certain levels of containment. So the work had to happen on one side of the wall, as an example, to do the remodeling, but then the work to support the OR had to happen on the other side. So it disrupted processes, their normal walk paths, things through that nature.

So we engaged them in that process to say, "While the work has to be done, we need your input how we can best build the processes in this short-term state to support the goals and needs of the hospital and our patients." That would be an example at work.

Q. Any others?

A. I know whenever we did the training plan, I canvassed Heather and Amanda and the development of that one as well. That would be the only other one.

**Page 40**

Q. Explain that again.

A. So as we developed the training plan and the updates to the training plan which we put into place, I canvassed input from the two of them, both as leaders as well as folks who are trained in those processes. So I got the benefit of both; somebody who can do the job and the tasks within sterile processing as well as the leaders that are involved with that as well. So I engaged them with how we could do that and improve that.

Q. So did you develop a training plan for central processing?

A. They developed the training plan. I charged them with that responsibility. But it would incorporate the same principles from a change management process of involving staff and getting input from those who are the most knowledgeable.

Q. What was the goal of the training plan that you charged?

A. Basically to improve the method by which we delivered the training and having validation of that training and the competencies expected to -- you know, as an outcome of that.

Q. So what was the expected result of this improved training program?

Page 41

A. It was to basically give us more options as far as how to better explain. Different -- the charge that I gave them is that a lot of what we were doing was very oral, very "I tell you; basically, you do it."

It was to look for other options as far as how we could do that, whether it be pictures or -- you know, there's I train and validate at incremental steps. It wasn't prescribed by me how to do it but to look at other options than the traditional way that we had taught to do that.

Q. And the reason that you set in motion this charge to create a new training program, is that because you wanted to have the employees perform better in their jobs?

A. The expectation was -- is that we would have higher quality, first and foremost, and that we would have better efficiencies within the department and efficiencies from the perspective of standardization and things of that nature as well.

Q. Were the efficiency levels of central processing at a level that you saw an opportunity for improvement?

A. Their sterile processing and other departments always have opportunities to improve. So there were opportunities, I believe, for improvement.

Page 42

If you look at specifically to -- for example, quality. Any time that we have a quality issue, you have to double handle that.

It went up. You invested in it. It was wrong. It comes back. You have to redo it and then resubmit it. That can cause delays of patient care, et cetera. So just in that alone, we could see improved efficiencies by addressing those.

Q. Do you have any experience or training? Something called lean management?

A. Yes.

Q. Tell me what lean management is, l-e-a-n.

A. Lean management comes from -- its foundations are largely around the Toyota production system, so the car company. And it focuses on continuous improvement, typically of an incremental nature. It looks at -- with -- to establish a standard. The standard then serves as a baseline for improvement. Again, at a very macro level.

Q. And what types of things are you measuring and hoping to improve upon through lean management principles?

A. You're looking at the overall business and operations of it, typical metrics, safety, quality, delivery costs.

Page 43

Q. The company's bottom line, would that factor into the costs?

A. It -- the bottom line would factor into that cost to customer, et cetera.

Q. Tell me how you first learned about lean management principles.

A. I started my career with Toyota. I worked for Toyota for nine and a half years.

Q. Is that a theory or a methodology that they taught at Toyota?

A. Yes. The Toyota production system, again, of which lean is built on and which basically any book that you look at that always refers back to them. And it was an expectation of each of us as employees to learn, to understand, and to use those practices to improve the organization.

Q. Is one of those principles of lean management improved efficiency?

A. It is an outcome that sometimes is a focus. But it is typically not where you start from.

Q. It's where you hope to end?

A. It is an outcome -- it's not the singular goal. It's not. If you look at safety as -- at the bottom -- excuse me, at the very base element, one of the key things that we look at, if it's unsafe, you're

Page 44

going to be more worried about your personal safety than you are the efficiency or the task that's at hand. So fix the core areas, and then the others will follow.

Q. Okay. So safety is a goal of lean management principle?

A. Absolutely.

Q. Okay. And efficiency is also a goal?

A. Efficiency is an outcome. It is not necessarily a goal. It's not why you do lean, but it is an outcome that comes from that, yes.

Q. And it's something that you expect to be an outcome?

A. Not always. Again, for example, it may be that there's a quality issue. It may be that there's a safety issue. And that's the expected outcome. That's what you're driving towards. So it is not every time you do something lean, that efficiency will be and is the singular focus of that activity. No, that's not the case.

Q. Okay. How about reduction and waste?

A. Yes.

Q. Is that --

A. Yeah, waste elimination is one of the tenants of that.

Q. Okay. So efficiency, would that also be a

Page 45

tenant?

A. No.

Q. Okay.

A. Not in my mind or in the application as I was taught.

Q. Okay. So reduction of waste is a tenant of lean management principles?

A. That is correct.

Q. Okay. You stated that you first were instructed on lean management principles at Toyota production; right?

A. At Toyota Motor Manufacturing, that's correct.

Q. Okay. Have you ever employed lean management principles or methodologies at any of your other places of employment since Toyota?

A. Yes.

Q. Okay. How about in the healthcare field?

A. Yes.

Q. Okay. So lean management principles can be applied to the healthcare field?

A. Absolutely.

Q. Okay. Did you implement any of those principles at St. Vincent Healthcare?

A. Yes.

Page 46

Q. Okay. Tell me how you did that, specifically with regard to central processing.

A. So one of the tasks, one of the projects that we did, was around our communication boards. And communication boards basically -- what's the standard? What's the expectation? And so how do you know if you've had a good day, et cetera?

There -- we went through and defined safety, quality, delivery cost metrics for the department. And that's been on an annual basis, we review those. We set those goals. And then we identify opportunities through and with the staff on how we can improve those goals.

That was one of the projects that we did.

Q. Any other methodologies of lean management that you employed that had any impact on central processing?

A. We looked at elements of kanban or basically inventory management, so how we manage our par levels within that environment, which then impacts the amount of inventory you have on hand, confusion, dollars associated, et cetera. We've done things with that.

We've looked at standardization, which, again, is a key component of lean as we look at products, vendors, things of that nature. Those are a

Page 47

couple of examples I can think of.

Q. Any others you can think of?

A. Visual management, how we identify, you know, the areas where work is to be performed and things of that nature. I can think of that one. We looked at, from a problem solving perspective, how we would begin -- and this is one that's in process. It's not done -- but how we derive the facts, do the investigation to address issues as they are presented. So that's another element that I can think of.

Q. Did you ever analyze staff salaries in the central processing to determine if that was an opportunity for reduction of expenses?

A. We have looked at salaries within the department. Not as a means of reduction, no. What we wanted to do was to take a look at it from a market perspective and make sure. Turnover within any business is of concern. And so what we wanted to do was make sure that from a market perspective, that we were in line with that and wouldn't have any risk from a salary perspective.

Q. What were your findings after that analysis?

A. At this point, it's the -- the market assessments that we've received back showed that we're in line, from a pay perspective, with the market. And

Page 48

so no changes, other than hospital-based across the board types of raises, have been done.

Q. Your market analysis, was that based on average rate of pay amongst all your central processing staff members?

A. So I don't know exactly how the market analysis is done. HR does that for us through their vendors, I'll say, for lack of a better word. But we look at -- there's a range for the jobs, so a low end and high end. And that range is compared across the markets, and whoever they have that participates in it, we get the feedback. Are we -- you know, are we in line or not? And we -- the answer has been that we are.

Q. You said safety was a major tenant of lean management principles; right?

A. Yes.

Q. With regard to the job duties of an instrument technician, is it important to harbor and maintain an error-free workplace in that particular job duty?

A. Absolutely.

Q. Okay. Do you know what Six Sigma is?

A. Yes.

Q. Tell me what that is.

Page 49

A. It's an improvement philosophy started by -- largely with Motorola. It has certification bands, different belts that go along with it. But it's got aspects of types who design the process of -- it's much more project oriented, uses mainly the same principles as lean.

But its implementation through defined experts make it somewhat unique and, I would say, more use at a macro project, large scale, infinite variable, you know, types of a situation. But at its core, it's trying to do many of the same things lean does.

Q. What's the overarching goal of the Six Sigma philosophy?

A. The overarching goal is to improve the performance of the entity, department, whatever the area of focus is. It's to make things better.

Q. And that could mean any number of things?

A. Absolutely. It's based on the need. It's, you know, what's the need of the department. If you're having a lot of people getting injured, that becomes the focus of the project. If you're having quality issues, that becomes the focus. It doesn't come in saying, you know, "You will do this, this, and this." It's what's the need, assess the need, define a plan, implement the plan.

Page 50

Q. Did you ever implement Six Sigma principles at St. Vincent Healthcare?

A. I would say my background incorporates both. And so they overlap with me. So I did not -- I have not specifically implemented Six Sigma. I've implemented lean and Six Sigma practices and standards, tools, et cetera, as we discussed earlier. But they have aspects of those. And you'll hear it referred to as "lean Sigma" or "lean Six Sigma." More and more the industry and combining those.

Q. So when you said, at the beginning of your answer, that you have implemented both, I just wanted to clarify that you meant both lean principles and Six Sigma principles?

A. That is correct.

Q. Okay. Are these approaches, change management, lean management and Six Sigma, things that you'd say you specialize in?

A. Yes.

Q. Okay. I want to go back in time a little bit from the job that you had right before you moved to St. Vincent Healthcare.

A. Okay.

Q. Tell me where you worked there.

A. I was at St. Joseph Health System. So I

Page 51

worked there as a -- for a couple years within that health system.

Q. Where is that located?

A. Their headquarters -- they've been -- they're now part of another health system. But they were, at that point in time, in Orange, California. That was their headquarters. They had hospitals in both Texas and California.

Q. Where were you located?

A. I had responsibility for hospitals both in Texas and California. I lived in Texas, supported a hospital in another city within Texas and a hospital within California.

Q. How long did you work there?

A. A little over two years.

Q. Okay. How about before St. Joseph? What did you did before that?

A. I was -- I worked for Freescale Semiconductor out of Austin, Texas.

Q. What was your job title there?

A. It was a lean manager.

Q. Lean manager, meaning you worked in lean management principles?

A. Yes. For different sites all across the globe for them.

Page 52

Q. Okay. Where were you located at?

A. Austin, Texas.

Q. Okay. What did you do before Freescale?

A. Before Freescale, I worked for Terex Corporation.

Q. How do you spell Terex?

A. T-e-r-e-x.

Q. What did you do there?

A. I was responsible for operations and their specific version of lean for that entity.

Q. Where did you work out of?

A. Oklahoma City.

Q. Let's go back to Freestyle. How long did you work for Freestyle Semiconductor?

A. It was, I think, like, two years, three months, in that ballpark.

Q. How about Terex? How long did you work there?

A. A little over two years.

Q. How about before Terex? What did you do?

A. I was -- I worked for E-Z-GO, golf cart manufacturing.

Q. And what was your role with them?

A. I was the director of operations.

Q. How long did you work there?

Page 53

A. I want to say about two and a half, two years.

Q. Where were you located there?

A. Augusta, Georgia.

Q. And how about before E-Z-GO? Where did you work?

A. General Motors.

Q. What was your title?

A. That's a ways back. So I was a transmission sector lean manager.

Q. Out of where?

A. Out of Pontiac, Michigan.

Q. How long did you work there?

A. Six and a half years.

Q. And before GM?

A. Toyota.

Q. And you may have said this earlier, but what was -- what did you do for Toyota?

A. I was -- my role was a group leader. So it's a member of the management team. I did new program launches and ran operations.

Q. Where were you located?

A. Georgetown, Kentucky.

Q. How long did you work there?

A. A little over nine years.

Page 54

Q. Where did you go for college?

A. Baker College out of Flint, Michigan.

Q. Did you receive a degree?

A. Yes. I have my masters, MBA from Baker.

Q. Okay. Both undergrad and MBA from Baker?

A. Yes.

Q. What was your undergrad?

A. Business.

MR. HOLM: Those are all the questions I have for you.

THE WITNESS: Okay.

MS. SAVORY: I do not have any questions.

(Proceedings concluded at 9:43 a.m., August 25, 2016.)

Page 55

DEPONENT'S CERTIFICATE

I, DAVID DOBSON, do hereby certify, under penalty of perjury, that I have read the foregoing transcript of my testimony consisting of 54 pages, taken on August 25, 2016, and that the same is, with any changes noted below, a full, true, and correct record of my deposition.

PAGE LINE    CORRECTION    REASON FOR CORRECTION

_____

David Dobson  Date

Page 56

CERTIFICATE

State of Montana
County of Yellowstone

I, Vonni R. Bray, RDR, CRR, freelance court reporter and notary public for the State of Montana, do hereby certify that I did report the foregoing deposition after having duly sworn DAVID DOBSON.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 6th day of September, 2016.

_____