IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

RECEIVED

FEB 2 4 2017

CLERK, U.S. DISTRICT COURT
DISTRICT OF MONTANA
BILLINGS, MONTANA

| | |
|---|---|
| ROXANNA JACKSON, | CV 15-115-BLG-SPW |
| Plaintiff, | |
| vs. | OPINION AND ORDER |
| ST. VINCENT HEALTHCARE, | |
| Defendant. | |

Plaintiff Roxanna Jackson filed this action against her former employer, St. Vincent Healthcare, for disability discrimination, age discrimination, retaliation, and wrongful discharge. (Doc. 1-1). Now pending is St. Vincent's motion for summary judgment on all of Jackson's claims. (Doc. 16). As discussed below, genuine issues of material fact exist respecting some of the remaining claims. Accordingly, the Court grants St. Vincent's motion in part and denies it in part.

## I. Statement of Facts

Roxanna Jackson has had speech and learning disabilities her entire life. (*Jackson Depo.*, Doc. 19-1 at 51:19-22; *Douglas Jackson Depo.*, Doc. 19-5 at 66:19-20). She went through high school under a special needs program and received her education under a special needs diploma. (*Id.* at 66:2267:2). She

1

attended a YMCA/YWCA special needs training program to learn self-care skills. (*Id.*).

In the mid-1970s, she graduated from high school and applied to St. Vincent Healthcare for a job in central processing ("CP"). (*Jackson Depo.*, Doc. 19-1, 14:25-15:3). Although Jackson had special needs, her cousin knew St. Vincent's director and explained Jackson's situation. (*Douglas Jackson Depo.,* Doc. 19-5, 65:23-67:25). St. Vincent hired Jackson as a CP aide. (*Jackson Depo.*, Doc. 19-1, 23:9-10). Jackson delivered sterile trays, linens, and machines throughout the hospital. (*Id.*at 19:12-21). She washed and sterilized dirty instruments, wrapped them, and occasionally filled carts with items for delivery. (*Id.* at 19:12-20:5). Although other aides were trained to do more, Jackson was initially limited to these duties because of her disability. (*Id.* at 23:18-18).

Six years into her employment, Jackson asked to become a CP tech so that she could make more money. (*Id.* at 21:17-22:1). CP tech duties included disassembling carts, sterilizing equipment and instruments, wrapping clean supplies and instruments, maintaining records for all instruments, transporting sterilized items, instrument assembly, checking instruments for cleanliness and impairments, checking power equipment, reporting and documenting missing instruments, maintaining instrument coding systems, inventorying equipment status, back orders, and changes and communicating the status to staff, and making

sure that all emergency, trauma, and add-on cases are picked and sent to the operating room in a timely manner. (Doc. 19-12). Techs were required to be capable of performing all aspects of the job in the event they had to work a weekend alone. (*Jackson Depo.*, Doc. 19-1 at 37:15-38:6). Jackson had previously learned and completed all the other tasks as an aide and was knowledgeable in them, so all she needed was training in completing the instrument sets, which she received. (*Id.* at 25:14-25).

During her tenure as a tech, Jackson was open with her co-workers about the fact that she had a disability and she experienced various accommodations. For example, although she could perform all of the duties required to be a tech, (*id.* at 104:22-23; *Hoffman Depo.*, Doc. 19-3 at 21:9-16), her manager, Diane Larson, did not typically have her work with the instruments because of her disability. (*Jackson Depo.*, Doc. 19-1 at 26:6-10, 26:20-22). Also, Larson and the evening head tech, David Wilcox, would switch Jackson out of instruments to another task if the instrument area was busy or if Jackson did not have a helper. (*Id.* at 99:14-24; 96:25-97:3). From the time she was promoted in 2006, Jackson worked successfully as a tech; she was never subjected to any discipline whatsoever until 2013. (*Smith Depo.*, Doc. 19-7 at 12:15-24; 29:10-19).

In 2013, David Dobson became the director of OR, surgical, procedural, and support services, which included oversight of CP. (*Dobson Depo.*, Doc. 19-9 at

4:16-5:9; 7:4-18; 8:10-16). As director, Dobson had control over policies and procedures in CP and he played a role in the discipline of the CP techs. (*Id.* at 9:22-10:3; 11:4-11; 14:7-25). After meeting Dobson, Jackson told him that she had special needs. (*Jackson Depo.*, Doc. 19-1 at 49:13-50:12). He told her he had worked with people with special needs before. (*Id.* at 50:13-15). Dobson promoted Jackson's co-worker, Heather Franzel, to be the CP department manager. (*Id.* at 9:19-21; *Franzel Depo.*, Doc. 19-6 at 13:22-14:1). Franzel had also worked with Jackson since 2007, and knew she had a disability. (*Id.* at 15:19-16:4; *Jackson Depo.*, Doc. 19-1 at 155:24-156:7).

Not long after Franzel became Jackson's manager, Franzel told Jackson that she was "going too slow on the instruments." (*Jackson Depo.*, Doc. 19-1 at 30:1-9). Periodic time trials were implemented to measure the amount of time it took employees to put instrument trays together. (*Smith 30(b)(6) Depo.,* Doc. 19-8 at 58:7-11). According to CP supervisor Amanda Mordhorst, the sole purpose of the time trials was to determine how long employees were taking to complete instrument trays. (*Mordhorst Depo.*, Doc. 19-2 at 26:4-7). These trials were not typical procedure in the CP department. (*Franzel Depo.*, Doc. 19-6 at 53:2-19). Through the trials, Franzel learned how long it took Jackson to complete her instrument trays. (*Id.* at 54:20-55:13). She contacted Human Resources Manager

Annette Hoffman with concerns about the time it took Jackson to process different types of instrument trays. (*Hoffman Depo.*, Doc. 19-3. at 12:8-15).

Hoffman, Franzel, Mordhorst, and Human Resources business partner Melissa Young met with Jackson and discussed the time Jackson took to complete instrument sets and advised her of the needs of the job and expectations. (*Id.* at 13:3-11). They discussed retraining with Jackson as a means to meet their expectations. (*Id.* at 13:8-11). They did not talk about her disability or any restrictions Jackson had. (*Id.* at 13:25-14:5). On July 24, 2013, Dobson and Franzel met again with Jackson and discussed "high, medium, and low perspectives of Productivity in the Central Processing Department to establish expectations." (Doc. 16-8, ¶ 1; Doc. 19-21). Franzel wanted Jackson to improve her instrument assembly time. (*Franzel Depo.* Doc. 19-6 at 47:24-48:1).

On October 10, 2013, Jackson received her first disciplinary notice or "correction action form" regarding her work. (*Id.;* Doc. 16-8; Doc. 19-21). Specifically, Jackson was advised that "[t]he request to improve your technical skills to be able to maintain the instrumentation area has not been met" and that changes in her "productivity skills" had not occurred. (Doc. 16-8 at ¶ 2). The form also stated, "we asked that if you needed assistance to make us aware and we would provide the training and a means of measure to improve on. To date, there has been only one request to the lead tech and none to [Franzel]. As a result, you

5

have either (sic) not taken on the tasks that would require you to improve your performance." (*Id.*). The form was signed by Franzel and St. Vincent's Human Resources Director Kathy Smith. (Doc. 19-21).

Jackson needed additional time to complete the instrument trays, so she provided Franzel and Dobson a letter dated October 16, 2013, from her doctor, William Phillips, DO. (*Jackson Depo.* Doc. 19-1 at 57:11-17; Doc. 16-9). In his letter, Dr. Phillips stated that Jackson was special needs and thus required additional time "to learn and perform certain tasks." (Doc. 16-9). He also advised that Jackson was a diabetic with a heart condition and asked that her employer take that into consideration when performing job evaluations. (*Id.*). Despite the fact that she thought Dr. Phillip's' letter was "vague," Franzel did not ask for further clarification, nor did she discuss the letter with Jackson, or find out from Jackson what disability or restrictions she might have. (*Franzel Depo.*, Doc. 19-6 at 32:6-20, 33;8-12, 34:21-23). In fact, Franzel never discussed Jackson's disability with her or any restrictions she had. (*Jackson Depo.* Doc. 19-1 at 33:8-13).

After receiving Dr. Phillips' letter, Dobson advised human resources of Jackson's potential disability and arranged for a clinical assessment to validate if Jackson did indeed have a disability. (*Dobson Depo.* 27:21-28:13). Jackson was referred to David R. Gumm, Ph.D., a St. Vincent employee, for a psychological evaluation on November 14, 2013. (Doc. 19-14). Dr. Gumm found that Jackson

6

"functioned in the borderline range of intellectual abilities." (*Id.* at 3). He noted that she was experiencing work-related stress due to a new manager who was not patient with her, she had relative strength in nonverbal abilities, and she was not confident in her skills regarding sterilization of instruments. (*Id.* at 4). He suggested that she "might learn best by having things demonstrated to her rather than explained to her orally" and she could benefit from "more repetition" than the typical employee. (*Id.*). He also suggested that Jackson be allowed to "perform some areas of her job that she has more confidence in," and that a third party mediator could be helpful to assist her in communicating with her manager. (*Id.*).

In response to Dr. Gumm's evaluation, St. Vincent appointed Hoffman to be Jackson's mediator to ensure effective communication between Jackson and Franzel. (*Jackson Depo.,* Doc. 19-1 at 61:20-62:3). St. Vincent also interpreted Dr. Gumm's remaining suggestions as three accommodation requests on Jackson's behalf: that she have things demonstrated to her rather than explained orally, that she be provided with more repetition, and that they explore "other opportunities that she may have an interest in." (*Smith 30(b)(6) Depo.*, Doc. 19-8 at 22:21-23:10).

After receiving Dr. Gumm's evaluation, Dobson and Franzel never discussed the possibility of allowing Jackson more time to accomplish certain tasks in her job. (*Dobson Depo.,* Doc. 19-9 at 32:5-10) Instead, they placed Jackson

into retraining for six weeks, despite the fact that the human resources manager had determined that Jackson could perform the essential functions of her position, and that neither Dr. Phillips nor Dr. Gumm suggested retraining was necessary. (*Smith 30(b)(6) Depo.*, Doc. 19-8 at 23:11-16; *Smith Depo.*, Doc. 19-7 at 26:15-22; 26:23-27:2).

Jackson underwent retraining from January 20, 2014 to February 28, 2014 with CP Supervisor Amanda Mordhorst. (*Franzel Depo.*, Doc. 19-6 at 39:8-9; Doc. 19-21). According to Franzel, the point of Jackson's retraining was to reteach her the instrument tasks so that she could eliminate mistakes and improve her instrument assembly times. (*Id.* at 57:21-58:1). Jackson was required to complete more assembly time trials to "help identify where she was less confident in her work," "[s]o that she could work in those areas quicker." (*Smith Depo.* Doc. 19-7 at 59:23-25; 61:19-61:5). During retraining, Dobson and Franzel told Jackson that she was going too slowly. (*Jackson Depo.*, Doc. 19-1 at 82:12-13).

Nevertheless, Jackson did well in retraining. (*Mordhurst Depo.* Doc. 19-2 at 24:17-25:1). She demonstrated that she was competent in the instrument area. (*Id.* at 32:18-19). She felt comfortable with and knew how to complete the instrument trays during the retraining program. (*Id.* at 79:10-12). After the retraining, Jackson felt more comfortable with the instrument trays because she learned a better way to put the instruments on the trays. (*Id.* at 81:14-15). Nevertheless,

Jackson expressed concerns to Hoffman that she was still being asked to work too fast. (*Hoffman Depo.*, Doc. 19-3 at 21:19-21).

In March 2014, after Jackson had completed the retraining, she received her 2013 performance review. (*Franzel Depo.*, Doc. 19-6 at 45:23-25; Doc. 19-35). In the evaluation, Franzel noted that Jackson was "strong in the decontamination and sterilization areas of the department . . . very familiar with the SR instrumentation and a great source of knowledge [but] we would like to see [Jackson] improve . . . her instrument assembly times." (*Id.* at 46:15-47:8; Doc. 19-35). Despite noting that she was still struggling with instrument assembly times, none of Jackson's supervisors considered restructuring her position or altering her job duties in any way. (*Mordhorst Depo.*, Doc. 19-2 at 41:23-42:7).

On April 9, 2014, Jackson received a "verbal coaching" regarding her training and performance. (Doc. 19-21). On April 16, 2014, Dr. Phillips wrote a second letter to St. Vincent on Jackson's behalf. (Doc. 19-15). Specifically, he stated that Jackson "felt she is being mistreated and harassed as she does her best with her physical limitations to meet the demands of her supervisor. She typically goes home in tears and is not getting the support that she needs to continue to provide diligent, faithful services in her capacity." (*Id.*). Dr. Phillips closed his letter requesting St. Vincent help Jackson "to get the support that she needs." (*Id.*).

Beginning a little over a month later, Jackson started receiving write-ups regarding her performance approximately every few weeks. (Doc. 19-21). On June 25, 2014, she received a write up for mislabeling instruments. (Doc. 19-18). On July 16, 2014, she received a write-up for not listening to her supervisor. (Doc. 19-19). On July 28, 2014, she received another write-up for mislabeling an instrument. (Doc. 19-20). On July 30, 2014, Jackson developed a Performance Improvement Plan indicating that she would use reference materials, double-check labeling and ask questions if she had them. (Doc. 19-23 at 3).

Sometime in early August, Jackson brought up transferring out of CP to a different department with Hoffman. (Doc. 19-1 at 122:25-123:24). She discussed it with Hoffman a few times and Hoffman thought it was a good idea. (*Id.*). Hoffman set up an opportunity for Jackson to job shadow in food services. (*Id.* at 124:14-17). Jackson enjoyed the job shadowing and expressed interest in moving to the cafeteria. (*Id.*). According to Jackson, Smith and Hoffman advised her she would need to wait until the opening was posted. (*Id.*). According to Hoffman, Jackson stated she was not interested in a kitchen position. (*Hoffman Depo.*, Doc. 19-3 at 37:1-13). Jackson expressed interest in a housekeeping position but Hoffman told Jackson no and that she would not like it. (*Id.* at 124:7-10).

On August 27, 2014, Jackson was terminated. (Doc. 19-21). On her termination form, in addition to listing the instances throughout June and July,

additional performance issues were cited: August 17, 2014, she entered a restricted sterile area in street clothes; August 17, 2014, she failed to put an indicator inside one of the instrument bags to show it had been sterilized, August 19, 2014, she failed to place her card in the tray indicating who completed the tray, and August 21, 2014, she failed to include a sterilized instrument on the correct tray. (*Id.*).

Dobson, Smith and Franzel participated in Jackson's termination decision. (*Smith Depo.* Doc. 19-7 at 44:12-17; *Franzel Depo.* Doc. 19-6 at 59:6-11). According to Smith, Jackson was fired for "perceived mistakes in the quality of her work." (*Id.* at 24:10-22). Franzel told Jackson she was being terminated because her "work was too slow." (*Jackson Depo.*, Doc. 19-1 at 157:22-158:5). Although there were open and available positions at St. Vincent for which Jackson was qualified, other job positions were not discussed with Jackson during her termination. (*Id.* at 109:22-110, 122:23-123:2; *Hoffman Depo.* Doc. 19-3 at 35:21-23). Allowing Jackson more time to accomplish certain tasks in her job was also not discussed. (*Dobson Depo.* Doc. 19-9 at 32:5-9).

Jackson submitted a grievance to Smith on September 5, 2014, with respect to her termination. (Doc. 19-24). In it, she objected to each of the reasons provided for her termination. (*Id.*). Smith responded that she could not process the report because it was unclear what was being grieved. (*Id.* at 4). Smith invited Jackson to refile her grievance by September 22, 2014. (*Id.*). Jackson did not re-

submit any grievance materials by September 22, 2014, and Smith advised her on the same day that Jackson's grievance was closed. (*Id.* at 5).

Jackson filed her charge with the Equal Employment Opportunity Commission (EEOC) and the Montana Human Rights Bureau (MHRB) on October 6, 2014. (Doc. 16-16). In it, she alleged that St. Vincent discriminated against her because of her age and/or disability on August 27, 2014, when it terminated her employment. (*Id.*) She did not address retaliation. (*See* Doc. 16-16).

On April 13, 2015, Jackson's counsel advised MHRB investigator, Meg Bennett, that Jackson planned on pursuing a retaliation claim. (Doc. 19-4 at ¶ 2). On May 8, 2015, Bennett pointed out that Jackson's charge did not include a retaliation claim. (*Id.* at 4). While Jackson's counsel urged Bennett to "update her records if necessary," Bennett explained to Jackson's counsel that she had no prior request to amend the Charging Party's complaint to include retaliation. (*Id.* at 11). She also explained that when a Charging Party amended a charge late in the HRB's investigation, the MHRB did not generally consider the new allegations. (*Id.*). The MHRB issued its decision a week later on May 14, 2015. (Doc. 16-17). The Human Rights Commission upheld the MHRB's decision on September 22, 2015. (Doc. 16-18). Neither opinion addressed a retaliation claim. (*Id.;* Doc. 16-17))

Jackson filed her Complaint in Montana Thirteenth Judicial District Court on

October 14, 2015. (Doc. 1-1 at 2). St. Vincent removed the case to this court on November 10, 2015.

## II. Legal Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 130, 150 (2000); *Anderson,* 477 U.S. at 249-50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson,* 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.,* 504 F.3d 1017, 1020–21 (9th Cir. 2007).

## III.   Discussion

### A.   Jackson's Retaliation Claim

St. Vincent first argues that Jackson failed to exhaust her administrative remedies with respect to her retaliation claim. Jackson argues that she amended her Charge of Discrimination ("charge") to include a retaliation claim and by so doing, exhausted her remedy on that claim.

To establish subject matter jurisdiction over her retaliation claim, Jackson must have exhausted her administrative remedies by filing a timely charge with the EEOC and the MHRB. 42 U.S.C. § 20000e-5(b); Mont. Code. Ann. § 49-2-501(4)(a). This affords the agency an opportunity to investigate the charge. *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1099 (9th Cir. 2002).

Under the Montana Human Rights Act (MHRA), a complaint alleging employment discrimination or retaliation must be filed with MHRB, "within 180 days after the alleged unlawful discriminatory practice occurred or was discovered." MCA § 49-2-501(4)(a). Conversely, the Americans with Disabilities Act (ADA) establishes two potential time limitations periods within which a plaintiff must file an administrative charge with the EEOC. *See* 42 U.S.C. § 2000e-5(e)(1). Generally, an ADA plaintiff must also file an administrative charge with the EEOC within 180 days of the last act of discrimination. *See id.* However, the limitations period is extended to 300 days if the plaintiff first

14

institutes proceedings with a "State or local agency with authority to grant or seek relief from such practice." *Id.* Because the Montana Human Rights Division is a deferral agency with respect to an ADA retaliation claim, *see* 29 C.F.R. § 1601.74, Montana is a "deferral state" with a 300-day filing period for retaliation claims. *Laquaglia v. Rio Hotel & Casino, Inc.*, 186 F.3d 1172 (9th Cir. 1999).

Jackson filed her charge alleging age and disability discrimination simultaneously with the EEOC and the MHRB on October 6, 2014. (Doc. 16-16). Because her termination on August 27, 2014, was the "last act of discrimination," Jackson's 300 days to file any associated claims under the ADA ended on June 23, 2015. *MacDonald,* 457 F.3d at 1081; 42 U.S.C. § 2000e-5(e)(1). Her 180 days to file any associated claims under the MHRA ended February 23, 2015.

Jackson seems to allege that her termination on August 27, 2014, and the actions underlying her subsequent grievances on July 29, 2014, and September 5, 2014, are the acts of retaliation that form the basis for her retaliation claim. (*See* Doc. 18 at 10). Assuming the "last discriminatory act" occurred on September 5, 2014, the time for Jackson to file her administrative charge with the EEOC ran on July 2, 2015, and on March 4, 2015, with the MHRB.

Jackson's counsel advised MHRB investigator, Meg Bennett, that Jackson planned on pursuing a retaliation claim on April 14, 2015, before the EEOC deadline, but after the MHRB deadline. (Doc. 19-4 at ¶ 2). Bennett explained that

15

when a Charging Party amended the charge late in the MHRB's investigation, the MHRB did not generally consider whether the new allegations turned out to be accurate. (*Id.*). Consistent with Bennett's statement, the MHRB issued its decision on May 14, 2015, and made no mention of retaliation. (Doc. 16-17). In other words, Jackson's counsel's attempt to include her retaliation claim was too late under Montana law, but within the time frame allowed under federal law.

The fact that Jackson missed the deadline in amending her charge to include the retaliation claim with the MHRB does not necessarily mean the claim is precluded, however. Subject matter jurisdiction extends not only to claims that fall within the scope of the MHRB or EEOC's actual investigation but also claims that could reasonably be expected to grow out of the charge. *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 644 (9th Cir. 2003), as amended (Jan. 2, 2004); *see also Saucier ex rel. Mallory v. McDonald's Restaurants of Mont., Inc.*, 179 P.3d 481, 494 (Mont. 2008) (whether a claim is subject to the MHRA's exclusivity provision, depends on the nature of the alleged conduct, and not upon the technical format of the complaint).

To determine whether Jackson's MHRB retaliation claim is reasonably related to her discrimination charge, the court may consider "such factors as the alleged basis of the [retaliation], dates of [retaliatory] acts specified within the charge, perpetrators of [retaliation] named in the charge, and any locations at

16

which [retaliation] is alleged to have occurred." *Vasquez,* 349 F.3d at 644.

Jackson's charge alleged that she was subject to age and/or disability

discrimination on August 27, 2014, because she was terminated for "poor

performance" and being "too slow." (Doc. 19-25). Jackson asserts that her

retaliation claims are consistent with her "original theory of the case," as they are

"based on the same or similar factual scenario and disability as the originally-pled

disability theory." (Doc. 18 at 10).

It is difficult to know exactly what Jackson's retaliation claim is, considering

that it was not addressed in Jackson's submissions to the MHRB or fleshed out in

her complaint or Preliminary Pretrial Statement. (*See* Docs. 1-1, 11). She fails to

offer any facts that show her retaliation claim was within the dates, or specific acts,

or locations the MHRB considered while investigating her discrimination claim.

She provides no discussion whatsoever about how the retaliation claim was

expected to grow out of her discrimination claim. Nevertheless, Jackson argues

that St. Vincent would suffer no prejudice if she is now permitted to proceed with

an untimely claim. But she states no basis and cites no authority for this position.

The Court is not persuaded that St. Vincent would suffer no prejudice if Jackson is

permitted to proceed in this action with her untimely retaliation claim under

Montana law.

Accordingly, Jackson's retaliation claim under Montana law is time-barred. She timely attempted to amend her ADA retaliation claim, however, so it survives. *See Casavantes v. Cal.St. U.*, 732 F. 2d 1441, 1442 (9th Cir. 1984) (*overruled on other grounds*) (holding that anti-discrimination laws are to be liberally construed in order to protect victims of discrimination, particularly when the complainant files *pro se*).

## B.    Qualified Individual Analysis

St. Vincent argues that because Jackson cannot prove she is a "qualified individual," she cannot establish a prima facie case for her disability claims, including her failure to accommodate claim. The ADA makes it unlawful for a private employer to discriminate against any "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). "Discrimination" is defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that (1) she is a disabled person within the meaning of the ADA; (2) she was qualified to perform the essential functions of the job, with or without a reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. *See Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003); *see also Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 988 (9th Cir.

18

2008).  Montana law uses a similar standard.  *Laudert v. Richland Cty. Sheriff's Dep't*, 7 P.3d 386, 390 (Mont. 2000).  In order to be a "qualified individual" for the purposes of the ADA, the plaintiff must have (1) the requisite "skills, training, and experience" to do the job and (2) be able to perform the essential functions of the job with or without an accommodation.  *Bates*, 511 F.3d at 990.

Essential functions are the fundamental job duties of the job, not the marginal functions.  29 C.F.R. § 1630.2(n)(1); *Dark v. Curry County*, 451 F.3d 1078, 1087 (9th Cir. 2006).  In determining whether a job function is essential, the court must consider, among other evidence, the following:

> (i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he consequences of not requiring the incumbent to perform the function; (v) [t]he terms of a collective bargaining agreement; (vi) [t]he work experience of past incumbents on the job; and/or (vii) [t]he current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

St. Vincent does not dispute that Jackson had the skills, training, and experience to be an Instrument Tech; St. Vincent argues that Jackson could not assemble instrument trays, an essential function of her position.  (Doc. 16-1 at 12-13).  St. Vincent asserts that Jackson made "quality mistakes on the instrument trays and continued to have performance issues that resulted in discipline," even after St. Vincent provided her with retraining.  (*Id.* at 14).  In essence, St. Vincent

argues that the fact Jackson could not successfully complete the instrument trays, even with accommodations, means she was not a qualified person. (*Id.*).

Jackson agrees that the instrument trays were an essential function of her position, and she does not dispute that she was making mistakes with the instrument trays at the time she was terminated. (*Jackson Depo.* Doc. 19-1 at 77:19-21; 104:7-10). But she argues that her historical performance demonstrates she could complete the essential functions of her position with reasonable accommodation.

The evidence in this case leads the Court to conclude that an essential function of the Instrument Tech job includes assembling instrument trays. Both parties agree that assembling instrument trays are an essential function of the job, and the job description specifically states that a CP tech must "assemble[] instruments and recheck[] all instruments[.]" (Doc. 19-12 at 1). Accordingly, Jackson has the burden to show that she could in fact carry out this essential function, with or without a reasonable accommodation. *Dark*, 451 F.3d at 1086.

Also, St. Vincent admits that Jackson could perform the essential functions of her job before, and after, retraining. Indeed, Kathy Smith, St. Vincent Human Resources Director, testified that Jackson could "function in the job," prior to any retraining. (*Smith Depo.* Doc. 19-7 at 24:10-19). Similarly, Human Resources manager Annette Hoffman testified that, following retraining, there were no duties

20

Jackson could not perform with or without accommodation. (*Hoffman Depo.* Doc. 19-3 at 21:9-16).

St. Vincent argues that Jackson's poor performance after the provided accommodations demonstrate that Jackson could not complete the essential functions of her position, even with reasonable accommodation. The Court disagrees.

A jury could find that Jackson was qualified for her job on the day St. Vincent terminated her, but she needed a reasonable accommodation - here, to be allowed more time to complete instrument trays - to perform the job's essential functions. Jackson was an Instrument Tech for seven years and successfully performed the essential functions of her position with no disciplinary or performance issues whatsoever. (*Smith Depo.* 10:9-11:11; 23:11-16; 12:15-24). The record shows she began receiving write-ups in 2013, after new management began requiring her to work faster with respect to the instrument trays. (Doc. 18 at 12).

When Jackson, her doctor, and St. Vincent's psychologist, Dr. Gumm, requested accommodations for Jackson, they suggested allowing her more time to complete the instrument trays or allowing her to complete other tasks in which she had more confidence, both accommodations she had received before 2013. Instead, St. Vincent provided Jackson with retraining and a mediator to help her

communicate with her managers. Notably, neither Jackson, nor anyone on her behalf, requested retraining as an accommodation. St. Vincent did not provide or even consider Dr. Phillips' or Dr. Gumm's suggested accommodations. Instead, during her retraining, Jackson was instructed to work faster, even though Jackson had advised Hoffman in the HR department that she made mistakes when she was required to go fast.

The court finds that Jackson's pre-2013 successful employment history as an Instrument Tech, which was completely free of any discipline whatsoever, demonstrates that Jackson was capable of performing all functions essential to her position, with a reasonable accommodation. What changed in 2013, was the speed with which she was required to complete the instrument trays. The Court will assume for purposes of this query that providing Jackson with additional time to complete the instrument trays was a reasonable accommodation, particularly because she had been accommodated in such a manner for many years. Certainly in light of her almost seven year discipline-free performance, disputed issues of material fact exist as to whether *rapidly* assembling instrument trays is an essential or marginal function of the job, and is a question best left for the jury. Assuming Jackson had such an accommodation, however, there is no dispute that Jackson was otherwise qualified to perform her job and was thus a "qualified individual

with a disability" as of August 27, 2014. Accordingly, St. Vincent's motion for summary judgment on this claim is denied.

## C. Pretext

Jackson has two avenues available for showing that St. Vincent's legitimate explanation for terminating her was pretext. *Hafner v. Conoco, Inc.*, 886 P.2d 947, 953 (1994). Pretext may be proved directly, by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence. *Hearing Aid Inst. v. Rasmussen*, 372, 852 P.2d 628, 632 (Mont. 1993); *see also Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).

There is substantial credible evidence sufficient to persuade the Court that a reasonable trier of fact could find that St. Vincent's proffered explanation for terminating Jackson is unworthy of credence. St. Vincent argues that Jackson's repeated mistakes on the instrument trays created patient safety issues because all Instrument Techs need to be able to complete all of the tasks. This argument seems to be contradicted by what St. Vincent accepted from Jackson in the past. Jackson's job description had not changed in six years prior to her first write up under Dobson and Franzel in 2013. During those six preceding years, Jackson was required to be on individual on-call duty, capable of performing all individual tasks

23

alone, and did so successfully. In other words, Jackson worked as an Instrument Tech for six years previously without any concerns on St. Vincent's part about detriments to patient health or safety. This evidence casts doubt on St. Vincent's purported reason for terminating Jackson's employment.

Further, St. Vincent argues that it terminated Jackson because she could not do the job. But a jury could find from the evidence that the accommodations St. Vincent provided were not, in fact, reasonable, and were outright discriminatory. As noted above, Jackson and Dr. Phillips both specifically requested that she be allowed more time to complete the instrument trays, as she had been allowed to do for years, yet none of Jackson's new managers ever discussed allowing her more time to complete the instrument trays as an accommodation. Additionally, Jackson requested placement in another division as a potential accommodation. Despite this request, and demonstrating enthusiasm for the position, it is disputed whether St. Vincent ever provided her with the opportunity for alternative placement. Based on the above, the Court concludes that there is sufficient evidence in the record from which a reasonable trier of fact could conclude that St. Vincent's stated reasons for terminating Jackson were in fact pretextual and that Jackson's termination was purely discriminatory. Accordingly, summary judgment is not appropriate on this claim.

**D.      St. Vincent is subject to the Montana Human Rights Act**

Finally, St. Vincent argues that as a charitable corporation, it is exempt from the MHRA for purposes of discrimination claims because it is not considered an "employer" under Montana statute. (Doc. 16-1 at 16). This argument is frivolous. For the purposes of Mont. Code. Ann. § 49-2-101(11), "employer" is defined as:

> an employer of one or more persons or an agent of the employer but does not include a fraternal, charitable, or religious association or corporation if the association or corporation is not organized either for private profit or to provide accommodations or services that are available on a nonmembership basis.

Under the plain language of the statute, a charitable corporation that provides accommodations or services to non-members is an employer. St. Vincent provides services to non-members. The argument fails.

## IV. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED that St. Vincent's motion for summary judgment on Jackson's retaliation claim under Montana law is GRANTED but DENIED as to all other claims.

DATED this _24_ day of February 2017.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge